**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

REAL ESTATE BOARD OF NEW YORK, INC., NEW   :
YORK STATE ASSOCIATION OF REALTORS, INC.,   :
BOHEMIA REALTY GROUP, BOND NEW YORK REAL :
ESTATE CORP., REAL NEW YORK LLC, LEVEL   :
GROUP INC., FOUR CORNERS REALTY, LLC, 21   :
WEST 74 CORP., 8 WEST 119TH STREET HDFC,   :
  :  Civ. No. _____
                    Plaintiffs,   :
  :
    v.   :  **COMPLAINT**
  :
THE CITY OF NEW YORK, *a municipal entity*, VILDA   :
VERA MAYUGA, *as Commissioner of New York City*   :
*Department of Consumer and Worker Protection,*   :
  :
                    Defendants.   :
  :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      Plaintiffs Real Estate Board of New York, Inc. ("REBNY"), New York State Association of Realtors, Inc. ("NYSAR"), Bohemia Realty Group ("Bohemia"), Bond New York Real Estate Corp. ("Bond New York"), Level Group Inc. ("Level Group"), REAL New York LLC ("REAL New York"), Four Corners Realty, LLC ("Four Corners Realty"), 21 West 74 Corp. ("21 West 74"), and 8 West 119th Street HDFC (collectively "Plaintiffs"), by their attorneys, Hogan Lovells US LLP, for their complaint against Defendants (collectively the "City of New York" or the "City"), hereby allege as follows on personal knowledge, except as to matters not within their personal knowledge, which are alleged on information and belief:

## NATURE OF THE ACTION

      1.    As many can attest, finding a rental apartment in New York City can be hard. In a city where rental apartments make up nearly 70% of the housing stock, availability is at an all-time low and rents have increased. In response to this city-wide predicament, on November 13,

2024, the New York City Council passed Int. No. 360-A, a profoundly misguided piece of legislation, the Fairness in Apartment Rental Expenses ("FARE") Act.

2.      While the FARE Act may have the "right intention," it will wreak havoc on the New York City rental markets and unleash a host of unintended consequences, causing immediate and irreparable harm to the consumers it purports to protect, as well as harm brokers and landlords around the city.

3.      Far from restoring fairness to the New York City housing market, the FARE Act will lead to higher rents, fewer properties advertised, and decreased overall transparency of the markets for consumers.

4.      The FARE Act, however, is constitutionally defective and preempted by New York state law.

5.      First, the FARE Act violates Plaintiffs' right to free commercial speech under the First Amendment to the U.S. Constitution.  The FARE Act makes it illegal for brokers to "publish" an apartment listing and then seek to receive compensation from a tenant—regardless of whether the landlord has actually retained that broker.  Because of the draconian penalties and fines that could be levied against them under the FARE Act, both brokers and landlords will likely stop advertising "open listing" apartments, which not only infringes on the First Amendment rights of brokers and landlords, but will have the net effect of reducing the level of advertising of open listings—making it even harder for consumers to find affordable apartments.

6.      Second, the FARE Act severely impairs brokers' and landlords' contracts in direct violation of the Contracts Clause of the U.S. Constitution.  For brokers and landlords who do execute listing agreements which require the broker to negotiate and seek compensation from a tenant, the FARE Act makes those contracts now void and unenforceable.  In addition, its

confusing prohibition on "condition[ing]" the rental of a property on the purported retention of a broker will make it impossible for landlords and brokers to comply with the terms of their exclusive listing agreements.  The effect of the FARE Act is to permanently and completely void contracts entered into validly—something the Contracts Clause directly forbids.

7.      Last, the FARE Act is preempted by New York state's comprehensive regime of laws and regulations governing the conduct, compensation, and procedures of real estate brokers, including the ability to file complaints and investigate potential unlawful conduct.  The New York state senate and assembly have passed a comprehensive regime of laws governing the compensation of real estate brokers and salespersons (Article 12-A of New York's Real Property Law), and 19 N.Y.C.R.R. § 175 includes additional regulations governing the practice of real estate brokerage, including Section 175.7, which sets forth when a broker may receive compensation from "more than one party," and Section 175.25, which specifically governs the advertising of real estate listings.  Moreover, the New York Department of State and the New York State Real Estate Board oversee the regulation and conduct of real estate brokers.  The FARE Act both misunderstands the nature of New York state fiduciary law, and conflicts with provisions already enacted by state legislators and promulgated by state regulators.  And as First Deputy Commissioner Ahmed Tigani, of the City's Department of Housing, Preservation & Development ("HPD") made clear during the June 2024 hearing on the FARE Act, "*[F]ees of this nature are typically subject to state regulation* . . . . [I]n addition to the licenses, which are overseen by the Department of State, *both seem to be on a state level regulation*." (emphasis added).  Accordingly, the FARE Act is preempted by New York State's comprehensive set of laws and regulations, which already cover issues such as compensation, advertising, and the "principal/agent" relationship.

3

8.    Finally, in addition to its constitutional infirmities, and other problems, the FARE Act is just bad public policy, which will also have the ultimate effect of causing rents to increase—not decrease.  Forced to incur the costs of brokerage commissions, landlords will have no other recourse than to increase the rent for their apartments.  The net effect of the FARE Act will not only be angry brokers and landlords, but, most of all, angry consumers.

9.    This Court should strike down the FARE Act because of its numerous constitutional infirmities, and prevent the imminent spike in New York City rents, which will make it even more difficult for New Yorkers to find a place to live.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action under 28 U.S.C. § 1331.  The Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).  Plaintiffs' state law claims arise from the same facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

11.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this action occurred in New York County, which is located within this District.

## THE PARTIES

**I.    Plaintiffs**

12.    Plaintiff REBNY is a New York not-for-profit trade association founded in 1896. REBNY represents commercial, residential, and institutional property owners, builders, managers, investors, brokers, and salespeople; banks, financial service companies, utilities, attorneys, architects, and contractors; corporations, co-partnerships, and individuals professionally interested in New York City real estate.  In particular, REBNY represents the

interests of close to 14,000 real estate brokerage professional members in the five boroughs of New York City, and provides business and other services related to the operation of real estate brokerage firms and individual real estate licensees throughout New York City. REBNY brings this action on behalf of itself, and its almost 14,000 members directly impacted by the harm created by the FARE Act. REBNY and its members will suffer an injury in fact as the result of the FARE Act and REBNY's members are within the zone of interests of the regulations governing this dispute.

13.    Plaintiff NYSAR is a New York not-for-profit trade association established in 1905. It represents the interests of approximately 60,000 real estate brokerage professional members throughout New York, including New York City. NYSAR provides business services related to the operation of real estate brokerage firms and real estate licensees. NYSAR and its 27 local boards/associations of REALTORS® and their individual real estate licensee members are affiliated with the National Association of REALTORS®, Inc. NYSAR brings this action on behalf of itself and its approximately 60,000 members directly impacted by the harm created by the FARE Act. NYSAR and its members will suffer an injury in fact as the result of the FARE Act and NYSAR's members are within the zone of interests of the regulations governing this dispute.

14.    Plaintiff Bohemia is a real estate brokerage firm incorporated in the State of New York and founded approximately 15 years ago. It maintains offices at 2101 Frederick Douglass Boulevard, New York, New York, 10026 and 3880 Broadway, New York, New York 10032. Approximately 140 real estate licensees are currently affiliated with Bohemia. Bohemia, and each of its licensees, are members of REBNY and NYSAR. Bohemia's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in

transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Bohemia's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should Bohemia find a suitable tenant who rents a landlord's apartment.

15.    Plaintiff Bond New York is a real estate brokerage firm incorporated in the State of New York and founded in 2000.  Bond maintains its corporate headquarters at 810 Seventh Avenue, New York, New York 10019.  Over 500 real estate licensees are currently affiliated with Bond.  Bond, and each of its licensees, are members of REBNY.  Bond's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Bond's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should Bond find a suitable tenant who rents a landlord's apartment.

16.    Plaintiff Level Group Inc. is a real estate brokerage firm incorporated in the State of New York.  It maintains offices at 211 East 43rd Street, New York, New York 10017.  Level Group, and each of its licensees, are members of REBNY.  Level Group's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Level Group's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation

terms should Level Group find a suitable tenant who rents a landlord's apartment.

17.    Plaintiff REAL New York is a real estate brokerage firm incorporated in the State of New York. It maintains offices at 164 Ludlow Street, New York, New York 10002. REAL New York has approximately 140 agents and each of its licensees is a member of REBNY. REAL New York is also a member of NYSAR. REAL New York's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent. In addition, REAL New York's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should REAL New York find a suitable tenant who rents a landlord's apartment.

