UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REAL ESTATE BOARD OF NEW YORK, INC., NEW  :
YORK STATE ASSOCIATION OF REALTORS, INC.,  :
BOHEMIA REALTY GROUP, BOND NEW YORK REAL :
ESTATE CORP., REAL NEW YORK LLC, LEVEL  :
GROUP INC., FOUR CORNERS REALTY, LLC, 21  :
WEST 74 CORP., 8 WEST 119TH STREET HDFC,  :
                                           :  Civ. No. 1:24-cv-09678 (RA)
                              Plaintiffs,   :
                                           :
              v.                           :
                                           :
THE CITY OF NEW YORK, *a municipal entity*, VILDA  :
VERA MAYUGA, *as Commissioner of New York City*  :
*Department of Consumer and Worker Protection,*   :
                                           :
                             Defendants.    :
                                           :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION


**HOGAN LOVELLS US LLP**
390 Madison Ave.
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ...........................................................................................3

    I.     New York City's Real Estate Market ................................................. 3

    II.    The Campaign to End Broker Fees ..................................................... 6

    III.   The Act.................................................................................................. 7

ARGUMENT ...............................................................................................................9

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................... 9

        A.    The Act's Prohibition On Brokers Collecting Fees For Published Open Listings Unconstitutionally Burdens Brokers' Commercial Speech. ......... 9

            1.    The Act's publication bar is subject to strict scrutiny because it burdens disfavored speech by disfavored speakers. .................. 10

            2.    The Act's publication bar fails even intermediate scrutiny. ......... 11

                a.    The City cannot demonstrate the Act's publication bar will directly and materially advance a genuine, real, and substantial interest.......................................................13

                b.    The City cannot show that the Act's publication bar is proportional to the interest served.....................................14

        B.    The Act is Preempted by New York State's Comprehensive Regulation Of Brokers and Their compensation. ..................................... 15

        C.    The Act Violates the Contracts Clause. .................................................... 19

            1.    The Act substantially burdens brokers' and landlords' existing contracts. ........................................................................ 20

            2.    The Act serves no significant and legitimate public interest and is not a reasonable and appropriate means of accomplishing the City's asserted purpose. ................................ 21

    II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION. ................................................................................................. 22

III.    A PRELIMINARY INJUNCTION WILL NOT HARM THE CITY AND WILL BENEFIT THE PUBLIC. ........................................................................... 24

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H.by and through Hester v. French,*
    985 F.3d 165 (2d Cir. 2021) ................................................................22

*Agudath Israel of America v. Cuomo,*
    983 F.3d 620 (2d Cir. 2020) ...............................................................22

*Arash Real Estate & Mgmt. Co. v. New York City Dep't of Consumer Affairs,*
    148 A.D.3d 1137 (2d Dep't 2017) ......................................................17

*Ba Mar v. Cnty. of Rockland,*
    164 A.D.2d 605 (2d Dep't 1991) ...................................................15, 16

*Bd. of Trs. of the State Univ. of New York v. Fox,*
    492 U.S. 469 (1989) ...........................................................................14

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
    447 U.S. 557 (1980) ................................................................... *passim*

*Matter of Chwick v. Mulvey,*
    81 A.D.3d 161 (2d Dep't 2010) ..........................................................16

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ...........................................................................15

*Connecticut State Police Union v. Rovella,*
    494 F. Supp. 3d 210 (D. Conn. 2020), *aff'd*, 36 F.4th 54 (2d Cir. 2022) ...............................22

*Cornelio v. Connecticut,*
    32 F.4th 160 (2d Cir. 2022) ..........................................................12, 13

*DJL Rest. Corp. v. City of New York,*
    96 N.Y.2d 91 (2001) ...........................................................................16

*DoorDash, Inc. v. City of New York,*
    No. 21 CIV. 10347 (AT), __ F. Supp. 3d __,
    2024 WL 4276245 (S.D.N.Y. Sept. 24, 2024) ........................10, 12, 14

*Energy Reserves Grp. v. Kansas Power & Light Co.,*
    459 U.S. 400 (1983) ...........................................................................19

*Eric M. Berman, P.C. v. City of New York,*
    25 N.Y.3d 684 (2015) .........................................................................16

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007).........................................................23

*Hertz Corp. v. City of New York*,
    80 N.Y.2d 565 (1992) ...............................................................16

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010), *aff'd* 564 U.S. 552 (2011) ...............12, 14

*Iowa Utilities Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) .....................................................23

*Jancyn Mfg. Corp. v. Cnty. of Suffolk*,
    71 N.Y.2d 91 (1987) .................................................................16

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)..................................................................14

*Loveridge v. Pendleton Woolen Mills, Inc.*,
    788 F.2d 914 (2d Cir. 1986).......................................................23

*Melendez v. City of New York*,
    16 F.4th 992 (2d Cir. 2021) ...................................................20, 21

*Melendez v. City of New York*,
    668 F. Supp. 3d 184 (S.D.N.Y. 2023), *vacated and remanded on other
    grounds by Elias Bochner, 287 7th Avenue Realty LLC v. City of New York*,
    118 F.4th 505 (2d Cir. 2024) .....................................................19

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)........................................................24

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................24

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)........................................................23

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995)..................................................................13

*Safelite Grp., Inc. v. Jepsen*,
    764 F.3d 258 (2d Cir. 2014)......................................................9, 12

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997).......................................................20

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
　502 U.S. 105 (1991) ......................................................................................9

*Sorrell v. IMS Health Inc.*,
　564 U.S. 552 (2011) ............................................................................9, 10, 11

*State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical
　Practice P.C.*,
　120 F.4th 59 (2d Cir. 2024) .........................................................................9

*Tucker Anthony Realty Corp. v. Schlesinger*,
　888 F.2d 969 (2d Cir. 1989) ......................................................................23

*United States v. Caronia*,
　703 F.3d 149 (2d Cir. 2012) ......................................................................12

*Vugo, Inc. v. City of New York*,
　931 F.3d 42 (2d Cir. 2019) ...................................................................10, 15

*Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*,
　536 U.S. 150 (2002) ....................................................................................13

**Statutes**

N.Y.C. Admin. Code § 20-699.20 ...........................................................10, 15

