# Exhibit B

## (Part 1 of 7)



**Testimony of the
New York City Department of Housing Preservation and Development
to the New York City Council Committee on Consumer and Worker Protection
on Introduction 360**

**June 12, 2024**

Good morning, Chair Menin, and members of the Committee on Consumer Protection and City Council. My name is Ahmed Tigani, and I am the First Deputy Commissioner at the New York City Department of Housing Preservation and Development (HPD). Thank you for the opportunity to testify on the proposed legislation on today's agenda.

Our priority at HPD, above all else, is to confront New York City's housing crisis with urgency, dedication and—when needed—creativity. We are always open to new solutions and are excited by any opportunity to discuss new legislation.

All New Yorkers should be able to choose homes in the neighborhoods they love, the communities they want to build their lives in next. Some prioritize proximity to local schools, while others prioritize being within arm's reach of a playground or their place of employment, and weigh numerous considerations about how to make the right choice. As a father to a young child, we've been faced numerous times with the question of whether where we live provides us the best situation for connecting him to the life we want to give him. I also think about my single mother's efforts to secure housing for our family and the questions that must have come up for her as a renter with limited resources about how to prepare if we had to make the decision to look for a different home. Those conversations are felt by New Yorkers of all backgrounds and incomes, in many ways most acutely for our more vulnerable neighbors, and the decisions become tougher as the situation gets compounded by other external factors.

I say this because, with an alarmingly low rental vacancy rate, finding an apartment that meets your needs can feel like an impossible task, and at HPD we want to do everything we can to improve access to affordable housing. Currently, New York City's vacancy rate sits at a mere 1.41% – the lowest it's been since 1968. To put that into perspective, during our recent New York City Housing and Vacancy Survey, out of over 2.3 million renter households, there were only about 33,000 homes available for rent. For lower-income New Yorkers seeking affordable housing, these options are essentially non-existent. That's why we're deeply committed to

1

improving the process of finding and renting a home in New York City. I firmly believe that the solution to our housing crisis lies in constructing more housing, safeguarding our existing stock of affordable housing, and ensuring that New Yorkers have meaningful options in our housing market.

The City needs to ensure that there is enough housing of all types, especially low-cost and affordable housing, in every neighborhood. This requires affordable housing development but also changes that allow the private market to build the additional housing we need. That's why we are working with our partners at the Department of City Planning and across the Administration to implement policies to support a little more housing in every neighborhood which, taken together, will have a big impact on New Yorkers' housing needs.

Another part of ensuring that New Yorkers have meaningful housing choice is through our tenant protection work. This includes inspections to enforce the Housing Maintenance Code, enforcement programs focused on distressed buildings through the Emergency Repair Program, Alternative Enforcement Program, 7A Program, and Underlying Conditions Program. HPD represented the City in 7,800 tenant-initiated actions in Housing Court and initiated 240 comprehensive litigation cases seeking civil penalties and Orders to Correct in 2023. Our Anti-Harassment Unit works to proactively identify bad actor owners and, when necessary, initiate litigation to address disruptions of essential services, false certifications, and failure to address hazardous violations.

It also includes ongoing outreach and education through classes and events, often in partnership with elected officials and community-based organizations, to bring housing information, resources, services, and one-on-one assistance directly to tenants. We deploy our outreach vans to ensure we can access New Yorkers wherever they are across the five boroughs.

It is clear that the proposed broker fee legislation strikes a chord with New Yorkers. And we understand why – for New Yorkers, moving costs can be prohibitively expensive and a financial barrier to securing housing amongst a limited number of options. The process leading up to a housing search, either by choice or due to unforeseen circumstances, for many households can result in an impossible scenario where you have to choose between paying rent, covering basic expenses, or saving for the future. At the same time, there is tremendous value in housing search support and the operational knowledge that brokers can provide both tenants looking to find a home, especially in communities where listings are harder to find, and property owners navigating the process of making their units available.

The Administration is therefore actively evaluating this legislation—carefully considering the potential impacts, both intended and unintended, on tenants, brokers, and landlords. We take these steps to do our due diligence because with any legislation, it may have consequences that are difficult to identify and quantify, including potentially passing fees to tenants through other charges or increased rents, particularly for units that are not rent stabilized.

We look forward to hearing the public feedback on this legislation today, diving deeper into the policy with the bill sponsors and stakeholders weighing in on this bill so that there is a robust conversation about ways to ensure New Yorkers have transparency in the rental process. On behalf of the Administration, we want to thank the City Council for their leadership on this issue.

2



THE CITY OF NEW YORK
OFFICE OF THE COMPTROLLER
BRAD LANDER

**Testimony of New York City Comptroller Brad Lander**
**New York City Council Committee on Consumer and Worker Protection**
**In support of Intro 360, the Fairness in Apartment Rental Expenses (FARE) Act**

June 12, 2024

Thank you, Chair Menin and Members of the New York City Council's Committee on Consumer and Worker Protection for convening this hearing and providing the opportunity to testify on critical legislation impacting tenants across the city.

I strongly support Intro 360, the Fairness in Apartment Rental Expenses (FARE) Act, sponsored by Council Member Chi Osse. Intro 360 requires that whoever hires a broker in a real estate transaction pays the broker fee. **The FARE Act is a commonsense bill that I urge the City Council to pass for two core reasons: transparency and fairness.**

The FARE Act would ensure that fair, transparent contracts are negotiated between parties involved in renting apartments in New York City. Over two-thirds of New York households are renters. These New Yorkers, disproportionately lower income compared to homeowners, deserve to know exactly how much it will cost to rent a new apartment. This bill would simply provide renters with the same fair treatment and transparency that are already provided to buyers in the homeowner market: making sure all fees and costs are known to the renter at the outset of the transaction.

It is also a commonsense element of fairness that the party that chooses the broker should pay the fee. Where tenants hire a broker to help them find an appropriate unit, of course they should foot the bill. But where landlords are the ones to identify and hire, they should pay for the broker they have chosen.

New York City has the lowest rental vacancy rate in decades, with a historic low of 1.4%. That number falls below 1% for affordable units rented below $1,650. At the same time, rents across the city have skyrocketed. Median asking rent for publicly listed apartments rose to record levels in 2023 and stands at $3,500 citywide. As we found in our January 2024 analysis of the rental market, a family would need to earn $140,000 or more to not be considered rent burdened – double the median household income in 2022.

Families are leaving the city at alarming rates, often citing the cost of housing as a key factor. The Fiscal Policy Institute recently found that 90% of the state's population loss is driven by residents leaving New York City – especially amongst lower- and middle-income families. The report also alarmingly found that Black and Hispanic New Yorkers are disproportionately leaving at higher rates than white residents.

Reducing the burden of broker's fees on families trying to find a new home could potentially counter these concerning trends. With record high rents, an unexpected and often last-minute request for a broker's fee can be the difference in a tenants' ability to afford a prospective apartment. With an increasingly competitive housing market, this is an inefficiency that can and must be avoided.

I urge the Council to pass the FARE Act. Thank you for your consideration and the opportunity to testify.

DAVID N. DINKINS MUNICIPAL BUILDING • 1 CENTRE STREET, 5TH FLOOR • NEW YORK, NY 10007
PHONE: (212) 669-3500 • @NYCCOMPTROLLER
WWW.COMPTROLLER.NYC.GOV

3



**JUMAANE D. WILLIAMS**

**STATEMENT OF PUBLIC ADVOCATE JUMAANE D. WILLIAMS
TO THE NEW YORK CITY COUNCIL COMMITTEE ON
CONSUMER AND WORKER PROTECTION
JUNE 12, 2024**

Good Afternoon,

My name is Jumaane D. Williams and I am the Public Advocate for the City of New York. I would like to thank Chair Menin and members of the Committee on Consumer and Worker Protection for holding this hearing.

As a co-sponsor of Int. 0360-2024 introduced by Councilmember Osse, I am in support of the bill as it would help shift a significant housing cost to whomever contracts the broker instead of always falling on the prospective tenant. To rent an apartment today, prospective tenants usually have to pay a brokerage fee - on top of costs to move their belongings, the traditional first month of rent, as well as a security deposit for a month or two. Additionally, while illegal, some brokers and property owners ask for a key fee to transfer the key to the new tenant. According to StreetEasy, it costs an average $10,500 to move into an apartment, with the largest portion going to broker fees[1]. This system contributes to the city's housing affordability crisis.

As of February 2024, NYC's Department of Housing and Preservation Development (HPD) reported the initial findings of the latest NYC Housing and Vacancy Survey (HVS) to City Council and shared that the vacancy rate reached a historic low of 1.4 percent. Additionally "among units renting for under $2,400, the net rental vacancy rate is below 1%".[2] The vacancy rate dropped over the last two years, even as the city has added 60,000 new homes, and findings also communicated that 86% of households who earn less than $50,000 without rental assistance are rent burdened. At the recent 2024 preliminary vote meeting, the Rent Guidelines Board (RGB) proposed further rent increases on rent stabilized tenants, both for 1 year and 2 year leases[3]. By removing broker fees,  this legislation would help the NYC Housing market become more elastic, giving tenants more access to housing by allowing them to move more easily and affordably.

---

[1] https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/
[2] https://www.nyc.gov/site/hpd/news/007-24/new-york-city-s-vacancy-rate-reaches-historic-low-1-4-percent-demanding-urgent-action-new#/0
[3] https://citylimits.org/2024/05/01/nyc-stabilized-tenants-on-track-for-another-round-of-rent-hikes/



**JUMAANE D. WILLIAMS**

No other city in the U.S., besides Boston, has this unique practice of requiring tenants to pay brokers. It is time for us to ease the burdens of these upfront costs.[4] There are plentiful stories of someone paying a broker fee and not being connected to housing or being forced to pay these fees when they've gone through the process of finding housing without the assistance of broker agents.

This bill ensures whoever hired a broker pays, regardless of whether it's a landlord or potential tenant. Tenants need to know that they can compensate a broker only when they hire one to represent them, which will provide them with increased transparency and financial relief on upfront rental costs.

We are in the midst of trying to build more affordable housing, while fixing our public housing and other housing systems. We are trying to help New Yorkers and assist asylum seekers with connecting to homes from shelter residences. All of this can be done with less financial burden on tenants, who should not have to pay additional costs to obtain a residence to begin with.

Thank You.

---

[4]
https://www.cityrealty.com/nyc/market-insight/features/get-to-know/a-renter039s-guide-broker-fees-new-york-city/56483#:~:text=Broker%20fees%20are%20paid%20to,when%20a%20property%20is%20sold.



ANHD
50 Broad Street, Suite 1402
New York, NY 10004
Tel: (212) 747-1117

**Testimony Before the New York City Council Committee on Consumer and Worker Protection and Regarding Proposed Intro 0360-2024**

June 12, 2024

The Association for Neighborhood and Housing Development (ANHD) thanks Chair Julie Menin, Lead Sponsor Council Member Osse, and members of the Committee on Consumer and Worker Protection for the opportunity to testify on Intro 360 regarding residential real estate transaction broker fees.

**About the Association for Neighborhood and Housing Development**

ANHD is one of the City's leading policy, advocacy, technical assistance, and capacity-building organizations. We maintain a membership of 80+ neighborhood-based and city-wide nonprofit organizations that have affordable housing and/or equitable economic development as a central component of their mission. We bridge the power and impact of our member groups to build community power and ensure the right to affordable housing and thriving, equitable neighborhoods for all New Yorkers. We value justice, equity and opportunity, and we believe in the importance of movement building that centers marginalized communities in our work. We believe housing justice is economic justice is racial justice.

**Intro 360**

There is a prohibitive upfront cost to moving in New York City. Apart from the cost of moving and down payments, tenants often have to pay a fee for a broker service they did not contract. These costs have an outsized impact on lower income New Yorkers, and in reality can be a fundamental barrier to mobility for tenants who want or need to rent new apartments. Intro 360, would help to address this problem by requiring whoever hires a broker in a residential rental transaction to be responsible for paying their fee - thus eliminating one specific and commonplace fee that is often unfairly placed on tenants seeking to rent new apartments.

We must ensure, however, that the passage of this bill will not encourage landlords or property owners to get around its intent by imposing new fees on prospective tenants, or simply increasing rents in the case of unregulated housing, to make up for the cost of paying their brokers. One approach to close that loophole would be to edit the bill to additionally prohibit property owners or their agents from collecting fees from prospective tenants outside of background checks and credit checks.

We also note that enforcement of this legislation will be both challenging and critical. New York City's rental housing market is extremely tight, especially at the more affordable end of the spectrum, which gives landlords outsized power not only over their existing tenants but in relation to prospective tenants. If the burden of enforcing this law falls to individual tenants experiencing violations, its impact will be limited. We therefore recommend adding a clear fine

structure for violations, with escalating fines for actors with multiple violations, and accompanying this legislation with a budget allocation for additional agency staffing to enable appropriate enforcement.

Thank you again for advancing this legislation to remove an important barrier to tenant mobility and housing affordability in New York City. Please do not hesitate to contact Israel Sanchez, Campaign Coordinator, at israel.s@anhd.org with any questions regarding our testimony.

***



R E A L T Y  G R O U P

Sarah Saltzberg, Intro 360 Testimony

As New York City grapples with a housing crisis, our legislators must focus on solutions that address the root cause of this complex problem instead of taking aim at the process by which residential rental brokers are compensated. Intro 360 would have myriad unintended negative outcomes for tenants that will raise housing costs and further limit housing access.

We have been down this road before. The 2019 passing of the state's disastrous Housing Stability and Tenant Protection Act serves as a troubling reminder of another legislative attempt to keep housing affordable by restricting landlords and brokers, which spectacularly backfired. Since 2019, rent in NYC has raised over 26%, far outpacing inflation. From 2022 - 2023 alone, wages increased 1.2% while rents increased 8.6%, the highest of any market IN THE COUNTRY. One of the many unintended consequences of HSTPA is the tens of thousands of RS units that sit offline, due to a mandate that allows for almost no rent increase regardless of the funds needed for renovation. City officials would better serve their constituents by immediately advocating for reforms to HSTPA which would bring tens of thousands of RS units back to market.

But once a law is passed, it's hard to roll it back - and that's why those of us in the industry are raising the alarm bell once again. Like 70% of those in the city, many rental agents are renters too, and are aware of the many unintended consequences this bill could have.

**1. Renters will pay more in rent and in fees.** If all exclusive relationships now mandate that the broker fee is paid by the owner, the owner will pass that cost to the tenant. Should that tenant stay longer than a year, they end up paying the fee over and over again, each year, while also paying a higher rent as the increase is taken from the inflated base.

**2. Renters will have less choice.** There are 14,036 units listed on SE in the 5 boroughs, 7,563 of which are listed as no fee. Were Intro 360 to pass, we would see a drastic and confusing change. Any exclusive listing would automatically convert to a No Fee listing, and any open listing would result in a fee to the tenant. There are many open listings that currently pay a fee to an agent which would no longer be legal; similarly, there are many exclusives where owners may prefer to keep rents lower for faster absorption and do not build the fee into the rent. The rigid rules of Intro 360 fail to consider the flexibility that the NYC market demands, and that has historically benefitted renters by giving them a choice.

