# Exhibit C

<u>Consumer and Worker Protection Committee Staff</u>
Sarah Swaine, *Legislative Counsel*
Natalie Meltzer, *Legislative Policy Analyst*
Glenn Martelloni, *Financial Analyst*

<u>Oversight and Investigations Division Staff</u>
Meagan Powers, *Deputy Director*
Zachary Meher-Casallas, *Assistant Deputy Director*
Kevin Frick, *Assistant Deputy Director*
Brian Parcon, *Investigative Counsel*
Katie Sinise, *Investigator*
Amisa Ratliff, *Investigative Policy Analyst*
Uzair Qadir, *Data Scientist*



**THE COUNCIL OF THE CITY OF NEW YORK**
**COMMITTEE REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION**
Andrea Vazquez, *Legislative Director*
Rachel Cordero, *Deputy Director*

**COMMITTEE ON CONSUMER AND WORKER PROTECTION**
Hon. Julie Menin, *Chair*

**November 13, 2024**

| | |
|---|---|
| **PROPOSED INT. NO. 360-A:** | By Council Members Ossé, Abreu, Feliz, Hudson, Krishnan, Nurse, Marte, Hanif, Brooks-Powers, Cabán, Sanchez, Louis, Won, Gennaro, Bottcher, Powers, Gutiérrez, Holden, Salaam, Hanks, Restler, Joseph, Avilés, De La Rosa, Stevens, Farías, Narcisse, Williams, Salamanca, Banks, Riley, Rivera, Ayala, Hanks and the Public Advocate (Mr. Williams) (in conjunction with the Brooklyn and Queens Borough Presidents) |

1

**TITLE:**  A Local Law to amend the administrative code of the city of New York, in relation to the payment of fees imposed in relation to the rental of residential real property

I.  **INTRODUCTION**

On November 13, 2024, the Committee on Consumer and Worker Protection, chaired by Council Member Julie Menin, will hold a vote on Proposed Introduction Number 360-A (Proposed Int. No. 360-A), in relation to the payment of fees imposed in relation to the rental of residential real property. The Committee heard an earlier version of this legislation on June 12, 2024 and received testimony from the Department of Housing Preservation and Development, members of the real estate and brokerage industries, tenant advocates, and other interested members of the public. Since the hearing, the Council continued to meet with stakeholders including real estate associations, real estate marketplaces, real estate brokers, property owners, tenants and legal advocates to gather feedback on the legislation.[1] In addition, in September and October 2024 the Council's Oversight and Investigations Division (OID) conducted an investigation of brokers' fees in the residential rental market.[2] The goal of the Council investigation was to better understand whether the current legal regime that governs the payment of brokers' fees properly protected the consumer rights of tenants.

---

[1] The Council met with organizations including the Real Estate Board of New York, Zillow/StreetEasy, the Legal Aid Society and the New York Apartment Association.

[2] Council investigators posed as prospective tenants and contacted real estate agents regarding more than 300 rental listings on StreetEasy that did not indicate a property owner would pay the broker fee. For 99 of those listings, investigators successfully received an application for the unit, and investigators toured 50 of those rental units. Investigators obtained applications from rental listings across the five boroughs, in approximate proportion to the estimated number of rental units in each borough.

## II.     **BACKGROUND**

According to the NYU Furman Center's *State of New York City's Housing and Neighborhoods in 2023* report, over 67 percent of New Yorkers are renters.[3] More than half of New York City's rental units are owned by landlords that have over 20 buildings in their portfolio and 27 percent of rental apartments are held by landlords with 61 or more buildings.[4]

The City's housing market is highly competitive, and finding affordable housing has become increasingly difficult, particularly for those with limited financial means. Median "asking rent" on publicly listed rentals citywide reached a historic high in 2023 and remains $3,500 per month.[5] The portion of rentals that were vacant and available dropped to just 1.4 percent in 2023, the lowest vacancy rate since 1968.[6] The vacancy rate for affordable housing is even lower: units with asking rents of less than $1,650 per month had a 0.65 percent vacancy rate, and rent stabilized apartments had a 0.98 percent vacancy rate.[7] Over half of New York City households are rent burdened, with 23 percent of households spending 30-to-50 percent of their income on rent, and 30 percent of households spending 50 percent or more of their income on rent.[8]

