Index No. 24-CV-9678 (RA)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REAL ESTATE BOARD OF NEW YORK, INC., NEW
YORK STATE ASSOCIATION OF REALTORS, INC.,
BOHEMIA REALTY GROUP, BOND NEW YORK
REAL ESTATE CORP., REAL NEW YORK LLC,
LEVEL GROUP INC., FOUR CORNERS REALTY,
LLC, 21 WEST CORP., 8 WEST 119TH STREET
HDFC,

Plaintiffs,

-against-

THE CITY OF NEW YORK, a municipal entity, VILDA
VERA MAYUGA, as Commissioner of the New York
City Department of Consumer and Worker Protection,

Defendants.

**DEFENDANTS MEMORANDUM OF LAW IN
SUPPORT OF THE MOTION TO DISMISS THE
COMPLAINT AND IN OPPOSITION TO THE
MOTION FOR A PRELIMINARY INJUNCTION**

***HON. MURIEL GOODE-TRUFANT***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Jessica Katzen & Aimee Lulich*
*Tel:  (212) 356-2369*
*Matter #:  2024-103651*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................... iii

STATEMENT OF FACTS ........................................................................................ 1

STANDARDS OF REVIEW ..................................................................................... 3

      A.  Motion to Dismiss ........................................................................ 3

      B.  Motion for Preliminary Injunction .............................................. 4

ARGUMENT

POINT I

      PLAINTIFFS CANNOT MAINTAIN A FIRST AMENDMENT CLAIM ..................................................................... 4

      A.  The FARE Act Does Not Implicate Any Speech Protected by the First Amendment .......................................... 5

      B.  The FARE Act is Not an Impermissible Restriction on Commercial Speech .................................................................. 7

            a.  Plaintiffs do not State a Facial Challenge .......................... 7

            b.  The FARE Act Survives Intermediate Scrutiny .................. 8

                 i.  The FARE Act Advances a Substantial Interest ...................................................................... 9

                 ii.  The FARE Act Directly Advances the City's Substantial Interest .................................... 100

                 iii.  The FARE Act is No More Burdensome than Necessary .................................................. 11

            c.  The FARE Act is Not Subject to Strict Scrutiny Review ........................................................................... 133

POINT II

      PLAINTIFFS' PREEMPTION CLAIM FAILS ............................................. 155

**Page**

POINT III

    PLAINTIFFS CANNOT MAINTAIN A CLAIM UNDER THE CONTRACT CLAUSE...........................................................211

    A.  The Complaint Fails to Allege that Any Plaintiff is a Party to an Existing Contract That Will Be Impacted by the FARE Act ....................................................................222

    B.  Plaintiffs Have Not Alleged Any Substantial Impairment to a Contract ...............................................244

    C.  The FARE Act Is An Appropriate And Reasonable Means Of Achieving A Legitimate Public Purpose ....................................266

POINT IV

    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ....................................................288

    A.  Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits ...............................................288

    B.  Plaintiffs Cannot Establish Irreparable Harm ..............................288

    C.  Balancing of the Equities ............................................300

CONCLUSION.............................................................. 300

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Pages**

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ...................................................................23

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978).............................................................................................26, 27

*Anderson v. Treadwell*,
    294 F.3d 453 (2d Cir. 2002)....................................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................3

*Ba Mar v. County of Rockland*,
    164 A.D.2d 605 (2d Dep't 1991) ............................................................................16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................3

*Bldg. & Realty Inst. of Westchester & Putnam Counties, Inc. v. New York*,
    2021 U.S. Dist. LEXIS 174535
    (S.D.N.Y. Sept. 14, 2021).......................................................................................25

*Bldg. & Realty Inst. of Westchester & Putnam Counties, Inc. v. New York*,
    2024 U.S. App. LEXIS 5905
    (Ct. App. 2d Cir. 2024)...........................................................................................24

*Buffalo Teachers Federation v. Tobe*,
    464 F.3d 368 (2d Cir. 2006)..............................................................................27, 28

*Catholic Charities of Diocese of Albany v. Serio*,
    28 A.D. 115 (3d Dep't 2006) ....................................................................................7

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*,
    447 U.S. 557 (1980)...............................................................................8, 9, 11, 14, 15

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
    598 F.3d 30 (2d Cir. 2010) .......................................................................................3

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989)....................................................................................................5

*Consolidated Edison Co. of New York v. Town of Red Hook*,
    60 N.Y.2d 99 (1983) ..........................................................................................16, 17

**Cases**                                                                                                       **Pages**

*Davidson v. Flynn*,
    32 F.3d 27 (2d Cir. 1994)....................................................................................3

*DiFrancesco v. County of Rockland*,
    41 A.D.3d 530 (2d Dep't 2007) ......................................................................18

*DJL Rest. Corp. v. City of New York*,
    96 N.Y.2d 91 (2001) ................................................................................15, 16

*Dougal v. County of Suffolk*,
    102 A.D.2d 531 (2d Dep't 1984) ....................................................................19

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ........................................................................30

*Fabri v. United Techs. Int'l, Inc.*,
    387 F.3d 109 (2d Cir. 2004)......................................................................22, 23

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995)..........................................................................................8

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)............................................................................30

*Galbreadth-Ruffin Corp. v. 40th & 3rd Corp.*,
    25 A.D.2d 114 (1st Dep't 1966) .....................................................................17

*General Motors Corp. v. Romein*,
    503 U.S. 181 (1977)........................................................................................25

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)..........................................................................................5

*Grandon v. Merrill Lynch & Co.*,
    147 F.3d 184 (2d Cir. 1988)..............................................................................3

*Granite State Outdoor Adver., Inc. v. City of Milford*,
    2003 U.S. Dist. LEXIS 27104
    (D. Conn. Aug. 25, 2003) .................................................................................7

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)........................................................................................22

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010)............................................................................13

**Cases**                                                                                                           **Pages**

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth
   Dep'ts, Appellate Div. of the Supreme Court of N.Y.*,
   852 F.3d 178 (2d Cir. 2017) .......................................................................................................7

*Jancyn Mfg. Corp. v. County of Suffolk*,
   71 N.Y.2d 91 (1987) .................................................................................................15, 17, 18

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) .......................................................................................................29

*Lakewood v. Plain Dealer Pub. Co.*,
   486 U.S. 750 (1987) ...............................................................................................................7, 8

*Long Island Bd. of Realtors, Inc. v. Inc. Village of Massapequa Park*,
   277 F.3d 622 (2d Cir. 2002) .................................................................................................14, 15

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) .................................................................................................................14

*Madonna v. United States*,
   878 F.2d 62 (2d Cir. 1989) .........................................................................................................3

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...................................................................................................................4

*Melendez v. City of New York*,
   16 F.4th 992 (2d Cir. 2021) ...........................................................................................22, 25, 26

*Metropolitan Funeral Dirs. Ass'n, Inc. v. City of New York*,
   702 N.Y.S.2d 526
   (Sup. Ct. New York Cnty. Dec. 10, 1999) ..............................................................................16

*Mongielo v. Hochul*,
   2023 U.S. LEXIS 34088
   (W.D.N.Y. Mar. 1, 2023) .........................................................................................................5, 6

*New York v. United States Dep't of Homeland Sec.*,
   969 F.3d 42 (2d Cir. 2020) .......................................................................................................29

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................................................4

*Nyack v. Daytop Village*,
   78 N.Y.2d 500 (1991) ..............................................................................................................16

**Cases**                                                                                         **Pages**

*Ogden v. Saunders*,
    25 U.S. 213 (1827).........................................................................................................22

*OTR Media Group, Inc. v. City of New York*,
    83 A.D.3d 451 (1st Dep't  2011) ...................................................................................8

*People v. DeJesus*,
    54 N.Y.2d 465 (1981) ............................................................................15, 16, 17, 19

*People v. Sieger Agency*,
    BRTO 1821-16, 2017 N.Y. Misc. LEXIS 2904
    (Dist. Ct. Suffolk Cnty. July 21, 2017) .......................................................................17

*Pittsburgh Press Co. v. Pittsburg Comm. on Human Relations*,
    413 U.S. 376 (1973)........................................................................................................6