18.    Plaintiff Four Corners Realty is a New York LLC. Four Corners Realty is a real estate brokerage firm which primarily brokers rental transactions in Manhattan.

19.    Plaintiff 21 West 74 is a New York corporation that owns a building with 13 rental units located at 21 West 74th Street, New York, NY.

20.    8 West 119th Street HDFC ("8 West 119th Street") is a not-for-profit cooperative corporation created and operating in the State of New York. 8 West 119th Street received a loan from the Housing Development Fund Corporation operated by the State of New York. 8 West 119th Street maintains four apartment units which it rents to consumers in New York. 8 West 119th Street will often work with real estate brokers in New York City to assist with the marketing and renting of their apartment units.

21.    Each of the plaintiffs which operates a brokerage shall be referred to individually as a "Brokerage Plaintiff," and collectively, as the "Brokerage Plaintiffs." 8 West 119th Street

and 21 West 74 may be collectively referred to as the "Landlord Plaintiffs."

## II.    Defendants

22.    Defendant City of New York is a municipal entity created under the laws of the State of New York.

23.    Defendant Vilda Vera Mayuga ("Commissioner Mayuga") is the Commissioner of New York City's Department of Consumer and Worker Protection ("DCWP"). Commissioner Mayuga is an employee of New York City and is the principal administrator for DCWP.  Commissioner Mayuga is responsible for the operations of DCWP and the application of DCWP's policies, including the enforcement of New York City's Administrative Code.  As will be set forth more fully, the FARE Act provides Commissioner Mayuga and the DCWP with the authority to enforce the FARE Act.

## FACTUAL BACKGROUND

## I.    The New York City Rental Market

24.    New York is a majority-renter city:  rentals make up nearly 70 percent of the available housing stock in the city.  In 2023, the rental vacancy rate fell to a 50-year low:  only 1.4 percent of the city's rentals were available, down from 4.5 percent in 2021.  City officials have acknowledged the current situation as a "housing emergency."

25.    Even as rental availability in New York City has decreased, rents continue to increase.  The median rent in New York City for active rental listings has increased from $3,495 in 2019 to $4,053 in 2024, an increase of almost 16%.  During the same time period, the median rent for rented listings has grown by over 23%, from $3,414 to $4,200.

26.    Household incomes have not kept pace with growing rents.  In 2019, real median renter household income was 119 percent of its 2007 level.  In 2021, however, real median renter

household income fell to 110 percent of its 2007 level.  In 2022, 52.1 percent of New York City households were moderately or severely rent burdened—defined as spending 30 percent or more of their income on rent.  Real estate brokers are not excluded from these challenges:  many are renters and suffer from the same rent burdens as their customers.

27.    The New York City rental market is the largest and most complex in the country, with significant variety among and within the different stakeholder groups of landlords, brokers, and consumers.

28.    Apartments owned by small business landlords make up a significant portion of the City's housing stock.  Around half of New York's rental units are owned by landlords who own fewer than 20 buildings in their portfolio.

29.    Owners of rental residential properties use different methods to market and maximize exposure of their properties.

### A.    Exclusive Listings

30.    Landlords sometimes elect to contract directly with one residential real estate brokerage firm to market and advertise a property exclusively.  This agreement is commonly referred to as an exclusive listing.  In an exclusive listing arrangement, the broker will sometimes be compensated by the landlord if the broker successfully secures a tenant for the listing.  This arrangement is called a "no-fee listing," meaning that the renter does not pay the broker's fee upfront.

31.    In other instances, a landlord may elect to give a broker the exclusive right to market and rent a listing, *but make clear that the broker must seek compensation from the renter*. This arrangement is called a "fee" or "tenant pays" listing.

32.    Such "tenant pays" exclusive listings are common in the New York rental real

estate market.  For years, brokers and landlords who are parties to such agreements substantially relied on the terms of their exclusive listing agreements, established their respective businesses based on the consideration set forth in these exclusive listing agreements, and premised their respective substantial investments of time and resources on these terms.  Plaintiff Bond has many such contracts and the FARE Act's provisions prohibiting a broker from receiving compensation from the tenant when retained by the landlord directly and permanently impair those agreements. Indeed, the FARE Act makes all tenant pays exclusive listings void and unenforceable.

33.    In addition to marketing and showing the apartment, a broker working pursuant to an exclusive agreement often provides valuable services to the renter despite having been hired by the landlord, including:  shepherding the renter through the application process, including, but not limited to, assisting with the preparation of the rental applications, assisting with the compilation of all necessary information required by the application, and other related tasks; conducting the necessary credit and background checks required in the application process; assisting with the overall administrative process, and ultimately reviewing and supplementing the application where necessary.  These services directly benefit the tenant—in short, even when retained by the landlord, brokers help navigate tenants through what can be a confusing and difficult process.

34.    Importantly, landlords who rely on brokers to provide such services do not need to create and maintain the administrative in-house infrastructure to market and rent their own units, which reduces landlords' overhead costs and helps to keep rents lower.  As First Deputy Commissioner Tigani, of HPD, told the City Council during the Committee on Consumer and Worker Protection Hearing over the FARE Act on June 12, 2024 (the "June 2024 Hearing"), brokers provide "tremendous value" to consumers engaged in the housing search:

> [T]here is tremendous value in housing search support and the
> operational knowledge that brokers can provide both tenants
> looking to find a home, especially in communities where listings
> are harder to find, and property owners navigating the process of
> making their units available . . . . [1]

**B.    Open Listings**

35.    In addition to exclusive listings, landlords provide a large volume of residential

listings, called "open listings," to brokers for advertising purposes only, without ever entering

into an exclusive listing agreement.  Nor do the landlords enter into a "broker/customer"

relationship with the brokers and salespersons that receive their open listings for advertising

purposes.

36.    While exclusive listings can be "no-fee" or "tenant pays," open listings generally

operate on a tenant pays basis.  Landlords send open listings to brokers, or to the broker's listings

technology provider (such as RealtyMX),with whom they are familiar (or worked with in the

past), knowing that brokers will likely advertise such listings on the brokers' website, or

syndicate listings to third-party real estate portals such as StreetEasy, RentHop, and other leading

websites which display rental properties.

37.    If a broker advertises a listing on its own website or on a site like StreetEasy,

however, it does not mean that the landlord hired the broker, or agreed to pay the broker's

commission—it means only that the landlord circulated an open listing to multiple brokers, and

may have authorized one of those brokers to post the property to StreetEasy.

38.    Brokers advertise open listings, notwithstanding the absence of a commission

arrangement with the landlord, because of the potential of finding a tenant who might be

interested in renting the apartment, and who in turn will negotiate a compensation arrangement

---

[1] Unless noted otherwise, quotations are to the transcript of the June 2024 Hearing and written testimony submitted
in connection with that hearing.

and pay the broker's commission for bringing about the rental of the property.

39.    Open listings are a vital and material segment of the New York rental market. For example, approximately half of the listings on Bohemia's website currently are open listings. Other Brokerage Plaintiffs similarly have hundreds of open listings currently advertised on their websites.

40.    Open listings benefit consumers as well as landlords and brokers in several ways.

41.    First, the open listings model generates efficiencies and savings, which landlords pass on to tenants in the form of lower rents:  "tenant pays" apartments have lower monthly rents than no-fee apartments.  Renters who find an apartment "on their own" through a third party real estate portal have a broker to thank for photographing, staging, and making that listing accessible online.  The brokers incur the costs (currently $8.00 per day per listing on a site like StreetEasy) of advertising and marketing the listing.  The brokers—not the landlords—also engage in the often time-consuming administrative tasks related to rental transactions described above, which many landlords are simply not equipped to handle, lacking both the staff and the infrastructure to efficiently handle such tasks.  Thus, for the thousands of open listings currently on the market, the brokers absorb the same advertising and marketing costs for the apartment.  These advertising costs can become significant, as a rental property that may stay on the market for a month can cost a broker at least $240 just to advertise on StreetEasy, and that cost does not include the costs of other websites.

42.    In addition to those advertising costs, the brokers and agents working an open listing will also absorb the costs of compiling, processing, and reviewing rental applications for landlords.  Importantly, landlords do not need to maintain staff on premises to show apartments or process applications.  Open listings allow landlords—particularly smaller landlords, who

account for around half of the rental market—to focus their energy and financial resources on other issues, most important of which is maintaining their rental properties.