N.Y.C. Admin. Code § 20-699.21 ............................................................. *passim*

N.Y.C. Admin. Code § 20-699.22 ....................................................................18

N.Y.C. Admin. Code § 20-699.23 .................................................................8, 18

N.Y. Real Prop. Law § 442 ...............................................................................17

N.Y. Real Prop. Law § 442-a ............................................................................17

N.Y. Real Prop. Law § 442-d ............................................................................17

N.Y. Real Prop. Law § 442-i .............................................................................17

N.Y. Real Prop. Law § 442-k ............................................................................17

N.Y. Real Prop. Law § 442-l .............................................................................17

N.Y. Real Prop. Law § 443 .............................................................................5, 17

**Other Authorities**

19 N.Y.C.R.R. Section 175.7 .............................................................................18

19 N.Y.C.R.R. Section 175.19.................................................................................18

19 N.Y.C.R.R. Section 175.25.................................................................................18

U.S. Const. art. I, § 10.........................................................................................19

## PRELIMINARY STATEMENT

While not yet in effect, the Fairness in Apartment Rental Expenses Act (the Act), N.Y.C. Admin. Code §§ 20-699.20-25, is upending New York City's rental markets, making it more difficult for low-income renters to secure affordable housing in New York City, and will continue to do so. The Act is already causing higher rents, and will lower housing supply, and create a less-transparent rental marketplace. Most significantly, the Act will increase the overall expense of renting by invalidating cost-saving listing arrangements whereby brokers negotiate compensation for their services from the tenant. And the Act will deprive renters of information about available housing by prohibiting any broker who "publishes" a listing with a landlord's permission or authorization from collecting a fee from a tenant who decides to lease the listed property. As stakeholders and commentators have warned, the Act will have devastating effects on the City's already beleaguered real-estate market.

Ironically, the Act was originally sold to the public as a way to address the city's housing-affordability crisis. The Act's sponsors repeatedly insisted in public statements that the Act would "put downward pressure on rents."[1] But the Council has yet to produce any data supporting that supposition. In fact, the Act will increase rents as landlords pass the cost of broker fees on to tenants and rent-stabilized apartments become too expensive to operate.

Rather than address the absence of supporting data, the City Council attempted to conjure up a new justification for the Act at the last moment. The Committee Report accompanying the final Council vote disavowed any connection between the Act and affordability and dismissed the Act's economic critics as "misunderstand[ing] the purpose of the bill." Szyfer Ex. C at 10.[2] The

---

[1] @OsseChi, X (Nov. 12, 2024, 11:29 AM), https://x.com/OsseChi/status/1856388829252374881.
[2] References to "Szyfer Decl." and "Szyfer Ex." are to the Declaration of Claude G. Szyfer and accompanying exhibits, filed concurrently herewith.

Report insisted—months of contrary campaigning notwithstanding—that the Act was not "an attempt to solve the affordability crisis in the city" but a law designed "to properly align the principal-agent relationship in the rental market." *Id.*

That eleventh-hour volte-face—combined with the Council's complete failure to conduct serious economic analysis leading up to enactment—betrays that the Act was motivated not by a legitimate governmental interest, but by the Council's evident animus toward brokers. The Act's attempt to deprive brokers of the financial benefit of their real-estate listings is a thinly veiled effort to punish disfavored speakers, which should be subjected to strict scrutiny under the First Amendment and enjoined.

The Act's prohibition on brokers publishing rental listings if they seek fees from a tenant also fails the intermediate scrutiny applicable to commercial-speech regulations. The City must show that the restriction directly advances a substantial government interest and is no more extensive than necessary to serve that interest. Presumably the Council's interest in properly aligning "the principal-agent relationship in the rental market" is meant to prevent payments for services in the absence of a fiduciary relationship. But in that case the publication bar is both overinclusive, because it applies even when a broker would collect his fee as a tenant's agent or as a dual agent with fiduciary responsibilities to the tenant, and underinclusive, because it fails to address transactions between landlords and tenants, which regularly take place in the absence of any applicable fiduciary obligations.

The City is also preempted from regulating brokers' fiduciary obligations in any event. The State of New York has long occupied the field of broker regulation. Indeed, during the one hearing held on the Act, a deputy commissioner of the New York City's Department of Housing, Preservation and Development (HPD) acknowledged that broker-compensation issues are left to

the State—not the City. Brokers and landlords have built entire business models in reliance on the State's detailed and comprehensive regulatory regime, including by entering into exclusive listing agreements premised on landlords' promise not to cut side deals with tenants.

Finally, by invalidating existing exclusive listing agreements, the Act also violates brokers' and landlords' rights under the U.S. Constitution's Contracts Clause. The Act invalidates existing agreements between owners and brokers that require the broker to seek compensation from the tenant. In addition, the Act prohibits any person, including landlords, from conditioning the rental of property on the engagement of a broker. But landlords contract to do exactly that in every "tenant-pays" brokerage agreement. The City can name no legitimate public purpose for this impairment, nor can the City demonstrate the impairment constitutes a reasonable and necessary means of addressing its purported public purpose. This Court should enjoin enforcement of the Act to preserve brokers', landlords', and ultimately tenants' right to an information-rich and flexible rental marketplace.

**STATEMENT OF FACTS**

### I. New York City's Real Estate Market

Apartment hunting in New York City is extremely competitive. The *New York Times* reported that only 1.4 percent of the city's housing stock was available to rent in 2023, representing "the lowest vacancy rate since 1968."[3] The vacancy rate for affordable housing is even lower: rent-stabilized apartments and units with asking rents of less than $1,650 per month both had a vacancy rate below 1 percent. *See* Declaration of Sam Chandan ("Chandan Decl."), dated January 10, 2025 at ¶ 18.[4]

---

[3] Mihir Zaveri, *New York's City's Housing Crunch Is the Worst It Has Benn in Over 50 Years*, N.Y. Times (Feb. 8, 2024).
[4] Gaumer, E. The 2023 New York City Housing and Vacancy Survey: Selected Initial Findings. New York, NY: New