**3. Some owners struggling since HSTPA may not be able to pay a fee to the broker and may kill their exclusives, resulting in less exposure for rent stabilized units.** A perfect example of this scenario would be thousands of rent stabilized units that may already be at their legal threshold. These owners may choose to simply have their supers list the units, or not - and rentals will happen via word of mouth.

We cannot afford additional legislation that exacerbates the crisis we find ourselves in. Like Intro 360, HSTPA was advanced as a knee jerk reaction to rising housing costs that sought to penalize the industry rather than work with it to address the problem, resulting in dire, unintended consequences for renters. Let's learn from history. We **must** prioritize solutions that tackle the root cause of the crisis and ensure that every New Yorker has access to safe, affordable housing for years to come.

256 W 116th Street, Fl 2 • New York, NY 10026 • 212-663-6215
3880 Broadway • New York, NY 10033 • 646-661-1579
www.bohemiarealtygroup.com





If passed, Intro 360 will set the market back by three decades by creating the least amount of advertising transparency and the greatest amount of Shadow Inventory since the days of classified newspaper advertising.

Landlords who make the business decision <u>NOT</u> to pay broker fees will simply offer their available apartments to the brokers they do business with on an "Open Listings" basis.

To avoid the perception any broker represents them, landlords will take back the *Permission to Advertise* which so many of them currently give their successful brokers, and invite them to bring any qualified tenants they represent to view and apply for the apartments.

This is what happened in 2019, when the NYS DOS issued guidance around HSTPA, preventing a landlord's agent from charging a broker fee to a tenant.  Although the guidance was immediately challenged by the industry and was finally overturned by the Court, landlords temporarily restated their relationships with brokers as a way to avoid paying broker fees while the dispute was pending.

We received many vacancy lists with huge disclaimers prohibiting advertising and warning us that brokers with whom the list was shared did not represent the landlord. We were encouraged to show listed apartments to, and bring applications from, tenants we represented – and who would pay our commission.

The number of online apartment ads would likely decrease by up to 85% when brokers are no longer allowed to advertise non-exclusive listings. Renters don't care whether a listing is exclusive or non-exclusive – they just want to find out what apartments are available!  We could go from 17,500 transparent apartment ads to about 2,500 in a week, removing consumers' choice to search between "No Fee" and "Fee" based listings, and effectively forcing anyone unable to find satisfactory apartments within the remaining inventory to hire a real estate broker and pay them a fee.

Most brokers would continue to receive vacancy lists from the landlords with whom they've been working. The information won't go away, it will just be significantly reduced from the internet, sort of like the 1990s when consumers had only a few pages of classified ads in a newspaper to comb through searching for apartments before they had to hire a broker to find out everything else that might be available for rent.

Why would the City Council permit what is now a widely transparent online rental marketplace showing accurate apartment listings with photos, floor plans, and detailed property descriptions to effectively disappear behind a paywall that few New Yorkers will be able to afford? When landlords no longer



allow permission to advertise as a way to prevent anyone from thinking brokers represent them because they posted an ad online, most renters will be pressed to hire brokers to represent THEM and pay their commissions. The bill that proposes to reduce tenant-paid broker fees would actually create more of them than have ever existed in our rental market!

Thank you.


**Douglas Wagner**
*Director of Brokerage Services*
**Bond New York Properties**



The last time I sat in this chamber to give testimony regarding a housing policy bill that was under consideration, I spoke on behalf and in defense of the many hardworking real estate professionals who pride themselves on providing their clients with quality service and informed counsel, while also proposing a series of reforms that would raise the bar of ethics in the industry and improve transparency for all. This time, I feel compelled to speak out on behalf of New York City renters and the public in general, who would be irreparably harmed if this bill should pass.  Intro 360 is the quintessential wolf in sheep's clothing – it sounds perfectly reasonable to anyone who doesn't understand the fundamentals of our market and provides a cheap, quick, and entirely misleading media headline for slick politicians who'd like to be seen as populists to their constituents.

However, the irony of this bill is that it will, in the ways many other experts will share specifically today, raise costs, raise rents, actively cause the deterioration of transparency, promote unethical bait & switch techniques among unscrupulous brokers, and, again ironically (in "1984" fashion), increase the prevalence of tenant-paid broker fees as a percentage of overall closed transactions.  Just as one particularly salient data point, my firm overwhelmingly represents tenants (that is, we're "Tenants' Agents", not agents of a landlord or management company) and in Q1 2024, over 60% of our business was comprised of transactions wherein we were "hired" to represent a tenants' interests, but we were paid only by a landlord or management company whom we did not represent via an "OP" – not by the tenant client.

Under the proposed legislation, that structure would become illegal and all those tenant clients for whom we worked would have had to pay for our services – services paid for by the landlords under the current structure.  Unfortunately, I don't have time today to detail the numerous other unintended negative consequences of this legislation, and I hope other industry experts can go more into depth about how this could cause the most precipitous rent increase our city has ever seen, the ways consumer choice will be obliterated, and why this bill could accurately become known, as some industry executives have already titled it, "The Discriminators' Delight Act", as it works against the interests of our most vulnerable New Yorkers, who are of course public assistance voucher holders.

I think it's fair to say that every one of us in this room agrees that our city has a serious and worsening affordability crisis which needs to be addressed in thoughtful and meaningful ways.  The rent is too damned high, the inventory is too damned low, and middle class New Yorkers are caught in the crosshairs.  To the tenants' rights advocates in this room who are concerned about affordability and equitable access to housing, I assure you that you & I are on the same team, and the meaningful common-sense solutions that we know to be at hand MUST be considered and adopted by our City & State representatives.





The people need & deserve more affordable housing to be built <u>RIGHT NOW</u>.  The people need & deserve our rent stabilized inventory that's available but being warehoused or otherwise held off the market by landlords to be brought online <u>RIGHT NOW</u>.  The people need & deserve our Council representatives to do their sworn duty in protecting the most socioeconomically vulnerable New Yorkers by reforming and improving our archaic, bureaucratic, broken public assistance voucher system <u>RIGHT NOW</u> (and there's already a blueprint published of what's needed to do it – they just need to take it up).

And equally importantly, New York renters need & deserve the most well-trained, ethical, transparent, and professional real estate representatives in any market anywhere, and that's NOT what they have access to as we sit here today.  Let's address that by resolving to immediately introduce and adopt a sweeping Tenants' Bill of Rights which elucidates precisely what choices renters have when they enter the marketplace and empowers them to make informed decisions, while finally holding accountable any brokers, agents, landlords, or management companies who act in bad faith or break their fiduciary obligations.

I vow to be a partner and advocate for anyone on this Council or indeed in this Chamber who wants to meaningfully address the costs of renting & tackle the many serious challenges facing our housing market, including holding unscrupulous or predatory brokers accountable. However, I can say with certitude that not only is the bill under consideration an unserious attempt at inspiring some cheap media headlines, it will have the direct effect of undermining ethical and transparent transactions at the expense of the public interest – so to those who would vote for it out of a short-term political calculation, I implore you to put the good of middle class New York tenants ahead of your own political ambitions.

Thank you.


**Brian P. Hourigan**
*Senior Managing Director*
*Director of Professional Development*
**Bond New York Properties**

810 Seventh Avenue, 39th Floor, New York, NY 10019 • Tel: 212.582.2009 • Fax: 646.328.4393





## Intro

My name is Bruno Ricciotti, and I am the owner and co-founder of BOND NEW YORK.  We are a full-service real estate marketing & brokerage firm based in Manhattan and Brooklyn, which specializes in apartment leasing. We have spent the last 24 years working to help thousands of tenants & hundreds of owners and management companies every year, to connect New York City's tenants with their homes.

## Legislative Track Record

I'll start off by sharing my grave concern regarding Intro 360 by first contextualizing the topic at hand by referencing two other pieces of recently passed State legislation that were supposed to be designed to protect tenants and those laws' aftereffects. First was the capping of security deposits to 1 month's rent in the 2019 Housing Stability & Tenant Protection Act (HSTPA). This legislation has had severely damaging consequences to tenants, property owners, and brokers over the course of the last 5 years, which continues to inflict damage to the public on a daily basis, and I believe runs parallel to the type of effect we can anticipate from Intro 360, if it were to pass.

So let's take a closer look at this first. Offering additional months of deposit to secure an apartment lease was a practice that would usually be initiated by a tenant to bolster the strength of their application to help them qualify for a lease that they may otherwise not qualify for. In what I have to assume was a well meaning effort, this practice was prohibited and at the time, touted in the press as a victory which would prevent tenants from being 'exploited with exorbitant upfront costs" which were barriers for New Yorkers to find housing.

The resultant reality couldn't be more diametrically opposed to the stated intention. All that has changed since, as a result of this law, is that now, otherwise unqualified or borderline qualified prospective tenants, who may be shy on income, have a new job, a low credit score, no credit history, and/or do NOT have a qualified guarantor in or close enough to New York to support their application, have been effectively stripped of the last remaining remedy to mitigate that risk for a landlord as a manner to secure an apartment for them, altogether.

These vulnerable housing hunters represent a substantial swath of New York. Ever since, not a single day has gone by where one of our agents has not borne the burden of delivering the heartbreaking news to one of their tenant clients that their application was rejected by a landlord or management company. They will not be allowed to live in the apartment they applied for and are just realizing that they  probably have no method whatsoever to qualify for any apartment, any longer.





Please bear in mind, we are talking about situations where all parties have consented to lease terms that the State now bars. Most often, the prospective tenant would initiate an offering, either by requesting to pay rent in advance or provide extra security deposit (which is refundable), and are oftentimes shocked when they are told that this is not allowed. Sometimes these applicants  beg, but to no avail.. The tenant, the landlord, and the broker all wish for the deal to be able to happen, yet it can not happen, because it is now illegal due to careless and misinformed political meddling on behalf of the State.

To add insult and humiliation to this injury, as a result of these new HSTPA restrictions, a new cottage industry has cropped up, which *is* legal, called "Third Party Guarantors". I'm sure many of you are probably familiar with these companies. These are insurance companies who offer insurance products which tenants can and sometimes MUST pay for, as an additional upfront fee of roughly one month's rent, which unlike security deposits, do NOT get returned to them at the end of their lease terms. This policy has to be renewed each year. These tenants are essentially purchasing a security deposit from an insurance company which then gives that deposit to the landlord. As ridiculous as this may sound, this is actually the reality which has now been in effect for 5 years, unnecessarily wreaking havoc on the rental market by costing additional fees to or flat out denying housing to tens of thousands of vulnerable New Yorkers. No one on the state or local lever has shown any concern or made any noise about this or taken any steps to roll this egregious error back.

I reference this story in particular because one does not need to be schooled in the real estate business to understand it.

In the same book of bills, there was another piece of legislation which restricted capital contributions for upgrades to rent stabilized apartments. As many of you have probably learned, this directly resulted in many landlords being unable to afford to make their apartments habitable and there are now tens of thousands of rent stabilized apartments being warehoused, held off the market and no longer available to the public. This also has also gone on for 5 years, lockstep with what may fairly be called a "homelessness crisis" with tens of thousands of homeless New Yorkers. This irony is both sad and painful. The political establishment is now taking steps to roll back this legislation and attempt to correct this blunder, but not nearly fast enough.

Lastly, on this topic of recent legislative track record, if we want to just ponder in general, I invite everyone who reads this to ask yourselves: do you think any of the legislation passed in the last 5 years has made New York more affordable?  Are rents lower than they were in 2019, or housing easier to find since the last time any major legislation was passed? I will take the liberty to answer that for you: Since





the HSTPA,  rents have surged upward, on average by almost 30%. This is the sharpest increase I am aware of in that short of a time period. In some neighborhoods rents have nearly doubled. Are we to believe this is coincidence or causal connection?  No one can say for sure, but I know that most industry experts believe what is I believe is obvious and explains why we are all here, frightened for not just what will massively disrupt our livelihoods as agents but the potential of another huge and irreparable step backwards in solving the affordability problem which we all agree exists in New York.

I share all 3 of these stories because they have all been written. They are no longer a theory or a debate to be heard at a hearing like the one we had 3 days ago. It is just another few in a long list of regulations which have yielded an awful reality of unintended consequences.

## Intro 360

Now let's move on to the topic at hand, the proposed Intro 360. To Councilman Chi, this is simple, as he has stated in his TikTok videos on numerous occasions. If you don't hire the broker, you shouldn't have to pay the broker. I would argue that this is already the case now and he is just unaware that in most cases, the broker hasn't been hired by a landlord. But let's explore a bit and see if we can figure out what the problem to solve here actually is.

Currently, we are in one of the tightest New York rental markets in decades, I keep hearing in 50 years. And even now, on this very day, in the most competitive, low vacancy months of the seasonal cycle, 54% of all NYC apartments and 49% of all apartments in Manhattan, are offered on StreetEasy as  "No Fee" apartments to the consumer. In the cooler, lower demand months in the seasonal cycle this percentage of No Fee listings trends much higher. Softer, more normal economic conditions often present far more No Fee options in all seasons, as well, and this is also constantly fluctuating. For example, during the pandemic in 2020, as well as the year after, No Fee apartments were provided by market conditions to make up well over 90% of what was available online. What we currently have is a diverse and free market with many choices for consumers, which suit both landlords and tenants with varying needs.

## Market Diversity & Choice

"No Fee" listings, simply put, are where the expenses that go towards the roles necessary to lease an apartment are included in the rent and paid for by the owners. This is the case whether or not ownership pays their own in-house leasing staff, if they have one, or a 3rd party broker. The reason these owners prefer and choose to pay the brokerage commission without any mandate is because they need or desire to get the highest rent possible for their banks and their investors and they usually





state so in any case where I have been hired under that payment arrangement. In my experience, these owners tend to be institutional investors who are in the real estate business for gentrification and profit. Most have bought their buildings in more recent years, have high mortgages and overhead expenses, and need to maximize every dollar possible to make a profit.They don't need to be regulated or forced to pay their leasing teams. They do so already because this benefits their business model.

However, this is not the case for approximately 45% of the owners in NYC and a large swath of consumers as well, whether they realize it or not.

Owners who prefer NOT to pay rental broker commissions, but who allow brokers to collect their commissions from tenants to help rent their apartments, do so for very specific needs or benefits and just like some tenants, are simply not liquid enough to afford it. The typical profile of these types of owners are usually mom and pops who have one or two buildings that they may have invested in over their lifetimes or inherited from their families over decades or generations and are not necessarily in the business of real estate. Often times these owners
prefer incoming tenants to pay commissions for several reasons. First let's make it clear that regardless of how you define who hires a broker to help lease an apartment, a tenant who pays a broker commission is purchasing a cheaper lease term. If this wasn't the case, no one would EVER pay a fee whether they hired the broker or not. Calling this a 'forced fee' is either a great misunderstanding or disingenuous and  designed to make sensational headlines. A tenant who thinks they have been 'forced' whether they realize it or not is simply saying they want their cake and eat it too by wanting the lower rent offered but not having to pay the fee for it and is not acknowledging the economics of the offering. A tenant who pays a broker fee for cheaper rent terms over time demonstrates an interest in staying in the apartment for a longer period of time. As the fee/rent  gets cheaper as it can be amortized over more and more years. This is attractive not just to smart tenants but to many mom and pop types of owners who prioritize easy, happy, tenants who commit to being part of their community over maximizing their assets' bottom line in a transient building. Less moving in and out also saves money in the long term  with less costs of vacancy over the years, and those savings for the landlord ultimately get passed on and benefit the renter. There is a broad spectrum of landlords with varying needs and a broad spectrum of tenants with varying needs and the current market provides choice and accommodates for all of these situations that sit on this continuum. The notion that all landlords are wealthy and swimming in money and all tenants are struggling is ridiculous. I can attest through experience there are just as many wealthy tenants as there are struggling tenants and as many wealthy landlords as there are struggling landlords. Anyone that believes otherwise is mistaken or just cherry picking information from a small and deliberately chosen sample that suits their agenda.