When renting a new home, prospective tenants face a variety of upfront costs: first month's rent, security deposit, fees for credit reports and background checks, and other moving expenses.[9]

---

[3] New York University Furman Center, *State of New York City's Housing and Neighborhoods in 2023*, available at https://furmancenter.org/stateofthecity.
[4] Sam Rabiyah, *Examining the Myth of the "Mom-and-Pop" Landlord*, JustFix.nyc, March 4, 2020, available at https://medium.com/justfixorg/examining-the-myth-of-the-mom-and-pop-landlord-6f9f252a09c
[5] Brad Lander, *Spotlight: New York City's Rental Housing Market*, January 17, 2024, available at https://comptroller.nyc.gov/wp-content/uploads/documents/January-2024-Spotlight.pdf
[6] NYC Housing Preservation and Development, *2023 Housing and Vacancy Survey Selected Initial Findings*, p. 22, available at: https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf
[7] Id.
[8] New York University Furman Center, *State of New York City's Housing and Neighborhoods in 2023*, available at https://furmancenter.org/stateofthecity.
[9] Scott M. Stringer, *Insecurity Deposits: A Plan to Reduce High Entry Costs for NYC Tenants*, New York City Comptroller, July 15, 2018, available at https://comptroller.nyc.gov/reports/insecurity-deposits-a-plan-to-reduce-high-entry-costs-for-nyc-tenants/.

The statewide Housing Stability and Tenant Protection Act of 2019 limits the amount a landlord can collect as a security deposit to one month's rent and prohibits landlords' agents from charging an application fee of more than $20 for a background or credit check.[10] In addition to the above expenses, many tenants moving into a new apartment must also pay a fee for a real estate broker engaged by the property owner.[11]

### a. The Role of Real Estate Brokers in New York's Rental Market

A real estate broker is a, "person, firm, limited liability company or corporation, who, for another and for a fee, commission or other valuable consideration, lists for sale, sells, at auction or otherwise, exchanges, buys or rents, or offers or attempts to negotiate a sale, at auction or otherwise, exchange, purchase or rental of an estate or interest in real estate, or collects or offers or attempts to collect rent for the use of real estate…"[12] Individuals working as real estate brokers, or their agents, in New York must secure a license from the Department of State.[13] There are currently over 21,000 licensed real estate brokers and agents in New York City.[14] Brokers and their agents can work on behalf of the landlord or the tenant. Landlords' agents are engaged by the landlord to secure a tenant for the property on terms acceptable to the landlord and represent the landlord's interest.[15] Tenants' agents are engaged by prospective tenants to negotiate the rental or lease of an apartment or house at a rent and on terms acceptable to the tenant and represent the

---

[10] New York State Department of State, Guidance for Real Estate Professionals Concerning the Statewide Housing Security & Tenant Protection Act of 2019 and the Housing Stability and Tenant Protection Act of 2019, May 2021, available at: https://dos.ny.gov/system/files/documents/2021/05/dos-guidance-tenant-protection-act-rev.5.25.2021.pdf.
[11] David Brand, *A rent-stabilized 1 bedroom apartment for $1,100? In NYC? The broker's fee is $15K, Gothamist/WNYC,* February 8, 2024, available at: https://gothamist.com/news/a-rent-stabilized-1-bedroom-apartment-for-1100-in-nyc-the-brokers-fee-is-15k.
[12] RPP § 440.
[13] RPP § 440-a.
[14] Data.NY.gov, Active Real Estate Brokers, available at: https://data.ny.gov/Economic-Development/Active-Real-Estate-Brokers/9twf-9yig/data
[15] New York Real Property Law § 443.