*Real Estate Bd. of N.Y., Inc. v. N.Y. Dep't of State*,
    Index No. 901586-20
    (Sup. Ct. Albany Cnty. Apr. 12, 2021) ...............................................................15, 26

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)......................................................................................................13

*Roman Catholic Diocese v. Cuomo*,
    592 U.S. 14 (2020)..........................................................................................................4

*Roman v. Lobe*,
    243 N.Y. 51 (1926) ......................................................................................................17

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)..........................................................................................................5

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997)...................................................................................26, 27

*Savage v. Gorski*,
    850 F.2d 64 (2d Cir. 1988)...........................................................................................29

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)...................................................................................................5, 13

*Sullivan v. Nassau County*,
    959 F.3d 54 (2d Cir. 2020)...........................................................................................26

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018).............................................................................................24, 26

**Cases**                                                                                          **Pages**

*TikTok Inc. v. Garland*,
    604 U.S. ___ (2025) .......................................................................................14, 15

*Turner Broadcasting System, Inc. v. FCC ("Turner I")*,
    512 U.S. 622 (1994) ......................................................................................14, 15

*U.S. Trust Co. v. New Jersey*,
    431 U.S. 1 (1977) ...............................................................................................22

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ...............................................................................9

*United States v. Laurent*,
    861 F. Supp. 2d 71 (S.D.N.Y. 2011) ................................................................11

*We the Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ................................................................................4

*Wholesale Laundry Bd. of Trade, Inc. v. City of New York*,
    17 A.D.2d 327 (1st Dep't 1962) ........................................................................19

*Williams v. Rodriguez*,
    20-cv-806 (VLB), 2021 U.S. Dist. LEXIS 96443
    (D. Conn. May 21, 2021) ...................................................................................29

*In re Wilson Sullivan Co.*,
    289 N.Y. 110 (1942) .............................................................................17, 18, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................4, 29, 30

*Young v. Ricketts*,
    825 F.3d 487 (8th Cir. 2016) ..............................................................................7

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
    471 U.S. 625 (1985) ............................................................................................6

**Statutes**

19 N.Y.C.R.R. § 175 ...............................................................................................15

19 N.Y.C.R.R. § 175.7 ............................................................................................19

**Statutes**                                                                                **Pages**

19 N.Y.C.R.R. § 175.19 .................................................................................19

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 3

M.H.R. § 10(1)(ii)(a)(12) .............................................................................16

N.Y.C. Admin. Code § 20-669.21(d) .............................................................6

N.Y.C. Admin. Code § 20-699.20 ................................................................21

N.Y.C. Admin. Code § 20-699.21(a)(1) ..........................................................3

N.Y.C. Admin. Code § 20-699.21(a)(2) ..........................................................3

N.Y.C. Admin. Code § 20-699.21(b) ...............................................................3

N.Y.C. Admin. Code § 20-699.21(e) .............................................................13

N.Y.C. Admin. Code § 20-699.22 ....................................................................6

N.Y.C. Admin. § 20-669.21(1) ......................................................................20

R.P.L. § 238-a .............................................................................................18

R.P.L. § 440-a .............................................................................................19

R.P.L. § 442 ................................................................................................19

R.P.L. § 442-k .............................................................................................19

R.P.L. § 442-k(2) .........................................................................................19

R.P.L. § 442-k(3) .........................................................................................19

R.P.L. § 442-k(4) .........................................................................................19

R.P.L. § 442-k(5) .........................................................................................19

R.P.L. § 442-k(6) .........................................................................................19

R.P.L. § 443 .....................................................................................17, 19, 20

R.P.L. § 443(6) .............................................................................................18

Defendants City of New York ("City") and New York City Department of Consumer and Worker Protection ("DCWP") Commissioner Vilda Mayuga ("Commissioner Mayuga"), in her official capacity, by their attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, respectfully submit this memorandum of law ("Def. Mem.") in support of the motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and in opposition to plaintiffs' motion for a preliminary injunction ("Pl. Mem.").

## STATEMENT OF FACTS

Local Law 119 of 2024 (the "FARE Act") amended the New York City Administrative Code ("Ad. Code") to prohibit a broker who is a landlord's agent or publishes a listing for the rental of residential property with the permission or authorization of a landlord (hereinafter "retained by a landlord") from charging the renter the broker's fee. Exhibit A.[1] The law addresses a market failure in the City's rental market where tenants are often forced to pay a broker's fee for a broker who was retained by the landlord. Prior to its passage, the Committee on Consumer and Worker Protection ("Committee") took testimony from the public and met with stakeholders to gather feedback. Ex. F, p. 2. The City Council's Oversight and Investigations Division ("OID") conducted an investigation of brokers' fees in the residential rental market in September and October of 2024 with the goal of understanding whether tenants' rights were properly protected with regard to the payment of brokers' fees. *Id.* The Committee considered the testimony, feedback, and investigation results prior to amending and approving the bill, which was then passed by City Council on November 13, 2024. Ex. H. The FARE Act does not go into effect until June of 2025. Ex. A.

The legislative record reflects that tenants are commonly required to pay the broker's fee

---

[1] All Exhibits referenced herein are annexed to the Declaration of Aimee K. Lulich, which accompanies this Memorandum of Law.

when renting a new apartment, notwithstanding that the broker was chosen, retained by, and working on behalf of, the landlord. Ex. F. These fees represent large upfront costs for renters. *Id.*, pp. 7-10. They can be a significant barrier for individuals who wish to move, especially for middle- and lower-income households, and contribute to the City's low apartment turnover rate. *Id.* Brokers retained by the landlord typically conduct the work necessary to fill a vacancy for the landlord, but may not provide comparable assistance to the prospective tenant who ultimately must pay its fee. *Id.* However, industry norms and the highly competitive rental market in the City weaken the bargaining power of renters in comparison to landlords and brokers, and in practice tenants cannot expect to negotiate the often insurmountable broker's fee for an apartment they want to secure. *Id.* In addition, the typical situation where the landlord and broker negotiate the terms of the broker's services, but the cost is then imposed on a third-party, does not align with basic principal-agent relationships and norms that place the fiduciary duty with the individual who hires the agent. *Id.* Indeed, the City and Boston are the only major American cities where rental brokers' fees are commonly passed to the tenant even if they did not retain the broker. *Id*., p. 6. Accordingly, based on the record, City Council determined that the FARE Act should be enacted in order to "properly align the principal-agent relationship in the rental market to ensure that the principal pays the agency for services rendered, not a third-party." *Id.*, p. 10.

Further, the legislative record reflects that City Council considered the same arguments and complaints raised by Plaintiffs herein but found them to be contrary to the data before the Council. Representatives of Plaintiffs BOND, Bohemia, and REBNY testified before the Committee, both written and in person, and their testimony mirrored the allegations in the Complaint and motion for preliminary injunction. Exs. C & D. Further, members of the Committee met with REBNY representatives regarding the bill, and noted that REBNY's suggested

amendments would not address the skewed principal-agent relationship or the upfront burden that brokers fees represent to City households. Ex. F, pp. 11-12. The November 13, 2024 amendments to the bill reflect feedback received by City Council from real estate stakeholders, for example by more clearly defining who is a landlord's agent under the law. *Id.*

The FARE Act prohibits a landlord's agent from imposing a fee on, or collecting a fee from, a tenant related to the rental of residential real property. Ad. Code § 20-699.21(a)(1). Additionally, it prohibits an agent who publishes a listing for the rental of residential property with the permission or authorization of the landlord from imposing a fee on, or collecting a fee from, the tenant. Ad. Code § 20-699.21(a)(2). It further makes it a violation for a landlord to require a tenant to pay the broker's fee for the landlord's broker or to require the tenant to retain a broker in order to rent a unit. Ad. Code § 20-699.21(b).

## STANDARDS OF REVIEW

### A.    Motion to Dismiss

When deciding a motion to dismiss pursuant to FRCP Rule 12(b)(6), the Court is required to accept the facts alleged in the complaint as true and to construe all reasonable inferences in the nonmoving party's favor. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1988); *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994) (citing *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989)). A complaint must nevertheless "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations and quotations omitted).