43.    In addition, brokers and agents are available to show apartments to consumers seven days per week—including during and after business hours, providing flexibility for consumers who need to find an apartment while still working full-time.  Landlords could never provide the same level of services to consumers without significantly increasing the price of rental properties.

44.    Most important, because tenants negotiate the compensation terms with the brokers in connection with "open listings," and then pay such compensation, landlords avoid incurring the costs of a commission, which would otherwise be passed on to the consumer resulting in higher overall rents—and in more detrimental long-term financial implications for consumers.

45.    Second, open listings promote market transparency and consumer access to information.  The advent of real estate advertising websites has empowered consumers by providing a trove of instantly-accessible information about the rental market, availability, and prices.  The dissemination of open listings by landlords, whether through a broker's website or third party advertising portals, helps maximize exposure for available units and puts more information in the hands of potential tenants.

46.    Third, by involving brokers in the rental process, open listings protect prospective tenants' rights.  Because of New York state licensing requirements, brokers are far more knowledgeable about the relevant New York State and federal regulations, including fair housing laws, as well as the processing of state and federal housing vouchers and other subsidy programs (such as Section 8 housing vouchers).  Landlords depend on real estate brokers to ensure that the

legal and administrative requirements for compliance with these programs are met and complied

with during the transaction process.

### C.    Fee and No-Fee Apartments

47.    New York City rental listings are split fairly evenly between fee and no-fee

apartments.  About half of rental listings in 2023 were marked as "no fee" for the tenant—

meaning the tenant does not pay any brokerage fee to rent the apartment.

48.    The same apartment may be advertised as a "fee" or "no-fee" apartment.  Indeed,

a "fee" apartment (where the tenant pays) may list for $2,700 per month, while the same

apartment advertised as "no fee" to the tenant may list for $3,000 per month.  The higher base

rent means that over the course of the tenancy, the tenant will likely pay more than if they just

paid the initial brokerage fee at the time they enter into the lease for the apartment.

49.    The FARE Act will target the tenant pays or fee apartments, which make up the

other half of the rental market.  Tenant pays apartments are more likely to be owned by small

landlords and have lower rents.

50.    The current system evolved to accommodate landlords' and tenants' varying

needs.

51.    A tenant may have a preference for fee or no-fee properties depending on a host

of factors, including liquidity.  A tenant with limited liquidity may prioritize the lower upfront

costs of a no-fee apartment.  On the other hand, a tenant who pays a broker commission is

effectively purchasing a cheaper lease term.

52.    Landlords, too, are a diverse group, each with their own preference that also

depends on a host of factors.  Large landlords with in-house administrative and leasing staff are

better suited to market and rent units themselves and more likely to take the no-fee route.

53.     Small landlords, however, who have less money and fewer or no in-house resources, rely on brokers to market and rent out units under a tenant pays arrangement.  Smaller, more affordable buildings with fewer amenities and lower rent are also more likely to be tenant pays.  Broker fees can always be negotiated, and in many cases, the landlord and tenant will agree to split the broker fee.  Among other things, the FARE Act wholly eliminates the ability of the landlord and the tenant to negotiate an agreement to share payment of the broker fee.

### D.     Market Rate and Rent Stabilized Apartments

54.     Around 40 percent of New York City's rentals are market rate.  Almost half of the city's rental apartments—and the majority of its affordable housing—are rent stabilized.  Rent stabilized apartments are most often located in buildings built before 1974 and containing six or more units.  The New York City Rent Guidelines Board ("NYCRGB") determines rent increases for lease renewals of rent stabilized apartments.

55.     Rent stabilized apartments can be further classified into those already renting at the maximum rent allowed by law (which tend to be older buildings) and those charging market rent that is below the maximum allowed by law (which tend to be new development).

56.     Thousands of rent stabilized units currently sit vacant, because the cost of operating them exceeds the maximum legal rent.  Because the FARE Act will shift the costs of brokerage commissions to landlords in many transactions, the Act will likely cause even more rent stabilized units to become warehoused and taken off the market.

### E.     Broker Compensation and Agency Relationships are Regulated at the State Level

57.     The New York State Legislature has enacted a comprehensive and detailed regulatory scheme to regulate licensed real estate brokers.  In addition, real estate brokers and agents are required by law to complete mandatory fair housing and other continuing education

courses to maintain their license with the Department of State ("DOS"), and can be fined or have

their license suspended or revoked by the DOS for fair housing violations.

58.    The State likewise regulates broker compensation, as well as agency relationships

between brokers and landlords, and between brokers and consumers.

59.    Article 12-A of New York's Real Property Law ("RPL") establishes a

comprehensive set of laws that govern broker and salesperson licensing requirements, broker and

salesperson compensation, and the nature of fiduciary relationships recognized under New York

State law.  Article 12-A assures, by means of licensing, that standards of competency, honesty,

and professionalism are observed by real estate brokers and salesmen.  Article 12-A also

establishes the New York State Real Estate Board (the "Board").  With certain exceptions, the

Board has general authority to "promulgate rules or regulations affecting brokers and sales

persons in order to administer and effectuate the purposes of … [A]rticle [12-A]."  RPL § 442-

k(1).  As part of its duties, the Board is also statutorily required to "study the operation of laws

and regulations with respect to the rights, responsibilities and liabilities of real estate licensees

arising out of the transfer of interests in real property," and to "make recommendation[s] on

pending or proposed legislation affecting the same."  *Id*. at § 442-k(4).  Article 12-A likewise

empowers the DOS to promulgate rules and regulations to administer or implement provisions

relating to the granting and revocation of real estate licenses, addressed in Section 441.  *Id.* at §

442-k(1).

60.    Article 12-A governs, among other things, "fee[s], commission[s and] other

compensation" that real estate brokers, associate real estate brokers, and salespersons can receive

(*id.* at § 442); with whom brokers can split their commissions (*id.*); salespersons' ability to

receive compensation only from the real estate brokers with whom they are affiliated (*id.* at §

442-a); when a licensee can bring an action for an unpaid commission (*id.* at § 442-d); and prohibiting after-the-fact referral fees (*id.* at § 442-l).

61.    Article 12-A also comprehensively addresses real estate agency relationships and defines many of the terms that feature in the FARE Act.  *See, e.g.*, *id.* at § 443 (defining "Agent," "Tenant's agent," "Landlord's agent").  Section 443 requires agents in the rentals of condominiums, co-ops, and dwellings housing one to four families, to provide the parties with disclosure forms.  *Id.*  Article 12-A explicitly contemplates dual agency in the real estate context (defined as an agent "who is acting as a . . . tenant's agent and a landlord's agent in the same transaction") and allows such dual agency relationships, provided that disclosure requirements are met.  *Id.*

62.    The RPL provides penalties for violations of Article 12-A, including criminal penalties, disgorgement of commission income, and the revocation and suspension of real estate licenses.  *See, e.g.*, *id*. at §§ 441-c, 442-e.

63.    ***Nothing in the plain text of Article 12-A creates a fiduciary/agency relationship between a broker and landlord arising out of the mere fact of advertising or "publishing" a rental listing***.

64.    The state law framework of broker compensation and agency is supplemented by rules and regulations promulgated by the DOS that, among other things, set forth the circumstances where a real estate broker may "receive compensation from more than one party" (19 N.Y.C.R.R. § 175.7) and prohibit real estate brokers from entering into a "net listing" contract (*id.* at § 175.19).

65.    In addition, the DOS has promulgated extensive rules and regulations concerning advertising by real estate brokers and salespersons.  In particular, Section 175.25, adopted by the

DOS in 2020, contains a broad range of requirements for real estate advertising, including its content and placement. *Id.* at § 175.25. Section 175.25(b)(2)(i) addresses authorization in the advertisement context, providing that "[n]o property shall be advertised ***unless the real estate broker has obtained authorization*** for such advertisement from the owner of the property . . . ." (emphasis added). Notably, while Section 175.25 requires "authorization" for advertising, *it does not require a principal/agent or contractual relationship, either express or implied, between a landlord and broker, and does not create a principal/agent or contractual relationship simply on the basis of advertising. Nor does Section 175.25 state anywhere that by virtue of advertising a listing, the broker must recover their fee from the landlord, and cannot be compensated by the tenant*. To the contrary, nowhere in either Article 12-A or Section 175.25 is there any provision mandating that an advertising by a real estate broker creates (or requires) a principal/agent (or broker/customer) relationship between the broker and the landlord. Nor is there any requirement that if a broker advertises a rental apartment, then that broker is limited to only receiving compensation from the landlord.