3

Low-income tenants have been hardest hit. Over half of New York City households are rent burdened, with 30 percent of households spending half or more of their income on rent.[5] Landlords of low rent or rent-stabilized units have likewise been pushed to—or past—the breaking point. Around half of the city's rental units are owned by landlords with fewer than 20 buildings in their portfolio. Szyfer Ex. C at 3. The paper-thin profit margins for many of these units are quickly subsumed by, among other things, operation and maintenance costs, property taxes, utilities, and repairs. Declaration of Eric Porco ("Porco Decl."), dated December 20, 2024, at ¶¶ 13-19; Declaration of Ryan Foregger ("Foregger Decl."), dated December 22, 2024, at ¶ 10; Szyfer Ex. B at 36. Landlords also have significant mortgage costs, further compounding the need to raise rents. Porco Decl. at ¶ 19. Worse, landlords forbidden by rent regulation laws from raising rent to levels sufficient to cover their costs may have to take their rent-stabilized units off the market, further decreasing the housing supply. Szyfer Ex. B at 8 (observing that "tens of thousands of [rent stabilized] units [] sit offline, due to a mandate that allows for almost no rent increase regardless of the funds needed for renovation"); *see also id.* at 24, 116.

Real estate brokers are experts at navigating New York City's uniquely complex market and bringing tenants and landlords together while complying with federal and state regulations. Brokers reduce transaction costs and increase transparency and consumer access by publishing listings on their own websites, as well as advertising portals like StreetEasy and RentHop. Declaration of Sarah Saltzberg ("Saltzberg Decl."), dated December 23, 2024, at ¶¶ 10-14; Szyfer Ex. B at 85. These listings are a vital resource for New Yorkers. But the listings are not free for

York City Department of Housing Preservation and Development; 2024, p. 22, available at: https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf.
[5] New York University Furman Center, *State of New York City's Housing and Neighborhoods in 2023*, available at https://furmancenter.org/stateofthecity.

brokers, who pay a daily fee to keep listings live. Declaration of Douglas Wagner ("Wagner Decl."), dated December 20, 2024, at ¶ 11.

Brokers also show apartments, identify qualified applicants, assist tenants with preparing rental applications, conduct state-mandated credit and background checks, process applications, and guide both landlords and tenants through applicable state and federal regulations. *See, e.g.*, Saltzberg Decl. at ¶ 14. Because of their training, brokers are far more knowledgeable than landlords about federal and New York State regulations concerning the renting of properties, including the fair housing laws, as well as the processing of state and federal housing vouchers and other subsidy programs (such as Section 8 housing vouchers). *Id.* Brokers are also available to show apartments outside regular business hours. *Id.* at ¶ 16. Owners, particularly small landlords, could not provide the same level of service without significantly increasing rents to account for the cost of additional administrative staff.

Brokers can work on behalf of a landlord, a tenant, or both. Landlords' brokers are engaged by the landlord to secure a tenant on terms acceptable to the landlord and represent the landlord's interests. New York Real Property Law § 443. Tenants' brokers are engaged by prospective tenants and represent the tenant's interests. *Id.* Brokers can also operate as "dual agents," representing the interests of landlord and tenant alike. *Id.*

Brokers may receive "open listings" from landlords. The broker is given permission to publish the listing, but does not enter into a listing agreement with the landlord. Saltzberg Decl., at ¶¶ 10-11, 29. Brokers advertise these listings even though they do not have a compensation agreement with the landlord because they hope to find a tenant interested in renting the apartment who will negotiate with the broker and pay their fee. *Id.*

## II.    The Campaign to End Broker Fees

Tenant-pays broker commissions generally save tenants money over the life of a lease because rolling a broker's commission into an apartment's rent often results in a tenant spending more overall than when paying the commission and rent separately. *Id*. at ¶¶ 10-13, 17; Szyfer Ex. B at 16 ("[A] tenant who pays a broker commission is purchasing a cheaper lease term."); Chandan Decl. at ¶¶ 30-32; Saltzberg Decl. at ¶ 22; Declaration of Robert Rahmanian ("Rahmanian Decl."), dated December 23, 2024, at ¶ 27. New York City councilmembers have nonetheless targeted tenant-pays broker fees, claiming that the fees make housing less affordable. At the June 12, 2024 hearing on the Act, for example, Councilmember Ossé insisted that eliminating tenant-pays fees would "put downward pressure on rents." Szyfer Ex. A at 16:13-14. Others testified similarly. *See* Szyfer Ex. B at 20, 28; Szyfer Ex. D at 32:2-19.

At the same time, councilmembers have cast brokers as villains responsible for the housing crisis. One supporter of the Act accused brokers of "acting out of greed," "taking hard earned money, flooding online rental options and holding people back from finding an apartment that would otherwise be affordable and accessible to them." Szyfer Ex. B at 126, 135. Another stated, "[t]he current system is . . . a blatant exploitation [by] brokers, making it increasingly challenging for everyday New Yorkers to secure affordable housing." Szyfer Ex. B at 96. Councilmember Nurse opined that when it comes to wrongdoing by brokers, "[t]he worst case scenario is generally what the rule is." Szyfer Ex. A at 78:6-16. The Council's contempt for brokers led one observer to decry the Council's "vitriol towards brokers who testified," with councilmembers "star[ing] at [their] phones and laptops as [brokers] spoke, while listening intently to anyone in favor of the bill." Szyfer Ex. B at 99. Councilmembers "asked follow-up questions to those in favor, while only making quick comments and moving onto the next group after anyone in opposition spoke." *Id.* In sum, there was a "dais of city council members who, for the most part, seemed to have

already made up their minds." *Id.* at 99. The online campaign against broker fees has been even more caustic, complete with t-shirts stating directly, "F*CK BROKER FEES." Szyfer Decl. ¶ 9, Ex. G.

For all its rhetoric, the Council has yet to produce data connecting brokers or broker fees to the housing crisis. When asked whether "entry into housing, including broker fees," were among the forces contributing to the rental shortage, HPD's deputy commissioner admitted that "[t]hat's not a data point that I have, so I can't speak to it in any quantitative manner." Szyfer Ex. A at 33:22-35:22. Councilmembers similarly confessed at hearings that there was an "embarrassing" lack of data backing the conclusion that ending tenant-pays broker fees will improve housing affordability. *Id.* at 36:10-38:13.