This current, unregulated, organic market expression may require the deeper digging I have just articulated for someone who doesn't study the industry to understand, but it is a choice that exists in the market that is beneficial to owners, renters and brokers.

In summation, today's unregulated rental market is split roughly down the middle with more expensive apartments that are no fee to the consumer, with leasing expenses baked in, amortized over the first year lease term, AND less expensive apartments where the tenant can purchase a lower rent  with an upfront commission that they can negotiate with a broker. If someone can't afford an upfront fee, they can go rent a no fee apartment. Right now, over half of the market, which is over 7,000 apartments, are no fee. No fees are ever 'forced' on anyone. Neither option should be eliminated by a mandate, as it restricts consumer choice, and will result in unintended consequences which I will get into more specifically on a moment.

**<u>Roles in Leasing Efforts</u>**

But before I conclude. I'd like to address something important, that is very much underestimated and often misunderstood. Since Councilman Che told me – and I'll try my best to quote – "most brokers don't do shit', I'd like to enumerate specifically some of the professional services that a broker performs, regardless of who they represent in order to effectuate a rental transaction. All of these actions take time, effort, expertise and money.

Site visit of an upcoming vacancy to assess conditions.
Creating comparable pricing analytics to assess market value.
Providing feedback to determine the scope of preparation of the unit.
Arranging for a professional photographer
Photographing the unit
Editing the photographs
Videoing the unit
Creating a 3D Tour
Creating a floor plan
Digitally staging the photos
Crafting accurate written descriptions of the unit, the building, and the neighborhood.
Proofreading all advertising content
Posting available units online
Syndicating online
Arranging for pick up, copying, and distribution of keys.
Coordinating to access the apartment through existing tenant schedules






Answering and vetting often times hundreds of emails, texts, and phone calls.

Answering questions for prospective applicants to help them further understand the listing details and desired building amenities or pet policies or move in dates, etc

Setting up appointments often times between the conflicting schedules of prospective tenants and existing vacating tenants.

Negotiation and aligning terms for rent, move in dates, concessions, etc.

Conducting showings and open houses which can take weeks or months

Compiling paperwork in a very specific manner to help leasing representatives and owners who are many times overburdened with impossible workloads with limited bandwidth to process an application to maximize the chance that the client will be fortunate enough to win the apartment.

Doing all of the above from A - Z, over and over and over to often times only to be ghosted by prospective applicants after 99% of the job is performed and executed, only to be paid absolutely nothing.

And remember, when successful, fees for these duties don't go to the agent you may only see open the door. The commision is paid to the firm which is the team behind and supporting the agent. The firm, which pays office rent and staff and marketing and other expenses, shares with the agent and/or agents when there are often more than one assisting each other to share in the deal. Many of those expenses pass through and an individual agent that you see open the door may walk away with only several hundred dollars from what amounted in the end to several weeks of hard work

**What Happens Next**

Many owners I know have explicitly told me that if this law passes, they they do not intend to pay brokerage commissions, and rather than raise the rents to pay brokerage commissions, their plan is to take measures necessary to make it clear to the public and regulators that the brokers who bring them tenants have not been hired by them and do not represent them.  As part of this effort, many have asked that all advertisements of their properties be pulled from the online public marketplace.

Much in the way that the HSTPA created tens of thousands of warehoused rent stabilized apartments which exist but the public cannot find on their own, I fear that by removing thousands of the current tenant fee offered apartments that the new reality would become a massive shadow inventory which will all but disappear from the public view. These apartments would still be rented by tenants hiring the brokers that know about these apartments, but it would be much the way that they were rented over the last several decades of the print and Craigslist era – by needing to "hire" a broker and saying "what do





you have available? There would be far less transparency for the consumer, bad actors will be unnecessarily empowered, far more bait and switch and agents who have earned the privilege of having the public facing  ad rights to these listings on popular aggregator sites,  by best understanding the process, having the highest level of customer service, and most detailed  knowledge of the inventory will be punished by being forced to share listings with those agents who do not possess those attributes – and we will all be back in the open listing business again. This would undo so much of the progress that the industry has made, on its own, for the benefit of the consumer. This would essentially set the New York City rental market back 20 years.

**<u>Conclusion</u>**
This is a complex topic, and while it may not be popular to those who do not understand the nuances, I argue that it is simply misunderstood and does not warrant this misguided bill.  If passed, this legislation will create more lose-lose situations, which the industry and the public have already experienced in the past and that continue to fester today.

I'd like for everyone and anyone reading this to know that I will gladly make myself available and I invite and welcome anyone on the City Council to meet with me directly to address any of your questions or discuss any concerns that you may have in more detail about any topics that I have shared today. I am also open to discuss alternatives that could satisfy the city council's goals without harming the public or interfering with the hard work brokers do.

Thank you for your time.


**Bruno Ricciotti**
*Co-Founder and Principal Partner*
**Bond New York Properties**

810 Seventh Avenue, 39th Floor, New York, NY 10019 • Tel: 212.582.2009 • Fax: 646.328.4393





**OFFICE OF THE BROOKLYN BOROUGH PRESIDENT**

**ANTONIO REYNOSO**
Brooklyn Borough President

**City Council Committee on Consumer and Worker Protection**
**Hearing on Intro 360/FARE Act**
**June 12, 2024**

Good morning Chair Menin and thank you for holding this hearing today, and thank you to Council Member Ossé for introducing this important and common-sense bill.

No one here, not even the landlords, needs me to tell you that we are experiencing a housing crisis. New York City's vacancy rate is the lowest it's been since 1968. Fewer apartments are available across all rent levels, meaning it's especially difficult right now for low- and moderate-income New Yorkers to find and secure housing.

Meanwhile, market rents have increased about 17% since 2020 and are continuing to go up. According to Apartments.com, the average rent for a one-bedroom apartment in Brooklyn is $2,693 per month. By Federal affordability standards, someone would need to make over $100,000 per year to afford that apartment. It is also becoming more difficult to qualify for affordable housing. The Area Median Income for New York City – the metric used to decide who qualifies – has increased 30% since 2021, yet I think we would be hard pressed to find any renter whose wages have increased 30% in that same amount of time. It is no surprise that the families leaving the city at the fastest rate are people of color who make between $32,000-$65,000 per year, according to the *New York Times*.

With more people looking for market-rate housing and fewer units available, it is critical for us to address the barrier to entry that broker fees create. You've all heard the horror stories: a $15,000 or $20,000 fee to secure a rent-regulated unit, an exorbitant fee paid to a broker that the tenant never even met. These stories are unacceptable, but even the average broker fee can mean the difference between a family being able to secure housing in this city and not.

Back to that "average" $2,693 per month apartment in Brooklyn. With first month's rent, last month's rent, and an "average" security deposit of 15% of the yearly rent, a single person or couple would have to pay more than $10,000 up front just to secure that apartment. That's a huge amount, even if the monthly rent would be affordable to them. And because White households are more likely than Black and Latino households to have liquid assets such as savings accounts, broker fees aren't just a barrier, they are a fair housing issue.

Brooklyn Borough Hall • 209 Joralemon Street • Brooklyn, NY 11201 • (718) 802 3700 • Fax (718) 802 3616 • brooklynbp.nyc.gov

20

Again, this bill is just common sense. While some may claim that this will negatively impact the job market for brokers, the truth is that many no-fee apartments already operate this way, with landlords employing brokers. And prospective tenants will still be able to enlist the fees of a broker if they choose to do so. In every other industry, if you want a service, you pay for that service. There's no reason real estate should be any different. Making this simple change will increase housing access and choice for tenants at all income levels and help keep our city vibrant and diverse.

Thank you again for holding this hearing. I urge the Council to move quickly to pass Intro 360.

**Chinese-American Planning Council, Inc.**
**Testimony Before the New York City Council Committee on Consumer & Worker Protections**
**Chair, Council Member Julie Menin**
**June 12th, 2024**

Thank you Chair Menin and members of the City Council for the opportunity to testify. The mission of the Chinese-American Planning Council, Inc. (CPC) is to promote social and economic empowerment of Chinese American, immigrant, and low-income communities. CPC was founded in 1965 as a grassroots, community-based organization in response to the end of the Chinese Exclusion years and the passing of the Immigration Reform Act of 1965. Our services have expanded to include three key program areas: education, family support, and community and economic empowerment.

CPC is the largest Asian American social service organization in the U.S., providing vital resources to more than 80,000 people per year in all five boroughs through more than 50 programs at over 30 sites. CPC employs over 700 staff whose comprehensive services are linguistically accessible, culturally sensitive, and highly effective in reaching low-income and immigrant individuals and families. With the firm belief that social service can incite social change, CPC strives to empower our constituents as agents of social justice, with the overarching goal of advancing and transforming communities.

CPC strongly supports the Fairness in Apartment Rentals (FARE) Act, which would require the party who hired the broker to pay the broker fee. CPC serves a large immigrant population and it is crucial that we acknowledge that immigrant New Yorkers face disproportionate housing barriers. During the COVID-19 pandemic, we surveyed over 1,000 AAPI New Yorkers and we found that more than 3 out of 4 individuals needed assistance during this time, with 26% of respondents needing help with housing and 26% needing help with utility bills. However, this was an issue even before the COVID-19 pandemic with immigrants more likely to be increasingly rent-burdened, live in overcrowded spaces, and live in substandard conditions that don't receive regular maintenance. First generation immigrants are more likely to be low income and significantly rent-burdened (more than 50% of income for rent) than second generation immigrants, at 19-35%. AAPI immigrants are also more likely to live in multi-generational households, which are more prone to crowding. In fact, according to 2021 data from the Asian American Federation Data Center, they found that 49.5% of Asian households in New York are rent-burdened and 12.2% of Asian households are overcrowded. Additionally, AAPI immigrants face significant language barriers and access to public housing and assisted living. In combination with the long waiting lists of NYCHA and Section-8 Housing, AAPI immigrants are left with fewer opportunities to find truly affordable housing.

However, even when our community members find housing that is suitable for them, they are subjected to astronomical and unfair hidden and broker's fees. It is unconscionable in one of the wealthiest cities in the world that we are continuing to prey on low-income and working class families. And the affordability crisis is driving New Yorkers out of the city. The Fiscal Policy Institute recently reported that households with young children are 40% more likely to leave our state, and 2x as likely to move out of NYC. This is due to the high cost of living especially with the administration's cuts to child care and increasing housing costs. Studies have continuously

shown that housing shortages cause rent and homelessness to rise. In fact, rent growth is higher in areas that add less housing.

In order to address the housing affordability crisis and empower our working class New Yorkers, we need to pass the FARE Act immediately.

We thank you for the opportunity to testify and for Council Member Osse's leadership and we look forward to working with the Council to ensure the passage of this bill.

If there are any questions, please reach out to Ashley Chen, Policy Analyst at achen9@cpc-nyc.org.



June 12, 2024

## CHIP Testimony on Int 360-2024 Broker Fees Bill

Thank you for holding this hearing today. I am Adam Roberts, Policy Director for the Community Housing Improvement Program (CHIP). We represent New York's housing providers, including apartment building owners and managers. Our members operate rent-stabilized housing, which contains 1 million units of housing in New York City, making up 40% of its rental housing and the vast majority of its affordable housing.

We have serious concerns about the repercussions Int. 360-2024 would have for current and prospective tenants in rent-stabilized housing. This bill will significantly add to the cost of apartment turnover. There are already tens of thousands of vacant rent-stabilized units, since operating and turnover costs far exceed legal rents.

Rather than address the core issues behind high housing costs and a tight rental market, this bill would exacerbate those conditions. Int. 360 would be another in a long list of laws that adds more cost to provide rent-stabilized housing, despite those buildings having no means of recouping these additional expenses.

This is particularly troubling because rent-stabilized housing finds itself in a major financial crisis. Net operating income for older rent-stabilized buildings has fallen consistently across the city for three years in a row. In 2022 alone, there was a 20% drop for Bronx buildings. Meanwhile, the lenders who fund capital expenditures have either collapsed or are near collapse, like Signature Bank and New York Community Bank, or have severely restricted lending like HPD. This council cannot add further expenses to this already distressed housing stock.

Furthermore, this bill removes one of the primary financial advantages voucher holders have over other prospective renters, which is that vouchers cover brokers fees. With thousands of voucher holders waiting to be housed, this council cannot reduce incentives to help those households find permanent housing.

We share the council's desire to reduce housing costs on tenants, but this bill would further defund rent-stabilized housing while also reducing the incentive to house voucher holders. Rather than passing this bill, the council should be pursuing other measures that will actually decrease rents, particularly increasing the supply of housing available and ensuring existing housing can be maintained and re-rented after a vacancy.

Again, thank you for holding this hearing today.

Adam Roberts, Policy Director                516-510-2773
Community Housing Improvement Program (CHIP)   aroberts@chipnyc.org



**NEW YORK CITY**
**CENTRAL LABOR COUNCIL, AFL-CIO**

President
**VINCENT ALVAREZ**
Secretary-Treasurer
**JANELLA T. HINDS**

**Testimony of Brendan Griffith**
**Chief of Staff, New York City Central Labor Council, AFL-CIO**
**before the**
**NYC Council Committee on Consumer and Worker Protection**
**regarding**
**Support for the Fairness in Apartment Rental Expenses Act**
**June 12, 2024**

Good morning, Chair Menin and members of the Council's Committee on Consumer and Worker Protection. My name is Brendan Griffith, and I am the Chief of Staff at the New York City Central Labor Council, AFL-CIO. Over 300 unions are part of the CLC and those unions represent over 1 million workers across all five boroughs of our City. We strongly support Intro. 360 which requires the party retaining the services of a broker to pay the broker.

Today, New York City is still a city where a majority of households, 69 percent, rent their homes. Currently, the median asking rent for an apartment is $3,500, a staggering $42,000 per year. In addition to meeting that high monthly rent, most tenants who want to move into a new apartment are forced to pay broker fees even when they did not retain the services of that broker and/or were able to find the apartment on their own. The resulting upfront costs of moving have made it even more difficult for working New Yorkers to find affordable housing within New York City.