4

tenant's interest.[16] In some instances, brokers in New York operate as "dual agents" that represent both the landlord and tenant in the same transaction.[17]

Broker fees typically range from one month's rent, or 8.3 percent of the annual rent, to 15 percent of the annual rent as a fee when signing the lease for a rental.[18] That fee can be paid by the apartment owner or the prospective tenant; StreetEasy found that about half of rental listings in 2023 were marked as "no fee" for the tenant, meaning the broker fee is paid by the property owner or there is no landlord broker involved in the transaction.[19] According to StreetEasy, the "no fee" apartments tend to be in luxury buildings with amenities such as doormen, in-unit laundry and fitness centers.[20]

Many landlords in New York City choose to list their units through what is called an "open listing" in which a property owner engages multiple brokers or agents to list a property and the broker that succeeds in finding the tenant to fill the vacancy collects the fee.[21] In some instances the property owner and brokerage enter into a contract for an open listing, however, in conversations with agents the Council learned this is not always the case. As part of the open listing agreements or communications, the landlord specifies whether they will pay the broker fee or whether the prospective tenant will be expected to pay the broker fee.

### b. Regulation of Broker Fees

---

[16] Id.

[17] Id.

[18] *See, e.g.*, Brick Underground, *How to rent an apartment in New York City, Step 1: Do you have to pay a broker's fee?*, *available at*, https://www.brickunderground.com/agent-referral/how-to-rent.

[19] Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*, StreetEasy, February 10, 2024, available at: https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/.

[20] Testimony of Zillow, New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&

[21] Maggie Glascott, "What is an Open Listing?" *StreetEasy,* August 11, 201, available at: https://streeteasy.com/blog/what-is-an-open-listing/

In most of the United States, it is the landlord's responsibility to pay the broker's fee for listing their property and finding a tenant.[22] This almost universal system aligns with basic norms around principal-agent relationships. When a principal hires an agent, like a real estate broker, the agent's fiduciary duties rest with the principal, not with a third party. The agent must act to protect the principal's best interests. Accordingly, the principal is typically responsible for paying for that agent. New York and Boston are the only major American cities where rental broker fees are commonly passed to the tenant regardless of whether they hired the broker.[23] In addition, states including Alaska, Colorado, Florida, Kansas, Maryland, Oklahoma, Texas, Vermont, and Wyoming have banned dual agency because it fosters inadequate representation and creates negotiation issues.[24]

For a brief period, New York State's rules were like most of the country. In early 2020, the New York Department of State announced that brokers acting on behalf of landlords could not be compensated by prospective tenants based on an interpretation of the Housing Security & Tenant Protection Act of 2019.[25] Days later, the New York Supreme Court issued a short-term restraining order on the ban after the Real Estate Board of New York filed suit arguing that the policy was never addressed as part of the rent laws adopted by the State Legislature.[26] In 2021, the

---

[22] Kevin Sun and Katherine Kallergis, *Broker fees for NYC rentals mystified outsiders. Here's how other US cities do it*, The Real Deal, February 7, 2020, available at: https://therealdeal.com/new-york/2020/02/07/broker-fees-for-nyc-rentals-mystified-outsiders-heres-how-other-us-cities-do-it/.

[23] Erin Lowry, *NYC Rents Are Outrageous. And That's Before the Broker's Fee*, *Bloomberg*, November 10, 2023, available at: https://www.bloomberg.com/opinion/articles/2023-11-10/nyc-rents-are-outrageous-and-that-s-before-the-broker-s-fee.

[24] Josephine Nesbit, *What Is Dual Agency?*, *US News and World Report*, June 21, 2023, available at: https://realestate.usnews.com/real-estate/articles/what-is-dual-agency.

[25] Jake Offenhartz, *Say Goodbye To 'Insane' Brokers Fees! (The Landlord Pays Those Now)*, Gothamist, February 5, 2020, available at: https://gothamist.com/news/say-goodbye-insane-brokers-fees-landlord-pays-those-now.

[26] Matthew Haag, *Sorry, Renters: You Still Have to Pay Brokers' Fees for Now*, *The New York Times,* February 10, 2020, available at: https://www.nytimes.com/2020/02/10/nyregion/nyc-broker-fees.html.

prohibition on brokers collecting fees from renters pursuant to the Housing Security & Tenant Protection Act of 2019 was struck down by a judge.[27]