3

**B.**     **Motion for Preliminary Injunction**

Injunctive relief "is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citations omitted). Plaintiffs must demonstrate that they are likely to succeed on the merits of their claims, are likely to suffer irreparable harm without preliminary injunctive relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Roman Catholic Diocese v. Cuomo,* 592 U.S. 14, 16 (2020) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021). Regarding the first factor, "a mere possibility that relief will be granted" is insufficient, rather plaintiffs must make a showing strong enough to establish a likelihood of success on the merits.   *Nken v. Holder*, 556 U.S. 418, 420 (2009). At minimum, plaintiffs must demonstrate "that there are 'serious questions' going to the merits, [and] additionally establish that 'the balance of hardships tips decidedly' in its favor." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35-36 (2d Cir. 2010).

<u>**ARGUMENT**</u>

**POINT I**

**PLAINTIFFS  CANNOT  MAINTAIN  A  FIRST
<u>AMENDMENT CLAIM</u>                                    **

Plaintiffs allege that the FARE Act "imposes content-based restrictions on Plaintiffs' lawful commercial speech by directly infringing on their ability to 'publish' or advertise open listing advertisements." Compl. ¶ 153. However, the FARE Act does not implicate the First Amendment, because it regulates conduct, not speech. The provisions of the FARE Act challenged herein prohibit certain transactions (the collection of fees from tenants by brokers retained by landlords) and only bar the publication of real estate listings that advertise those unlawful

4

transactions. Even if the First Amendment was implicated, the FARE Act advances the substantial government interest of ensuring that the party who retains a broker pays for that service, thereby resolving a skewed principal-agent relationship that burdens the party with the least bargaining power and lowering upfront costs for City renters, which constitute a significant barrier to entering the rental market, and is no more burdensome than necessary to advance these important goals.

### A. The FARE Act Does Not Implicate Any Speech Protected by the First Amendment

Since the FARE Act regulates commercial transactions between brokers and tenants, it falls outside of the reach of the First Amendment. The FARE Act "neither limits what [brokers and landlords] may say nor requires them to say anything" and therefore, it "regulates conduct, not speech." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006). It simply requires that brokers be paid by the person who retained them. Laws directed at "commerce or conduct," such as the FARE Act, do not implicate the First Amendment because they impose, at most, "incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

While the conduct prohibited here is often brought about through speaking or writing, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Indeed, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes… but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Accordingly, as the FARE Act regulates conduct, and not speech, it does not implicate the First Amendment. *See Mongielo v.*

*Hochul*, 2023 U.S. LEXIS 34088, at *27–*28 (W.D.N.Y. Mar. 1, 2023) (state's mask mandate did not implicate the First Amendment, even if it incidentally affected the ability to communicate, because it regulated conduct, not communication).

The FARE Act's prohibition of listings for illegal transactions also does not implicate the First Amendment. The FARE Act provides that "[n]o person shall post a listing for the rental of residential real property that represents that fees must be paid in a manner that would violate this section." Ad. Code § 20-669.21(d). It is well established that governments "are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction." *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 625, 638 (1985). For example, in *Pittsburgh Press Co. v. Pittsburg Com. on Human Relations*, 413 U.S. 376 (1973), the Supreme Court found that an Ordinance that proscribed employment discrimination, and specifically the publication of advertisements relating to employment which indicate discrimination, did not implicate the First Amendment. The Court stated that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes," and while "[t]he illegality in this case may be less overt, . . . we see no difference in principle here." *Id.* at 388. Likewise, the publications proscribed by the FARE Act are not protected by the First Amendment.

All other activity regulated under the challenged provisions of the FARE Act is conduct, not speech. [2] A broker will not be liable under the FARE Act for merely posting a listing for a residential rental, unless and until the broker imposes a fee on, or collects a fee from, a tenant. And a landlord will not be held liable unless and until a broker they have retained imposes a fee on, or collects a fee from, a tenant, or conditions rental of a property on a tenant hiring a broker. As such,

---

[2] Plaintiffs do not challenge the FARE Act's disclosure requirements. *See* Ad. Code § 20-699.22.

the FARE Act does not implicate any speech protected by the First Amendment or the Free Speech Clause. *See Young v. Ricketts*, 825 F.3d 487, 494 (8th Cir. 2016) (Nebraska requirement that real estate broker obtain a license before publishing listings did not violate the First Amendment, as it was not a regulation of speaking or publishing, but rather a legitimate regulation of the profession); *Catholic Charities of Diocese of Albany v. Serio*, 28 A.D. 115, 130 (3d Dep't 2006) (free speech claim failed where plaintiffs did not establish that mandated conduct was expressive).

### B. The FARE Act is Not an Impermissible Restriction on Commercial Speech

### a. Plaintiffs do not State a Facial Challenge

The Second Circuit has held that a First Amendment challenge to a law that is filed pre-enforcement is treated as a facial rather than an as applied challenge. *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts, Appellate Div. of the Supreme Court of N.Y.*, 852 F.3d 178, 184 (2d Cir. 2017). Even in the First Amendment context, the Supreme Court has set parameters for when a facial challenge is appropriate. "A facial challenge lies whenever a license law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers" and the law has "a close enough nexus to expression, or to conduct commonly associated with expression to post a real and substantial threat of… censorship risks." *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1987). However, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship.... such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Id.* at 760–61.

Here, Plaintiffs' challenge is a facial challenge, because the FARE Act does not go into effect until June 2025. However, Plaintiffs fail to plausibly allege a facial challenge because they

cannot establish that the FARE Act gives the government substantial power to discriminate based on the content or viewpoint of speech. The FARE Act in no way regulates the content or viewpoint of real estate listings, nor imposes penalties related to broker licensing.  As discussed *infra*, Plaintiffs' allegation that the fear of penalties will cause both landlords and brokers to stop advertising open listings, Compl. ¶ 148, is too speculative to warrant judicial review of a facial challenge to the FARE Act. *See Granite State Outdoor Adver., Inc. v. City of Milford*, 2003 U.S. Dist. LEXIS 27104, at *27 (D. Conn. Aug. 25, 2003) (*quoting Lakewood*, 486 U.S. at 760–61) (facial challenge to regulation of signs and billboards not justified because provision was "not 'aimed at conduct commonly associated with expression'").

### b.  The FARE Act Survives Intermediate Scrutiny

Even assuming Plaintiffs have demonstrated that the FARE Act burdens speech protected by the First Amendment, Plaintiffs' claim fails as a matter of law, because the FARE Act withstands intermediate scrutiny. Plaintiffs concede that the speech they allege is impaired by the FARE Act is commercial speech, *see* Compl. ¶ 153, which is entitled to "a lesser protection" than other "constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of N. Y.*, 447 U.S. 557, 562 (1980). Generally, restrictions on commercial speech are subject to intermediate scrutiny and analyzed under the four-part test set forth in *Central Hudson*.[3] *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995). Under the *Central Hudson* test, the commercial speech must concern lawful activity and not be misleading, the asserted governmental interest must be substantial, and the regulation must directly advance the governmental interest and not be more extensive than necessary to serve that interest. *See Central Hudson*, 447 U.S. at

---

[3] The New York State Constitution's free speech clause does not afford heightened free speech protections to commercial speech, and New York State Courts similarly apply the *Central Hudson* analysis to restrictions on commercial speech. *See OTR Media Group, Inc. v. City of New York*, 83 A.D.3d 451, 452 (1st Dep't 2011).

566; *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012).

### i.    The FARE Act Advances a Substantial Interest

The FARE Act advances the substantial government interest of bringing fairness into the apartment rental process by requiring that any broker fee associated with a residential real estate transaction be paid by the individual who retained the broker. *See* Ex. E at 12–13. The legislative record reflects that this commonsense consumer protection measure, that one who seeks out a service pays for that service, is especially important given the current state of the City rental market. Over 67 percent of New Yorkers are renters, and over half of City renters are rent burdened, paying 30 percent or more of their income in rent. *See* Ex. C at 2. In 2023, just 1.4 percent of City rentals were vacant and available, the lowest vacancy rate since 1968, and there is an even lower vacancy rate for affordable housing. *See* Ex. F at 3. In addition to low vacancy rates and high rents, the average upfront costs for a City renter moving to a new apartment in 2023 was $10,454, the equivalent to 14 percent of the City's median household income. *See* Ex. C at 4.