66.     At the June 2024 Hearing, HPD Deputy Commissioner Tigani emphasized that broker fees are "subject to state regulation":

> ***[F]ees of this nature are typically subject to state regulation*** . . . .
> [I]n addition to the licenses, which are overseen by the Department of State, ***both seem to be on a state level regulation***.

(emphasis added).

67.     When challenged by Councilmember Chi Ossé, who introduced the bill, on "[the] point you made about this being a state regulation," Commissioner Tigani elaborated:

> So, on the licenses, I think it's [] fairly well-documented where licenses for real estate brokers exist, and so anything related to that profession would live there. On—When it comes to things related *to rental payments in the private market, non-HPD regulated*

18

*housing, we would—**we usually defer that to state regulation***.

(emphasis added).

68.    Indeed, Councilmember Ossé himself recognized that "the laws in Article 12-A that deal with compensation are laws that talk about who the broker can split fees with, ***or who a real estate salesperson can receive compensation from***."  (emphasis added).

## II.    The FARE Act

### A.    Provisions of the FARE Act

69.    On November 13, 2024, the New York City Council passed the FARE Act, and on December 16, 2024, the Act became law.  The FARE Act added a new Subchapter 15 to Chapter 4 of Title 20 of the Administrative Code of the City of New York and will become law 180 days after being signed into law.  N.Y.C. Admin. Code § 20-699.20-25.  The full text of the FARE Act is attached as **Exhibit A**.

70.    Section 20-699.21(a)(1) of the FARE Act bars a broker who has been retained by a landlord, defined as the "landlord's agent," from receiving any compensation from the tenant for consummating the rental transaction.  Similarly, Section 20-699.21(a)(2) of the FARE Act bars a broker from receiving any compensation from a tenant when a broker "publishes" a listing with a landlord's permission—notwithstanding the fact that there is no brokerage agreement or broker/customer relationship between the broker and the landlord.

71.    Section 20-699.21(b)(1) of the FARE Act makes landlords liable for the conduct of the "landlord's agent" who receives compensation from a tenant.  Similarly, Section 20-699.21(b)(2) makes the landlord liable for a broker's receipt of compensation from a tenant if the broker has "publishe[d]" the listing with the landlord's permission or authorization (*e.g.*, such as an open listing).  Section 20-699.21(b)(2) creates this violation even in the absence of any

brokerage/customer relationship or compensation agreement between the landlord and the broker.  Thus, pursuant to the FARE Act, landlords who currently send their open listings to brokers (or other technology providers used by brokers) in order to maximize exposure of the listings may now be found in violation of New York City law for an advertisement (or other form of "publish[ing]" a listing) which they did not place, based on a broker's fee they neither collected nor shared.

72.    Section 20-699.21(c) prohibits the "condition[ing]" of the rental of residential real property on a tenant engaging any agent, "including but not limited to a dual agent."  The FARE Act, however, fails to define what "condition" means and provides no guidance on whether a simple request by a broker to be retained by a tenant could constitute "conditioning" a rental on engaging the services of the broker.

73.    In addition, Section 20-699.21(e) establishes a "rebuttable presumption that an agent who publishes a listing for a rental of residential real property does so with the permission or authorization of the landlord of such property."  Notwithstanding the absence of any provision in Article 12-A or Section 175.25 which creates such a fiduciary relationship, this "rebuttable presumption" imputes a "brokerage/fiduciary" relationship between any real estate agent that "publishes" or advertises a rental listing and the landlord, such as in the context of an open listing.

74.    Section 20-699.22 requires landlords and brokers to disclose all fees a tenant is required to pay in their listings and prior to the execution of a rental agreement.

75.    Section 20-699.23 establishes a civil penalty scheme for violations of the FARE Act, to be enforced by the DCWP.  Section 20-699.24 establishes a private cause of action for consumers who believe a violation of the FARE Act has occurred.

76.     An earlier version of the bill, Int. 360, provided that it "only applies to residential real estate transactions involving the rental of real property entered into ***or after the effective date of this law***." (emphasis added).  Importantly, this limitation was removed in the final version of the FARE Act enacted by the City Council.

77.     Finally, the FARE Act states that it will ultimately become effective 180 days after it becomes law.  That date appears to be June 14, 2025.

**B.     Stated Purpose of the FARE Act**

78.     The November 13, 2024 Committee Report from the Committee on Consumer and Worker Protection ("November 13 Committee Report") stated the purpose of the FARE Act was to "properly align" agency relationships rather than address the housing shortage in New York City:

> Opponents of the bill testified at the June 12, 2024 hearing that the bill was not a solution to the affordable housing crisis in the city. This sentiment misunderstands the purpose of the bill.  The bill is not an attempt to solve the affordability crisis in the city. Solutions to that problem are being explored by the Council in multiple other avenues.  The purpose of this bill is ***to properly align the principal-agent relationship in the rental market*** to ensure that the principal pays the agent for services rendered, not a third party.

(emphasis added).

79.     The November 13 Committee Report also compared New York to other major cities, noting that "[i]n most of the United States, it is the landlord's responsibility to pay the broker's fee for listing their property and finding a tenant.  This almost universal system ***aligns with basic norms around principal-agent relationships***." (emphasis added).  Of course, the Committee Report failed to identify the "basic norms" upon which it was relying.  It similarly failed to consider distinguishing characteristics between New York and other major cities that

may contribute to their different approaches.

80.    Moreover, in the Committee Report, the City Council criticized dual agency and stated that "[i]n addition, states including Alaska, Colorado, Florida, Kansas, Maryland, Oklahoma, Texas, Vermont, and Wyoming have banned dual agency because it fosters inadequate representation and creates negotiation issues."

81.    But in New York, the state legislature has made clear that dual agency is lawful and sanctioned by state law and the DOS.

82.    The record behind the FARE Act belies the City's disingenuous, after-the-fact justification concerning "align[ing] the principal-agent relationship in the rental market. . . ." Indeed, the Committee Report itself included an entire section on "Issues and Concerns Related to Broker Fees" focusing on how broker fees create a "financial burden for New York City renters who wish to move."

83.    Similarly, when promoting the bill publicly, Councilmembers have not focused on the alleged stated purpose of "***align[ing] the principal-agent relationship in the rental market***." Instead, the FARE Act has been heralded as a win for affordability, not a means for realigning agency relationships.

84.    At the June 2024 Hearing, Councilmember Chi Ossé gave the following examples of "the magnitude of the crisis we are here to solve":

> The union worker unable to move near her job; the young couple that wants to have a child but [cannot] afford to trade in their studio for a two bedroom, so they put off building a family; the graduate moving to the city . . . for work; and the artist moving here to add to the rich fabric of the world's cultural capital; the woman seeking to leave her toxic relationship, but who stays because she lacks the savings for a new apartment; the immigrant working hard to build a life here; the young man finally ready to move out of his family home, but stay in his childhood neighborhood [who] is instead driven from New York City

altogether.

Councilmember Ossé's discussion of the "crisis" omits any mention of "align[ing] the principal-agent relationship" and focuses squarely on housing affordability—while saying absolutely nothing about agency relationships.  He went on to say: "In short, the FARE Act will ***put downward pressure on rents***." (emphasis added).

85.    In a November 12, 2024 social media post, Councilmember Ossé repeated: "The #FAREAct ***puts DOWNWARD pressure on rents*** by increasing bargaining power for tenants.  It also saves thousands upfront." (emphasis added).  Councilmember Ossé's other social media posts promoting the FARE Act likewise avoided any mention of "aligning" agency relationships:

- "I swear that the main reason they're trying to ban TikTok is so that NYC tenants have to be forced to pay broker fees" (June 10, 2024);

- "Come be a part of history, ***and you'll never have to pay a broker fee again*** . . ." (October 23, 2024) (emphasis added);

- "***We just voted to kill broker fees*** . . ." (November 13, 2024) (emphasis added).

86.    The FARE Act's other proponents similarly emphasized housing affordability, particularly for low- and moderate-income tenants, avoiding any mention of problems with the "alignment" of principal/agent relationships.

87.    For example, Antonio Reynoso, Brooklyn Borough President, testified at the June 2024 Hearing that broker fees are "a barrier to entry" to housing and "can mean the difference between a family being able to secure housing in this city and not."  He stressed that "[f]ewer apartments are available across all rent levels, meaning ***it's especially difficult right now for low- and moderate-income New Yorkers to find and secure housing***." (emphasis added).