In fact, the data demonstrates the opposite—ending tenant-pays broker fees will increase monthly rents and decrease both the supply of available listings and access to information about those listings. Chandan Decl. at ¶¶ 30-32, 35; Saltzberg Decl. at ¶¶ 11, 24. The increase in monthly rents will be more pronounced for renters of lower-cost units, who will experience relatively larger increases in market rents as a result of the Act. Chandan Decl. at ¶¶ 13(d), 32. At the same time, ending tenant-pays broker fees is unlikely to substantially increase overall tenant mobility in the New York City rental apartment market. *Id.* at ¶ 33. Indeed, because of New York City's persistent low vacancy rate and lower annual turnover rate for rental units as compared to the national average, a tenant who remains in the unit for several years may pay the equivalent of multiple broker fees over the lifetime of the repeated lease renewals. *Id.* at ¶¶ 13(e), 32.

### III.    The Act

Undaunted, the Council pressed forward with the Act, which transforms the New York City real-estate market in a number of significant ways. *First*, the Act forbids "any agent who publishes a listing for a rental of residential property with permission or authorization of the

landlord" from "impos[ing] any fee on, or collect[ing] any fee from, a tenant related to the rental of such property." N.Y.C. Admin Code § 20-699.21(a)(2).[6]  *Second,* while purporting to allow a broker to collect a fee from a tenant when acting as a "dual agent," the Act prohibits "a landlord's agent" from "impos[ing] any fee on, or collect[ing] any fee from, a tenant related to the rental of residential real property." N.Y.C. Admin. Code § 20-699.21(a)(1).  *Third*, and relatedly, the Act further prohibits any person from "condition[ing] the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent." *Id.* § 20-699.21(c).[7]  This no-conditioning provision effectively eliminates any ability of a landlords' broker to seek a fee from a tenant by becoming a dual agent before consummating a lease.  It also outlaws contract terms—found in every tenant-pays exclusive-brokerage contract—that the landlord must refer all inquiries regarding an apartment to his broker.  Wagner Decl. at ¶¶ 7, 18; Wagner Ex. A.  The City's Department of Consumer and Worker Protection can enforce the Act by seeking civil penalties of up to $2,000 along with restitution for allegedly harmed tenants.  N.Y.C. Admin. Code § 20-699.23(a), (c).

The day before the Act's passage, the City Council released a Committee Report that—for the first time—insisted that the Act "is not an attempt to solve the affordability crisis in the city" but "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." Szyfer Ex. C at 10.  But the report contains exactly one paragraph discussing the "basic norms around principal-agent relationships." *Id.* at 6.  By contrast, the Report has a dedicated multi-page section on the "significant financial burden" that broker fees impose on "renters who wish to move." *Id.* at 7-10.

---

[6] Of course, the Act fails to define what it means to "publish" a listing.
[7] The Act also fails to define what it means to "condition" a rental on the engagement of a broker.

The Council passed the Act on November 13, 2024, and it became law on December 16, 2024.  Plaintiffs' suit followed.

## ARGUMENT

"To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'"  *State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical Practice P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (quoting *North American Soccer League, LLC v. United States Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018)).  Plaintiffs clear each hurdle.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The Act's Prohibition On Brokers Collecting Fees For Published Open Listings Unconstitutionally Burdens Brokers' Commercial Speech.

"A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech," *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991), and "[c]ommercial speech is no exception," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).  After all, a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue."  *Id*. (*quoting Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977)).

Commercial-speech regulations are generally subject to *Central Hudson*'s intermediate-scrutiny test under which "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial government interest, and only through means that directly advance that interest."  *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)).  But as this Court recently recognized, "government action

evincing an improper purpose compels a higher level of scrutiny." *DoorDash, Inc. v. City of New York*, No. 21 CIV. 10347 (AT), __ F. Supp. 3d __, 2024 WL 4276245, at *12 (S.D.N.Y. Sept. 24, 2024). The Act's publication restriction flunks any standard of scrutiny.

> 1. *The Act's publication bar is subject to strict scrutiny because it burdens disfavored speech by disfavored speakers.*

The Act's prohibition on seeking fees for published open listings must survive strict scrutiny because it burdens disfavored speech—open listing advertisements—by disfavored speakers—brokers. *Sorrell v. IMS Health* proves as much. *Sorrell* involved a commercial-speech challenge to a state law restricting the sale, disclosure, and use of pharmacy records revealing individual doctors' prescribing practices. 564 U.S. at 558-59. But the state law applied solely to the use of prescriber information by pharmaceutical salespeople for marketing purposes. *Id.* at 564. Others could use the same information however they wanted. *Id.* at 571. The pharmacy-records law therefore imposed "a speaker- and content-based burden on protected expression" of particular speakers for particular speech—a uniquely disfavored approach "sufficient to justify application of heightened scrutiny." *Id.*[8]

The same is true here. Like the pharmacy-records law in *Sorrell*, the Act "disfavors marketing, that is, speech with a particular content." *Id.* at 564. Its publication bar applies solely to "listing[s]." N.Y.C. Admin. Code § 20-699.21(a)(2). And, also like the pharmacy-records law, "the statute disfavors specific speakers." *Sorrell*, 564 U.S. at 564. The Act operates exclusively against "agent[s]," N.Y.C. Admin. Code § 20-699.21(a)(2), a term the Act defines as "a person

---

[8] The Second Circuit has stated that "*Sorrell* leaves the *Central Hudson* regime in place." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019). But *Vugo* did not address the unique situation presented here and in *Sorrell* itself: a First Amendment challenge to a law that facially disfavors particular speakers and particular speech content. *See id.* n.7 (distinguishing *Sorrell* because "[t]he statute in *Sorrell* was content- and speaker-based in that it targeted a single category of speech by a single category of speaker"). The First Amendment rightly treats such laws as uniquely pernicious and properly the subject of heightened scrutiny.

who is licensed as a real estate broker or real estate salesperson," *id*. § 20-699.20. The Act leaves intact others' ability to publish the same information in any form, including as a listing—even landlords may still publish their own listings. "As a result of these content- and speaker-based rules," brokers cannot profit from property listings even though the same information "may be used by a wide range of other speakers." *Sorrell*, 564 U.S. at 564.