With rental costs already accounting for more than 30 percent of New Yorkers' income, many of our members are already rent burdened or, at 50 percent of their income, *severely* rent burdened. That's before even accounting for substantial payments to third parties they had no choice in retaining. The current state of affairs has contributed to making NYC unaffordable for working families. Intro. 360 eases some of that burden by ensuring that, like in almost every other city in the U.S., the person who decides to hire a broker is the one who will pay for their services. By shifting the burden of some of these upfront costs back to the party who hires these brokers, the FARE Act brings us one step closer to ensuring that everyday working families are able to live and thrive in New York.

I would like to end by stating that the CLC and our affiliates appreciate the opportunity to testify in support of this much-needed legislation. We look forward to continuing to work with this committee as well as the Department of Consumer and Worker Protection in developing policies that will improve the lives of working people in New York City.

350 West 31ST Street, New York, NY 10001 • Tel: (212) 604-9552 • Fax: (212) 604-9550
E-mail: info@nyccic.org • www.nyccic.org

26



**Testimony in support of the FARE Act (Intro 360)**
Communications Workers of America, District 1
June 12th, 2024

Thank you, Chair Julie Menin and Council Member Chi Ossé, and the members of the Committee for holding this hearing. My name is Mia McDonald and I am the Deputy Legislative Director of Communications Workers of America, District 1.

CWA District 1 represents nearly 145,000 workers belonging to almost 200 CWA local unions in New York, New Jersey, New England, and eastern Canada. Our members work in telecommunications, healthcare, the public sector, higher education, social work, printing, publishing, newspapers, broadcasting, and many other fields.

Nearly 80,000 CWA members and their family members live in New York City, many of whom are feeling the impact of the City's housing and affordability crisis. According to a report by the New York State Comptroller, over 48% of renters in New York City are cost-burdened, paying over 30% of their gross income in rent. Wages have not kept up with rising rents and inflation, making it no surprise that lower and middle-income New Yorkers are far more likely to move out of New York City, while the millionaire class grows.

Rising rents and costs of living, along with many other factors, force New Yorkers to consider moving, an already daunting process made even more challenging by exorbitant forced brokers' fees, which are often 15% of the annual rent. We want working class New Yorkers, already faced with many barriers in their search for housing, to have the option to stay in New York City. Addressing the upfront costs of moving is a crucial step in ensuring working families can thrive here.

We urge the City Council to pass the FARE Act, which will require the party who hires the broker to pay the broker fee. This will alleviate a major burden on renters and create a more fair system in rental housing. In addition, it will bring New York City in line with the vast majority of other cities.

Thank you again for holding this hearing, and we're looking forward to the swift passage of the FARE Act!

Testimony on the FARE Act

June 12th, 2024

TESTIMONY: Pass the FARE Act and Combat Unfair Brokers' Fees

Thank you, Council Member Menin and the Committee on Consumer and Worker Protection for holding this hearing on an important piece of legislation. My name is Samuel Stein, and I am a senior policy analyst at the Community Service Society of New York (CSS). For over 175 years, the Community Service Society has directly aided and advocated for low-income New Yorkers. Throughout that time, we have maintained a focus on housing affordability, housing quality, and housing stability, particularly for the city's majority of renters.

We are here today to testify in strong support of Intro 360, better known as the Fairness in Apartment Rental Expenses (or FARE) Act. The bill is remarkably simple and reasonable; in fact, it should be shocking and embarrassing that this is not already the practice – let alone the law – in New York City.

The FARE Act simply says that the party who hires a broker should pay that broker's fee. That's it.

Today tenants have to pay high fees for brokers that their future landlord hired. Often, these brokers have no interaction whatsoever with the future tenant. Broker fees can cost thousands of dollars and make apartments that might otherwise be attainable out of reach to low- and moderate-income tenants – which is to say most tenants, given that the median renter household in New York City earns just 59% of the Area Median Income. In an already tight housing market, this makes moving even less possible for most households, leaving them vulnerable to unfair treatment by the landlord they have today.

**A City of Movers**

The select initial findings from the most recent New York City (2023) Housing and Vacancy Survey (HVS) – the survey designed by the Department of Housing Preservation and Development and conducted every three to four years by the US Census Bureau – contained remarkable new data about household mobility. According to the survey, 761,2000 households – or more than one and five New York City households – moved into their home in either the year 2021 or 2022. This is a 44 percent increase in movement relative to 2021, and it runs counter to national data from the same time.

Most (57 percent) of those who moved ended up in market-rate apartments. This was not because of any preference or love for the "free market," but rather because that was the subset of the market. where most available apartments could be found. Market rate apartments, however, very likely to come with broker fees, and, given the rents in many of these apartments, those fees are quite high.

**No Money to Move**

Tenants, however, often do not have the money necessary to pay a broker fee, on top of a security deposit and first month's rent. Every year, CSS conducts an annual survey of New Yorkers' experiences and opinions called the "Unheard Third." In the most recent survey, conducted in July 2023, we found that most tenants have very little to fall back on, and therefore would have little ability to pay an expensive broker's fee on a new apartment.

A majority of our tenant respondents said they could not cover a $400 expense. Instead, tenants told us they would have to take on debt, borrow from friends or family, or sell something in their possession. When we asked about how much money New Yorkers have in savings, we found that while half of homeowners answered "$10,000 or more," while the most common response for public, subsidized housing and rent regulated tenants was between zero and $99. The percentage with nothing at all in savings ranged from 39 percent of market-rate renters to 63 percent of public housing residents.

Meanwhile, while 40 percent of homeowners reported that they "never" have to worry about family expenses, fewer than 20 percent of renters could say the same. For public and subsidized housing residents, the most common answer to that question was "all of the time," while for market-rate and rent stabilized tenants it was "some of the time."

The findings of the HVS and the Unheard Third Survey show that tenants in a tightening bind: more and more of them are having to move, but few have the money to afford the costs associated with moving. There is much more that needs to be done to unwind this bind, from increased wages to more social housing, but the simplest thing the City can do *right now* is to pass the FARE Act.

**The Wrong Kind of New York Exceptionalism**

In many ways, New York is ahead of the United States when it comes to housing. We built the first public rental housing in the nation. Our rent stabilization system features some of the country's strongest tenant protections. But when it comes to broker fees, our city is a strange and regressive outlier: New York is the only city in the United States where the tenant is expected to pay their would-be landlord's broker fee. The solution to this problem is so simple and straightforward that it boggles the mind as to why it is not already law.

Passing the FARE act will not mean that brokers are not paid; it will simply mean that the party who hires them pays them. It will not raise rents, since for-profit landlords already charge the maximum price the market can bear or the relevant regulations allow. This bill will hurt no one, while helping hundreds of thousands of New Yorkers every year. We call on the City Council to pass the FARE Act immediately and bring New York City in line with every other city in this country.



**TESTIMONY: Pass the FARE Act and Combat Unfair Brokers' Fees**

Thank you, Council Member Menin and the Committee on Consumer and Worker Protection for holding this hearing on an important piece of legislation. Our names are Samuel Stein and Oksana Mironova, and we are senior policy analysts at the Community Service Society of New York (CSS). For over 175 years, the Community Service Society has directly aided and advocated for low-income New Yorkers. Throughout that time, we have maintained a focus on housing affordability, housing quality, and housing stability, particularly for the city's majority of renters.

We are here today to testify in strong support of Intro 360, better known as the Fairness in Apartment Rental Expenses (or FARE) Act. The bill is remarkably simple and reasonable; in fact, it should be shocking and embarrassing that this is not already the practice – let alone the law – in New York City.

The FARE Act simply says that the party who hires a broker should pay that broker's fee. That's it.

Today tenants have to pay high fees for brokers that their future landlord hired. Often, these brokers have no interaction whatsoever with the future tenant. Broker fees can cost thousands of dollars and make apartments that might otherwise be attainable out of reach to low- and moderate-income tenants – which is to say most tenants, given that the median renter household in New York City earns just 59% of the Area Median Income. In an already tight housing market, this makes moving even less possible for most households, leaving them vulnerable to unfair treatment by the landlord they have today.

**A City of Movers**

The select initial findings from the most recent New York City (2023) Housing and Vacancy Survey (HVS) – the survey designed by the Department of Housing Preservation and Development and conducted every three to four years by the US Census Bureau – contained remarkable new data about household mobility. According to the survey, 761,2000 households – or more than one and five New York City households – moved into their home in either the year 2021 or 2022. This is a 44 percent increase in movement relative to 2021, and it runs counter to national data from the same time.

Most (57 percent) of those who moved ended up in market-rate apartments. This was not because of any preference or love for the "free market," but rather because that was the subset of the market. where most available apartments could be found. Market rate apartments, however, very likely to come with broker fees, and, given the rents in many of these apartments, those fees are quite high.

**No Money to Move**

Tenants, however, often do not have the money necessary to pay a broker fee, on top of a security deposit and first month's rent. Every year, CSS conducts an annual survey of New Yorkers' experiences and opinions called the "Unheard Third." In the most recent survey, conducted in July 2023, we found that most tenants have very little to fall back on, and therefore would have little ability to pay an expensive broker's fee on a new apartment.

A majority of our tenant respondents said they could not cover a $400 expense. Instead, tenants told us they would have to take on debt, borrow from friends or family, or sell something in their possession.

When we asked about how much money New Yorkers have in savings, we found that while half of homeowners answered "$10,000 or more," while the most common response for public, subsidized housing and rent regulated tenants was between zero and $99. The percentage with nothing at all in savings ranged from 39 percent of market-rate renters to 63 percent of public housing residents. Meanwhile, while 40 percent of homeowners reported that they "never" have to worry about family expenses, fewer than 20 percent of renters could say the same. For public and subsidized housing residents, the most common answer to that question was "all of the time," while for market-rate and rent stabilized tenants it was "some of the time."

The findings of the HVS and the Unheard Third Survey show that tenants in a tightening bind: more and more of them are having to move, but few have the money to afford the costs associated with moving. There is much more that needs to be done to unwind this bind, from increased wages to more social housing, but the simplest thing the City can do *right now* is to pass the FARE Act.

**The Wrong Kind of New York Exceptionalism**

In many ways, New York is ahead of the United States when it comes to housing. We built the first public rental housing in the nation. Our rent stabilization system features some of the country's strongest tenant protections. But when it comes to broker fees, our city is a strange and regressive outlier: New York is the only city in the United States where the tenant is expected to pay their would-be landlord's broker fee. The solution to this problem is so simple and straightforward that it boggles the mind as to why it is not already law.

Passing the FARE act will not mean that brokers are not paid; it will simply mean that the party who hires them pays them. It will not raise rents, since for-profit landlords already charge the maximum price the market can bear or the relevant regulations allow. This bill will hurt no one, while helping hundreds of thousands of New Yorkers every year. We call on the City Council to pass the FARE Act immediately and bring New York City in line with every other city in this country.

June 12, 2024
10:00 AM



### NYC Council Committee on Consumer and Worker Protection
### Public Hearing - The Fairness in Apartment Rental Expenses (FARE) Act

### Testimony of Esteban Girón
### Member, Crown Heights Tenant Union (CHTU)
### Member, Tenants PAC Board of Directors

Good morning. My name is Esteban Girón and I am a member of the Crown Heights Tenant Union (CHTU) and serve on the Tenants PAC board. Thank you, Chair Menin, members of the Committee and Council Member Ossé, for this opportunity to testify today.

The General Membership of the CHTU is proud to support this legislation. Council Member Ossé's district includes areas where we organize, and he and his staff sought our input in the drafting and development of this bill. Today you will hear a lot of horror stories from tenants who went through hell to secure a home, so instead, I want to direct my remarks to the brokers who oppose the bill.

I've reviewed REBNY's explainer video and talking points. Do they really expect any reasonable person to accept that they, the organization that has done everything in its power to raise rents, strip tenants of basic protections and destroy rent stabilization - THAT REBNY - wants to protect renters from rent increases? This is the same organization that spent MILLIONS of dollars on lobbyists and a misinformation campaign to stop Good Cause Eviction from becoming law and is still attempting to roll back the 2019 HSTPA. They've used our rent money to hire attorneys to help them undo rent stabilization at the Supreme Court. Let's be clear: REBNY does not want your rent to be affordable!

Brokers, don't let yourselves be gaslit. REBNY's talking points affirm that your yearly income starts at around $52,000; this is unconscionable coming directly from the wealthiest landlords and developers in the world who sustain their profits on your backs. The fact that this is your starting salary only proves that REBNY doesn't give a sh*t about you and is not acting in your best interests. All of you are workers, and a large number of you are renters who are being exploited at your jobs and forced to spend way too much of your income on your housing. The fact of the matter is that you have more in common with me than you do with James Whelan or Daniel Brodsky or Stephen Ross. We should be on the same side.

Tenants may not have millions of dollars to blow on lobbyists and consultants, but we do believe and fight for tenant and worker power. And considering we won the passage of the Right to Counsel, the 2019 HSTPA, new Good Cause protections and the rejection of every case brought against rent stabilization to the Supreme Court, I would encourage brokers to join our ranks and stop playing for the losing team.

The CHTU urges the New York City Council to stand up for the rights of workers and tenants and brokers by passing this bill without delay. Thank you.

**Testimony to City Council Committee on Consumer and Worker Protection Hearing**

*Submitted to the City Council Committee on Consumer and Worker Protection on June 14, 2024*

*Prepared by Melinda Wang, Research and Advocacy Manager of Dance/NYC*

---

Thank you for your consideration of this testimony, submitted on behalf of Dance/NYC

(Dance.NYC), a service organization that reaches over 6,000 individual dance artists, 1,700 dance entities, and the many for-profit dance businesses based in the

metropolitan New York City area. Its areas of service are of special benefit to BIPOC

(Black, Indigenous, and Peoples of Color), immigrant, disabled, low-income, and

small-budget dance workers. Through its action-oriented research and advocacy, Dance/NYC seeks to represent and advance the interests of the dance field. It embeds the values of justice, equity, and inclusion into all aspects of its operations and frames the following requests through the lens of those values.

Dance/NYC urges you to **pass the Fairness in Apartment Rental Expenses (FARE) Act.** Ending forced broker fees is vital to ensuring that dance workers, and New Yorkers as a whole, are able to live and prosper in New York City.

**Dance and cultural workers are a part of New York City's working class.** Our constituents, in addition to shaping the lively cultural and tourism landscape of our city, are educators, healthcare workers, food service workers, hospitality workers, and more.[1] Like much of our city's working class, **dance workers are struggling under the conditions of the current housing crisis**. Based on Dance/NYC's most recent 2023 report[1], average dance worker wages sit 15% below the New York City living wage. Dancers and choreographers, on average, earn just $23,000 a year from dance, and $39,500 total.  Immigrant and transgender/gender-expansive (TGE) dance workers earn even less. **The median asking rent for a New York City apartment**

---

[1] State of NYC Dance 2023: Findings from the Dance Industry Census.

https://hub.dance.nyc/wp-content/uploads/2023/12/State-of-NYC-Dance-2023-Report-FINAL-23_12_11_ACC.pdf

in 2023 was $3,500[2]-- this is *82% more* than the average dancer's monthly pre-tax income from dance, and $210 more than the average dancer's total pre-tax income from all sources. When a household would have to earn $140,000 to not be rent-burdened– that's *three and a half times more* than dancers earn from all income streams– it is clear that dance workers are struggling to afford the city they call home.