### III.   Issues and Concerns Related to Broker Fees

Broker fees can be a significant financial burden for New York City renters who wish to move. In 2023, the average New York City renter moving to a new apartment spent $10,454 in upfront costs—a sum equivalent to 14 percent of the city's median household income of $74,694.[28] The high costs of broker fees induce some individuals to remain in apartments that they no longer wish to live in.[29] According to the Citizen's Budget Commission, the annual turnover rate for New York City rental units is 41 percent lower than the national average and the share of renters who have lived in their unit for more than 10 years is also 3.5 times higher than the national rate.[30] The 2023 New York City Housing and Vacancy Survey found that tenants who moved from 2021 to 2023 are more likely to be white and have higher incomes than those who remained in their homes.[31] In StreetEasy surveys, 60 percent of New York City renters said broker fees prevent them from moving into a different apartment and over half of the city's renters (54 percent) would be willing to pay a higher monthly rent if they didn't have to pay upfront broker fees.[32]

---

[27] David Cruz, *Those Hefty Broker's Fees Can Still Be Collected Following State Judge's Ruling*, Gothamist, April 10, 2021, available at: https://gothamist.com/news/those-hefty-brokers-fees-are-returning-following-state-judges-ruling.

[28] Lee.

[29] See testimony of Annie Abreu, Sean Davis, Boris Youssefov, Amy Condie, New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&

[30] Sean Campion, "A Building Crisis: The Quality-of-Life, Population, and Economic Effects of Housing Underproduction," Citizens Budget Commission, June 2024, available at: https://cbcny.org/sites/default/files/media/files/CBCBRIEF_NYC-Housing-Underproduction_06252024.pdf

[31] NYC Housing Preservation and Development, *2023 Housing and Vacancy Survey Selected Initial Findings*, available at: https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf p. 46-47

[32] Caroline Burton, "Changing broker fees helps all for NYC rentals," *The Daily News*, November 12, 2024, available at: https://www.nydailynews.com/2024/11/12/changing-broker-fees-helps-all-for-nyc-rentals/; Testimony of Zillow, New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&

This bill addresses a market failure stemming from the fact that tenants are often forced to pay a broker's fee despite lacking a meaningful ability to negotiate the amount of those fees. While it is possible to negotiate with brokers regarding their fees, and many brokers emphasized that their fees are negotiable during the June 2024 hearing,[33] prospective tenants in New York City find that industry norms and the highly competitive rental market weaken bargaining power for anyone other than landlords or property owners. The Council's investigation underscored the inability for tenants to negotiate broker fees: when investigators inquired whether the broker fee was negotiable during their tours, they were told an unequivocal "no" by half of the brokers they asked. In many instances, the real estate brokers indicated that while the fee was technically negotiable, a renter who offered a lower broker fee would likely stand little chance of securing the unit.[34] Other brokers responded that they would not negotiate the fee unless the landlord agreed to pay a portion of it.

During the June 2024 hearing, representatives of the brokerage industry claimed that "every person signs a brokerage agreement in advance of seeing that apartment, which clearly sets forth what the broker fee is" and that this is "what the law provides."[35] However, this does not typically happen in practice—Council investigators toured 50 rentals, and on not one of those tours was the "prospective tenant" required to sign an agreement in advance which clearly set forth the agency relationship and broker fee. During the hearing, tenants also reported that they responded to listings that either did not indicate there was a broker's fee or were advertised as "no fee" and

---

[33] See testimony of New York State Association of Realtors, New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at:
https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&

[34] There are reports of tenants entering into "bidding wars" over broker fees to get a better chance of securing apartments; see Anna Bradley-Smith, "In Brooklyn's Heated Rental Market, Broker Fees Return With a Vengeance," *Brownstoner*, August 3, 2022, available at: https://www.brownstoner.com/real-estate-market/broker-fee-brooklyn-rental/

[35] Ryan Monell before the New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&e

8

were surprised to be told they need to pay such a fee once they had already visited the apartment and submitted paperwork or even a non-refundable deposit.[36]

There is also substantial variation between whether brokers engaged by the landlord ever disclose their agency relationships and, when they do disclose their relationships, who they claim to represent. In the Council's investigation of apartments that required the tenant to pay the broker's fee, only 35 percent of real estate agents who sent OID investigators a rental application also provided a copy of the New York State Disclosure Form for Landlord and Tenant.[37] In the disclosure forms received by Council investigators, 63 percent of brokers said they were a landlord's agent, 20 percent said that they were a tenant's agent, and 11 percent disclosed that they were a dual agent. This difference in agency relationship did not correlate meaningfully with the provision of different services being provided by the broker. In other words, Council investigators were not given any more specialized service by the agents who claimed that they were the tenant's agent. In none of these instances did the Council investigator seek to hire a broker.