A large portion of these upfront costs to tenants are fees paid to a broker who was retained by the landlord, which typically range from 8.3 to 15 percent of the annual rent. *Id*. at 2. Despite these high costs to tenants, a City Council investigation, where investigators posed as prospective tenants, found that brokers retained by landlords are often not providing valuable services to prospective tenants. *See* Ex. F at 9. In fact, some prospective tenants expected to pay a broker fee never even meet the broker or have any interaction with them. *Id.* at 9–10. Because any agreement regarding the work to be done is reached between the landlord and the broker, but the cost is borne by the tenant, there is little motivation for the landlord to negotiate fees that reflect the fair market value of the broker's work. And, due to industry norms and the highly competitive nature of the rental market, even where brokers' fees are "negotiable," the negotiating power of prospective tenants is severely limited. *Id.* at 8.

At committee hearings, many testified that upfront costs for moving have become barriers to moving to a different apartment, or to entering the rental market. *Id.* at 7, n.29. The cost of housing has also caused many families, especially low- and middle-income families, to leave the City, with Black and Hispanic New Yorkers leaving at disproportionately higher rates than white residents. *See* Ex. D at 3. StreetEasy surveys show that 54 percent of City renters said that they would be willing to pay a higher monthly rent[4] if they did not have to pay upfront brokers' fees. *See* Ex. F at 7, n. 32. The FARE Act, by properly aligning the principal-agent relationship regarding real estate brokers, will alleviate a significant upfront cost on renters and encourage the parties with negotiating power to agree upon and pay the broker's fees, a vital measure given the upfront barriers to renting an apartment in the City.

### ii.    The FARE Act Directly Advances the City's Substantial Interest

The FARE Act precisely advances the City's substantial interests in shifting a significant upfront cost of moving to the party who retained the broker by prohibiting brokers who were retained by landlords, or given authority by landlords to list a rental, to impose or collect fees from tenants. Further, this proper alignment of principal-agent relationships will directly lower upfront moving costs for tenants who do not choose to hire a broker, thereby eliminating one significant barrier to moving or entering the rental market.

Plaintiffs argue that "the Council's late-breaking focus on the principal-agent relationship represents little more than a 'post-hoc rationalization,'" and that "it bears little if any logical connection to the publication bar." Pl. Mem. at 13. However, the legislative record illustrates that

---

[4] Plaintiffs use a significant portion of their Complaint to warn that the FARE Act will cause rents to increase, despite not having standing to bring their claims based on this alleged harm. As explained by one of the Act's sponsors, Councilmember Chi Ossé, "[t]his assertion is disingenuous and wrong," because (1) nearly half of the City's rental units are rent stabilized, meaning rent cannot be raised beyond the legal limit; (2) rent is determined by market forces; and (3) with lower upfront costs of moving, tenants will no longer be at a disadvantage during lease renewal, and can more freely leave at the end of a lease if rents are raised beyond what they are willing to pay. *See* Ex. E at 15–16.

from the outset, City Council sought to address the concern that tenants pay hefty brokers' fees for brokers they did not retain and who often do not provide them a service. *See* Ex. D at 84  ("the central premise of this entire hearing is: Why are tenants asked to pay in instances when they have not hired the broker to show them the apartment?"); Ex. E at 3 ("It is also a commonsense element of fairness that the party that chooses the broker should pay the fee . . . where landlords are the ones to identify and hire, they should pay for the broker they have chosen."); 4 ("I am in support of the bill as it would help shift a significant housing cost to whomever contracts the broker instead of always falling on the prospective tenant."); 21 ("In every other industry, if you want a service, you pay for that service. There's no reason real estate should be any different.").

### iii.    The FARE Act is No More Burdensome than Necessary

Intermediate scrutiny analysis under *Central Hudson* does not entail a least restrictive means analysis. Instead, all that is required is a reasonable fit between the government's objective and the means chosen to accomplish the objective. *See United States v.  Laurent*, 861 F. Supp. 2d 71, 99 (S.D.N.Y. 2011). The FARE Act accomplishes City Council's goal of shifting broker fees to the party who has retained the broker in a narrow and direct way that does not interfere with any speech or expressive conduct protected by the First Amendment, let alone more speech than is necessary to further the City's substantial interests. The FARE Act prohibits a broker who was retained by a landlord to collect a fee from a tenant, and nothing more. Plaintiffs' argument that the FARE Act is overinclusive because it "sweeps in all brokers who post an advertisement with a landlord's permission, including those that *do* have fiduciary obligations to the tenant," is unavailing.[5] Pl. Mem. at 15. The inclusion of brokers who were authorized by landlords to publish

---

[5] Plaintiffs have not identified any circumstance where a broker is authorized by a landlord to publish a listing and also is in a fiduciary relationship with the tenant.  However, the FARE Act does not prohibit dual agents.  Additionally, a single hypothetical scenario such as this cannot support a facial challenge.

a listing under the FARE Act's prohibitions advances the aims of the Act—that broker fees cannot be imposed on tenants who did not select or hire the broker. This provision is necessary to avoid creating a loophole whereby landlords retain brokers who represent their interests, but purport not to have a fiduciary relationship, thereby passing the cost to tenants.

Plaintiffs' argument that the FARE Act is underinclusive is equally unpersuasive, and misconstrues the FARE Act. *See* Pl. Mem. at 14. That the FARE Act is not triggered by the existence of a fiduciary relationship between the broker and landlord is immaterial, since the legislative record shows that the FARE Act was intended to stop the practice of tenants being forced to pay fees to brokers retained by the landlord. *See, e.g.*, Ex. E at 99–100. Plaintiffs' argument that a landlord is allowed to hire a broker to show a unit to a tenant and then still legally seek compensation from the tenant under the FARE Act is not true, because that broker would be acting as a landlord's agent, as defined by state law. Plaintiffs seek to overcomplicate the FARE Act, but it simply requires that the party who retains the broker pay the broker's fee.

Plaintiffs' argument that the FARE Act will chill speech by limiting the number of open listings is unsupported. The FARE Act does not impose any liability for open listings. In current practice, landlords can authorize multiple brokers to advertise an available rental property, and the broker who finds a tenant can collect a fee from the tenant. *See* Ex. F at 5. Under the FARE Act, landlords can still authorize multiple brokers to share open listings, but instead of imposing a fee on the tenant, the landlord and broker will negotiate a fee to be paid by the landlord. It is speculative that landlords will stop authorizing brokers to publish listings because of the fear that brokers will violate the FARE Act, thereby exposing landlords to liability. Landlords, unlike tenants in the current rental market, can select which brokers to retain, and like any service, only retain those that are reputable and trustworthy. Landlords are also protected by the opportunity to

rebut a presumption that the illegal listing was done with the landlord's permission. *See* Ad. Code § 20-699.21(e). Further, landlords are in a better position to assess the value of the broker's services and negotiate fees. Importantly, landlords will still need to find tenants to rent their properties, so it is unlikely that open listings will disappear, whether landlords chose to retain and pay brokers or post listings themselves. Plaintiffs concede that 50 percent of City rentals are "no fee," but Plaintiffs do not allege that there are fewer open listings for those properties than for tenant pay rentals. Compl. at ¶ 47.[6] Finally, none of the "less burdensome alternatives" suggested by Plaintiffs, such as exempting small landlords or including a need requirement for renters, would be less burdensome on speech, but they would curtail the City's efforts to prevent tenants from paying for broker fees when they did not hire a broker. *See* Compl. at ¶¶ 125–35. For all the reasons set forth above, the FARE Act survives intermediate scrutiny.