88.    Another supporter of the FARE Act testified that "***[b]roker fees can cost thousands of dollars*** and make apartments that might otherwise be attainable out of reach to

low- and moderate-income tenants." (emphasis added).

89.     The November 13, 2024 Stated Meeting of the City Council likewise never delved into the nuances of New York agency law.

90.     Councilmember Ossé stated: "You get what you pay for, and you pay for what you get," emphasizing that the passage of the FARE Act "is a win for all New Yorkers."  Other Councilmembers—both supporters and opponents of the FARE Act—emphasized the legislation's impact on rents and affordability.  Councilmember Feliz, voting in favor of the Act, emphasized its impact on low-income New Yorkers.  Councilmember Paladino, who voted no, observed that the Act "will fundamentally break the rental market, driving up prices and limiting availability," and further exacerbate—rather than alleviate—the shortage of rental housing in the city.

## C.     Legislative Process

91.     The record reveals that the City Council acknowledged a lack of data to support the assumptions underlying the FARE Act, but nevertheless conducted no further analysis. Instead, the Council credited anecdotal and conclusory evidence—some of it baldly disparaging to brokers—over statistically rigorous data and economic analysis, failed to consider any meaningful alternatives to the FARE Act, and disregarded extensive warnings about the many negative unintended consequences that the FARE Act will have on New York City's rental markets and the people it is ostensibly meant to help—namely low- and moderate-income renters.

1.     <u>The City Council Acknowledged the Lack of Data but Conducted No Further Analysis</u>

92.     Thus, Public Advocate Jumaane Williams, who supported the FARE Act, described the legislative process in June 2024 as "trying to . . . find the balance" in order to

24

"make sure that brokers can get paid for the work that they're doing, while releasing some of the pressures o[n] tenants."

93.    But the record reveals no such effort at finding a "fairer balance."  Indeed, at the June 2024 Hearing, Councilmembers and members of the Adams Administration acknowledged the lack of any key data and analysis to inform the legislative process.

94.    Councilmember Powers observed "the actual difficulty [of] finding real data on [broker fees and their prevalence] because they're a series of private transactions happening."

95.    When asked whether "entry into housing, including brokers fees," was among the forces contributing to the shortage of rental housing, HPD Deputy Commissioner Tigani testified:  "***That's not a data point that I have, so I can't speak to it in any quantitative manner***."  (emphasis added).  He also testified that HPD had no data on complaints about broker fees.

96.    Importantly, DCWP, the agency empowered to enforce the FARE Act, did not even attend the June 2024 Hearing, leading Councilmember Hudson to observe that DCWP's absence

> . . . ***hinders our ability*** as Councilmembers to ask the most appropriate questions and to get relevant answers . . . . ***[W]ithout the agency solely responsible for the implementation of this bill, it makes it really difficult for us to get the answers and to have the productive and constructive hearing*** that we were hoping to have this morning.

(emphasis added).

97.    Councilmember Nurse expressed a similar frustration, and echoed Councilmember Hudson's remarks, adding:

> So, you right now are basically saying you have ***zero data points to offer*** in this hearing, a hearing that you knew was going to be about broker fees . . . . [T]his administration has wasted our time

25

today.  You all knew that many people were going to be here today, because this clearly impacts so many New Yorkers, and ***you all showed up with no data, no input, nothing conclusive, no analysis to offer on this bill***.  It's embarrassing, truly embarrassing.

(emphasis added).

98.    Brooklyn Borough President Reynoso said:

It is embarrassing, and it is sad that there are many people here for or against this legislation that would love to ***really get to the bottom of data that supports the case that's being made by Councilmember Chi Ossé*** and his legislation.  ***Instead, we're going to be relegated to having a conversation that we've already had in the public.  We are wasting time***.

(emphasis added).

99.    Councilmember Avilés observed:

[I]t is unconscionable that in a housing crisis, we have an Administration that ***won't even come to the table with some analysis***, that won't contribute to a constructive conversation, ***because this impacts so many lives, both the brokers who are here, the renters who are here, and families who cannot live in neighborhoods because they can no longer afford to do so***.  We need to do better.

(emphasis added).

100.    Thus despite being charged with enforcing the FARE Act, the DCWP failed to even appear at the June 2024 Hearing, much less provide vital data that could have informed the legislative process.

101.    When asked for the Administration's perspective, HPD Deputy Commissioner Tigani recognized that more analysis was needed to understand the impact of the FARE Act on other costs associated with housing and on the city's brokers:

. . . particularly in non-regulated, non-rent-regulated housing, market housing as it's often referred to, costs can be pushed into other areas of the housing search and lease-up process.  So we're

26

trying to look at the different ways that that may happen, different permutations.  Additionally, we want to understand better the impact this may have on an industry that employs many New Yorkers here within the city.  ***And those two factors . . . require a deeper analysis from multiple agencies, both in the housing front, housing supply, access, and economic development front, and workforce development front***.

(emphasis added).

102.     The City Council, however, did not perform or solicit any "deeper analysis." Instead, it relied on anecdotal evidence and conjecture.

103.     The Committee Report tries in vain to set forth the information the Committee purportedly considered.  Indeed, the Committee report notes that it "heard an earlier version of this legislation on June 12, 2024 and received testimony from the Department of Housing Preservation and Development, members of the real estate and brokerage industries, tenant advocates, and other interested members of the public."  The Council also "[met] with stakeholders including real estate associations, real estate marketplaces, real estate brokers, property owners, tenants and legal advocates to gather feedback on the legislation," including "[REBNY], Zillow/StreetEasy, the Legal Aid Society and the New York Apartment Association."  In September and October 2024, the Council's Oversight and Investigations Division ("OID") conducted an "investigation" of brokers' fees in the residential rental market. A closer look at that investigation reveals no methodology other than obtaining rental applications for 99 units across the five boroughs, touring 50 of those apartments, and extrapolating those observations in an attempt to bolster the Council's flimsy assumptions.

104.     Moreover, it bears significant mention that the version of the FARE Act voted on November 13, 2024 bears very little resemblance to the first version of the FARE Act, which was the subject of the June 2024 Hearing.  Indeed, the first version of the FARE Act did not

contain the ambiguous provision concerning "condition[ing]" the rental of a property on a consumer retaining an agent or broker.  In addition, the first version of the FARE Act also did not include the "rebuttable presumption" language included in the version of Intro 360-A voted on November 13.  Furthermore, the first version of Intro 360-A did not include any penalties, nor did it contain a private right of action.  Most of all, the first version of Intro 360-A did not make it unlawful for a broker or agent to negotiate and receive compensation from a tenant simply because the broker or agent "published" a real estate listing.  Indeed, the main thrust of the first version of Intro 360-A was that  a real estate agent seeking to collect a fee in connection with a real estate transaction must be paid by the party that retained them:

> § 26-3602 Fees in rental real estate transactions. a. A person collecting fees in connection with a rental real estate transaction, whether such person is a representative or an agent of the owner of the property or of the tenant or prospective tenant in such transaction, shall collect such fees from the party employing such person in such transaction.

A copy of the first version of the FARE Act is attached hereto as **Exhibit B.**

105.    Amazingly, when voting on the second version of the FARE Act in November, the City Council failed to obtain the missing data that it sought during the June 2024 Hearing, and the Committee Report is bereft of any data or statistics concerning whether "entry into housing, including brokers fees" contributed to the shortage of rental housing.  In short, despite its complaints about the lack of data concerning a critical piece of legislation under its review, and despite having nearly five months of time to find such data, the City Council failed to conduct any considered or serious analysis of the new version of Intro 360-A, the legislation that it ultimately passed.

    2.    <u>The City Council Relied on Anecdotal Evidence</u>

106.    Much of the testimony in favor of the FARE Act relied on personal anecdotes of

renters—many of them carping about conduct that not only falls outside the FARE Act umbrella but is already illegal.

107.    Multiple speakers at the June 2024 Hearing described being lied to by brokers and being "subjected to astronomical and unfair hidden and broker's fees."  Councilmember Nurse reported: "I have seen ads on the internet that don't say there's a broker fee, and then when you show up there is suddenly a broker fee."  Public Advocate Jumaane Williams stated that "some of the worst examples we've seen are stories of someone paying a broker fee, and not being connected to housing."  One speaker testified about encountering a "broker [who] knew almost nothing about the apartment/building, and lied to me about multiple things in lease riders that ended up costing me extra money in the long run."