As in *Sorrell*, "[a]ny doubt" that the Act "imposes an aimed, content-based burden on" a disfavored speaker—in this case, brokers—"is dispelled by the record." *Id.* Councilmembers expressed open hostility for brokers and their work, claiming, for instance, that anecdotal accounts of wrongdoing by brokers reflect "the most common experience," and "the rule" rather than the exception. Szyfer Ex. A at 78:6-16. The Act's supporters accused brokers of "acting out of greed" to take "people's hard earned money." Szyfer Ex. B at 126, 135. And the Council was openly contemptuous of brokers' concerns during their testimony on the Act, listening intently and asking questions to everyone else while staring indifferently at phones and laptops while brokers testified. *Id.* at 99.

### 2. *The Act's publication bar fails even intermediate scrutiny.*

The Court can stop there. "In the ordinary case it is all but dispositive that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571. Even so, *Sorrell* deemed it unnecessary to "determine whether all speech hampered by" the pharmacy-records law was subject to a heightened scrutiny analysis because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Id. But see id*. at 565 ("Act 80 is designed to impose a specific, content-based burden on protected expression. *It follows that heightened judicial scrutiny is warranted*.") (emphasis added). The Act also cannot pass muster even under the less-exacting *Central Hudson* test, allowing the Court to take the same path *Sorrell* did.

To succeed under *Central Hudson*, the City must demonstrate (1) that there are real anticipated harms; (2) that the Act's publication bar directly and materially advances its asserted government interest; and (3) that the publication bar is proportional to the interest served. *DoorDash, Inc.*, 2024 WL 4276245, at *12. These requirements have teeth, and courts in the Second Circuit have not hesitated to hold commercial-speech regulations unconstitutional under *Central Hudson*.[9]

First, courts will "inquire into the actual purpose of the law." *Cornelio v. Connecticut*, 32 F.4th 160, 173 n.5 (2d Cir. 2022). The City cannot satisfy intermediate scrutiny with "post-hoc rationalizations." *Id.* (quoting *Jepsen*, 764 F.3d at 265 (commercial-speech case)). If the City survives this initial step, it must then produce evidence that its interest is not only sincere but arises from a real, substantial public concern. "[T]he City cannot simply 'posit the existence of the disease sought to be cured'; it must demonstrate that the harms exist.'" *DoorDash, Inc.*, 2024 WL 4276245, at *13 (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994)). Finally, the City must produce evidence that the challenged commercial-speech regulation will effectively address that harm. *See, e.g.*, *Sorrell*, 630 F.3d at 276 (concluding that "Vermont has not shown any effect on the integrity of the prescribing process or the trust patients have in their doctors from the use of [prescriber information] data in marketing"); *DoorDash, Inc.*, 2024 WL 4276245, at *13-14 (holding that City did not connect study establishing restaurants' inability to collect customer data to the City's asserted interest in protecting the restaurant industry). Thus, "a commercial speech regulation 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Caronia*, 703 F.3d at 164 (citation omitted).

---

[9] *See, e.g.*, *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012); *IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010), *aff'd* 564 U.S. 552 (2011); *DoorDash, Inc.*, 2024 WL 4276245.

a.     *The City cannot demonstrate the Act's publication bar will directly and materially advance a genuine, real, and substantial interest.*

The Committee Report accompanying the Act states that the "purpose of this bill is to properly align the principal-agent relationship." Szyfer Ex. C at 10. The City must therefore prove that this supposed alignment interest is genuine, real, and substantial.

But the Council's late-breaking focus on the principal-agent relationship represents little more than a "post-hoc rationalization[]," *Cornelio*, 32 F.4th at 173 n.5, and a poor one at that. *Cf. Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (Breyer, J., concurring) (noting that an asserted interest in "crime prevention" was "not a strong one" because, "there is no indication that the legislative body that passed the ordinance considered this justification"). Indeed, it bears little if any logical connection to the publication bar because the bar applies even when the publishing broker *does* have fiduciary obligations to the tenant, and because the bar does not address the many other transactions in the rental process that occur in the absence of a fiduciary relationship—such as between a tenant and a landlord. *See infra* pp. 14-15; *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (looking to the "irrationality of th[e] unique and puzzling regulatory framework" as bringing "into question the purpose of" a commercial speech regulation).

Nor has the Council explained the harm it seeks to alleviate by purportedly realigning the principal-agent relationship. The Committee Report complains about a "lack of transparency in fees and their negotiability," but the Report also acknowledges that these concerns are fully addressed by the Act's separate "notice and fee disclosure requirements." Szyfer Ex. C at 12.

The Report also prevaricates about the need to address "the dynamics that compel tenants to pay fees to individuals who do not represent their interests and from whom they do not seek services"; "the practical inability for tenants to negotiate fees in many instances"; and "the practical

necessity of paying for these services they do not seek to get an edge in a highly competitive rental market." *Id.* To the extent these statements amount to an assertion that the need to pay for services from a non-fiduciary is *itself* a public harm, the City has merely "posit[ed] the existence of the disease sought to be cured." *DoorDash, Inc.*, 2024 WL 4276245, at *12. New Yorkers pay for services from non-fiduciaries all the time, and the City has identified no special reason to prohibit payment to non-fiduciaries here. Moreover, as detailed in the declarations of Ms. Saltzberg, Mr. Rahmanian, and Mr. Wagner, rental agents provide a multitude of services to tenants—even when they are not retained by the tenant.

> b.  *The City cannot show that the Act's publication bar is proportional to the interest served.*

"The last step of the *Central Hudson* analysis 'complements' the [prior] step, 'asking whether the speech restriction is not more extensive than necessary to serve the interests that support it.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation omitted). In this analysis, the fit need not be "perfect, but" it must be "reasonable." *Bd. of Trs. of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989). It must "represent[] not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'" *Id.* (citation omitted).

*Sorrell* once again lights the way. In the Second Circuit iteration of the case, the Court rejected Vermont's asserted interest in protecting the privacy of prescribers and prescribing information because the challenged law was fatally under-inclusive: It still permitted prescribing data to be sold for non-marketing purposes. 630 F.3d 263, 275–76 (2d Cir. 2010).