This affordability crisis comes to a peak when dance workers move. **Dance/NYC's 2021 survey found that 29% of New York City dance workers needed additional funds for housing and 45% needed funds for groceries.[3]** This makes dance workers vulnerable to sudden moves when rents rise or life circumstances change. When these moves happen, the high burden of paying rent, a security deposit, and a hefty broker fee on top of that is simply untenable. For many, this means taking money out of savings. As **62% of artists in New York State have no emergency savings,**[4] arts and cultural workers are left with very few options. Many are faced with the prospects of either living in unsafe and unstable housing, or leaving the city altogether.

Dance and cultural workers want to live and stay in New York. Our city is a major cultural capital of the world, with the dance industry alone contributing an estimated $300 million[5] annually to the local economy. The arts and culture sector is the number one driver of tourism to the city and accounts for nearly 13% of New York City's total economic output.[6] It is clear that **dance and other low-wage workers make New York City what it is. But rising rents and high moving costs are displacing everyday New Yorkers and fundamentally changing the important cultural landscape of the city.** We need urgent action on housing to protect low-wage workers as well as our city's status as an arts and culture haven.

By eliminating forced broker fees, the FARE Act can intervene at a crucial moment of instability in tenants' lives. When landlords hire brokers, tenants should not have to be the ones to pay. Lifting this burden increases fairness and transparency, boosting affordability and allowing cultural and other low-wage workers to stay in the city. **By passing the FARE Act, the Council**

---

[2] Office of the New York City Comptroller (2024). *Spotlight: New York City's Rental Housing Market.* https://comptroller.nyc.gov/reports/spotlight-new-york-citys-rental-housing-market/

[3] Dance/NYC Data on Independent Dance Workers 2021. https://www.dance.nyc/covid-19/Impact-Survey/IndependentDanceWorkerData

[4] https://www.creativesrebuildny.org/2024/05/30/portrait-of-ny-state-artists/

[5] State of NYC Dance 2016 & Workforce Demographics 2016. https://www.dance.nyc/uploads/State%20of%20NYC%20Dance%20and%20Workforce%20Demographics%20Online%20Version.pdf

[6] Office of the New York City Comptroller (2019). *The Creative Economy: Art, Culture and Creativity in New York City.* https://comptroller.nyc.gov/reports/the-creative-economy/

**has the opportunity to uplift tenants and workers, building a city that is affordable, safe, and culturally inclusive for all.** We thank you for considering the needs of our constituents as you move forward.

**Brian Phillips, Associate Broker**
**New York State Association of REALTORS®**
**Int. 360 Testimony**
**June 12, 2024**

Good morning/afternoon Chair Menin and members of the Committee on Consumer and Worker Protection. My name is Brian Phillips. I am an Associate Broker with Douglas Elliman Real Estate here in Manhattan, where I both live and earn a living. I am a member of the New York State Association of REALTORS®, where I am the 2024 Chair of the New York City Issues Working Group and serve on the Legislative Steering Committee. Many NYSAR members are here in attendance with me today. Additionally, I am a member of the Real Estate Board of New York. As a small landlord and real estate agent, I specialize in rentals as a key part of my business.

As a small landlord, I have faced significant financial pressures due to rising real estate taxes and homeowner's insurance costs. These increases have forced me to raise rents, a situation shared by many of my landlord clients. This financial strain is further complicated by the proposed requirement for landlords to pay the brokerage fee when hiring agents on an exclusive basis. This requirement could lead to two likely outcomes:

1. Landlords may incorporate the broker fee into the rent, spreading it over the entirety of the lease. This would result in higher monthly rents and increased lease renewal rates which are based on the last rented price.

2. Alternatively, landlords might opt not to list with agents exclusively. This means tenants would have to pay the brokerage fee, and listings would not appear on platforms like StreetEasy, which require exclusive listings. In Manhattan, rental listings do not syndicate to Zillow unless they are first listed on StreetEasy.

Consequently, available listings would become harder to find for renters.

As agents and brokers, we cover the costs of professional photography, floor plans, and 3-D video tours, which can easily range from $300 to $500 per listing. Additionally, listing apartments on StreetEasy costs $8 per day per rental listing, totaling $240 per month per listing. These service expenses enhance our listings and improve the consumer experience. Without exclusive listings on platforms like StreetEasy, it becomes harder for consumers to find available rentals, reducing listing visibility and negatively impacting renters.

As state licensed real estate professionals we are committed to providing the best service to our clients despite the high cost of doing business in the city.

Although state law prohibits discrimination against "source of income", government voucher recipients continue to face challenges in finding housing. I have been working with many voucher recipients for six months to a year or more. If landlords are made to pay the brokerage fee, they will be even less inclined to work with voucher holders, preferring renters without vouchers. This will increase source of income discrimination and other fair housing violations.

The FARE Act, while well-intentioned, could lead to higher rents and reduced listing visibility, ultimately harming tenants.

Thank you for considering my perspective.



**TESTIMONY OF LEGAL SERVICES NYC
IN SUPPORT OF INTRO 360, THE FAIRNESS IN APARTMENT RENTAL EXPENSES
ACT (FARE ACT)**

**New York City Council
Committee on Consumer and Worker Protection**

June 13, 2024

My name is Amanda Maisel. I am a member of the Universal Access to Counsel section of the Housing Unit in the Bronx office of Legal Services NYC. Our unit provides free direct legal services to thousands of families and individuals with low or fixed incomes who rent their homes and are at risk of being evicted.

I welcome the opportunity to testify before the Committees on Consumer and Worker Protection to address the impact of the proposed "FARE Act." I would like to thank the Committee Chairs on Consumer and Worker Protection, as well as the various Committee members, for the opportunity to testify. I would also like to specifically thank Council Member Chi Ossé for his sponsorship of the bill that is the subject of this hearing.

Allocating brokers' fees to landlords, as proposed in the FARE Act, will create a more equitable rental market. This allocation is fair, in that brokers render a service to landlords, rather than to would-be tenants, by screening and vetting potential renters on their behalf; moreover, it is practical, in that it will create uniformity, consistency, and transparency for all parties entering rental contracts involving brokers and will thus protect the average consumer.

Allocating brokers' fees to landlords will also help level the playing field for voucher-holders and low-income renters, including elderly and disabled New Yorkers living on social security income. For many of our clients, the additional burden of a broker fee is the difference between being able to move and having to remain in a home that is not appropriate or is not safe. The combined up-front cost of the first month's rent, a security deposit, and the broker's fee required for a new apartment makes moving prohibitively expensive. Our clients who use Section 8, FHEPS, or CityFHEPS vouchers to pay their rent rely on HRA to help with broker fees. But even if these tenants are able to secure assistance from HRA to move, HRA often pays less than half of the typical 15% broker fee. These tenants are often unable to pay the remainder of the fee—on top of the first month's rent and security. As a result, landlords and brokers refuse to work with them.

Being unable to move has severe consequences for many families and individuals. Many of the families we work with have landlords who are not attentive to the need for repairs and ignore housing code violations. I have worked with families who have not had cooking gas in months or even years and cannot prepare meals at home; families who have rodent or bug infestations in their homes and have been requesting professional exterminators for months; families who have had

38

mold in their homes for so long that they have been hospitalized for mold-related illnesses—even families facing a building-wide listeria outbreak who had to purchase bottled water as their entire building's water was deemed unsafe. In none of these instances have the families or individuals moved, not because they have not wanted to, but because they were economically constrained from doing so or unable to find another apartment with their voucher without assistance with the multiple up-front costs, including the broker fee. The allocation of brokers' fees proposed in the FARE Act would go a long way towards creating a more equitable rental market for the most vulnerable tenants in New York City, and thus improve overall housing access.

Respectfully submitted,

Amanda Maisel, Housing Unit
Bronx Legal Services
369 E. 148th Street
Bronx, NY 10455
(718)928-3687



TESTIMONY REGARDING

Intro 0360-2024

PRESENTED BEFORE:

THE NEW YORK CITY COUNCIL'S
COMMITTEE ON CONSUMER AND WORKER PROTECTION

PRESENTED BY:

GALI DAVAR
LEGAL INTERN
MOBILIZATION FOR JUSTICE, INC.

JUNE 12, 2024

---

**MOBILIZATION FOR JUSTICE, INC.**
100 William Street, 6th Floor
New York, NY 10038
(212) 417-3700
**www.mobilizationforjustice.org**

1

1. **Introduction**

Mobilization for Justice's (MFJ) mission is to achieve justice for all. MFJ prioritizes the needs of people who are low-income, disenfranchised, or have disabilities as they struggle to overcome the effects of social injustice and systemic racism. We provide the highest-quality free, direct civil legal assistance, conduct community education and build partnerships, engage in policy advocacy, and bring impact litigation. MFJ also promotes diversity, equity, and inclusion in our workplace, and understands the need to eliminate all racial disparities to achieve justice for all.

MFJ appreciates the opportunity to share with the New York City Council Committee of Consumer and Worker Protection our support of initiative 0360-2024, the FARE Act. Broker fees make NYC rental housing unaffordable before renters even step foot inside. High upfront costs contribute to a housing affordability crisis that especially burdens low-income New Yorkers. Broker fees also prevent vulnerable renters from moving in times of need, such as to escape domestic violence or leave dangerous conditions, or when facing a no cause eviction or moving to an accessible apartment. The FARE Act is a step in the right direction to address the housing affordability crisis by reducing upfront costs that prevent renters from moving where and when they need.

2. **Broker fees contribute to burdensome upfront moving costs.**

Broker fees make it difficult for low-income New Yorkers to move by creating massive upfront costs. Currently, many renters who want to move must save up for months to afford high upfront costs.[1] Renters may want or need to move into new apartments for all kinds of urgent reasons, like to escape poor housing conditions, flee domestic violence, or find a home that's more accessible for one's disability. Beyond implicating the basic freedom to live where one chooses, many of those needs are more prevalent among renters of color and lower-income renters.[2] Thus, the burdens imposed by broker fees aren't just barriers to moving, but also barriers to racial, gender and economic equality.

For example, A.L., is a mother of three, needed to move after having a baby for a home more appropriate for her family in the Bronx. Even after obtaining government assistance to pay for half the broker fee, she still needed $1,700 for the balance that put her ability to move at risk without the assistance of MFJ.

---

[1] Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*, StreetEasy (Feb. 10, 2024), https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/.
[2] *See e.g.,* U.S. Census, *2023 New York City Housing and Vacancy Survey* 51 https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf (showing renter households headed by Black individuals and households with lower incomes experience more serious housing issues); Mayor's Office to End Domestic and Gender-Based Violence, *2020 Report on the Intersection of Domestic Violence, Race/Ethnicity and Sex* 1-4 (Sept., 2021) https://www.nyc.gov/assets/ocdv/downloads/pdf/endgbv-intersection-report.pdf (identifying increased prevalence of domestic violence in certain communities of color and communities in poverty); Nanette Goodman et al., *Financial Inequality: Disability, Race, and Poverty in America* 5-6 (2019) https://www.nationaldisabilityinstitute.org/wp-content/uploads/2019/02/disability-race-poverty-in-america.pdf (identifying links between race, class, and disability).

Jean M.'s landlord asked her to move when her lease expired. As a senior citizen on social security, her options were limited. Even after being awarded a rent subsidy, the broker fee cost was a major barrier for her to move despite the fact she was facing an eviction and she feared missing out on apartments and being homeless.

Typical broker fees are 12-15% of the annual rent, but there is no legal cap.[3] Some brokers attempt to charge fees as high as 40% of the annual rent for rent stabilized units.[4] In 2023, the average New Yorker spent $10,454 in upfront costs for a rental, amounting to 14% of the city's median household income.[5] The largest of these expenses is often the broker fee.[6] Broker fees are unique of the upfront fees. Tenants can shop around for a mover or move themselves if they are physically able. First month's rent and security deposit also contribute to upfront rental costs, but the first month's rent is a part of expected annual rent payment, and security deposits are returned at the end of the lease. Brokers are chosen by those who do not pay, so there is little accountability or market pressure for reasonableness in the fees.

When vacancy rates for affordable apartments are below 1%, then the choices are far and few between so those most economically disadvantaged are the most exploited. Upfront rental costs place a disproportionate burden on low-income New Yorkers. Luxury apartments, with higher monthly rents and desirable amenities, are more likely to be listed without a broker fee than more affordable options.[7] Only 22% of New Yorkers can afford high upfront moving costs out of pocket.[8] The rest rely on gifts from family and loans when moving into new apartments.[9] A 2023 survey found that for nearly three in four NYC renters, high upfront costs affected their move.[10] The upfront cost of moving impacted the homes 43% of respondents were able to afford, the desire for 25% of respondents to move, and the ability of 23% of respondents to move.[11] Further, high upfront costs cause many renters to delay moving or to move to a less than ideal location.[12]

The cost to tenants is magnified by the cost of their labor. Even as renters shoulder more of the burden of finding an apartment on their own in thanks to internet services, broker fees

---

[3] *See generally* RPL § 238-a (limiting other fees but not broker fees); *see also* Austin Havens-Bowen, *Are there caps on broker fees for rent-stabilized apartments in NYC?*, Brick Underground (June 30, 2022), https://www.brickunderground.com/rent/realty-bites-broker-fee-limits-laws-rent-stabilized-apartments-nyc.

[4] Molly Osberg, *Want a Rent-Regulated Apartment? Pay This Broker $10,000*, Hell Gate (June 9 2022), https://hellgatenyc.com/broker-fees-destroying-affordable-housing.

[5] Lee, *supra* note 1.

[6] *Id.*

[7] *Id.* (showing the average upfront cost for a no-fee apartment listed on StreetEasy was around $8,600, compared to over $12,300 for apartments that required a fee, assuming a broker fee of 12% of the annual rent)

[8] *Id.*

[9] Mihir Zaveri, *Boxes, Tape, $10,000: What It Takes to Move Into an N.Y.C. Apartment*, N.Y. Times (Feb. 12, 2024), https://www.nytimes.com/2024/02/10/nyregion/moving-costs-brokers-fees-ny-apartment.html.

[10] Lee, *supra* note 1.

[11] *Id.*

[12] *Id.*

have remained the same.[13] New York's broker fees are a legacy of a pre-internet rental market and keep thousands of New Yorkers locked into apartments and neighborhoods they would not otherwise be in, even as tenants do more of the work to find their home.

### 3. The current broker fee structure no longer makes financial sense for the City or its economy.

Beyond the benefits to New York renters, the FARE Act is an opportunity to reduce city housing assistance costs and modernize the rental market. The Human Resources Administration (HRA) currently pays broker fees through CityFHEPS and One Shot Deals.[14] CityFHEPS is a rental assistance program for households earning less than 200% of the federal poverty level.[15] One Shot Deals are grants for housing emergencies, with eligibility determined on a case-by-case basis.[16] Through these two programs, HRA pays $22 million in broker fees every year.[17] The amount HRA pays will continue to increase as rents increase and more vouchers are issued.[18] By reducing the cost of broker fees paid by renters using HRA's assistance program, the FARE Act has the potential to directly reduce costs to those programs and allow more New Yorkers to access housing.