Although brokers hired by property owners may perform many services to help the landlord fill a unit such as taking photographs and listing it on online platforms, many of the renters who pay their fees have little or no interaction with them. At the June 12, 2024 hearing, multiple renters including Brooklyn Borough President Antonio Reynoso testified that they were expected to pay a fee for a broker they never even met when looking for an apartment.[38] Representatives of the real

---

[36] See testimony of Gladys Pugio, Alexandra Martinez, Amanda Maisel, Alexa Santiago New York City Council Committee on Consumer and Worker Protection, June 12, 2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&

[37] New York Department of State, "New York State Disclosure Form for Landlord and Tenant," available at: https://dos.ny.gov/system/files/documents/2019/11/1735-f.pdf N.Y. RPL § 443 requires agents in certain types of residential real estate transactions (including rentals of condominiums, cooperatives, and buildings with fewer than five families) to provide the parties a disclosure form. The law outlines specific information the form must include, and the New York State Department of State publishes a version on its website.

[38] See testimony of Brooklyn Borough President Antonio Reynoso, Mary Sommerville, Olivia Palumbo, Sarah Farma and Tiffany Mathias, New York City Council Committee on Consumer and Worker Protection, June 12,

estate industry claimed this was exceedingly rare; however, in 12 percent of the rentals toured by Council investigators, no one from the brokerage was present at the unit but instead left tours to building superintendents or even left the door unlocked for the prospective tenants to let themselves in.

Opponents of the bill testified at the June 12, 2024 hearing that the bill was not a solution to the affordable housing crisis in the city. This sentiment misunderstands the purpose of the bill. The bill is not an attempt to solve the affordability crisis in the city. Solutions to that problem are being explored by the Council in multiple other avenues.[39] The purpose of this bill is to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party.

### IV.  BILL ANALYSIS

**Proposed Int. No. 360-A—A Local Law to amend the administrative code of the city of New York, in relation to the payment of fees imposed in relation to the rental of residential real property**

Proposed Int. No. 360-A would add subchapter 15 to chapter 4 of title 20 of the Administrative Code. Section 20-699.20 of this bill would add definitions for "agent," "dual agent," "engage," "fee," "landlord," "landlord's agent," "lease," "listing," "listing agent," "listing agreement," "residential real property," "tenant," and "tenant's agent."

Section 20-699.21 of this bill would prohibit a landlord's agent from imposing their fee on a tenant. This would include an agent who publishes a listing with the landlord's permission or authorization. It does not prohibit a third party other than the tenant from paying a fee to a

---

2024, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1192722&GUID=50BE660E-5533-4C79-BB0E-4EA46295DD3B&e
[39] *See, e.g.,* Speaker Adrienne Adams, Council Members, and Advocates Announce City for All Housing Plan to Advance Comprehensive Housing Solutions for All New Yorkers with Focus on Affordability, November 1, 2024, available at: https://council.nyc.gov/press/2024/11/01/2732/

landlord's agent, nor does it prohibit a landlord or anyone else from agreeing to pay a fee to a tenant's agent. A landlord whose agent violates these provisions would also be in violation of such provisions. This section would prohibit anyone from conditioning a rental on the prospective tenant engaging an agent, with "engaging" defined as entering into an agreement to pay that agent a fee. This section would also create a rebuttable presumption that any agent who publishes a listing for a rental property did so with the permission of the landlord.

Section 20-699.22 of this bill would require landlords or their agents to disclose the fees that the tenant must pay in their listings and in rental agreements.

Section 20-699.23 of this bill would establish a civil penalty scheme, and section 20-699.24 would establish a private cause of action.

Section 20-699.25 would establish an outreach and education campaign that would be administered by DCWP.