### c. The FARE Act is Not Subject to Strict Scrutiny Review

Plaintiffs argue that strict scrutiny should apply because the FARE Act "burdens disfavored speech—open listing advertisements—by disfavored speakers—brokers," Pl. Mem. at 10, but the argument is unavailing. Unlike in *Sorrell*, where Vermont's law banned the "sale, transmission or use of prescriber-identifiable data for marketing or promoting a prescription drug unless the prescriber consents," the FARE Act does not impose a burden based on the content of the speech. *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 266 (2d Cir. 2010). A law is content-based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The FARE Act does not in any way regulate the content of rental advertisements. Therefore it does "not impose a 'restriction, penalty, or

---

[6] Additionally, New York City and Boston are the only major American cities where broker fees are passed to tenants regardless of who retained the broker, and Plaintiffs do not allege that there is a lack of transparency in the rental market in every other major American city. *See* Ex. F at 6.

burden' by reason of content [of real estate listings]—a conclusion confirmed by the fact that [Plaintiffs] 'cannot avoid or mitigate' the effects of the Act by altering their speech." *See TikTok Inc. v. Garland*, 24-656, 24-657, 604 U.S. __, at *10, 2025. (*quoting Turner Broadcasting System, Inc. v. FCC ("Turner I")*, 512 U.S. 622, 644 (1994)). As such, the FARE Act is a facially content-neutral regulation.

The FARE Act also does not target brokers as disfavored speakers. It is true that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner I*, 512 U.S. at 658, but not "when the differential treatment is justified by some special characteristic of the particular [speaker] being regulated." *Id.* at 660–661 (internal quotations omitted). Here, while real estate brokers are primarily the subject of the FARE Act's regulations, it is not because the legislature disfavors brokers, but because of their special characteristic of brokering transactions in the real estate rental market. Contrary to Plaintiffs' allegations, the legislative record does not reflect animus toward brokers. In fact, Councilmember Osse testified that "[t]he bill does not end broker fees, and I know that there was a lot of communications coming from REBNY about that, which is disinformation, but it says whoever hires a broker must pay… if [brokers provide] a valuable service like we all agree, then people will still be hiring a broker, right?" Ex. E at 99; *see also id.* at 72, 76.

Courts have consistently applied the *Central Hudson* test to regulations on advertising or other conduct that implicate commercial speech. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) (Court declined to apply strict scrutiny in challenge to state regulations of advertisements for cigarettes); *Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) (regulations targeting real estate solicitations were subject to *Central Hudson* analysis, not heightened scrutiny); *Long Island Bd. of Realtors, Inc. v. Inc. Vill. of Massapequa Park*, 277 F.3d

622, 626 (2d Cir. 2002) (municipal sign ordinance was subject to *Central Hudson* analysis). Even regulations on conduct that impose a disproportionate burden on *expressive activity* are subject to intermediate scrutiny. *See TikTok Inc. v. Garland*, 604 U.S. at * 11.

As Plaintiffs cannot establish that the FARE Act poses a "substantial risk of excising certain ideas or viewpoints from the public dialogue," strict scrutiny analysis is inappropriate. *Turner I*, 512 U.S. at 644. However, should this Court determine that strict scrutiny applies, Defendants submit that the FARE Act meets this high threshold. While the reasons for the legislation are substantial, they are also compelling, because the large upfront fees for tenants who did not retain a broker are a significant barrier to moving or entering the rental market. Moreover, the FARE Act imposes limited restrictions that directly advance the compelling interest and regulate conduct, not speech. As such, the law is narrowly tailored and should be upheld. For all the reasons set forth above, Plaintiffs' First and Fourth Causes of Action should be dismissed.

## POINT II

## <u>PLAINTIFFS' PREEMPTION CLAIM FAILS</u>

Plaintiffs argue that the "FARE Act is preempted by New York state's comprehensive regime of laws and regulations governing the conduct, compensation, and procedures of real estate brokers," including Article 12-A of the New York Real Property Law ("RPL") and 19 N.Y.C.R.R. § 175. Compl. ¶ 7–8. Plaintiffs are incorrect. Not only is RPL Article 12-A devoid of any express or implied intent to occupy the field of real estate brokers' fees, but courts have also consistently interpreted RPL Article 12-A narrowly, and found that State laws are silent as to whether rental brokers acting as landlords' agents are prohibited from requiring tenants to pay fees. *See Real Estate Bd. of N.Y., Inc. v. N.Y. Dept. of State*, Index No. 901586-20 (Albany County Apr. 12, 2021).

The power of local governments to enact laws is derived from the State Legislature. *See DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91, 94 (2001); *see also People v. DeJesus*, 54

N.Y.2d 465, 468 (1981); N.Y. Const. art. IX, §§ 2(c)(i); 2(c)(ii)(10). "To implement article IX, the Legislature enacted the Municipal Home Rule Law." *DJL Rest.*, 96 N.Y.2d at 94. The Municipal Home Rule Law § 10(1)(ii)(a)(12) gives local governments the power to adopt and amend local laws—to the extent they are not inconsistent with the provisions of the constitution or any general law—for "[t]he government, protection, order, conduct, safety, health and well-being of persons or property therein. This provision shall include but not be limited to the power to adopt local laws providing for the regulation or licensing of occupations or businesses…"

Under New York law, a local law enacted pursuant to the broad police powers granted by the State Constitution and the Municipal Home Rule Law may be invalidated as inconsistent with State law only if the local law expressly conflicts with the State law or when the State has "clearly evinced a desire to preempt an entire field thereby precluding any further local regulation." *Metropolitan Funeral Dirs. Ass'n, Inc. v. City of New York*, 702 N.Y.S.2d 526, 530 (Sup. Ct., N.Y. County, Dec. 10, 1999) (*quoting Jancyn Mfg. Corp. v. County of Suffolk*, 71 N.Y.2d 91, 97 (1987)). Such an intent may be express or implied. *Ba Mar v. County of Rockland*, 164 A.D.2d 605, 612 (2d Dep't 1991). No section of Article 12-A expressly prohibits local government from enacting statutes regulating brokers' fees, and Plaintiffs do not allege as such. Thus, for Plaintiffs to state a claim that the law is preempted, the intent to occupy the entire field of real estate brokers' fees must be implied. To divine the intent of the State Legislature, courts look to declarations of State policy, whether the State enacted a comprehensive and detailed regulatory scheme, including whether controls are imposed at the local level, the nature of the subject matter being regulated, and the need for State-wide uniformity in a particular area. *See Consolidated Edison Co. of New York v. Town of Red Hook*, 60 N.Y.2d 99, 104–05 (1983); *see also Ba Mar*, 164 A.D.2d at 612; *Nyack v. Daytop Village*, 78 N.Y.2d 500, 505 (1991). "[T]hat the State and local laws touch upon the same

16

area is insufficient to support a determination that the State has preempted the entire field of regulation in a given area." *Jancyn Mfg. Corp.*, 71 N.Y.2d at 99.

Article 12-A of the RPL does not include any legislative declarations or statements of legislative intent, nor is the legislative history particularly instructive. The legislative purpose of the adding Article 12-A to the RPL put forth in 1922 was "[t]o amend the real property law, in relation to the licensing and regulation of real estate brokers and salesmen in cities and counties adjoining a city having a population of one million or more." Ex. J. Contemporaneous case law reveals that Article 12-A established a licensing scheme for real estate brokers and salespeople to ensure professional conduct and prevent dishonesty in the field. *See Roman v. Lobe*, 243 N.Y. 51, 54 (1926); *In re Wilson Sullivan Co.*, 289 N.Y. 110, 114 (1942); *Galbreadth-Ruffin Corp. v. 40th & 3rd Corp.*, 25 A.D.2d 114, 123 (1st Dep't 1966). The strong statements that typically indicate legislative intent to occupy a field are absent. For instance, the *Consolidated Edison* Court greatly relied upon statements by the legislature and Governor which stressed the importance of a "one-stop certificate procedure" to streamline the approval of steam electric generating facilities into one proceeding before a single State entity. 60 N.Y.S.2d at 106. *See also People v. DeJesus*, 54 N.Y.2d 465, 470 (1981) (the statement that the Alcoholic Beverage Control Law was meant "to regulate and control the manufacture, sale and distribution within the state of alcoholic beverages…" left little doubt as to the intent of the Legislature to preempt the entire field). Here, Plaintiffs cannot point to any provisions of Article 12-A or legislative history that imply an intent to control the entire field of real estate broker relationships.