108.    In the same vein, the November 13 Committee Report recounted instances of OID investigators receiving a rental application but not the New York State Disclosure Form for Landlord and Tenant.  Other anecdotal testimony in favor of the FARE Act focused on unsafe and dangerous conditions and landlords who refused to remediate them.  For example, one tenant testified: "Over the last four years my landlord has raised my rent by nearly 30% and ***neglected to make much-needed repairs*** because he knows that moving within NYC is a huge burden." (emphasis added).

109.    As one Corcoran agent explained, these and other anecdotes reflect a fundamental misapprehension of existing regulations that already prohibit much of the behavior highlighted in testimony at the June 2024 Hearing:

> As others in my industry testified, prior to showing an apartment for rent, ***agents must give three state mandated forms*** (annexed to this testimony) ***and disclose if there is a broker's fee.  The law already requires that these fees not be "hidden" as those who support this legislation claim.***  Unfortunately, some agents do not follow the law, and this leads to confusion and a belief that we all

29

> do not follow the law . . . . A broker fee is never supposed to be
> disclosed at the last minute.

(emphasis added).

110.    For example, the "hidden" broker fees of which speakers complained are

prohibited under Article 12-A of the RPL, which requires a landlord's agent to provide the

potential tenant with the New York State Disclosure Form for Landlord and Tenant "at the time

of the first substantive contact with the . . . tenant." RPL § 443.  The Disclosure Form, in turn,

informs the tenant that "New York State law requires real estate licensees who are acting as

agents of landlords and tenants of real property to advise the potential landlords and tenants with

whom they work of the nature of their agency relationship and the rights and obligations it

creates."  DOS-1735-f.  Existing regulations likewise require brokers to deal honestly and in

good faith: as the Disclosure Form explains, "[i]n dealings with the tenant, a landlord's agent

should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal

honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially

affecting the value or desirability of property, except as otherwise provided by law."  *Id.*

Likewise, pursuant to 19 N.Y.C.R.R. Section 175.25(c)(9), real estate "[a]dvertisements shall

include an honest and accurate description of the property to be . . . leased."

3.    <u>The City Relied on Conjecture and Ignored Evidence About Negative
Consequences</u>

111.    The City Council heard extensive testimony about the negative consequences that

would flow from the FARE Act, including higher rents for renters and lower market

transparency.  These warnings fell on deaf ears.  The City Council failed to conduct further

analysis, discounted evidence against the FARE Act, and credited conjecture and generalizations.

112.    The City Council heard extensive testimony that the FARE Act would result in

higher rents for tenants, particularly as small landlords struggled to absorb the cost of broker

fees.  Brian Phillips, a small landlord and real estate broker specializing in rentals, testified that,

as a small landlord, he "faced significant financial pressures due to rising real estate taxes,

homeowners[] insurance[,] and maintenance costs.  These increases have forced me to increase

rents, a situation shared by many of my landlord clients."  The FARE Act's requirement that

landlords pay the brokerage fee when hiring agents on an exclusive basis "could lead to two

likely outcomes," Mr. Phillips said:

> Landlords may either incorporate the broker fee into the rent,
> spreading it over the entirety of the lease.  This would result in
> ***higher monthly rents and increased lease renewal rates***, which
> are based on a last rented price.  Alternatively, ***landlords might opt
> not to hire agents on an exclusive basis***.  This means tenants
> would have to pay the brokerage fee, and listings would not appear
> on platforms like StreetEasy, which require exclusive listings.

(emphasis added).

113.    Mr. Phillips' remarks were echoed by other brokers and small landlords.

114.    In a social media post [after the June 2024 Hearing,] Councilmember Ossé

dismissed the critics, stating that "The #FAREAct puts DOWNWARD pressure on rents by

increasing bargaining power for tenants."

115.    The City Council and other supporters likewise responded with conjecture.

Among the refrains often heard in support of the FARE Act was the argument that "any rent

increases that do occur would be ameliorated over a 12- or 24-month lease, ***which is preferable

to paying a large sum up front*** and ***could*** still reduce tenants' long-run costs and increase their

future bargaining power." (emphasis added).

116.    The City Council explicitly assumed—with no data to back up that assumption—

that New York City tenants prefer the lower upfront cost of not paying a broker fee over greater

long-term costs.  In doing so, the City Council ignored extensive testimony regarding the long-term costs the FARE Act will exacerbate for renters.  One speaker explained the increased long-term costs for tenants as follows:

> Most tenants in NY stay in their units for more than a year.  Landlords increase their rent based on perceived value, rate of inflation, and the CPI.  This increase will be on top of the already inflated rent.  ***Therefore, the tenant is now paying the fee several times over several years instead of paying a onetime fee when they initially signed the lease***.  The fee is significantly less expensive over the length of the lease as we do not charge repeatedly for multiple years.

(emphasis added).

117.    The Council also heard testimony that "[m]ost landlords require renters to make at least 40 times the monthly rent," which will cause some renters to become priced out as a result of higher rents.  Other renters will have to turn to third party guarantors, incurring additional expense:

> [I]nsurance companies . . . offer insurance products . . . as an additional upfront fee of roughly one month's rent, which unlike security deposits, do NOT get returned to [the tenant] at the end of their lease terms.  This policy has to be renewed each year.  These tenants are essentially purchasing a security deposit from an insurance company which then gives that deposit to the landlord.

118.    Nor did the City Council address the implications for renters with housing assistance vouchers, despite testimony that the FARE Act harms some voucher holders by "remov[ing] one of the primary financial advantages voucher holders have over other prospective renters, which is that vouchers cover brokers fees."

119.    The City Council also discounted the FARE Act's impact on the availability of rent stabilized housing and market transparency.  At the June 2024 Hearing, Councilmember Ossé argued that rents would not go up in part because "nearly half of New York City rental

units are rent stabilized, meaning rent legally can't be raised beyond the levels established each year by the rent guidelines board . . . ."  Of course, Councilmember Ossé's logic omits the roughly half of rental units which are not rent stabilized.  Moreover, Councilmember Ossé's logic is also defied by the fact that rent stabilized apartments rarely come up for rental as families try to remain in such lower priced apartments, and pass them on to younger generations.

120.    In written testimony submitted to the City Council, Sarah Saltzberg, of Bohemia Realty Group observed that "tens of thousands of [rent stabilized] units [] sit offline, due to a mandate that allows for almost no rent increase regardless of the funds needed for renovation."  She also cautioned that the FARE Act would have similar unintended consequences on the availability and exposure of rent stabilized units:  if owners of rent stabilized units that already rent at their legal threshold cannot afford to pay a broker fee, they "may choose to simply have their supers list the units, or not—and rentals will happen via word of mouth."

121.    The result, another broker warned, would be a "shadow inventory" not seen "since the days of classified newspaper advertising" instead of today's "widely transparent online rental marketplace showing accurate apartment listings."

122.    Adam Roberts, from the Community Housing Improvement Program, whose members operate rent-stabilized housing, echoed these remarks:

> [The FARE Act] adds more cost to provide rent-stabilized housing,
> despite those buildings having no means of recouping these
> additional expenses.  This is particularly troubling because rent-
> stabilized housing finds itself in a major financial crisis.  Net
> operating income for older rent-stabilized buildings has fallen
> consistently across the city for three years in a row.  In 2022 alone,
> there was a 20% drop for Bronx buildings.  Meanwhile, the lenders
> who fund capital expenditures have either collapsed or are near
> collapse . . . or have severely restricted lending . . . .

123.    The FARE Act's negative repercussions would not be limited to rent-stabilized

33

housing, and in particular, the City Council heard that the FARE Act would disproportionately

impact *owners and tenants of color*:

> Small rental units have the largest share of owners of color; 13
> percent of owners are Black, and 15 percent are Hispanic . . . .
> COVID-19 has disproportionately affected Black and Hispanic
> households, and their greater representation both as tenants and
> landlords in two-to-four unit buildings may further exacerbate
> wealth inequality if no action is taken to protect these landlords
> from losing their property due to the decline in rental income.

124.    The City Council also heard testimony about the "major financial impact" the

FARE Act would have on honest and hard-working brokers by hurting their livelihoods as

landlords forego exclusive and open listings: "[d]espite reality TV shows the starting income for

a New York City agent is $52,000 a year."