The Act's publication bar suffers from the same underinclusivity problem. It does not, for example, require a broker to have a fiduciary relationship with a landlord before charging the landlord for the broker's services. The Act also appears to allow a landlord to send a listing to a broker, have the broker *show that unit* to a consumer, and still allow the broker to seek

compensation from the tenant. In other words, it is specifically the broker's exercise of her First Amendment right—"publishing" or advertising the unit—that is forbidden under the Act. The Act is also fatally overinclusive in that it sweeps in all brokers who post an advertisement with a landlord's permission, including those that *do* have fiduciary obligations to the tenant. *See* N.Y.C. Admin. Code §§ 20-699.21(a)(2), 20-699.20.

Although the "First Amendment imposes no freestanding 'underinclusiveness limitation,'" *Vugo, Inc.*, 931 F.3d at 53, a law that addresses so little of the government's stated purpose—one that "bears no relationship *whatsoever* to the particular interests that the [government] has asserted," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993); that carries with it a record smacking of pretext; and that has never been connected to a real harm and substantial government interest—lies well on the wrong side of the constitutional line. *See Vugo, Inc.*, 931 F.3d at 53 (explaining that the "'relationship test' is an analytical tool that in some circumstances indicates that a speech restriction is unconstitutional because it casts doubt on whether a regulation is 'part of a substantial effort to advance a valid state interest'") (quoting *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 108 (2d Cir. 2010)).

### B. The Act is Preempted By New York State's Comprehensive Regulation Of Brokers And Their Compensation.

The Act's prohibitions, including its restriction on publishing listings with landlord permission if the broker seeks a fee from the tenant, are unenforceable for the additional reason that they are preempted by New York State law. In New York, "[l]ocal governments have been delegated broad powers to enact local legislation consistent with the State Constitution and general State laws relating to the welfare of its citizens," *Ba Mar v. Cnty. of Rockland*, 164 A.D.2d 605, 612 (2d Dep't 1991), and the mere fact "that the State and local laws touch upon the same area is insufficient to support a determination that the State law has preempted the entire field of

regulation in a given area." *Jancyn Mfg. Corp. v. Cnty. of Suffolk*, 71 N.Y.2d 91, 99 (1987).  But state preemption doctrine "prohibit[s] local legislation in an area that the State has clearly evinced a desire to preempt."  *Ba Mar*, 164 A.D.2d at 612.

"A local law will be preempted either where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)."  *Eric M. Berman, P.C. v. City of New York*, 25 N.Y.3d 684, 690 (2015).[10]  In other words, to show preemption, Plaintiffs need not demonstrate an "express conflict" between the Act and state law.  State field preemption instead "prohibit[s] local legislation in a particular area" where there is an "intent on the part of the State to occupy the entire field."  *Ba Mar*, 164 A.D.2d at 612.

The Legislature may indicate its intent to occupy the field either expressly or by implication.  *DJL Rest. Corp. v. City of New York,* 96 N.Y.2d 91, 95 (2001).  To that end, the State's intent to preempt "may be implied from the nature of the subject matter being regulated and the purpose and scope of the State legislative scheme, including the need for State-wide uniformity in a given area."  *Ba Mar*, 164 A.D.2d at 612 (citation omitted); *see also Hertz Corp. v. City of New York*, 80 N.Y.2d 565, 569 (1992).  And critically, "the Legislature's enactment of a comprehensive and detailed regulatory scheme is deemed to demonstrate an intent to preempt local laws."  *Matter of Chwick v. Mulvey*, 81 A.D.3d 161, 169-70 (2d Dep't 2010).

New York has enacted a comprehensive regime of statutes and regulations regarding the conduct of real-estate licensees and how those licensees are compensated.  Specifically, Article 12-A of New York's Real Property Law ("RPL") and associated regulations form a detailed

---

[10] Plaintiffs do not waive, and do not intend to waive, a conflict preemption argument, and reserve the right to raise it, and amend their Complaint, depending on discovery in this action.

regulatory scheme that evinces the State's intent to occupy the field with respect to the law governing real-estate transactions and real-estate brokers.

Beginning with state statutes, Article 12-A erects "a comprehensive plan to assure, by means of licensing, that standards of competency, honesty and professionalism are observed by real estate brokers and salesmen." *Arash Real Estate & Mgmt. Co. v. New York City Dep't of Consumer Affairs*, 148 A.D.3d 1137, 1139 (2d Dep't 2017) (citation omitted). The State has also created the New York State Real Estate Board. RPL § 442-i. The Board has general authority to "promulgate rules or regulations affecting brokers and sales persons in order to administer and effectuate the purposes of" Article 12-A. *Id.* § 442-k(1). The Board is also statutorily required to "study the operation of laws and regulations with respect to the rights, responsibilities and liabilities of real estate licensees arising out of the transfer of interests in real property," and to "make recommendation[s] on pending or proposed legislation affecting the same." *Id.* § 442-k(4). And Article 12-A empowers the Secretary of State to promulgate rules and regulations to administer provisions relating to the granting and revocation of real estate licenses. *Id.* § 442-k(1).

Article 12-A is a broad framework that governs "commissions, fees and other compensation" that real-estate brokers, associate real-estate brokers, and salespersons can receive (*id.* § 442); who brokers can split their commissions with (*id.*); salespersons' ability to receive compensation from the real estate brokers with whom they are or are not affiliated (*id.* § 442-a); prerequisites to bringing an action for an unpaid commission (*id.* 442-d); and prohibitions on after-the-fact referral fees *(id.* § 442-l). The statute also addresses real-estate agency relationships and defines many of the terms that feature in the Act. *See, e.g.*, *id.* § 443 (defining "agent," "Tenant's agent," "Landlord's agent," and other terms).

State regulations also address broker compensation and agency relationships. 19 N.Y.C.R.R. Section 175.7 regulates when a real-estate broker may "receive compensation from more than one party." Section 175.19 prohibits real-estate brokers from entering into a "net listing" contract, where the broker receives any sum above an agreed amount. Section 175.25 regulates real-estate advertising and includes a requirement that "[n]o property shall be advertised unless the real estate broker has obtained authorization for such advertisement from the owner of the property." *Id.* § 175.25(b)(2)(i). But although section 175.25 requires owner authorization before advertising a property, it never ties the broker's compensation to that authorization.