Beyond direct cost savings, the FARE Act will bring the city's rental market in line with almost every other city in the nation. New York City is an outlier in passing broker fees onto tenants, as renters in most other U.S. cities do not have to pay fees for brokers landlords hire.[19] Boston is the only other U.S. city where renters pay the broker fee regardless of who hired the broker.[20] In most markets, the landlord's cost of advertising units and vetting new tenants is included in the cost of rent.[21] Many landlords still employ brokers to market and show properties to prospective tenants, but without charging tenants an upfront fee.[22] In some major cities,

---

[13] Erin Lowry, *NYC Rents Are Outrageous. And That's Before the Broker's Fee.*, Bloomberg (Nov. 10, 2023), https://www.bloomberg.com/opinion/articles/2023-11-10/nyc-rents-are-outrageous-and-that-s-before-the-broker-s-fee.

[14] N.Y.C. Indep. Budget Off., Ban Property Owners from Charging Broker Fees to Renters (Feb. 2023), https://www.ibo.nyc.ny.us/iboreports/new-options-february-2023.pdf.

[15] N.Y.C. Dep't Soc. Servs., CityFHEPS Frequently Asked Questions For Clients in the Community (Jan. 4, 2024), https://www.nyc.gov/assets/hra/downloads/pdf/cityfheps-documents/dss-7r-e.pdf.

[16] Soc. Serv. § 303.

[17] N.Y.C. Indep. Budget Off., *supra* note 14.

[18] CityFHEPS issues more new vouchers every year, issuing approximately 10,000 new vouchers in 2023. N.Y.C. Indep. Budget Off., Understanding the City Fighting Homelessness & Eviction Prevention Supplement (CityFHEPS) Program: Budget, Usage, Expansion Projections, and Concerns, (Jan. 2024), https://www.ibo.nyc.ny.us/iboreports/CityFHEPS_Jan2024.pdf.

[19] Zaveri, *supra* note 9.

[20] Kevin Sun and Katherine Kallergis, *Broker fees for NYC rentals mystified outsiders. Here's how other US cities do it*, The Real Deal (Feb. 7, 2020), https://therealdeal.com/new-york/2020/02/07/broker-fees-for-nyc-rentals-mystified-outsiders-heres-how-other-us-cities-do-it/.

[21] *Id.*

[22] *Id.*

tenants can hire brokers to help them find apartments, but landlords pay some of these agencies through referral fees.[23] Adjusting the fee structure would not end the careers of brokers in New York City but align them with nearly every other major city where the brokers would serve the interest of those who pay their fees.

### 4. The FARE Act is unlikely to result in untenable rent increases and could save some tenants money in the long run.

Opponents to the FARE Act argue that landlords will pass the cost of brokers on to renters by raising rents. However, existing rent regulation protects millions of renters from unrestricted rent increases. Further, any rent increases that do occur would be ameliorated over a 12- or 24-month lease, which is preferable to paying a large sum up front and could still reduce tenants' long-run costs and increase their future bargaining power.

Many of New York's most vulnerable renters are already protected from large rent hikes because of existing regulations. Almost half of New York's rental housing stock is rent stabilized or rent controlled, protecting over one million rental units and millions of individual residents.[24] In these units, landlords won't be able to pass on broker fees through rent increases beyond existing rent caps. The FARE Act is unlikely to have a significant impact on current leases in rent-regulated housing, and future renters of these units are protected from drastic rent increases in the form of passed-on broker fees. Further, many of New York's most vulnerable, rent-burdened tenants live in rent-regulated housing.[25] This group includes Black and Hispanic renters, disabled individuals, and older adults.[26]

Second, for renters who are not protected by rent regulation, the benefits of improved tenant mobility and housing accessibility gained by avoiding up-front broker fees outweigh potential rent increases. The key issue that a broker fee presents to tenants is how significantly it increases their one-time costs to move into a new apartment.[27] Even if landlords were to increase rent by the exact same amount as a broker's fee would have been, reducing the upfront cost would still make it easier for renters to move when and where they want.[28] Landlords also will not need to raise rents by the same amount as a full broker's fee spread over the term of a lease, because they still won't owe broker fees for tenants who choose to renew.

When landlords were required to pay their own broker fees in the past, they did not raise rents as much as a full broker's fee. At least one analysis of the single week in 2020 where the New York Department of State suspended broker fees[29] has shown that many landlords chose to

---

[23] *Id.*

[24] U.S. Census Bureau, *supra* note 2, at 6 (indicating that 42.6% of all New York City rental units are rent-controlled or rent-stabilized.

[25] *Id.*, at 50 (showing that a majority of households in rent-stabilized housing are either Black or Hispanic, that 31% include an older adult, and that a quarter include a person with disabilities); *id.* at 58 (showing that almost half of Black and Hispanic renter households, as well as more than half of renter households with a person with disabilities or an older adult, are moderately or severely rent burdened). Residents in public housing, who would similarly be protected from broker-fee rent increases, are also frequently members of these groups. *Id.*, at 50.

[26] *Id.*

[27] *See e.g.,* Lee, *supra* note 1.

[28] *Id.*

[29] That fee suspension was a result of the DOS's interpretation of the 2019 Housing Stability and Tenant Protection Act and was quickly enjoined by the courts. *See e.g.,* Celia Young, *City*

raise rents less than the full amount of a broker fee.[30] More than 70% of the units analyzed in that study had annual rent increases of less than one-month's rent.[31] That means renters are saving money over the course of their first year in a unit. The analysis found that renters in many neighborhoods would save money over the course of their first year, compared to paying a 15% broker fee.[32] The data showed that, for example, in Bushwick, tenants could save about $2,000 in the first year, despite a 7.8% rent increase; and in Harlem, tenants could save upwards of $1,300 in the first year despite a 10.9% rent increase, the highest identified by in the analysis.[33] Those savings at move-in mean tenants can switch apartments more easily, increasing their bargaining power and incentivizing landlords to keep rent increases more modest in the long-run.[34]

### 5.  Conclusion

MFJ urges the City Council to pass initiative 0360-2024 to tackle the housing affordability crisis by reducing upfront housing costs, modernizing the city's broker fee system, and improving housing mobility and accessibility for vulnerable tenants. The current system is failing New Yorkers as broker fees are literal barriers to entry to affordable apartments where brokers are not accountable to those who pay their high fees. New York City should follow nearly every other city to make it easier for those in need to find safe, secure, and accessible housing.

---

*Council bill to shift broker fees to landlords unlikely to pass this year*, Brick Underground (Oct. 20, 2023), https://www.brickunderground.com/rent/broker-fee-bill-fare-act-frozen-chi-osse.

[30] PropertyClub, *New York City Renters Stand to Win Big if Landlords are Required to Pay Broker Fees* (Feb. 13, 2020) https://propertyclub.nyc /article/new-york-city-renters-stand-to-win-big-if-landlords-are-required-to-pay-broker-fees.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*



**New York City Council**
**Committee on Consumer and Worker Protection**
**FARE Act (Intro 360) Hearing**

**Testimony by Neighbors Together**
**Written by Amy Blumsack, Director of Organizing & Policy**

**June 12, 2024**

Neighbors Together would like to thank the Chair of the New York City Council Committee on Consumer and Worker Protection, Council Member Menin, as well as the other council members on the committee for the opportunity to submit testimony.

<u>**About Neighbors Together**</u>

Neighbors Together is a community-based organization located in central Brooklyn.  Our organization provides hot meals five days per week in our Community Café, offers a range of one-on-one stabilizing services in our Empowerment Program, and engages members in community organizing, policy advocacy and leadership development in our Community Action Program.  We serve approximately 100,000 meals to over 12,000 individuals per year. Over the past year alone, we have seen a 63% increase in the number of meals we are serving, and we see new people on the line every day.

Our members come to us from across the five boroughs of New York City, with the majority living in central Brooklyn. Nearly 60% of our members are homeless or unstably housed, with a significant number staying in shelters, doubled-up with relatives or friends, and living on the street. Approximately 40% of our members rent apartments or rooms in privately owned homes, or live in rent stabilized units.

Over the last five to ten years, our members increasingly report that homelessness and lack of affordable housing options are their primary concern. Our data backs the anecdotal evidence we see and hear from our members daily: an increasing number of our members are either living in shelter with vouchers for years at a time, ineligible for a voucher, or unable to find permanent housing due to rampant source of income discrimination and a vacancy rate of under 1% for affordable housing units in New York City.



## Our Work with Voucher Holders

Neighbors Together has been organizing voucher holders since 2018. We conduct Know Your Rights trainings on how to identify and report source of income (SOI) discrimination, and Housing Search Workshops where voucher holders get additional support in their housing search and assistance on filing source of income discrimination complaints to the City Commission on Human Rights (CCHR) when needed. We work closely with CCHR to ensure that source of income discrimination reports are effective and have the best possible outcomes for our members. We also partner with CCHR on their restorative justice set-aside program to ensure that set-aside units obtained through settlements are most likely to go to people in need as efficiently and effectively as possible. Additionally, in partnership with Unlock NYC, we built and launched the Stop Source of Income Discrimination (SID) NYC website, which provides information about source of income discrimination and how to report it as well as a mechanism for reporting via the website.

We work closely with Unlock NYC to improve New Yorkers' ability to utilize their vouchers. Starting in 2019 our members worked with the Unlock team to design and test an online tool to help voucher holders easily report source of income discrimination. The tool has enabled hundreds of our members to quickly and easily gather evidence and report source of discrimination to CCHR. In our partnership with Unlock NYC, we have released multiple reports on source of income discrimination and voucher efficacy, including "An Illusion of Choice," the SOI mapping tool, the "Serial Discriminators List", as well as ongoing budget advocacy to ensure CCHR is adequately funded to enforce against SOI discrimination.

After over a year of collecting data through the Stop SID NYC website, running know your rights trainings and conducting housing searches for people with vouchers, Neighbors Together built a grassroots organizing campaign of directly impacted people who had voucher shopping letters but couldn't find housing.  The VALUE in Housing (**V**oucher **A**dvocates **L**ifting **U**p **E**quity in **H**ousing) campaign created a platform of 5 policy reforms aimed at making vouchers effective tools for accessing permanent affordable housing. Since launching in 2019, the VALUE in Housing campaign has won a significant portion of its platform, including:
- Ensuring that CityFHEPS voucher holders receive know-your-rights information about SOI discrimination upon receipt of their shopping letter
- Increasing the size of the source of income unit at CCHR
- Increasing the payment standard of CityFHEPS to fair market rent
- Improving income requirements for CityFHEPS vouchers so that recipients can increase their income until they are financially self-sufficient without fear of losing their voucher.



## Support of the FARE Act

**Neighbors Together supports Intro 360, also known as the FARE Act, and encourages City Council to pass this bill into law swiftly.** With over 60% of our members being homeless or unstably housed, a rental assistance voucher can act as a lifeline. However, not all vouchers pay for brokers fees; Section 8, one of the most well-known vouchers, does not cover brokers fees. Prospective tenants with Section 8 end up stuck in homelessness because brokers fees are prohibitively expensive.

People with rental assistance vouchers receive them because they are low-income or working class, and need income support. Requiring someone with a voucher to pay a broker's fee can act as a subtle form of source of income discrimination, which is illegal in both New York City and New York State. If and when voucher holders do have to pay brokers' fees, they end up paying a significantly higher portion of their income towards broker fees than many prospective renters, making brokers fees an issue of equity.

The city recently opened the waiting list for Section 8 vouchers, and over 600,000 households (over three times more households than available waitlist slots) applied. These numbers demonstrate the severe need for affordable housing targeted to 30% AMI or below, but they also serve as further evidence of the need for the FARE Act- if over 600,000 households need income support through a rental assistance voucher, then those 600,000 households will likely be unable to afford brokers fees, which are not covered by Section 8. CityFHEPS vouchers do cover broker fees of up to 15% of annual rent, but if this cost were footed by the person who hired the broker, it would create cost-savings for New York City.  Additionally, if the FARE Act were passed, it would remove the incentive for brokers to discriminate against voucher holders.

Even tenants renting with cash can find it difficult to afford brokers fees.  There have been documented instances of brokers essentially holding hard-to-come-by rent stabilized apartments hostage by requiring an exorbitant broker's fee.  According to the New York Times, the average upfront cost of moving, including first month's rent, security deposit, and broker's fee, was more than $10,400 in 2023- the "largest sum in more than a decade and nearly 30 percent above the pre-pandemic figure in 2019."

## Conclusion

In order to address the historic homelessness and housing crisis in New York City, Council must do everything in its power to remove barriers to housing for working class and low-income New Yorkers, and the FARE Act is a common-sense way to do just that.  Passing the FARE Act will help make housing more accessible for tens of thousands of households with rental assistance vouchers, and will remove barriers to housing for other prospective tenants as well. City Council should vocally support and pass the FARE Act immediately.

For questions regarding this testimony, please contact Amy Blumsack, Director of Organizing & Policy at Neighbors Together, at amy@neighborstogether.org or 718-498-7256 ext. 5003.

New York State Association of REALTORS®, Inc.

130 Washington Avenue | Albany, NY 12210-2220
P 518.463.0300 | F 518.462.5474
info@nysar.com | www.NYSAR.com

June 12, 2024

New York City Council
Committee on Consumer and Worker Protection
New York City Hall
New York, NY 10007

RE: Testimony on Int. No. 360 (FARE Act)

The New York State Association of REALTORS® (NYSAR) thanks the Committee on Consumer and Worker Protection for the opportunity to submit written testimony on behalf of its more than 13,000 members living and working in New York City.

NYSAR strongly opposes Int. No. 360 (Osse) as it will harm renters and real estate licensees alike. Renters and real estate professionals in New York City are navigating the largest and most complex residential rental market in the United States, which suffers from historically low inventory and high rents due to failed policies.

The effort to eliminate broker's fees is the latest in a long list of efforts to artificially address the high cost of housing in New York by city and state governments alike. Existing rent regulation laws have done nothing to address the affordability crisis. More recently the passage of Good Cause Eviction laws and laws preventing rental resets have resulted in the prevention of thousands of housing units coming onto the market. Adopting a law that limits broker fees will once again do nothing to address our housing shortage.

The unaffordability of rental housing is driven by the low rate of housing development, which drives up prices. To put things in perspective, a January 2024 report by the New York City Comptroller stated that the median rent for public listed apartments citywide is $3,500, or $42,000 per year. The typical broker's fee on a median priced apartment – which is negotiable – would not exceed 15 percent of the annual rent, or $6,300. Lower priced apartments have lower broker's fees. However, the dearth of lower priced apartments is what makes the rental market in New York City so challenging. The solution is to build more rental housing, including affordable housing, not to shift the responsibility for compensation to an entire class of licensed professionals, as this bill would do.

The intent of the bill is to alter the current practice of a real estate licensee collecting this fee from the renter for their services rendered. Unfortunately, it would harm the renter by leading to higher rents, as the broker's fee would be included in the rent. Furthermore, the broker's fee would effectively be paid each year the lease is renewed, rather than paid once at the onset of the initial lease.