Since introduction, Council staff met with numerous stakeholders including real estate associations, real estate marketplaces, real estate brokers, tenants, property owners and legal advocates to gather feedback on the legislation. Both tenants and real estate brokers expressed concerns that the version of the bill the Council heard in June did not articulate what it means to hire a broker, and it did not address the relationship between parties in an open listing. Some stakeholders raised questions about whether, or at what point, a landlord has hired a broker if there is no exclusive agreement between them. The bill was therefore amended to clarify the employing party by defining landlord's agent, tenant's agent and dual agent, and prohibiting a broker who acts as the landlord's agent from passing their fee onto the tenant. This would also extend to brokers who were authorized by the landlord to list the property on the landlord's behalf.

11

The Real Estate Board of New York also proposed amendments that would eliminate the bill's core requirement of prohibiting a landlord's agent from collecting a fee from a tenant and replace it with only notice and fee disclosure requirements. While this proposal would address one piece of the policy issue—namely the lack of transparency in fees and their negotiability—it would not address the dynamics that compel tenants to pay fees to individuals who do not represent their interests and from whom they do not seek services, the practical inability for tenants to negotiate fees in many instances, nor the practical necessity of paying for these services they do not seek to get an edge in a highly competitive rental market. The current version of the bill does require landlords and brokers to disclose all fees a tenant is required to pay in their listings and prior to the execution of a rental agreement.

Since introduction, the bill has also been amended to establish a civil penalty scheme and a private right of action and to authorize DCWP to conduct education and outreach, and to enforce the bill.

This bill would take effect 180 days after it becomes law.

### V.  CONCLUSION

The Committee looks forward to a vote on Proposed Int. No. 360-A.

Proposed Int. No. 360-A

By Council Members Ossé, Abreu, Feliz, Hudson, Krishnan, Nurse, Marte, Hanif, Brooks-Powers, Cabán, Sanchez, Louis, Won, Gennaro, Bottcher, Powers, Gutiérrez, Holden, Salaam, Hanks, Restler, Joseph, Avilés, De La Rosa, Stevens, Farías, Narcisse, Williams, Salamanca, Banks, Riley, Rivera, Ayala, Hanks and the Public Advocate (Mr. Williams) (in conjunction with the Brooklyn and Queens Borough Presidents)

A Local Law to amend the administrative code of the city of New York, in relation to the payment of fees imposed in relation to the rental of residential real property

Be it enacted by the Council as follows:

1    Section 1. Chapter 4 of title 20 of the administrative code of the city of New York is

2    amended by adding a new subchapter 15 to read as follows:

3    SUBCHAPTER 15

4    RENTAL REAL ESTATE AGREEMENTS

5    § 20-699.20 Definitions. For purposes of this subchapter, the following terms have the

6    following meanings:

7    Agent. The term "agent" means a person who is licensed as a real estate broker or real

8    estate salesperson under section 440-a of the real property law and is acting in a fiduciary capacity.

9    Dual agent. The term "dual agent" means an agent who is acting as a tenant's agent and a

10   landlord's agent with respect to an agreement regarding the same residential real property.

11   Engage. The term "engage" means to enter into an agreement that requires the payment of

12   a fee by a person for the performance of services by another person.

13   Fee. The term "fee" means an amount of money that is charged by a person for the

14   provision of services to one or more persons, including but not limited to a commission.

15   Landlord. The term "landlord" means the lessor in a residential real property agreement,

16   and includes an owner who lists residential real property for lease with an agent, whether or not a

17   lease results, or who receives an offer to rent residential real property, except for a cooperative

13

1  housing corporation leasing residential real property to a dwelling unit owner or shareholder of
2  such cooperative housing corporation.
3      Landlord's agent. The term "landlord's agent" means a listing agent who acts alone, or an
4  agent who acts in cooperation with a listing agent, acts as a landlord's subagent, or acts as a
5  broker's agent, to find or obtain a tenant for residential real property. The term "landlord's agent"
6  does not include a dual agent.
7      Lease. The term "lease" means an agreement by which a landlord conveys residential real
8  property for a specified term and for a specified rent.
9      Listing. The term "listing" means an advertisement or written notice conveying that a
10 property is available for lease.
11     Listing agent. The term "listing agent" means a person who has entered into a listing
12 agreement to act as an agent of the landlord for compensation.
13     Listing agreement. The term "listing agreement" means an agreement between an owner
14 of residential real property and an agent, by which the agent has been authorized to lease the
15 residential real property or to find or obtain a lessee therefor.
16     Residential real property. The term "residential real property" means a dwelling unit, as
17 defined in paragraph 13 of subdivision a of section 27-2004, including a dwelling unit held in the
18 condominium or cooperative forms of ownership.
19     Tenant. The term "tenant" means a lessee in an agreement to rent residential real property
20 and includes a person who executes an offer to rent residential real property from a landlord
21 through an agent, or who has engaged the services of an agent with the object of entering into a
22 residential real property agreement as a lessee.