There is, however, indication of legislative intent that Article 12-A *not* control the entire field of broker relations. RPL § 443, titled "disclosure regarding real estate agency relationship," provides that "[n]othing in this section shall be construed to limit or alter the application of the

common law of agency with respect to residential real estate transactions." RPL § 443(6). Consistent with the legislature's intent not to occupy the entire of real estate broker relationships, the Court in *Sullivan Co.* found that the standards for brokers and salesmen set forth in Article 12-A did not alter the independent contractor status of real estate salesmen. 289 N.Y. at 115. Courts have continued to interpret the RPL as a comprehensive scheme governing the *licensing of brokers*, but not of all broker relationships or broker commissions. In *DiFrancesco v. County of Rockland*, 41 A.D.3d 530 (2d Dep't 2007), the Court rejected real estate brokers' preemption challenge to a Rockland County local law that required brokers to inform sellers and buyers of the requirement related to water system testing and certification. The Court found that the law was not preempted by Article 12-A, "which was enacted to regulate the activities and licensing of real estate brokers and salespeople for the prevention of fraud," because "the fact that the local law 'touch[es] upon the same area' of regulation as Article 12-A of the [RPL] does not establish that the State has preempted the entire field." *Id.* at 531 (*quoting Jancyn Mfg. Corp*, 71 N.Y.2d at 99). *See also People v. Sieger Agency*, BRTO 1821-16, 2017 N.Y. Misc. LEXIS 2904, at *9 (Suffolk Dist. Ct. July 21, 2017) (Town Code provision regulating advertising of rental properties was not preempted by Article 12-A because it "does not intrude upon or regulate the licensing of brokers/agents").

Importantly, in April 2021, an Albany Court found null and void a section of a New York State Department of State ("DOS") guidance document advising that RPL § 238-a prohibited rental brokers acting as an agent of the landlord from requiring tenants to pay brokers fees. *See* Ex. K. Considering the text of the provision, as well as the legislative record, which indicated that the provision was meant to prohibit application fees over the actual cost of background and credit checks, the Court concluded that the provision prohibited pre-negotiation fees only. *Id.* at *7. The Court reasoned that since there is no reference to "broker's commissions" in RPL § 238-a, that the

18

legislature did not intend to regulate brokers' fees. *Id.* at \*8. As State law is silent as to who can be required to pay brokers' fees, the RPL does not preempt the FARE Act.

Plaintiffs' argument that the RPL is so comprehensive and detailed that it must occupy the entire field of regulating real estate brokers is unpersuasive. The comprehensiveness of a state regulatory regime is often measured by the existence or absence of local controls. *See DeJesus*, 54 N.Y.2d at 469; *Wholesale Laundry Bd. of Trade, Inc. v. City of New York*, 17 A.D.2d 327, 330 (1st Dep't 1962). Here, the RPL does not provide local municipalities with detailed instructions for the enforcement of broker compensation, which strongly weighs against any preemptive intent on the part of the State legislature. The real estate broker industry also does not pose any special concerns requiring statewide uniformity, especially given market differences in the City, which also weighs against any preemptive intent. *See Dougal v. County of Suffolk*, 102 A.D.2d 531 (2d Dep't 1984). Plaintiffs emphasize that RPL § 442-k authorizes the state real estate board to promulgate rules and regulations to effectuate the purposes of the Article, but that does not imply that *no other entity* may regulate in the field in brokers' commissions. In fact, the majority of the responsibilities delegated to the real estate board concern the education, licensing, and responsibilities of real estate brokers and salespeople, not the charging of fees. *See* RPL §§ 442-k(2) – (6). Plaintiffs also list multiple provisions of the Article 12-A to illustrate the comprehensiveness of the scheme, but these provisions demonstrate that Article 12-A primarily regulates real estate broker *licensing* and *code of conduct*, not broker compensation or relationships. *See, e.g.*, RPL § 442.  Even RPL § 443, which requires brokers to disclose fiduciary relationships with tenants and landlords, is silent as to compensation brokers may charge. Similarly, 19 NYCRR § 175.7 (specifying when a broker can act as a dual agent) and § 175.19 (prohibiting brokers from entering into a "net listing" contract) do not indicate an intent to occupy the field of broker relationships or compensation.

Plaintiffs also argue that the FARE Act is preempted by the RPL because "[n]othing in the plain text of Article 12-A creates a fiduciary/agency relationship between a broker and landlord arising out of the mere fact of advertising or 'publishing' a rental listing," Compl. ¶ 63, but this argument is unavailing. As discussed above, it is well established that Article 12-A does not alter agency relationships recognized by common law, and therefore does not occupy the field of real estate broker's fiduciary relationships. *Sullivan Co.*, 289 N.Y. at 115. Additionally, the FARE Act does not create a fiduciary relationship where one did not exist before. In fact, the FARE Act's definition of "agent" references the definition of agent "under section 440-a of the real property law," and the definitions of "landlord's agent" and "tenant's agent" in the FARE Act are nearly identical to the definitions for the same in Section 443 of the RPL. Ad. Code § 20-699.20Rather than create a fiduciary relationship,[7] the FARE Act defines conduct that is prohibited. Indeed, the FARE Act does not define any duties a broker owes to a landlord, nor does it create a cause of action for breach of any fiduciary duty. Rather, a consumer protection law at its core, the FARE Act's prohibition on brokers charging tenant fees is triggered by the broker being retained by the landlord, not having a fiduciary relationship with the landlord.

Finally, Plaintiffs' focus on testimony of New York City Department of Housing Preservation and Development ("HPD") Deputy Commissioner Tigani and Councilmember Ossé to show that the FARE Act is preempted, is misguided. While Deputy Commissioner Tigani suggested that brokers fees "are subject to state regulation," he also admitted that HPD was still "reviewing the legislation as an administration and trying to make sure that we understand it thoroughly." Ex. E at 27-28. Councilmember Ossé disagreed with any suggestion that brokers'

---

[7] Section 20-669.21(1) distinguishes between a "landlord's agent" and "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord."

fees could only be subject to state regulation, explaining that "the Department of State, through its real estate board, governs licensure" and "deals with the laws written in Article 12-A of the state's real property law" but "[c]urrently, there is no statute or law in Article 12-A that would preempt the City from legislating on who pays for the broker fee." *Id.* at 42–43. As such, nothing in the legislative record supports Plaintiffs' argument that the FARE Act is preempted. By contrast, the legislative record shows that sponsors of the bill carefully thought about the City's authority to regulate broker's fees, and correctly reasoned that the FARE Act is not preempted by Article 12-A of the RPL. For all of these reasons, plaintiff's Second Cause of Action should be dismissed.

**POINT III**

**PLAINTIFFS CANNOT MAINTAIN A CLAIM**
**UNDER THE CONTRACT CLAUSE**

Plaintiffs argue that the FARE Act violates the Contract Clause of the U.S. Constitution by impairing existing "exclusive listing" contracts between brokers and landlords that contain provisions that the tenant must pay the broker fee.  Compl. at ¶¶ 169–70. However, this claim fails at the outset because the Complaint is devoid of factual allegations from which this Court could infer that any of the Plaintiffs have any contracts that will be impacted by the FARE Act.  Even if sufficient facts were pled, any such contracts cannot be "substantially impaired" by the FARE Act because it does not impair the rights and responsibilities of the contracting parties, it was not a "reasonable expectation" that landlords and brokers could contract amongst themselves to require the tenant to pay the fee arising out of that contract, and this Act was entirely foreseeable prior to any alleged contracts' existence. Additionally, the FARE Act serves a legitimate and significant public purpose and is a reasonable and appropriate means of achieving that purpose.

The Contract Clause of the U.S Constitution restricts the power of the States to disrupt contractual arrangements by forbidding the passage of "any… Law impairing the Obligation of

Contracts." U.S. Const., Art. I, § 10, cl. 1. Yet, the prohibition on contractual impairment is "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (quotation marks omitted). Legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result." *Id.* at 22. This is especially true where, as here, the government is acting to "safeguard the vital interests of its people." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934). Further, the Contract Clause can only protect contracts that existed at the time the law was enacted; it does not apply to the regulation of future contracts. *Fabri v. United Techs. Int'l, Inc.*, 387 F. 3d 109, 124 (2d Cir. 2004); *Ogden v. Saunders*, 25 U.S. 213, 327 (1827).