125.    But rather than consider the impact on brokers in earnest, the June 2024 Hearing

and written testimony submitted at the Hearing were replete with generalizations and disparaging

comments about brokers, accusing brokers of merely "opening doors," "acting out of greed,"

"taking hard earned money, flooding online rental options and holding people back from finding

an apartment that would otherwise be affordable and accessible to them."  One FARE Act

supporter stated: "The current system is . . . a blatant exploitation of brokers, making it

increasingly challenging for everyday New Yorkers to secure affordable housing."  Without any

supporting evidence, Councilmember Nurse stated that when it came to wrongdoing by brokers,

"[t]he worst case scenario is generally what the rule is . . . . The worst case scenario is generally

the most common experience."

126.    The vitriol against brokers led one observer to describe the hearing as follows in

written testimony submitted to the City Council:

> I also take issue with how you conducted yourselves during the
> hearing today.  I heard nothing but vitriol toward brokers who

34

> testified. ***I watched as you stared at your phones and laptops as they spoke, while listening intently to anyone in favor of the bill.*** You asked follow-up questions to those in favor, while only making quick comments and moving onto the next group after anyone in opposition spoke. ***I observed a dais of city council members who, for the most part, seemed to have already made up their minds.***

(emphasis added).

127.    Most important, the City Council heard from no party about the need to more "***properly align the principal-agent relationship in the rental market,***" ***or that any of the existing laws failed to properly take into account the nature of agency relationships in the brokerage transaction.***

4.    The City Council Did Not Consider Less Burdensome Alternatives

128.    Despite the extensive testimony about the many negative consequences that this ill-considered legislation would have on New Yorkers and the rental markets, the City Council did not meaningfully consider other, less burdensome alternatives for addressing the FARE Act's stated purpose.

129.    The Council heard repeated testimony that New York City is one of only two cities in the country where renters pay broker fees. In response, at least two witnesses testified about the factors that make New York's market different, highlighting factors such as the prevalence of co-ops, rent laws, and tenant protections:

> In Manhattan, co-ops constitute approximately 75% of the housing market, which makes for lengthy application and stringent approval processes that experienced agents know how to navigate well. Unlike many other cities and markets surrounding Manhattan, where a centralized Multiple Listing Service (MLS) simplifies property searches and transactions, NYC—particularly Manhattan, downtown Brooklyn, and northwest Queens—relies heavily on platforms like StreetEasy, which is owned by Zillow and often requires exclusive listings. In Manhattan, rental listings do not syndicate to Zillow unless they are first listed on StreetEasy.

35

This limits the visibility of available rentals and complicates the process for tenants.

Additionally, you asked about New York versus other cities so I looked up Miami's rental situation.  In Miami, *tenants must pay 3 months [sic] rent up front: first and last month's rent and their security deposit which is more than our permitted first month's rent and security.  Plus in Miami, landlords give 3 day notice for eviction of non-payment unlike our laws which mandate 30, 60, or 90 day notice and then you're stuck in housing court for at least a year.*

(emphasis added).

130.    The City Council did not explore these distinguishing characteristics between New York and other markets, instead assuming that because the New York market is an outlier in its approach to broker fees, it must be in the wrong.

131.    The City Council also heard testimony about the disproportionate impact that the FARE Act will have on small landlords, whose buildings are a crucial source of affordable housing:

Exempting the smallest buildings, which have the lowest eviction filing rates, from the broker fee requirement is another critical aspect to consider.  These buildings are often managed by owners who are not full-time professional property managers and often provide some of New York City's least expensive and most stable housing.  Protecting these small landlords is crucial to maintaining affordable housing options and preventing further displacement in our communities.

132.    The City Council did not consider exempting small landlords from the FARE Act.

133.    Nor did the City Council consider whether it could create a need requirement for renters.  In a city as economically diverse as New York, there is a wide range of potential renters and not every renter in New York City needs the potential financial advantage provided by the FARE Act.

134.    Moreover, the City Council failed to identify any evidence or hear any testimony

or data from the any City department demonstrating that all landlords are better and more financially equipped to absorb the costs of a brokerage commission.

135.     Indeed, the City Council did not consider any alternatives to mitigate the FARE Act's negative consequences on landlords, brokers, and tenants.

### III.     The Impact of the FARE Act

136.     The FARE Act fundamentally misunderstands the New York City rental markets and will cause irreparable harm to all stakeholders.

137.     The FARE Act completely invalidates all existing listing agreements between Plaintiff real estate brokers and landlords which provide that while the landlord retains the services of one of the Brokerage Plaintiffs, the broker must seek compensation only from the tenant rather than the landlord.  Indeed, the FARE Act permanently and completely voids all existing listing agreements which require that the broker must seek compensation from the tenant.  This fundamental and permanent impairment of listing agreements between brokers and landlords violates the Contracts Clause of the Constitution.

138.     For example, Plaintiff Bond New York includes a provision in its "Exclusive Right to Rent" agreement with landlords that states that despite entering into an exclusive agreement with that landlord, BOND New York must seek to negotiate any compensation arrangement with the tenant, and can only receive such compensation from the tenant:

> If the Property is rented pursuant to this Agreement, BOND will collect its fee from the tenant.

The FARE Act, however, permanently makes this provision void, and in fact makes any attempt by BOND, or any other Brokerage Plaintiff, to negotiate a compensation arrangement with any consumer illegal and punishable with a fine.  In short, the FARE Act severely impairs the contractual rights of the Brokerage Plaintiffs, as well as the

37

landlords who have entered into exclusive listing agreements with the Brokerage

Plaintiffs containing such provisions, fundamentally undermines the expectations of the

parties to the exclusive listing agreement, and makes clear that such impairment is

permanent.  In addition to the contracts of the Brokerage Plaintiffs at issue, the FARE

Act will also impact likely thousands of other exclusive listing agreements already

entered into by brokerages across New York City.

139.    Moreover, the FARE Act prohibits any "person" from "condition[ing] the rental

of residential real property on a tenant engaging any agent, including but not limited to a dual

agent."  This prohibition directly impairs countless existing exclusive listing agreements between

landlords and the Brokerage Plaintiffs—including those where the landlord has agreed to pay the

brokerage commission—by making it impossible for landlords to fulfill their explicit contractual

obligation to refer all inquiries regarding their property to the broker.

140.    Plaintiff Bond, for instance, includes a provision in its "Exclusive Right to Rent"

Agreement which requires the landlord to direct all "inquiries, proposals and offers regarding" a

property to Bond:

> During the term of this Exclusive Agreement, you agree to refer to BOND New
> York all inquiries, proposals and offers regarding the Property; this includes all
> principals and any other real estate brokers.

141.    Thus, even those exclusive listing agreements where a landlord has agreed to

compensate the broker also suffer a permanent and severe impairment due to the arbitrary

"conditioning" provision of the FARE Act.  As noted earlier, the FARE Act never defines what it

means to "condition the rental of" a unit on the "tenant engaging any agent," and fails to provide

brokers and landlords with any guidance as to what constitutes lawful conduct.

142.    The loss of the fees from exclusive listing agreements will be permanent and

impose substantial hardship on brokers by upending the longstanding business model on which they have come to rely.

143.    Landlords of both market rate and rent stabilized apartments will likewise suffer substantial hardship because the FARE Act requires them to pay for broker fees, incurring increased costs.

144.    In the process, the FARE Act also harms renters.  The FARE Act puts the financial burden of paying a brokerage commission exclusively on the shoulders of landlords, without regard to whether they are better situated than renters to bear that cost.  The tenant pays rentals at the heart of the FARE Act are more likely to be rent-stabilized apartments and lower priced units owned by small landlords.  Small landlords operate with thin margins, and paying broker fees on top of taxes, maintenance, and operating costs will push many of those landlords into the red.

145.    Landlords of market rate apartments who cannot afford the extra costs will be forced to amortize the broker fee (plus any additional administrative costs they incur) over the course of the lease term.  As a result, tenants will incur higher long-term costs due to higher rents and higher lease renewal rents.

146.    Higher base rents will also make it more difficult for prospective renters who need to demonstrate income which is 40 times the monthly rent of an apartment.  While a New Yorker making $120,000 per year may qualify for an apartment with rent of $3,000 or less, because of the impact of the FARE Act, that same apartment may now rent for $3,300 per month or even more.  That New Yorker would no longer qualify for the apartment based on income alone.  In that case, the renter can keep looking for a place to live, or they can pay a third-party guarantor or insurer to make up the difference, further exacerbating the high cost of housing.