The Act goes much further. Under the Act, agents who publish a listing with a landlord's permission cannot collect a fee from a tenant for renting that listing, N.Y.C. Admin. Code § 20-699.21(a)(2)—something conspicuously absent from Sections 175.7 and 175.25. The Act even contains a "rebuttable presumption that an agent who publishes a listing for a rental of residential real property does so with the permission or authorization of the landlord of such property." *Id.* § 20-699.21(e). But Section 175.25 already requires such authorization.

The Act also purports to add to Article 12-A by creating rules about how and when a broker may collect fees from a tenant, N.Y.C. Admin. Code § 20-699.21(a)(1) and (2); when and how an agent may ask a tenant to engage them as a dual agent, *id.* § 20-699.21(c); landlords' responsibility for broker actions over which they have no control, *id.* § 20-699.21(b); new limits on what can and cannot be included in a listing, *id.* § 20-699.21(d); new disclosure requirements, *id.* § 20-699.22; and penalties for violation of its provisions, *id.* § 20-699.23. These provisions intrude on the field of real-estate law already occupied by the State's comprehensive regulatory scheme. As HPD's deputy commissioner Tigani recognized during the Council's discussions over the Act, all of these areas are already regulated by the State and should be left to the State. Szyfer Ex. A at 27:12-

28:11, 42:2-14.  In enacting the Act, the City has now created laws for just the five boroughs different from the rest of the State.  The Court should not allow the City to disturb the State's carefully crafted regulatory scheme.

### C.    The Act Violates the Contracts Clause.

Under the Contracts Clause, no State may pass any law "impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  Despite its "absolute terms," courts have interpreted the Contracts Clause to permit "limited interference in contracts, so long as that interference is in furtherance of the 'inherent police power of the State to safeguard the vital interests of its people.'" *Melendez v. City of New York*, 668 F. Supp. 3d 184, 197 (S.D.N.Y. 2023), *vacated and remanded on other grounds by Elias Bochner, 287 7th Avenue Realty LLC v. City of New York*, 118 F.4th 505 (2d Cir. 2024) (quoting *Energy Reserves Grp. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983)).

To that end, courts assessing a Contracts Clause claim ask: "(1) whether the contractual impairment is substantial and, if so, (2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and necessary."  *Id.* (quoting *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020)).  "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)).

The Act substantially impairs landlords' and brokers' exclusive listing agreements; the Act does not remedy a general or social economic purpose; and the Act does not use reasonable and necessary means to combat the harms it purports to identify.  The Act therefore cannot be constitutionally applied to contracts entered into before its enactment.

1.      *The Act substantially burdens brokers' and landlords' existing contracts.*

"The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).  The Court must "consider 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (citation omitted).

A few years ago, the Second Circuit applied these principles to hold that a law rendering "unenforceable any personal guaranties of rent obligations arising" during COVID-19 lockdowns "impose[d] a substantial impairment" on covered leases and guaranties.  *Id.*  In doing so, the Court treated as dispositive the fact that, under the challenged law, "the landlord can never seek to recover those amounts from the guarantor.  Not during the pandemic period.  Not after the emergency declaration is withdrawn.  Not ever." *Id.*

So too here.  The Act permanently invalidates all existing listing agreements between real estate brokers and landlords requiring the broker to render services to the landlord but to collect her fee from the tenant, N.Y.C. Admin. Code § 20-699.21(a)(1), a common term in New York real-estate contracts, *see* Wagner Ex. A, BOND NY Exclusive Right to Rent Agreement, at 1.  The Act similarly prohibits any "person" from "condition[ing] the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent."   N.Y.C. Admin. Code § 20-699.21(c).  That no-conditioning provision impairs existing exclusive-listing agreements between landlords and brokers by prohibiting landlords from fulfilling their contractual obligation to refer all inquiries regarding their property to the broker.  *See, e.g.*, Wagner Ex. A.  The Act's

180-day delay in effectiveness does not help it because many tenant-pays and exclusive listing agreements last for a year or more. Wagner Decl. at ¶ 18.

Both brokers and landlords will be harmed by these impairments as both have reasonably relied on the ongoing enforceability of their listing agreements, including exclusive listing agreements. Rental-transaction commissions are the bulk of many brokers' livelihoods, and brokers spend both time and effort earning their fees. By rendering brokers' contractual right to payment "completely unenforceable," the Act "seriously upsets this reliance." *Melendez*, 16 F.4th at 1034. Like the COVID-19 law in *Melendez*, the Act "substantially undermines" the broker's "contractual bargain, interferes with his reasonable expectations, and prevents him from safeguarding or ever reinstating rights to which he was entitled" prior to the Act's passage. *Id.* at 1033. And the same is true for the landlords on the other side of the transaction. Landlords, too, have established their businesses around these tenant-pays provisions, and the permanent impairment of those provisions substantially undermines the reasonable expectations which serve as the basis for many landlords' ongoing business practices. Foregger Decl. at ¶¶ 7-8; Porco Decl. at ¶¶ 11, 23; Rahmanian Decl. at ¶¶ 3-4, 7-8, 18; Saltzberg Decl. at ¶ 5.

> 2. *The Act serves no significant and legitimate public interest and is not a reasonable and appropriate means of accomplishing the City's asserted purpose.*

A "[s]evere impairment" like that posed by the Act necessarily pushes "the inquiry to a careful examination of the nature and purpose of the [challenged] legislation." *Melendez*, 16 F.4th at 1029 (quoting *Allied Structural Steel Co.*, 438 U.S. at 245). The Act serves no significant and legitimate public purpose, nor is it an appropriately tailored means for addressing the Council's asserted goal of aligning the principal-agent relationship. *Supra* pp. 13-14. As noted above, the Committee Report is bereft of evidentiary support or data demonstrating that there is any problem with the alignment of "the principal-agent relationship in the rental market." Szyfer Ex. C at 10.