REALTORS® in New York State had an average median gross income of $36,150 in 2021. Wages for real estate agents in New York City typically start at $52,000 per year. Thus, many of the same professionals whose compensation model would be altered or eliminated under this legislation are middle income workers also dealing with the high cost of rental housing. As stated earlier, this bill would increase the already high cost of rent for many apartments as landlords will be forced to recoup the cost of compensating real estate brokers for services currently paid for by the tenant. The alternative to landlords not increasing rents to recoup the cost of broker's fees is to eliminate the use of real estate licensees altogether. Landlords would then be responsible for rental transactions directly or would hire unlicensed workers unfamiliar with fair housing laws.

| Joe Rivellino | Jacqlene Rose | Ron Garafalo | Duncan R. MacKenzie |
|---|---|---|---|
| President | President-Elect | Treasurer | Chief Executive Officer |

REALTORS® and other licensed real estate brokers and agents are required by law to complete mandatory fair housing and other continuing education courses to maintain their license with the Department of State. Real estate brokers and agents can be fined or have their license suspended or revoked by the DOS for fair housing violations. Furthermore, multi-family housing providers often rely on the expertise of REALTORS® to list, show and represent the property owner in the rental of their units. Under current practice, the broker's fee is typically paid at the onset of a lease. This upfront payment protects real estate licensees by delinking their compensation from monthly rent payments.

No renter is required to rent an apartment with a broker's fee, as many apartments in New York City do not require the payment of broker's fees. Prohibiting the collection of broker's fees from renters who do not hire real estate licensees would reduce the availability of licensees who work with property owners and drive many real estate licensees away from the rental business – limiting choice for renters.

For these reasons, the New York State Association of REALTORS® strongly opposes Int. No. 360 (Osse) and urges the Committee to not advance this legislation. Thank you for the opportunity to submit written testimony.

*The New York State Association of REALTORS® is a not-for-profit trade organization representing more than 64,000 of New York State's real estate professionals. The term REALTOR® is a registered trademark, which identifies real estate professionals who subscribe to a strict code of ethics as members of the National Association of REALTORS®. These REALTORS® are also members of the New York State Association of REALTORS® as well as their local board or association of REALTORS®.*



# NYSNA Testimony In Support of Intro 460/2024 (FARE Act)

## A Local Law to Amend the Administrative Code of the City of New York, In relation to the fees charged in a residential rental real estate transaction

### Judith Cutchin, DNP, RN, First Vice President, New York State Nurses Association (NYSNA)

My name is Judith Cutchin. DNP, RN, and I am a nurse at Woodhull Hospital, part of the NYCHH public hospital system.  I also serve as the First Vice President on the NYSNA Board of Director.

New York City is in the middle of an acute housing crisis.  Rents and home prices are getting higher and higher, homelessness is spreading, and more and more New Yorkers cannot find affordable homes.

As a lifelong New York City resident and front-line nurse at Woodhull for 32.5 years, I have seen first-hand how unaffordable rents impact my patients and my co-workers.

More than half of City renters pay more than 30% of their income on rent, and a third pay more than 50%.  Many of our patients are homeless or living doubled up in overcrowded apartments.  Unsafe or overcrowded housing and homelessness are major social determinants of community health.  The housing crisis is also a public health crisis that affects the prevalence of chronic disease, increases acute health conditions, and lowers New Yorker's life expectancy.

The housing crisis also affects nurses and other frontline healthcare workers.  Many nurses, especially those just starting their careers, are being driven out of the City because of high housing costs.  High housing costs are fueling the exodus of health workers from the bedside.

The affordability crisis is made worse by the high up-front costs of finding an apartment.  Tenants are required to pay application fees, the first month's rent, a month's rent as a security deposit, and, on top of all that, are also forced to pay thousands of dollars to rental brokers who are working for landlords.  Most New Yorkers cannot afford these high costs just to find a place.

The FARE Act would help to help to address this major housing barrier by requiring landlords who use brokers to pay the fees themselves.  Landlords would no longer be able to hire a broker and make tenants foot the cost.

Though this legislation will not by itself end the housing crisis in New York, it will make it easier for my patients and my co-workers to find a place to live.

NYSNA urges the city council to pass the FARE Act to immediately improve access to housing.

We also urge the council to consider other forceful measures to increase the supply of public housing and affordable private apartments and to reduce costs for rent burdened New Yorkers.

FOR THE RECORD



OPEN NEW
YORK

### <u>Committee on Consumer and Worker Protection</u>
**Testimony in support of Int. 360-2024: FARE Act**
**06/12/2024**

Thank you Chair Menin, Council Member Ossé, and the members of the Committee for the opportunity to share testimony in support of Int. 360. My name is Logan Phares and I serve as the Political Director of Open New York. Open New York is an independent, grassroots, pro-housing nonprofit. We have 12 chapters across the state with more than 600 volunteer members.

New York faces a severe housing crisis. In February, the <u>New York City Housing & Vacancy Survey</u> revealed that the rental vacancy rate had fallen to 1.4%, the lowest point since 1968, meaning that New Yorkers are experiencing the tightest housing market in decades. Of course, tenants know this crunch better than anyone. Rents are soaring, options for new apartments are limited, and long-time residents are being pushed out of their homes and neighborhoods.

While renters are suffering, landlords have more power than ever. Tenants are essentially forced to accept high rent increases and substandard living conditions, because the average upfront cost for a tenant to move into a different apartment in NYC is now over $10,000 – that's assuming you can even find a new apartment. And for anyone who wants to move to NYC and follow the dream of so many people before them, it is nearly impossible to find an affordable and safe home.

While it's clear that the City needs a comprehensive approach to increase the housing supply, building the housing we need will take time, and we must find ways to help alleviate the burden of the crisis on renters in the short term as well. Int. 360, or the Fairness in Apartment Rental Expenses (FARE) Act, is one way we can help to reduce the burdens on renters. This is simple, common sense legislation—whoever hires the broker should pay the fee—and it will save many renters thousands of dollars if and when they have to search for an apartment in New York City.

I am here testifying in favor of this bill today on behalf of my organization, but also as a tenant myself. Over the last four years my landlord has raised my rent by nearly 30% and neglected to make much-needed repairs because he knows that moving within NYC is a huge burden. He's right—with so few apartments available to rent and the upfront costs of moving being equivalent to 3 months rent—I have no bargaining power, and my landlord is able to take advantage of that situation.



Your landlord should always be afraid that you can find a new apartment, but until we create more housing and pass much needed reforms like the FARE Act, they will continue to have the upper hand.

We look forward to the passage of this legislation, and to working with the Council to pass City of Yes for Housing Opportunity, so we can start to build more housing in every neighborhood. Thank you for your time and consideration.

**THE LEGAL AID SOCIETY CIVIL**

Judith Goldiner
Law Reform Unit
49 Thomas Street, 5th Floor
New York, NY 10013
Jgoldiner@legal-aid.org
212-577-3332

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Adriene L. Holder
*Chief Attorney*
Civil Practice

Judith Goldiner
*Attorney in Charge*
Law Reform Unit

TESTIMONY OF THE LEGAL AID SOCIETY IN SUPPORT OF INTRO 360-24, A LOCAL LAW TO AMEND THE ADMINISTRATIVE CODE OF NEW YORK, IN RELATION TO THE FEES CHARGED IN A RESIDENTIAL RENTAL REAL ESTATE TRANSACTION

New York City Council Committee Consumer and Worker Protections

June 12, 2024

Thank you to Chair Menin, Council member Ossé, and the New York City Council Committee on Consumer and Worker Protection for the opportunity to speak at this very important hearing.

The Legal Aid Society

The Legal Aid Society (Legal Aid) is the nation's oldest and largest not-for-profit legal services organization. Legal Aid provides comprehensive legal services in all five boroughs of New York City for people who cannot afford to pay for private counsel. Since 1876, Legal Aid has advocated for low-income families and individuals and has fought for legal reform in City, State, and federal courts across a variety of civil, criminal and juvenile rights matters. Legal Aid takes on 300,000 cases annually, including thousands of cases in which we fight for the rights of tenants in regulated and unregulated apartments across the

**Justice in Every Borough.**

city.  Legal Aid also takes on law reform and appellate cases, the results of which benefit

more than 1.7 million low-income New Yorkers; the landmark rulings in many of these

cases have a state-wide and national impact.

The Legal Aid Society welcomes this opportunity to testify before the New York City

Council Committee on Consumer and Worker Protections concerning the unjustified and

outrageous fees that tenants must pay brokers to access housing in New York City.

Introduction 360-24

The Legal Aid Society strongly supports Intro 360-24.  The idea behind this bill is that

the party who hires a broker should be the party who pays the broker.  This would bring

New York City in line with almost every other city in the rest of the country.  It is a simple

concept, the party that hires a service pays for a service.  But where there is scarcity, it is

easy to gouge people who are desperate.

Our low-income clients cannot afford to move, even when they are living in

dangerous conditions.  Tenants who move must come up with the moving costs, security,

first months rent and fifteen percent of the annual rent costs for the broker's fee.  Moving

wipes out any savings our clients have.  This might be understandable if brokers provided

tenants with a service.  Instead brokers provide a service to landlords and then extort money

from desperate tenants.  For clients on public assistance, public assistance only pays ½ the

standard broker fee.  As a result, these clients cannot get brokers to rent them an apartment

unless they pay under the table – money they cannot afford.

Because brokers are unregulated, they are working with landlords to sell low rent regulated apartments to the highest bidder.  We have all read stories about brokers asking for a broker's fee that is greater than an apartments annual rent – 15,000 for a 1,100 a month apartment[1], 20,000 for 1,700 a month apartment[2].  The vacancy rate for apartments renting under $2400 is less than 1 percent.  There are almost no vacant apartments affordable to our clients and where brokers are demanding that low-income tenants pay over 10,000 as a brokers fee, it means that this scarce resource goes to high income tenants.

While the work that brokers do has changed significantly since the spread of the internet, the cost to prospective tenants has not.   Tenants do all the work to find housing and then must pay the broker to access that housing.  In a city where housing costs are already out of control, it is nonsensical that there is an industry that provides a service to landlords but relies on tenants to pay them.  During COVID, landlords paid the broker fee. That should be the rule again.

While we strongly support the idea behind Intro 360, we have some concerns about the language in the bill.  There is no definition of what it means for someone to employ a broker.  We are concerned that brokers will avoid the plain language of the law by requiring tenants to sign agreements that they are employing the broker.  We also think that there must be language added to prohibit owners from forcing prospective tenants to employ a certain broker.  We believe that the definition of employment should clarify that where a

---

[1] https://nypost.com/2024/02/08/metro/nyc-tenants-shocked-by-exorbitant-broker-fees-including-15k-to-secure-1100-rent-stabilized-queens-apartment/
[2] https://gothamist.com/news/nyc-brokers-charging-exorbitant-fees-forced-to-pay-260k-in-penalties

landlord hires a broker to market an apartment, that landlord employs the broker. These are minor changes that should be easy to effectuate. Brokers provide a service but that service is to the landlord seeking to rent an apartment. Tenants are not getting a service, they are merely forced to pay to access apartments.

This bill would help people searching for housing in New York City at all income levels but especially low-income people. We strongly support it.

Conclusion

Thank you so much to Council member Ossé for introducing and championing this bill. Thank you to Chair Menin and the members of the committee for considering this important bill.

Respectfully Submitted:

Judith Goldiner
Attorney in Charge, Law Reform Unit
The Legal Aid Society
49 Thomas
New York, NY 10013
212-577-3332



Licensed Real Estate Broker

Date: 6/11/24
Re: Testimony on Fare Act

In consideration of proposed legislation regarding broker fees and who is responsible for them, we must consider what is the problem we are trying to solve and what are the intended and unintended consequences of remedying the perceived problem. The council person who is proposing the legislation is woefully misguided in terms of the conditions of the market and tools that are used to navigate the market on the tenants' and owners' sides. As brokers it appears we are being targeted as the problem as it relates to affordable housing in NYC. Passing the cost of using brokers exclusively to one party or the other without consideration of market conditions will have a devastating effect primarily on the consumer.

If a tenant wishes to lease a unit without using a broker, they have that opportunity readily available. If legislation is required to fix the problem, I will ask the council to consider whether there is a problem. In Brooklyn as of today StreetEasy is showing 4,332 available rental units of which 2,749 are listed as no fee. 100 listings are being advertised by the owner. In Chelsea, Gramercy, West Village, East Village, LES, Noho, and Hudson Yards show 1,964 available rentals of which 932 of them are listed as no fee. Most listings in NYC are also advertised directly to public by the landlord or the landlord's agent by their own marketing outlets and efforts.

I am willing to bet that most landlords have not hired a broker to represent their property. Based on our work and reputation, certain landlords will give permission to several brokers to advertise their units. Only one of which is allowed to advertise on StreetEasy and Zillow sites based off StreetEasy and Zillow protocols and regulations. This should not be interpreted to mean that a broker is the exclusive broker or has been hired by a landlord or that the broker represents the landlord in any way. My knowledge of this is based off 20 years of being in this industry and understanding the nuances of how these relationships are formed working in several major firms and now operating independently as a small business. As brokers or salespersons, we are not considered the landlord's agent but rather a third party. In some instances, we pay our fiduciary responsibilities to the landlord, and in other instances we pay our fiduciary responsibility to the tenant. In some cases, a Broker represents both with advanced dual consent.

The consequences of legislating the broker's fee and who pays the fee will have devasting effects on our industry and will place an untenable burden on all New Yorkers including the wealthy, but particularly those of modest incomes. If the broker's fee is to be paid by an owner, that owner will forward that cost to the tenant in the form of higher rent. That ratio will include the fee amortized over the course of the lease term. In addition, they will include any administrative costs that they incur. Most tenants in NY stay in their units for more than a year. Landlords increase their rent based on perceived value, rate of inflation, and the CPI. This increase will be on top of the already inflated rent. Therefore, the tenant is now paying the fee several times over several years instead of paying a onetime fee when they initially signed the lease. The fee is significantly less expensive over the length of the lease as we do not charge repeatedly for multiple years.

Whoever pays the fee is directly driven by the market demand, and perceived value of any unit. This is regardless of who the broker represents. It is also always negotiable. When the historic pandemic shutdown happened in NYC the landlords immediately switched to paying the fee and reduced their rents by a massive margin. In many cases these fees were negotiated with the landlord.  In many cases as much as 50% lower than its normal rate of the rent and the fee. If the council passes such legislation, it will prevent a landlord from offering an incentive to a tenant by offering to pay the renter's broker. Imagine in the middle of the next shutdown, or financial disaster where demand has fallen dramatically. The tenant still must pay a fee even though the market conditions do not merit them doing so. Also consider the inherent problem that arises with new building developments. The owners often need to fill up their vacancies quickly and offer to pay a broker's fee to the tenant's broker and added free rent. October through February is the slowest time of year for rentals. Many

times, landlords will offer to pay the brokers fee for the tenant broker as an incentive to lease. Under this proposed legislation it would be illegal for them to do so. This would be placing an undue burden on both sides.