1   Tenant's agent. The term "tenant's agent" means an agent who agrees to locate residential
2   real property for a tenant or who finds a tenant for a property and presents an offer to lease to the
3   landlord or landlord's agent and negotiates on behalf of the tenant.
4   § 20-699.21 Payment of certain fees imposed in relation to the rental of residential real
5   property. a. Except as expressly provided by subdivision 1 of section 238-a of the real property
6   law:
7   1. a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related
8   to the rental of residential real property; and
9   2. any agent who publishes a listing for a rental of residential real property with the
10  permission or authorization of the landlord for such property shall not impose any fee on, or collect
11  any fee from, a tenant related to the rental of such property.
12  b. A landlord is in violation of subdivision a of this section if:
13  1. a landlord's agent of such landlord violates such subdivision; or
14  2. any agent who publishes a listing for a rental of residential real property with the
15  permission or authorization of such landlord violates such subdivision.
16  c. No person shall condition the rental of residential real property on a tenant engaging any
17  agent, including but not limited to a dual agent.
18  d. No person shall post a listing for the rental of residential real property that represents
19  that fees must be paid in a manner that would violate this section.
20  e. There shall be a rebuttable presumption that an agent who publishes a listing for a rental
21  of residential real property does so with the permission or authorization of the landlord of such
22  property.

1 §	20-699.22 Total fee disclosure. a. Every listing related to the rental of residential real property shall disclose in such listing in a clear and conspicuous manner any fee to be paid by the prospective tenant for the rental of such property.

4 b. Prior to the execution of an agreement for the rental of residential real property, the landlord or landlord's agent shall provide to the tenant an itemized written disclosure of any fees that the tenant must pay to the landlord or to any other person at the direction of the landlord in connection with such rental. Such itemized written disclosure shall include a short description of each fee, and the tenant shall sign any such itemized written disclosure prior to signing an agreement for the rental of such residential real property. The landlord or landlord's agent shall retain the signed written disclosure required by this subdivision for 3 years and shall provide a copy of such signed written disclosure to the tenant.

12 § 20-699.23 Penalties. a. Any person who violates the provisions of section 20-699.21 shall be subject to a civil penalty of not more than $1,000 for the first violation and not more than $2,000 for each subsequent violation occurring within a two-year period.

15 b. Any person who violates the provisions of section 20-699.22 shall be subject to a civil penalty of not more than $500 for the first violation and not more than $1,000 for each subsequent violation occurring within a two-year period.

18 c. In a proceeding alleging a violation of this subchapter, the department may seek an order imposing all applicable civil penalties authorized pursuant to this section and requiring restitution of any fees charged in violation of this subchapter.

21 § 20-699.24 Private cause of action. Any person alleging a violation of this subchapter may bring a civil action, in accordance with applicable law, in any court of competent jurisdiction. Such court may order compensatory, injunctive and declaratory relief.

| | |
|---|---|
| 1 | <u>§ 20-699.25 Outreach and education. a. The commissioner shall establish an outreach and</u> |
| 2 | <u>education campaign about the provisions of this subchapter. Such outreach and education shall be</u> |
| 3 | <u>provided to real estate brokers, tenants, prospective tenants and members of the public who are</u> |
| 4 | <u>likely to be affected by this law.</u> |
| 5 | <u>b. The materials required by this section shall be made available on the department's</u> |
| 6 | <u>website in English and the designated citywide languages as provided in section 23-1101.</u> |
| 7 | § 2. This local law takes effect 180 days after it becomes law. |

DPM/SS
LS #12679
11/4/24

18