To succeed on their Contract Clause claim, Plaintiffs must show that the FARE Act substantially impairs their existing contracts, that the law does not serve a "significant and legitimate public purpose," and that the law is not a "reasonable" and "appropriate" means of achieving that purpose. *Melendez v. City of New York*, 16 F.4th 992, 1031 (2d Cir. 2021) (quotations and citations omitted). The Second Circuit understands the Contract Clause's text "to demand some flexibility to allow states to protect the public welfare…." *Id.* at 1032. The standard for reviewing Contract Clause claims "is more deferential to legislative judgment than strict scrutiny, particularly when the impaired contract at issue is private and state self-interest is not an obvious concern." *Id.*

## A. The Complaint Fails to Allege that Any Plaintiff is a Party to an Existing Contract that Will Be Impacted by the FARE Act

Here, Plaintiffs argue that the FARE Act impairs "exclusive" contracts between a landlord and a broker that obligate the broker to take actions intended to fill any vacant unit and obligate the landlord to refer any vacancy, or any inquiries from potential tenants, to the broker, for the

period of the contract. Compl., ¶¶ 31-32. The FARE Act was enacted on November 13, 2024 and does not go into effect until June, 2025. Ex. A. Accordingly, any Contract Clause claim would be limited to, using the most generous timeline for Plaintiffs, contracts that were in effect on or before November 12, 2024 and that were not slated to expire prior to June 2025. *Fabri,* 387 F. 3d at 124. Plaintiffs have not pled facts sufficient to suggest that any Plaintiff is a party to such a contract.

The only Plaintiff who alleges in the Complaint that it has existing "exclusive, tenant pay" contracts is BOND. Compl., ¶ 32. Thus, the remainder of the Plaintiffs have failed to plead facts to demonstrate that they even have standing to bring a Contract Clause claim, and, thus, cannot proceed in this action. BOND alleges that it has "many such" existing "exclusive, tenant pay" contracts, but the Complaint is devoid of any other information about these purported contracts, for example the contracts' start and end dates or the landlords with whom BOND contracted. *Id.* As such, the Complaint fails to provide sufficient facts from which the Court could infer that any of the contracts to which BOND is a party will be impacted at all by the FARE Act, let alone impacted substantially.

Nor does the motion for preliminary injunction fill in the blanks. BOND purports to provide a blank sample of such a contract as an exhibit to the Affirmation of Douglas Wagner, who also affirms that the contracts "often will last for one year." Wagner Aff., ¶ 7 & Ex. 1. Additionally, REAL NY, for the first time in the motion, claims to have exclusive listings, but provides even less information about these alleged contracts than BOND. Rahamanian Aff., ¶¶ 3, 7-8.[8] Thus, the Complaint and the motion are devoid of information suggesting that either BOND or REAL NY have existing contracts that will be impacted at all by the FARE Act because, for example, (1)

---

[8] It is well-settled that a plaintiff cannot amend the complaint through briefs or affirmations, and the Rahamanian Aff. does not remedy the pleading deficiencies regarding alleged contracts for REAL NY.  *See In re Agape Litig.*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011).

such contracts do not expire prior to June of 2025, or (2) any of the contracted landlords will have vacancies to which the exclusive contract applies between June of 2025 and the contract's expiration date. The conclusory statement that a brokerage has "many" exclusive contracts is insufficient to state a claim, and the Contract Clause claim should be dismissed. *See Bldg. & Realty Inst.*, 2024 U.S. App. LEXIS at \*12-13 (plaintiff failed to state a Contract Clause claim where there were insufficient facts about the leases at issue from which the court could infer that the leases "could potentially implicate the Contract Clause" even though it was "theoretically possible" the leases were impacted by the challenged law.)

The Complaint fails on its face to plead the bare minimum—that any Plaintiff has a contract that will be impacted by the FARE Act—and this claim must be dismissed.

### B. Plaintiffs Have Not Alleged Any Substantial Impairment to a Contract

Even if BOND's conclusory statements were sufficient, the Contract Clause claim fails because: (1) the law does not substantially impair the contract, (2) the law was entirely foreseeable to Plaintiffs, and (3) it was an appropriate means of achieving a legitimate public purpose. To determine whether a contract has been substantially impaired, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). Even a "significant change" to existing contractual relationships does not necessarily cause a substantial impairment. *Id.* The FARE Act does not substantially impair existing contracts because it does not implicate the contracting parties' bargain or reasonable expectations, or prevent either party from safeguarding or reinstating its rights.

First, the FARE Act on its face does not undermine the contractual bargain because it does not implicate any rights or obligations *of the contracting parties*. The contracts at issue are entered into by a landlord and a broker, who cannot contractually obligate a hypothetical future tenant to

pay the broker fee. Any agreement between a tenant and broker or landlord that the tenant will pay the broker fee necessarily happens much later, after the tenant applies for the apartment, and an expectation that a tenant will agree to pay the broker fee in a separate, future agreement is not protected by the Contract Clause. *See Bldg. 7 Realty Inst. Of Westchester & Putnam Ctys., Inc. v. N.Y.*, 2021 U.S. Dist. LEXIS 174535, *113 (S.D.N.Y. Sept. 14, 2021). Plaintiffs have not alleged any existing contract in which a tenant has agreed to pay a fee for a landlord's broker after June of 2025. This is a material difference between the contracts alleged herein and the contracts in *Melendez*, 16 F.4th at 1033, in which a local law discharged certain guarantors' obligations after those guarantors had entered into an agreement to guarantee the leases. Because there is no alleged contractual agreement under which a tenant has agreed to pay a broker fee, there can be no impairment of the agreements between the landlords and brokers. *General Motors Corp. v. Romein*, 503 U.S. 181, 186–87 (1977) ("In this case, however, we need not reach the questions of impairment, as we hold that there was no contractual agreement regarding the specific workers' compensation terms allegedly at issue.")

Nor is it a reasonable expectation that a third party will agree to pay the broker fee for every unit that becomes vacant during the pendency of an exclusive contract. Each broker fee is contingent on a variety of factors, including a prospective tenant's willingness and ability to pay it, the presence of a vacancy in the landlord's property, the cost and attractiveness of the unit, and a multitude of economic and market forces and circumstances. It is not within the control of either contractual party, and landlords and brokers could never rely on an assumption that they will always be able to find a tenant to pay the broker fee. The contracting parties retain the same rights and remedies under their existing contracts as they would if a tenant could not be located to fill a vacancy for any other reason. The FARE Act does not render these contracts "permanently and

completely unenforceable" *Melendez*, 16 F.4th at 1034, and, to the extent any impairment does exist, it is a minimal alteration that bears so little weight that the inquiry should end here. *Melendez*, 16 F.4th at 1034 (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)); *see also Sveen*, 138 S. Ct. at 1822.

Second, the FARE Act does not interfere with Plaintiffs' reasonable expectations because it was foreseeable well before any alleged existing contracts that the practice of charging brokers' fees to tenants who did not retain the broker could be prohibited. *See Sullivan v. Nassau Cnty.*, 959 F.3d 54, 64 (2d Cir. 2020). Significant attention has been paid to fees charged to tenants since at least 2019, when the New York legislature enacted tenant protections that were initially interpreted by DOS as prohibiting the practice of passing broker fees on to renters. *Real Estate Bd. of N.Y., Inc.*, Ex. K. Int. 360 itself was introduced a year ago, and, notably, had 33 sponsors, making it highly plausible that a version of the bill protecting tenants from being obligated to pay fees for brokers retained by the landlord would be enacted. Ex. B. Accordingly, the law was not "wholly unexpected" at the time any of the purported contracts were signed, and thus constitutes no impairment of Plaintiffs' contracts. *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).

### C. The FARE Act is an Appropriate and Reasonable Means of Achieving a Legitimate Public Purpose

Since Plaintiffs cannot establish substantial impairment, this Court's inquiry should end without the need to address the remaining prongs of the Contract Clause analysis. *See Allied Structural Steel Co.*, 438 U.S. at 245. However, should this Court find that the FARE Act substantially impairs BOND's existing contracts, the law nevertheless serves a significant and legitimate public purpose and was an appropriate and reasonable means of achieving that purpose.