147.    Unlike landlords of market rate apartments, landlords of rent stabilized apartments *already* renting at their maximum cannot raise rents.  As a result, they may have to make significant cutbacks on building maintenance or even take units off the market entirely if they become prohibitively expensive to operate, adding to the thousands of rent-stabilized units already sitting vacant in New York City.  This "warehousing" of units would further exacerbate the extremely low vacancy rate, especially for more affordable apartments:  as the City Council heard during the June 2024 Hearing, the net rental vacancy rate is below one percent for units renting under $2,400 per month. Landlords who choose to move leasing in-house will inevitably have less availability and less education about fair housing laws than licensed brokers—ultimately harming consumers.

148.    Finally, the FARE Act violates landlords' and brokers' right to free commercial speech in the form of open listing advertisements.  Because of the FARE Act's prohibition on "publish[ing]" an apartment and seeking to receive compensation from the tenant, brokers will stop advertising open listings where they are not retained and paid by the landlord—which is the case with most open listings.  Faced with potential liability for the acts of brokers whom they have not retained and do not control, landlords will likewise stop sending open listings to brokers to advertise.  The "open listing" model will be completely upended.  Thus in addition to infringing on brokers' and landlords' First Amendment rights, the FARE Act will also lead to the loss of advertising.  Listings will not appear on brokers' proprietary websites, nor will they appear on third party websites.  Renters will have to rely on word of mouth, or hire a broker—and then still pay the fee—to find an apartment. The FARE Act will be an enormous step backwards in terms of market transparency and information available to consumers—running counter to the Council's goal of "mak[ing] residential real estate transactions more transparent

and more equitable."

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the First Amendment to the U.S. Constitution**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**(Against All Defendants)**

149.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 148 of this

Complaint as if fully set forth herein.

150.    At all relevant times, Defendants, their agents, and their employees were persons

acting under color of State law.

151.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other

person(s) within the jurisdiction thereof" entitled to bring suit under 42 U.S.C. § 1983.

152.    The First Amendment of the U.S. Constitution, as incorporated through the

Fourteenth Amendment, prohibits a state or municipality from abridging the freedom of speech.

153.    The FARE Act imposes content-based restrictions on Plaintiffs' lawful

commercial speech by directly infringing on their ability to "publish" or advertise open listing

advertisements.  By prohibiting the Brokerage Plaintiffs from "publish[ing]" a listing and

seeking to receive compensation from the tenant, the FARE Act inhibits brokers from advertising

open listings where they are not retained and paid by the landlord.  By rendering the Landlord

Plaintiffs potentially liable for the acts of brokers whom it has not retained and does not control,

the FARE Act likewise chills the Landlord Plaintiffs' commercial speech.  In short, the FARE

Act disfavors specific speech—the "publishing" of open listings—and disfavors certain

speakers—real estate brokers and agents.

154.    Defendants cannot show that the FARE Act advances a substantial interest

41

through means that is no more extensive than necessary.  Indeed, the legislative record reflects that in passing the FARE Act, the City Council relied on anecdotal evidence while failing to conduct any meaningful tailoring analysis.

155.    Because of Defendants' actions, all of the Plaintiffs have suffered or will imminently suffer irreparable harm from the denial of their First Amendment rights.

156.    Plaintiffs are entitled to a declaratory judgment that Defendants have violated their First Amendment right to freedom of speech.

157.    Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the FARE Act.

158.    Plaintiffs are entitled to recover their attorneys' fees and costs.

## COUNT II

### Preemption Under New York State Law
### (Against All Defendants)

159.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 158 of this Complaint as if fully set forth herein.

160.    The FARE Act legislates in a field fully occupied by the New York State Legislature and the DOS.

161.    New York has enacted a comprehensive regime of statutes and regulations regarding the licensing, conduct, and nature of fiduciary relationships for real estate licensees. Those state laws also govern how, and by whom, real estate licensees are compensated.  Article 12-A of the RPL and attendant regulations form a comprehensive and detailed regulatory scheme that evinces the State's intent to occupy the field with respect to the law governing real-estate transactions and real-estate brokers.

162.    Similarly, the DOS has also promulgated additional state-wide regulations which

govern the conduct of real estate brokers, including rules that set forth when a real estate broker

may be compensated by more than one party (Section 175.7) and how real estate brokers and

salespersons can advertise listings (Section 175.25).

163.    Plaintiffs are entitled to a declaration that the FARE Act is preempted by New

York State Law.

164.    Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the

FARE Act.

**COUNT III**

**Violation of the U.S. Constitution's Contracts Clause**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**(Against All Defendants)**

165.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 164 of this

Complaint as if fully set forth herein.

166.    At all relevant times, Defendants, their agents, and their employees were persons

acting under color of State law.

167.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other

person(s) within the jurisdiction thereof" entitled to bring suit under 42 U.S.C. § 1983.

168.    Article I, Section 10, Clause 1 of the U.S. Constitution provides that "[n]o State

shall . .  pass any . . . law impairing the obligation of contracts."

169.    The FARE Act permanently impairs the Brokerage Plaintiffs' existing contracts.

By prohibiting a broker from receiving compensation from the tenant when they have executed

an exclusive listing agreement with a landlord, the FARE Act makes all tenant pays exclusive

listing agreements void and unenforceable.

170.    The FARE Act further impairs countless existing exclusive listing agreements

43

between the Brokerage Plaintiffs and landlords by prohibiting any "person" from "condition[ing] the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent."  This prohibition makes it impossible for landlords to fulfill their explicit contractual obligation to refer all inquiries regarding their property to the Brokerage Plaintiff with whom a specific landlord has contracted.

171.    The loss of the fees coming from their impaired exclusive listing agreements will be permanent and impose substantial hardship on the Brokerage Plaintiffs.  The Brokerage Plaintiffs relied upon the terms of their exclusive listing agreements, established their businesses based on these exclusive listing agreements, and invested substantial time and resources based on such terms.

172.    In addition, landlords have also relied upon the terms of their exclusive listing agreements with the Brokerage Plaintiffs, and established their businesses based on these exclusive listing agreements, and invested substantial time and resources based on such terms.

173.    The FARE Act is neither reasonable nor appropriate to address the purported public interest of "align[ing] the principal-agent relationship," nor reasonable and appropriate to solve its true aim of improving housing affordability.

174.    In placing the economic responsibility for broker fees squarely on the shoulders of landlords, the City Council relied on no economic analysis demonstrating that landlords are better equipped or capable of absorbing the costs of the brokerage commission.  Nor does the Act make any distinction between tenants who may demonstrably need assistance to pay a brokerage commission and tenants who can readily afford to pay the fee.

175.    The Brokerage Plaintiffs are entitled to a declaratory judgment that Defendants have violated the Brokerage Plaintiffs' rights under the Contracts Clause.

44

176.    The Brokerage Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the FARE Act.

177.    The Brokerage Plaintiffs are entitled to recover their attorneys' fees and costs.

## COUNT IV

### Violation of the New York State Constitution's Free Speech Clause
### 28 U.S.C. § 2201
### (Against All Defendants)

178.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 177 of this Complaint as if fully set forth herein.

179.    Article I, Section 8 of the New York State Constitution provides that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech."

180.    For the same reasons that Defendants violated Plaintiffs' First Amendment rights under the U.S. Constitution, as alleged above, Defendants have violated Plaintiffs' rights to free speech guaranteed by the New York State Constitution.

181.    Plaintiffs are entitled to a declaration that Defendants violated their right to free speech under the New York State Constitution.

182.    Plaintiffs are entitled to injunctive relief enjoining the enforcement of the FARE Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

(a)    Declaring that Defendants violated Plaintiffs' First Amendment right to freedom of speech;

(b)    Declaring that the FARE Act is preempted by New York State Law;

(c)     Declaring that Defendants violated Plaintiffs' rights under the Contracts Clause of

the U.S. Constitution;

(d)     Declaring that Defendants violated Plaintiffs' right to free speech under the New

York State Constitution;

(e)     Enjoining the enforcement of the FARE Act;

(f)     Awarding Plaintiffs their attorneys' fees and costs; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
          December 16, 2024

**HOGAN LOVELLS US LLP**

By: */s/ Claude G. Szyfer*
       Claude G. Szyfer
       Darya D. Anichkova
       390 Madison Avenue
       New York, NY 10017
       (212) 918-3000
       claude.szyfer@hoganlovells.com
       daria.anichkova@hoganlovells.com

       Sean M. Marotta (*pro hac pending*)
       Drew Mackenzie (*pro hac pending*)
       555 13th Street NW
       Washington, DC 20004
       (202) 637-5600
       sean.marotta@hoganlovells.com
       drew.mackenzie@hoganlovells.com

       *Attorneys for Plaintiffs*