And even assuming the City's alignment goal were a legitimate public purpose, the impairment of existing contracts is not "reasonable and necessary" to its achievement. The City could easily accomplish its purpose with a prospective rule that carves out already-executed agreements. Indeed, a previous version of the Act did just that. Szyfer Ex. F at 1 (providing that "This local law . . . only applies to residential real estate transactions involving the rental of real property entered into on or after the effective date of this law."). But the City inexplicably removed that portion of the Bill before enactment, and without explanation. There is simply no reason to invalidate existing exclusive listing agreements, which will eventually be consummated on a relatively modest time horizon as the units to which they apply are rented out.

## II. PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION.

Brokers and landlords throughout New York City will suffer irreparable harm from enforcement of the Act. As for the ban on publishing open listings when the broker seeks a fee from the tenant, it is axiomatic that "the deprivation of First Amendment rights is an irreparable harm." *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *accord A.H.by and through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods' of time") (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996)). The impairment of brokers' and landlords' listing agreements in violation of the Contracts Clause likewise "raises 'a presumption of irreparable harm.'" *Connecticut State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020), *aff'd*, 36 F.4th 54 (2d Cir. 2022).

In addition to harming Plaintiffs' constitutional interests, the Act's tenant-pays and conditioning prohibitions will irreparably harm Plaintiffs' businesses. Indeed, tenants are already refusing to pay broker fees, although the Act has not yet gone into effect. *See* Saltzberg Decl. at ¶

20; Szyfer Decl. at ¶ 10, Ex. H at 5. While pure monetary loss does not ordinarily qualify, it is well-stablished that the "destruction of an ongoing business" may constitute irreparable harm. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986); *accord Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (bankruptcy is an irreparable harm); *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007) (loss of current or future market share may constitute irreparable harm); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (loss of business opportunities may constitute irreparable harm). That is because the devastation or overhaul of a business "cannot be rectified by financial compensation." *Tucker*, 888 F.2d at 975.

New York City's brokers have built their businesses around the reasonable expectation that they can collect fees from tenants under conditions prohibited by the Act. If the Act is permitted to go into effect, brokers will need to retool their businesses to—without publishing an open listing—attract tenants willing to engage them as tenants-side brokers. Or they must compete for a limited number of landlord-side exclusive listing agreements. Some will fail and be driven from the market; all will need to spend potentially unrecoverable sums to adapt to the new regime.

Similarly, if the Court does not preliminarily enjoin the Act's tenant-pays and conditioning prohibitions for existing listing agreements, brokers will not be able to negotiate and collect tenant fees they entered into their listing agreements in reliance on. And if the prohibitions are not preliminarily enjoined, the lost tenant fees are gone forever. Brokers cannot double-back after prevailing at final judgment and collect fees they would have been entitled to while the Act was in effect. *Cf. Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss . . . does qualify as irreparable harm.").

### III.  A PRELIMINARY INJUNCTION WILL NOT HARM THE CITY AND WILL BENEFIT THE PUBLIC.

The third and fourth preliminary injunction factors—balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  That is because the "Government does not have an interest in the enforcement of an unconstitutional law," and the public always benefits from the vindication of its constitutional rights.  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted).  That is enough for this Court to grant a preliminary injunction against the challenged provisions.

There are concrete public benefits to a preliminary injunction, as well.  The Act's prohibition on publishing open listings where a broker seeks a fee will harm the public by substantially reducing the number of broker-initiated advertisements—both on the brokerage firm's own website and on third-party listing sites.  Chandan Decl. at ¶¶ 35-38; Saltzberg Decl. at ¶ 23.  Open listings and exclusive listings make up the majority of advertised listings, and advertised listings are how most tenants find apartments. But if the Act goes into effect, those advertised listings will disappear, and the transparency available to tenants across the city will disappear along with it—an outcome that, ironically, will make brokers more essential than ever. *See* Wagner Decl. at ¶¶ 23-24, 27.  As one broker warned the Council, the Act threatens to replace today's "widely transparent online rental marketplace showing accurate apartment listings" with a "shadow inventory" not seen "since the days of classified newspaper advertising."  Compl. at ¶ 121; Szyfer Ex. B at 9.

If the Act goes into effect, it will also harm the public by imposing higher long-term costs on consumers that exceed any savings they may enjoy when first entering into a rental lease.  While the Act reduces the initial financial burden of securing a rental unit for which the tenant would

otherwise pay a broker fee, the economic dynamics of New York City's rental markets—including the City's very low rental vacancy rate—make it highly likely that landlords will pass higher costs on to tenants by raising rents. Chandan Decl. at ¶¶ 13, 26-27, 30-32. The resulting rent increase will be especially pronounced for New Yorkers living in lower-cost units. *Id.* Moreover, because of New York's comparatively low rate of renter turnover—which is significantly below the national average—consumers will experience higher long-term costs over the life of the lease that negate any upfront savings provided by the Act. *Id.* Indeed, a tenant who stays in the apartment for multiple years—like many New Yorkers do—may pay the equivalent of multiple broker fees over the course of repeated lease renewals. *Id.* At the same time, despite promises by its proponents, the Act is unlikely to significantly increase tenant mobility. *Id.* at ¶ 33.

Some landlords, including those with rent stabilized properties already at their maximum rent, will be constrained in how much they can raise rents to pass along the extra cost of broker fees. *Id.* at ¶ 34. This, too, will hurt consumers to the extent that landlords cannot afford to invest in their properties, meet their mortgage obligations, or make units available for rent at all, exacerbating the City's already-low vacancy rate. *Id.* A preliminary injunction is therefore in the public interest for this additional reason.

## **CONCLUSION**

The Court should grant Plaintiffs' motion and enter a preliminary injunction enjoining Defendants from enforcing the Act.

Dated:   New York, New York
         January 13, 2025

**HOGAN LOVELLS US LLP**

*/s/ Claude G. Szyfer*
_____
Claude G. Szyfer
Darya D. Anichkova
390 Madison Ave.
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com
*Counsel for Plaintiffs*
*\* Pro Hac Vice Application Pending*

Sean Marotta\*
J. Andrew Mackenzie (*pro hac vice*)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

## WORD COUNT CERTIFICATION

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York. This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities and signature block is 8,146 words.

Dated:   New York, New York
        January 13, 2025

*/s/ Claude G. Szyfer*
Claude G. Szyfer