It is highly doubtful that tenants in NYC, knowing this dynamic, would be happy to pay the higher rents. Rents are at an all-time high. The vacancy rate is historically low. I doubt that the council person proposing this legislation has sufficient evidence that most tenants understand this dynamic and would support paying higher rents than they are currently paying. It is our experience that most tenants are becoming exhausted by the incessant rent increases this city has seen post the global pandemic shutdown. Many of those increases have occurred based on recent legislation. However, most increases are based on the demand for housing far exceeding available units. The broker's fee is not the problem. Legislating this portion of a transaction causes more harm than it does good to both the tenant and landlord. More affordable housing stock is the only reasonable answer to bringing costs down for everyone. The city council should instead work with the state and private sector to enact programs that directly impact the issue of affordable housing development and empowering at risk communities with new investment.

I am a native New Yorker who has lived in every borough of the city. I grew up in Bronxdale projects from a modest income single parent household. I have never paid a broker's fee. This is because I was aware that I could find suitable housing without paying the fee. It is a choice! As an Afro Puerto Rican, who now owns a small business with my partner who is a woman, who was born of modest means and who is active in several charitable initiatives aimed at improving the lives of our community, I am failing to understand how the council person is protecting our community with this initiative. It appears to me that the council person is working against what is in the best interest of all New Yorkers and small businesses. Trying to score political points on the backs of small business in this environment is tone deaf. What New Yorkers need is more affordable housing. Short of that, these types of initiatives will do very little to bring housing costs down. It will in fact make the already inflated market more expensive while doing nothing to increase New Yorker's ability to afford it.

Sincerely

*Nelson M. Cabassa*

Nelson M. Cabassa
Principal Broker
Brooke Baker
Managing Partner and CFO
Urbane Brokerage Inc.

**10 West 74th Street Ste # LLA New York, New York 10023**

I had a pay a 12% broker fee for an apartment I moved into year in the Lowest East Side of Manhattan. This is absolutely ridiculous, more so because I found the apartment myself. The broker being there added zero value to the process for me – and yet I'm expected to foot the entire bill, almost 1.5 months of rent. Please let this bill pass and do right by the vast majority of New Yorkers instead of cowering to Real Estate interests.

Good morning,

My name is Adam Graubart, and I moved to New York 4 years ago to study at rabbinical seminary. My Jewish tradition teaches me in Leviticus 25:14, "When you sell property to your neighbor, or buy any from your neighbor, you shall not wrong one another," and later Jewish law clarifies that this verse refers to overcharge. My tradition is clear – price gouging is wrong. Beyond Jewish communities, this principle makes moral and practical sense for people throughout our city. Forcing tenants to pay exorbitant fees – for a broker they were forced to use and did not hire themselves – at a time when their housing situation is most uncertain is exploitative. Personally, as a graduate student, I live on a fixed income. If I ever needed to move, paying current rates for a broker's fee could push me to drain my savings or need to leave the city altogether. The Council has a moral obligation to create a system in which real estate cannot extract additional profits from the limited funds of working class and middle class tenants.

Moreover, REBNY members claim that this bill would tie that hands behind their back, but let us be clear landlords do not need to take advantage of tenant vulnerability and drive real estate profits. I also agree with Councilmember Ossé that rent stabilization and market forces negate REBNY's claims that this bill will lead to rapid increases in rent. This wringing of New Yorkers trying to make ends meet for the sake of profit is not inherent. It is a willful act.  I implore the Council to not acquiesce to the pressure and false claims of the monied interests and hold the line for tenants by passing the FARE Act.

**From:**      Alan Morningstar
**To:**        New York City Council
**Subject:**   Written Testimony In Re: Broker Fees

Dear Councilpersons,

I support the broker fee law that is being proposed. I suggest that you don't let the voice of special interests drown out the millions of hard working New Yorkers that are affected negatively by this bill every single day who don't even know about this hearing.

Sincerely,

Alan Morningstar

1 ███████

NYC Hearing on Proposed Rules Concerning the FARE ACT

Committee on Consumer and Worker Protection

June 12, 2024

I urge you to support the FARE Act.

New York is one of the only U.S. cities where tenants have to pay for a broker they did not hire. Those fees can range from one month's rent up to 20% of the annual rent depending on the market. In a rental market with a 1.4% vacancy rate, broker fees are a barrier preventing people from moving. The market that is so constrained with so few options available to low- and middle-income New Yorkers, and so many tradeoffs need to be made when looking for a place to live. Renters are constantly forced to move due to a lack of negotiating power with their landlords, who have all of the options on this market. Renters are stuck deciding whether to stay in an apartment where the rent is being hiked unpredictably or moving and depleting their savings by paying thousands of dollars in brokers fees on top of the extreme unaffordability of the market.

Brokers can also charge whatever they like in such a competitive housing market, regardless of the value of the service, which can be just unlocking a door, if anything. Why would they be incentivized to point clients towards affordable apartments, or even serve low-income renters, when they get a bigger fee based on what the apartment is renting at? The fees should match the service provided, and a possibly painful change to right-size the real estate industry is needed in New York.

Before the internet, when brokers had to hustle to list apartments in an array of publications, answer calls, arrange tours and handle all the necessary paperwork, maybe a fee was warranted. But now any prospective tenant can find an apartment online, in many cases tour it virtually from their phone and never meet a broker. Those of us who have been through the rental search know that those of us who manage to find an affordable apartment rarely do so through a broker, but rather through friends and family, housing connect, or directly with a landlord starting with their postings in windows or yards.

This legislation is common sense, and I hope the Committee and Council show that they are on the side of New Yorkers looking for homes and stability. I thank you for this opportunity to submit testimony.


Alex Moscovitz

Resident of City Council District 35

**Alexa Santiago**

██████████
Baltimore, MD 21217
██████████
alexacsanti@gmail.com


7th June 2024

**Subject: Testimony in Support of Ending Forced Broker's Fees for Renters in New York City**


Dear Reader,

My name is Alexa Santiago and I was a former resident of the Yorkville / Upper East Side neighborhood in New York City. I am writing to express my strong support for the proposed legislation to end forced broker's fees for renters in New York City.

In New York City, the current practice of requiring renters to pay broker's fees is a significant financial burden. These fees, which can amount to as much as **20% of the annual rent**, are often unexpected and can pose a serious obstacle for individuals and families seeking housing.

As a former resident of New York City, I have experienced firsthand the challenges associated with broker's fees. In October 2023, I was laid off from my full-time position at a tech startup, resulting in the loss of my primary source of income for rent and other living expenses. With New York's unemployment benefits providing $441 weekly post-taxes, amounting to approximately $1,764 monthly, I was unable to meet my rent of $1,952.33. This shortfall left me struggling to cover essential expenses such as utilities, WiFi, and food.

In an effort to find more affordable housing, I searched for apartments in Harlem and Queens. However, the required upfront costs, including the broker's fees, amounted to at least $8,000, covering the first month's rent, security deposit, and broker's fee, excluding moving expenses or lease termination fees. Even if I had been in a better financial position, the necessity of nearly $10,000 for renting an apartment in an older building without luxury amenities or an elevator seemed both unrealistic and inequitable, especially considering stagnant wages and rising inflation.

New York City is renowned for its high cost of living. While I believe in fair compensation for services rendered, it seems unreasonable to pay a $4,000

broker's fee simply for someone to arrange a showing of an apartment I found independently on StreetEasy. I did not engage the broker's services to locate the apartment; I discovered it online. Every expense matters in today's economic climate, and it stands to reason that if landlords hire brokers to fill their properties, they should bear the cost of broker's fees, not the tenants.

## Further Points in Favor of Ending Broker's Fees

1. **Financial Burden on Renters**:
   - Broker's fees can add thousands of dollars to the upfront cost of renting an apartment. For many renters, especially those with lower incomes, this creates a significant financial barrier.
2. **Lack of Transparency and Choice**:
   - Often, renters are not given a choice about whether to use a broker, and the fees are presented as a non-negotiable part of the rental process. This lack of transparency is unfair and exploitative.
3. **Market Distortion**:
   - Broker's fees artificially inflate the cost of moving, distorting the rental market and making it more difficult for renters to find affordable housing.
4. **Precedents in Other Cities**:
   - Other major cities, including Chicago and Washington D.C., do not allow brokers to charge fees to renters. These models demonstrate that the rental market can function effectively without imposing these additional costs on tenants.

Ending forced broker's fees is a necessary step towards making housing more affordable and accessible in New York City. This change would alleviate a significant financial burden for renters, promote fairness and transparency in the housing market, and align our city with best practices observed in other metropolitan areas.

I urge you to support the legislation to end forced broker's fees and help ensure that all New Yorkers have a fair chance at securing affordable housing.

Thank you for your time and consideration.

## Sincerely,

Alexa C. Santiago

Amy Condie
Regarding the FARE Act
June 13, 2024

My name is Amy Condie and I am a resident of Brooklyn, formerly Manhattan, and a REBNY affiliated real estate agent. I am testifying in support of Chi Osse's FARE Act and believe that whoever hires the real estate agent needs to pay the broker fee.

This may come as a surprise given my profession as a real estate agent, however I am first and foremost a citizen of New York City and believe that broker fees are causing emotional and financial distress for New Yorkers.

When I was 23 years old, I was in an abusive relationship with an older man. He had convinced me to move into his apartment on the grounds that I would pay minimal rent considering his financial status. At the time, I was making $40,000 a year in my job in fashion after graduating from the Fashion Institute of Technology. I jumped at the opportunity to significantly reduce my rent.

After years of emotional and physical abuse, once I saved up enough to pay first month's rent and the security deposit, I decided that it was time to leave. Except every time I looked for an apartment, I didn't have enough money to pay the broker fee. I was stuck.

In New York, the average price of a 1 bedroom apartment is around $3,500. Which means that a tenant needs $7,000 for the security deposit and first month's rent. On top of that, they would also need a 15% broker fee, an additional $6,300 that does not get refunded at the end of the rental period, unlike the security deposit. With so many New Yorkers living paycheck to paycheck, requesting almost 4x the monthly rent up front is impossible for some.

From an agent's perspective, with the emergence of websites like Streeteasy, tenants are now able to procure their own apartments, eliminating a large part of the agent's role. And while procuring apartments is easier for the tenant, it's a nightmare for the agent. Many agents don't want to co-broke, especially during busy periods, so once you find the perfect apartment for your client, your client will need to set the appointment because listing agents who are receiving the fee from the tenant won't respond to agents! Only agents who are being paid by the landlord respond because they're getting paid anyway.

In conclusion, the current broker fee system sucks for both the tenant and the agent. If the landlord hires an agent, they should pay the broker fee. There is no reason that

a tenant who procures their own apartment should pay 1.8x the rent to an agent who opened a door for them.

Thank you for reading my testimony.

Best Regards,
Amy Condie

June 12th, 2024

Dear Members of the NYC Council,

I am writing to express my full support for the FARE (Fairness in Apartment Rentals) Act sponsored by Councilmember Chi Ossé, a critical initiative aimed at addressing inequities in the rental housing market in New York City. The current practices surrounding broker fees create significant barriers for tenants, hindering their ability to secure affordable housing and navigate an already challenging rental market. I am a community and cultural leader on the East Side of Manhattan, a cradle to some of the greatest American artists who have ever lived, which is endangered by an unprecedented crisis of affordability.

New York City stands out as one of the few American cities where tenants are burdened with paying broker fees, even if they did not hire the broker themselves. These fees, which can sometimes amount to as high as 20% of the annual rent, pose a substantial financial obstacle for individuals and families seeking housing. In a rental market with a meager 1.4% vacancy rate, broker fees are not just a financial burden but also a barrier that limits mobility and exacerbates housing insecurity for many New Yorkers.

The FARE Act, as proposed by Councilmember Osse, seeks to rectify this unjust practice by requiring the person who hires the broker to pay their fee. Currently, tenants are unfairly saddled with these fees, leaving them vulnerable to exorbitant costs even when the broker was hired by the landlord. The FARE Act represents a crucial step towards ensuring transparency, fairness, and affordability in the rental housing market, aligning with the values of equity and social justice that define our city.

The average upfront cost, including broker fees, to move into a rental in New York City soared to $10,454 in 2023, a 29% increase from before the pandemic. This financial burden disproportionately impacts low-income individuals and exacerbates housing insecurity in our city. It is imperative that we enact measures like the FARE Act to protect renters, promote fairness, and create a more equitable housing landscape for all New Yorkers.

I thank Chair Menin and Speaker Adams for bringing this legislation to a hearing, which comes at a time when trust in government, particularly from young people like myself, is at an all time low. I urge each member of the Council to support the FARE Act and advance this legislation to bring about concrete, positive changes in our rental housing market. Let us stand together in support of fairness, transparency, and affordability for all residents of New York City.

Sincerely,

Andrea Gordillo
East Village/LES resident, Community, and Cultural Leader

Testimony from Andrea Joseph on behalf of UAW Region 9A in support of INTRO 360 the FARE Act

Good morning councilmembers,

My name is Andrea Joseph, I am a postdoctoral fellow at Mt Sinai and am the President of United Auto Workers Local 4100. Today, I have the pleasure of speaking not only on behalf of my members in Local 4100, but all our New York City members in Region 9A.

In Region 9A, we represent workers in nonprofits, arts, museums, higher education, movie theaters, car dealerships, sciences and more. And, the vast majority of our membership are renters.

We have a housing and affordability crisis in our city. Our members work hard. We fight at the bargaining table for everything we get. I know this firsthand, my shop at Mt Sinai, now in Local 4100 went on strike for a first contract last winter.

In our strike, we won nation leading wages for postdocs, we are proud of that, but I am equally proud that we stayed on strike to win housing guarantees for our members. The reason we did this is because we are a majority immigrant workforce. We knew that if we didn't fight for it at the bargaining table, and our members were subject to the open market, they would be vulnerable to exploitation by broker fees.

Along with housing, the other issues we stayed on strike for were to keep women in the sciences, and childcare subsidies. I've heard from members across our region, that they are deciding to move out of the city because they cannot afford an apartment with space for their families. Broker fees, despite our members searching Zillow, streeteasy, and the likes make it nearly impossible for working class families to upgrade to bigger apartments.

One example of this I heard was from a leader in our union with a young child who wanted to move within his rent stabilized building to a newly

vacant apartment one floor down. He has a 18 month daughter and when he asked about moving into the other apartment, the landlord tried to charge him a broker fee by connecting him with his preferred broker, instead of letting him transfer. This was someone already paying a monthly rent to this exact landlord. That worker is now moving out of that building, moving further from his daughter's school, friends, and family because they needed more space.

I'll close here, I mentioned in the beginning that I am a postdoctoral fellow at Mt Sinai. I study, pregnancy, maternal, fetal, and neonatal health. You don't need my degree to know that for a thriving city, a city that supports families, and that supports workers, we need to be supporting our next generation.

At the bargaining table, UAW fights for workers to get our fair share. But we also stand for the entire working class because not everyone is in a union. As the UAW we fundamentally support Councilmember Ossé's INTRO 360 and know that if you procure a real estate agent, you should be paying for it. That is only fair. We stands with all our allies in supporting the FARE Act. Thank you.