"A legitimate public purpose is one 'aimed at remedying an important general social or

26

economic problem rather than providing a benefit to special interests.'" *Buffalo Teachers*, 464 F.3d at 368 (quoting *Sanitation,* 107 F.3d at 993). As detailed in Point (I)(B)(b)(i) & (ii), the FARE Act serves significant and legitimate public purposes. It easily meets the public-purpose test because it was designed to prevent common market practices that fail to align with expected principal-agent relationships, significantly burden consumers, and limit residents' ability to afford and access housing within the City. The FARE Act protects tenants, who have less bargaining power and less information about the housing market, from a practice that permits landlords and brokers to reach agreements between themselves that place the obligation to pay for the contracted services on the tenants, who are not a party to the agreement.

To the extent that Plaintiffs argue that the legislative record "is bereft of evidentiary support or data demonstrating that there is any problem with the alignment of the 'principal-agent relationship,'" this allegation ignores large swathes of the record as described above in the Statement of Facts and Point (I)(B)(b)(i) & (ii). The record reflects that the majority of households in the City are renters, that at least half of the apartments on the market at any given time require the payment of broker fees, and that renters do not have the requisite bargaining power to negotiate these fees. *See, e.g.,* Exs. B-E. Additionally, the OID investigation demonstrated that a significant portion of the real estate agents approached did not disclose their agency relationships, and that, 31 percent of the brokers approached claimed to be the tenant's agent or a dual agent, even though the investigator, posing as a prospective tenant, had not sought to hire a broker. Ex. F, p. 9.

The FARE Act is an appropriate and reasonable means of achieving the above purpose for several reasons. First, the law does not single out BOND, or any of the Plaintiffs, but rather applies to all brokers and landlords in the City. *See Allied Structural Steel*, 438 U.S. at 247–50 (striking the law in part because the record suggested the target was a single employer). Second, landlords

can continue to use the services of brokers, so long as they pay the broker fee. And, as Plaintiffs repeatedly point out, landlords do not need to unilaterally absorb the cost of these fees—in many circumstances, they may choose to add the cost to a tenants' rent, a cost that is often more accessible to tenants than the large upfront payment required prior to the FARE Act. In the same way, brokers may continue to work with landlords by collecting the fees from landlords, or, if they wish, they may collect fees from tenants by contracting with a prospective tenant who wants to engage a broker to represent the tenant's needs. Plaintiffs are incorrect in their assertion that the City "could easily accomplish its purpose with a prospective rule that carves out already-executed agreements…" Pl. Mem., p. 21. The enactment of a law that grandfathered in existing contracts would encourage landlords and brokers to enter into long-term contracts while the bill was pending as a means of avoiding compliance with the law, which would defeat the law's purpose. As Plaintiffs acknowledge, City Council considered, and rejected, this option. *Id.* The record also reflects that City Council heard and considered feedback from, *inter alia*, Plaintiffs and other stakeholders, amended the bill to reflect that feedback where appropriate, and explained the rationale for rejecting feedback where necessary. *See* Ex. F; *see also Buffalo Teachers*, 464 F.3d at 371 (taking into account whether or not the government considered other alternatives).

**POINT IV**

**PLAINTIFFS ARE NOT ENTITLED TO A
PRELIMINARY INJUNCTION**

**A.  Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits**

For the reasons set forth in Points I through III, above, Plaintiffs cannot establish a likelihood of success on the merits, and their motion for a preliminary injunction fails.

**B.  Plaintiffs Cannot Establish Irreparable Harm**

Plaintiffs' request for a preliminary injunction to prevent the duly-enacted FARE Act from

28

being enforced starting June 2025 also fails because Plaintiffs cannot show that they will suffer irreparable harm without injunctive relief. *Winter*, 555 U.S. at 20. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. United States Dep't of Homeland Sec.*, 969 F. 3d 42, 86 (2d Cir. 2020), (internal quotation omitted). Plaintiffs' main allegation of "harm" is that, since the passage of the FARE Act, "tenants are already refusing to pay brokers fees." Pl. Mem. at 22. Interestingly, this assertion that now tenants feel empowered to negotiate disproves Plaintiffs' contention that tenants always had the power to negotiate broker fees and the FARE Act was unnecessary. In any event, Plaintiffs have not alleged that they have been unable to fill vacancies or collect broker fees, just that, in broad generalization, some tenants have refused to pay broker fees, so the harm is difficult to identify. Even if no tenant were willing to pay a broker fee between now and June, Plaintiffs' harm would amount to financial losses and are not irreparable.

Plaintiffs' allegation of irreparable harm based on a constitutional violation fares no better. Most notably, there is no constitutional violation, as described above. Further, while the Second Circuit has found a presumption of irreparable harm where there are allegations of constitutional violations, the rule is not universal. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). "The Second Circuit has recognized that in a case involving an alleged constitutional violation, where other forms of relief can make a plaintiff whole, a plaintiff cannot establish irreparable harm." *Williams v. Rodriguez*, 20-cv-806 (VLB), 2021 U.S. Dist. LEXIS 96443, at *22–25 (D. Conn. May 21, 2021) (citations omitted); *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988) (since reinstatement and money damages could make appellees whole they had not demonstrated the type of harm entitling them to injunctive relief). Here, Plaintiff brokers claim that they will have to "retool" their businesses. Again, these are alleged financial losses that can be compensated. Plaintiffs

cannot establish a constitutional violation, let alone one for which money damages could not compensate, and they have alleged no damages arising from their First Amendment claim. *See also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("ordinary compliance costs are typically insufficient to constitute irreparable injury.")

### C. Balancing of the Equities

Finally, Plaintiffs' request for a preliminary injunction fails because they cannot show that the balance of equities weighs in their favor, and that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20; *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge."). The record demonstrates that broker fees are burdensome to renters, impede the ability of households to move, tenants do not have the bargaining power to negotiate with a broker who has already been retained by a landlord, and tenants will be required to pay broker fees for services provided to landlords if the FARE Act is enjoined. Finally, Plaintiffs' tout an alleged impact on transparency in advertising and alleged increase in rents. As described above, there is evidence in the record to disprove these speculations, but even if Plaintiffs are correct, they ignore the fact that it is the significant upfront cost of the broker fee that prevents renters from being able to move. Ex. F (reflecting that over half the City's renters would be more able to move to a new apartment if there were no upfront broker fee but the monthly rent were higher). Consumer protections that prevent a structure that causes a skewed principal-agent relationship to the detriment of renters is clearly in the public interest.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants City and Commissioner Mayuga respectfully request that this Court deny the motion for a preliminary injunction and dismiss the Complaint in its entirety, together with such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           February 28, 2025

Muriel Goode-Trufant
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2369

By: _____/S/_____
    Jessica Katzen & Aimee K. Lulich
    *Assistant Corporation Counsels*

31

24-CV-9678 (RA)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REAL ESTATE BOARD OF NEW YORK, INC., NEW
YORK STATE ASSOCIATION OF REALTORS, INC.,
BOHEMIA REALTY GROUP, BOND NEW YORK REAL
ESTATE CORP., REAL NEW YORK LLC, LEVEL GROUP
INC., FOUR CORNERS REALTY, LLC, 21 WEST CORP., 8
WEST 119TH STREET HDFC,

Plaintiffs,

- against -

THE CITY OF NEW YORK, *a municipal entity*, VILDA
VERA MAYUGA, *as Commissioner of New York City
Department of Consumer and Worker Protection*,

Defendants.

**DEFENDANTS MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION TO DISMISS THE COMPLAINT AND IN OPPOSITION
TO THE MOTION FOR A PRELIMINARY INJUNCTION**

**MURIEL GOODE-TRUFANT**
*Corporation Counsel of the City of New York*
*Attorney for Defendant City and Commissioner
Mayuga*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel: Jessica Katzen & Aimee Lulich*
*Tel:  (212) 356-2369*
*Matter No.:*

*Due and timely service is hereby admitted.*

*New York, N.Y.  .................................................................. , 2025......*

*....................................................................................................... , Esq.*

*Attorney for ..............................................................................................*

33