# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REAL ESTATE BOARD OF NEW YORK, INC., NEW YORK STATE ASSOCIATION OF REALTORS, INC., BOHEMIA REALTY GROUP, BOND NEW YORK REAL ESTATE CORP., REAL NEW YORK LLC, LEVEL GROUP INC., FOUR CORNERS REALTY, LLC, 21 WEST 74 CORP., 8 WEST 119TH STREET HDFC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF NEW YORK, *a municipal entity*, VILDA VERA MAYGUA, *as Commissioner of New York City Department of Consumer and Worker Protection*, <br><br> Defendants. | Case No. 24-cv-09678 (RA) |

**MEMORANDUM OF LAW OF AMICUS CURIAE NEIGHBORS TOGETHER CORP. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Date: March 6, 2025

Evan Henley
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 5
New York, NY 10013
Tel.: 212-298-5233
ewhenley@legal-aid.org

# **TABLE OF CONTENTS**

I.     STATEMENT OF INTEREST ............................................................................. 1

II.    PRELIMINARY STATEMENT ........................................................................ 1

III.   THE NEED FOR THE FARE ACT ................................................................... 3

IV.    WHAT THE FARE ACT PROHIBITS............................................................. 8

V.     WHAT THE FARE ACT DOES NOT PROHIBIT ......................................... 9

VI.    PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM .......................... 10

    A.    Plaintiffs' First Amendment claim is meritless because speech proposing an illegal
transaction receives no First Amendment protection............................................... 11

    B.    The FARE Act does not impair an obligation of contract within the meaning of the
Contract Clause......................................................................................................... 14

    C.    New York State Law does not preempt the FARE Act. .................................... 19

VII.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION. .......................................................................................................... 23

    A.    Plaintiffs' claims do not have a substantial likelihood of success. ................... 23

    B.    Plaintiffs do not face irreparable harm............................................................. 24

    C.    The FARE Act promotes the public interest, and the equities militate against blocking
it…..........................................................................................................................  25

VIII.  CONCLUSION ........................................................................................................ 26

## **TABLE OF AUTHORITIES**

**Cases**

*2 Park Ave. Assocs. v. Cross & Brown Co.*, 327 N.E.2d 632 (N.Y. 1975)...................................21

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ........................................................................ 23, 24

*A-1 Realty Corp. v. State Div. of Human Rights*, 318 N.Y.S.2d 120 (N.Y. App. Div. 1970) ........ 9

*Airlines Reporting Corp. v. Barry*, 825 F.2d 1220 (8th Cir. 1987) ................................................ 25

*Arash Real Estate Mgmt. Co. v. N.Y.C. Dep't of Consumer Affairs*, 52 N.Y.S.3d 102 (N.Y. App. Div. 2017) ....................................................................................................................................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................... 10

*Ba Mar, Inc. v. Cnty. of Rockland*, 566 N.Y.S.2d 298 (N.Y. App. Div. 1991) ............................ 19

*Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466 (8th Cir. 1994) ................................................ 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2006) ......................................................................... 11

*Bldg. & Realty Inst. of Westchester & Putnam Cntys. v. New York*, No. 19-CV-11285 (KMK); No. 20-CV-634 (KMK), 2021 U.S. Dist. LEXIS 174535 (S.D.N.Y. Sept. 14, 2021), *aff'd* 2024 U.S. App. LEXIS 5905 (2d Cir. Mar. 12, 2024) (unpublished opinion) .................................. 16

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, No. 21-2526; No. 21-2448, 2024 U.S. App. LEXIS 5905 (2d Cir. Mar. 12, 2024) (unpublished opinion) ............... 16

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006)...................................................... 15

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557 (1980) ........................ 13

*Cipollone v. Liggett Grp.*, 505 U.S. 504 (1992) ........................................................................... 21

*Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477 (S.D.N.Y. 2009) .......... 11

*Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33 (E.D.N.Y. 2020), *aff'd* 549 F.4th 540 (2d Cir. 2023)........................................................................................... 18

*Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540 (2d Cir. 2023)................. 1

*Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210 (D. Conn. 2020) ............................... 24

*DiFrancesco v. Cnty. of Rockland*, 839 N.Y.S.2d 105 (N.Y. App. Div. 2007)............................ 21

*DJL Rest. Corp. v. City of New York*, 749 N.E.2d 186 (N.Y. 2001)............................................. 20

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983) ........................... 18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .............................. 24

*FOP, Metro. Police Dep't Labor Comm'n, D.C. Police Union v. District of Columbia*, 502 F. Supp. 3d 45 (D.D.C. 2020) ............................................................................................... 16

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007)............................... 24

*Hertz Corp. v. City of New York*, 607 N.E.2d 784 (N.Y. 1992) .................................................. 20

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ..................................................... 14

*Hum. Servs. Council of N.Y. v. City of New York*, 21-CV-11149 (PGG), 2024 U.S. Dist. LEXIS 208054 (S.D.N.Y. Nov. 14, 2024) ................................................................................... 14, 17

*In re Wilson Sullivan Co.*, 44 N.E.2d 387 (N.Y. 1944) ......................................................... 21, 22

*Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015) ........................................ 13

*Iowa Utilities Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996).............................................................. 25

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) .............................. 24

*Jancyn Mfg. Corp. v. Cnty. of Suffolk*, 518 N.E.2d 903 (N.Y. 1987) .................................... 20, 21

*Jeannot v. New York*, 24-CV-05896 (HG), 2025 U.S. Dist. LEXIS 6357 (E.D.N.Y. Jan. 13, 2025) ..................................................................................................................................... 23

*Kavasutra 6th St., Inc. v. Adams*, No. 24-15, 2024 U.S. App. LEXIS 32181 (2d Cir. Dec. 19, 2024) (unpublished opinion).................................................................................................... 26

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) .............................. 15, 18

*Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618 (1st Cir. 1981) ... 14

*Loveridge v. Pendleton Wooden Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986)................................... 25

*Marcel v. Donovan*, No. 11–CV–1560 (RRM) (VVP), 2012 U.S. Dist. LEXIS 34493 (E.D.N.Y. Mar. 14, 2012).......................................................................................................................... 24

*Martin v. Colon*, 149 N.E.3d 39 (N.Y. 2020) ............................................................................. 21

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021)................................................... 8, 14

*Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294 (2d Cir. 2022)................................................. 11

*Metro. St. Louis Sewer Dist. v. Ruckelshaus*, 590 F. Supp. 385 (E.D. Mo. 1984)....................... 16

*Miller v. McDonald*, 720 F. Supp. 3d 198 (W.D.N.Y. 2024) ....................................................... 23

*Monroe-Livingston Sanitary Landfill, Inc. v. Caledonia*, 417 N.E.2d 78 (N.Y. 1980) ................ 20

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)............................................ 24

*N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1 (1988)................................................... 16

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).......................................................... 13

*Newson v. Vivaldi Real Estate Ltd.*, 2024-00261, 2025 N.Y. App. Div. LEXIS 46 (N.Y. App. Div. Jan. 7, 2025)................................................................................................................... 9

*Nken v. Holder*, 556 U.S. 418 (2d Cir. 2009) ............................................................................. 25

*Ogden v. Saunders*, 25 U.S. 213 (1827) ..................................................................................... 15

*People v. Cook*,  312 N.E.2d 452 (N.Y. 1974) ...................................................................... 20, 22

*People v. Judiz*, 344 N.E.2d 399 (N.Y. 1976) ............................................................................ 20

*Perfect Puppy, Inc. v. City of East Providence*, 98 F. Supp. 3d 408 (D.R.I. 2015)..................... 17

*Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973)............ 12

*Police Benevolent Ass'n of the City of N.Y. v. City of New York*, 224 N.E.3d 522 (N.Y. 2023).. 19

*Preseault v. I.C.C.*, 494 U.S. 1 (1990) ......................................................................................... 2

*Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir. 1990) ....................................................... 12

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).................................................... 25

*Rivkin v. Century 21 Teran Realty LLC*, 887 N.E.2d 1113 (N.Y. 2008) ..................................... 22

*Roso-Lino Beverages Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y.,* 749 F.2d 124 (2d Cir. 1984) ...................................................................................................................................... 25

*Safelite Grp. v. Jepsen*, 764 F.3d 258 (2d Cir. 2014) ................................................................. 13

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46 (2d Cir. 1998)......................... 18

*Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985 (2d Cir. 1997) ...................... 16

*Scott v. Ross*, 140 F.3d 1275 (9th Cir. 1998) .............................................................................. 14

*Seattle City Emps. Ret. Sys. v. Epsilon Global Active Value Fund II, L.P.*, C10-555RAJ, 2010 U.S. Dist. LEXIS 155134 (W.D. Wash. May 11, 2010)........................................................... 24

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970)...................................... 25

*Sonnenschein v. Douglas Elliman-Gibbons & Ives*, 753 N.E.2d 857 (N.Y. 2001) ...................... 22

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................................................ 11, 13

*South Terminal Corp. v. EPA*, 504 F.2d 646 (1st Cir. 1974)................................................. 14, 16

*Sturges v. Crowninshield*, 4 Wheat. 122 (1819) ..................................................................... 14

*Sven v. Melin*, 584 U.S. 811 (2018) ....................................................................................... 15

*Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) .................................. 25

*U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1977).................................................................... 18

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) ........................................................ 13

*United States v. Williams*, 553 U.S. 285 (2008) ................................................................... 12

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ................................................................... 1

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537 (E.D. Va. 1999) .......... 15, 16, 17, 18

*White v. Corr. Med. Servs.*, 08-CV-277, 2009 U.S. Dist. LEXIS 16095 (W.D. Mich. Mar. 2, 2009) ............................................................................................................................... 26

**Statutes**

N.Y. Mun. Home Rule L. § 10 .............................................................................................. 19

N.Y. Real Prop. L. § 441 ..................................................................................................... 22

N.Y. Real Prop. L. § 442 ..................................................................................................... 22

N.Y. Real Prop. L. § 443 ................................................................................................ 10, 22

N.Y. Real Prop. L. § 443-a .................................................................................................. 20

N.Y.C. Admin. Code § 20-699.20 ......................................................................................... 10

N.Y.C. Admin. Code § 20-699.21 ................................................................................... passim

N.Y.C. Admin. Code § 20-699.22 ........................................................................................... 9

N.Y.C. Admin. Code § 20-699.23 ........................................................................................... 9

**Constitutional Provisions**

N.Y. Const., art. IX, § 2 ...................................................................................................... 19

U.S. Const. art. I, § 10.............................................................................................. 14

**Regulations**

N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10............................................................ 5, 9

N.Y. Comp. Codes R. & Regs. tit. 19, § 175.19............................................................... 23

N.Y. Comp. Codes R. & Regs. tit. 19, § 175.25............................................................... 23

N.Y. Comp. Codes R. & Regs. tit. 19, § 175.7................................................................. 23

**Other Authorities**

2013-25 N.Y. Reg. 23 (June 19, 2013)........................................................................... 21

2019-42 N.Y. Reg. 43 (Oct. 16, 2019)............................................................................ 21

*Condition Definition*, Merriam-Webster.com...................................................................... 8

*Conditional Definition*, Merriam-Webster.com.................................................................... 8

David Brand, *A Rent-Stabilized Apartment 1 Bedroom Apartment for $1,100? In NYC? The Broker's Fee is $15K*, Gothamist (Feb. 8, 2024)................................................................ 4

*Engage Definition*, Merriam-Webster.com.......................................................................... 8

Hilary Wilson & Debipriya Chatterjee, Community Service Society, *Teetering on the Edge* (Oct. 2024) .................................................................................................................. 4

Kenny Lee, *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%*, StreetEasy.com (Dec. 9, 2024) .................................................................... 4, 5, 26

Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*, StreetEasy.com (Feb. 10, 2024)........................................................................... 4

N.Y. Dep't of State, *Real Estate Broker FAQs*................................................................. 23

New York City Dep't Hous. Preservation & Dev., *2023 Housing and Vacancy Survey Selected Initial Findings*........................................................................................... 4, 18

Note, *Preemption as Purposivism's Last Refuge*, 126 Harv. L. Rev. 1056 (2013) ...................... 21

*Publish Definition*, Merriam-Webster.com.......................................................................... 8

StreetEasy Team, *NYC Broker Fee Changes: What the FARE Act Means for Agents* (Dec. 9, 2024) ...................................................................................................................... 2

I.     **STATEMENT OF INTEREST**

Founded in 1982, Neighbors Together is a non-profit organization dedicated to ending hunger and poverty. The core of Neighbors Together is its members, who both use and run its programs. Neighbors Together provides direct services and engages in policy advocacy.

In the past decade, Neighbors Together's work has focused increasingly on housing and in particular on housing vouchers. Many of Neighbors Together's members are homeless or stuck in unstable housing situations despite having housing vouchers. One obstacle to obtaining stable housing is the prevalence of broker fees. Broker fees create hardships for Neighbors Together's members and keep them homeless or unstably housed for longer. They also undermine Neighbors Together's efforts to achieve policies and practices that improve vouchers' effectiveness. As a result, Neighbors Together's members decided to support the Fairness in Apartment Rental Expenses Act ("FARE Act" or "Act"), and Neighbors Together testified in support of it.

II.     **PRELIMINARY STATEMENT**

In Neighbors Together's extensive experience, broker fees greatly increase the upfront costs required to move. They usually represent over one month's rent and therefore require prospective tenants to have saved additional thousands of dollars before they can obtain an apartment. Tenants must pay these fees even when the broker has listed the apartment at the instance or with the authorization of the landlord, and the disparity in bargaining power between suppliers and seekers of housing means that there is little opportunity to negotiate them. The result is decreased tenant mobility and widespread dissatisfaction with a practice that many tenants feel forces them to pay for services that the landlord requested and benefits from. Additionally, tenants who must move due to lease expiration or eviction may become homeless if they cannot afford broker fees.

In response, the New York City Council passed a law intended to protect consumers: the FARE Act. Fundamentally, the FARE Act prohibits certain brokers—who either have been engaged by landlords to market apartments or whom landlords have authorized to publish listings—from charging prospective tenants broker fees. Both landlords and brokers are responsible for compliance with the Act.

Plaintiffs spend the bulk of their complaint and motion for a preliminary injunction arguing that the FARE Act is a "profoundly misguided piece of legislation." Compl. para. 1, ECF No. 1. However, legislation must only be "rationally related to legitimate government interests," *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 557 (2d Cir. 2023) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)), and rational basis review is not a vehicle for judges to "second guess legislative judgment," even where that judgment may conflict with the opinions of some experts, *id.* (citing *Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990)).[1] Implicitly recognizing that a rational basis challenge to the FARE Act would be futile, Plaintiffs grasp for other arrows in their quiver of constitutional arguments. Each misses the mark.

First, the FARE Act prohibits brokers who are marketing an apartment for a landlord (either because they have an agreement to do so or because they have listed an apartment with the landlord's permission) from charging a tenant a fee to rent the apartment. In other words, it is illegal for the broker to charge a fee under these circumstances. A listing that represents that fees

---

[1] Many disagree with Plaintiffs' dire predictions regarding the FARE Act's impact, including StreetEasy, which has published multiple blog posts supporting the policies underlying the FARE Act. *See, e.g.*, StreetEasy Team, *NYC Broker Fee Changes: What the FARE Act Means for Agents* (Dec. 9, 2024), https://streeteasy.com/blog/nyc-broker-fee-changes-what-the-fare-act-means-for-agents/ (last visited Jan. 27, 2025).

must be paid in a manner that would violate the FARE Act proposes an illegal transaction. Such speech receives no First Amendment protection.

Second, Plaintiffs' contracts provide that the brokers "will collect their fee from the tenant." The FARE Act does not impair Plaintiffs' contracts, particularly because this term does not create any obligation between landlords and brokers.

Finally, New York State law does not preempt the FARE Act. New York laws governing brokers ensure brokers' competency, honesty, and professionalism. The FARE Act operates outside that field.

The Court should dismiss Plaintiffs' complaint for failing to state a claim and deny their motion for a preliminary injunction as moot. Should the Court reach the merits of Plaintiffs' motion, it should deny it because Plaintiffs' claims have no substantial likelihood of success, Plaintiffs do not face irreparable harm, and the public interest and equities favor enforcement of the FARE Act. A preliminary injunction would especially harm the low-income tenants who stand to benefit from the FARE Act.

## III.    THE NEED FOR THE FARE ACT

Among the obstacles that New York City residents (or prospective New Yorkers) face when searching for an apartment is the prevalence of broker fees. Nearly uniquely among American cities, to obtain an apartment in New York City, many tenants must first pay a fee to the broker who listed the apartment.[2] Pls.' Mot. for Prelim. Inj., Szyfer Ex. C, Council of the City of New York, *Committee Report of the Governmental Affairs Division on Proposed Int. No. 360-A* at 6 (Nov. 13, 2024), ECF No. 21-9. Fees charged by brokers vary, but they typically equal 15% of the apartment's annual rent. David Brand, *A Rent-Stabilized Apartment 1 Bedroom*

---

[2] Tenants may also hire their own broker to help them search for an apartment. As discussed *infra*, that practice is unaffected by the FARE Act.

3

*Apartment for $1,100? In NYC? The Broker's Fee is $15K*, Gothamist (Feb. 8, 2024).[3] These

fees contribute significantly to upfront moving costs: in 2024, the average upfront cost for a

tenant to move into a unit with a broker fee was $12,951—17 percent of New York City's

median household income. Kenny Lee, *FARE Act Will Cut Upfront Costs for NYC Rentals by*

*More Than 40%*, StreetEasy.com (Dec. 9, 2024).[4]

       By adding to transaction costs, broker fees have an obvious impact on tenant mobility

and access to housing. Some people who want or need to move cannot afford to move. *See, e.g.*,

Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*,

StreetEasy.com (Feb. 10, 2024)[5]; *see also* Hilary Wilson & Debipriya Chatterjee, Community

Service Society, *Teetering on the Edge* 9-10 (Oct. 2024)[6] (describing 2023 survey findings that

48 percent of low-income New Yorkers had less than $500 in savings and only 41 percent of

moderate- and high-income New Yorkers had at least $10,000 in savings). Tenants who moved

between 2021 and 2023 were more likely to have higher incomes than those who stayed in their

apartments. New York City Dep't Hous. Preservation & Dev., *2023 Housing and Vacancy*

*Survey Selected Initial Findings* 46-47.[7] Moreover, broker fees disproportionately affect

apartment seekers who are searching for moderately priced units—and therefore the low- and

moderate-income New Yorkers who can only afford these apartments. While 46.8 percent of all

---

[3] *Available at* https://gothamist.com/news/a-rent-stabilized-1-bedroom-apartment-for-1100-in-nyc-the-brokers-fee-is-15k (last visited Mar. 4, 2025). As this article notes, while broker fees typically equal fifteen percent of the annual rent, sometimes they can be far more.

[4] *Available at* https://streeteasy.com/blog/fare-act-will-cut-upfront-costs-40-percent/ (last visited Mar. 4, 2025).

[5] *Available at* https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/ (last visited Mar. 4, 2025).

[6] *Available at* https://www.cssny.org/publications/entry/teetering-on-the-edge-unheard-third-survey-reveals-pervasive-financial-insecurity-new-york.

[7] *Available at* https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf.

New York City's rentals charged tenants broker fees, 57.3 of rentals priced below the City's median rent did. *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%.*

New York City tenants typically must pay fees to brokers whom they only meet because the broker marketed the apartment for the landlord[8] (or never meet at all). ECF No. 21-9 at 9-10. These broker fee arrangements create a consumer protection issue, especially given the cost and impact of broker fees: tenants do not seek to hire the listing broker, have no meaningful opportunity to negotiate fees with the broker, and pay for services that are primarily for the benefit of the landlord, no matter how the agency relationship is characterized. *Id.* at 8-9. It is utterly unsurprising that 60 percent of renters reported to StreetEasy that broker fees prevent them from moving, and 54 percent said they would be willing to pay a higher monthly rent if they did not have to pay a broker fee upfront. *Id.* at 7.

After hearing extensive testimony, communicating with stakeholders, and performing an investigation into broker practices, *id.* at 1, the New York City Council passed the FARE Act. The Act became law on December 16, 2024, but its provisions will only become effective in six months. It promises to significantly reduce upfront transaction costs and will prevent tenants from being forced to pay for a service that they do not want or need.

Neighbors Together's experience highlights the need for the FARE Act. Among other programs, Neighbors Together runs a housing search clinic. Its Housing Services Specialist, Joel Gil, provides housing search assistance to members with housing vouchers. Most members who participate in the housing search clinic are homeless or are at risk of eviction. Each month, Mr. Gil holds approximately thirty to forty "live search session" appointments during which he actively assists members search for apartments and secure viewings. Once a member obtains an

---

[8] Even in an "open listing," where the landlord and broker do not form an agency agreement, the broker lists the apartment with the landlord's authorization. N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10.

appointment to view an apartment, Mr. Gil continues to work with them throughout the application and voucher approval process. For example, he collects the necessary documents for the rental application and for the agency that administers the voucher and regularly communicates with all stakeholders. He spends many hours working with each member between their application and move-in dates. And he must do all this even though 90% of the apartments that members apply for require them to pay broker fees.

Broker fees pose a significant obstacle for members with Section 8 or FHEPS who must pay all or part of the broker fee. While members can obtain a security voucher from the New York City Human Resources Administration ("HRA") to satisfy their security deposit, they must pay the broker fee in cash. Because no member has had sufficient savings to pay the broker fee themselves, broker fees add significant complexity and delay to the move-in process. Once a landlord has accepted a member's application for an apartment, and the agency that administers the voucher has approved the apartment, Mr. Gil helps the member apply to HRA for a "One-Shot Deal" (which often must be repaid) to cover the broker fee. This is typically the last step that a member must take before they can move into the apartment. It generally takes HRA two to four weeks to consider a One-Shot Deal application. Some members are not eligible for One-Shot Deals, in which case they will need to seek assistance from charities. During this time, the member remains homeless or in an unstable living situation. Brokers and landlords may become upset due to the delay and threaten to cancel the rental. Sometimes, the landlord does cancel the rental, forcing the member to start the housing search process all over again.

Three stories illustrate the harms that broker fees cause to Neighbors Together's members:

Member A sought a One-Shot Deal from HRA to pay the broker fee. The broker and landlord would not give them the keys to the apartment until they paid the broker fee. HRA took over two months to consider the One-Shot Deal application. The landlord told Member A that he could not hold the apartment any longer and would have to move on to another applicant. The member lost the apartment.

Member B had a Section 8 voucher. Her program would only pay half of the broker fee. The broker tried to block the voucher approval process until she had assurance that she would receive the other half of the broker fee. Mr. Gil had to seek assistance from the Commission on Human Rights to overcome the broker's resistance. This caused a considerable delay. Member B managed to obtain a One-Shot Deal for the other half of the broker fee and moved into the apartment.

Member C's landlord permitted her to move in before she paid the broker fee. Afterward, the broker contacted the member frequently and threatened that she would have the member evicted if she did not pay her. The member applied for a One-Shot Deal, but HRA denied the application. The broker pressed the landlord to start the eviction process. Eventually, the member obtained assistance to pay the broker fee from a charity.

As these stories demonstrate, although Neighbors Together's members have been required to pay broker fees, the brokers are aligned with the landlord, and the brokers' services primarily benefit landlords, not the members. The member (aided by Mr. Gil) must act and advocate on their own behalf, while the broker serves as an intermediary for the landlord by communicating information about the apartment, providing access to the apartment for a viewing,[9] and receiving application materials. If given the choice, no member would pay for a

---

[9] In some instances, a superintendent shows the apartment to a member, not the broker.

broker, and the FARE Act will remove a significant impediment to the voucher approval and move-in process.

IV.    **WHAT THE FARE ACT PROHIBITS**

At its base, the FARE Act prohibits a broker who acts on a residential landlord's behalf to find or obtain a tenant from charging the tenant a fee. A broker acts on a landlord's behalf either when they serve as the landlord's agent for the rental or publish[10] a listing for the rental with the landlord's permission or authorization. *See* N.Y.C. Admin. Code § 20-699.21(a)(1)-(2). This proscription addresses the City Council's concern regarding market conditions that force tenants to pay fees for a broker whom they do not seek to hire—a broker who, at least by virtue of having received authorization for the listing, has a prior relationship with the landlord. *See* ECF No. 21-9 at 8-10.

The rest of the FARE Act contains additional terms and an enforcement scheme to reinforce this central principle. Landlords and brokers cannot condition a rental on a tenant engaging[11] an agent because otherwise they could easily circumvent the FARE Act's central prohibition by requiring the tenant to hire and pay a broker in order to secure an apartment. *See* N.Y.C. Admin. Code § 20-699.21(c). Similarly, a listing cannot announce that a tenant must pay the broker fee because such an arrangement would be illegal and because the listing could either

---

[10] One can ascertain the meaning of words in the statute by, *inter alia*, looking at their dictionary definitions. *See Melendez v. City of New York*, 16 F.4th 992, 1011-1012 (2d Cir. 2021) (citations omitted). "Publish" means to disseminate to the public. *Publish Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/publish (last visited Mar. 4, 2025). Brokers typically disseminate a listing to the public by posting it on a website. *See* ECF No. 1 para. 41.

[11] "Condition" means to "make conditional," or make "subject to . . . or dependent on a condition." *Condition Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/condition (last visited Jan. 31, 2025); *Conditional Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/conditional (last visited Mar. 4, 2025). "Engage" means to "arrange to obtain the use or services of" or "hire." *Engage Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/engage (last visited Mar. 4, 2025).

discourage prospective tenants who are not familiar with the FARE Act from applying or induce them to pay an illegal fee. *See id.* § 20-699.21(d). The requirement that listings disclose the total fees that a prospective tenant must pay to rent the apartment provides transparency and helps ensure that brokers and landlords do not impose brokers fees under the guise of another type of fee. *See id.* § 20-699.22.

Finally, the FARE Act imposes liability for violations, including on landlords for violations by brokers acting on their behalf. *See id.* § 20-699.23. Imposing vicarious liability on landlords for the acts of their agents, including brokers, is a fundamental precept of New York's common law. *See, e.g.*, *A-1 Realty Corp. v. State Div. of Human Rights*, 318 N.Y.S.2d 120, 121 (N.Y. App. Div. 1970); *see also Newson v. Vivaldi Real Estate Ltd.*, 2024-00261, 2025 N.Y. App. Div. LEXIS 46, at *9-11 (N.Y. App. Div. Jan. 7, 2025) (discussing landlords' use of brokers). And imposing liability on landlords for listings that they authorize ensures that landlords review the content of open listings before they permit them, *see* N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10, and only do business with brokers who follow the law.

## V.     WHAT THE FARE ACT DOES NOT PROHIBIT

Plaintiffs argue that the FARE Act "fundamentally misunderstands the New York City rental markets and will cause irreparable harm to all stakeholders," ECF No. 1 para. 136, but the FARE Act's only direct effects will be to shift who has to pay for services that brokers are performing on behalf of landlords and to require listings to disclose any fees that tenants must pay. Otherwise, brokers can continue providing the same services under the same general conditions.

First, landlords and brokers may still use exclusive listings, and the obligation to refer any inquiring tenants to the listing broker can remain intact. In this situation, the listing broker will serve solely as the landlord's agent, and any fee for services performed by the broker cannot

be collected from the tenant. N.Y.C. Admin. Code § 20-699.20, .21(a)(2); *see also* N.Y. Real Prop. L. § 443(o) (defining landlord's agent). Second, landlords and brokers may still use open listings. Again, if a broker whom a landlord authorizes to publish a listing secures a tenant, the tenant cannot pay their fee. *See* N.Y.C. Admin. Code § 20-699.21(a)(2). In other words, the FARE Act proscribes so-called "tenant pays" listings, where the tenant must engage and/or pay a broker to rent a unit. ECF No. 1 paras. 31, 36. Plaintiffs tout that brokers provide valuable services. *See id.* paras. 34, 41. After the FARE Act's effective date, landlords themselves will compensate brokers for the marketing, advertising, and application services that they provide to landlords.

Third, the FARE Act places no limits on tenant's agents; prospective tenants who decide that they want a broker's services can engage one and pay the agreed-upon fee. Fourth, brokers may still serve as dual agents; landlords and brokers just cannot require a tenant to engage a dual agent to secure an apartment. *See* N.Y.C. Admin. Code § 20.699.20, .21(c). When a tenant engages a broker for their housing search, the FARE Act does not prevent the broker from making the disclosures required by Article 12-A of the Real Property Law, obtaining consent, and serving as a dual agent. *See* N.Y. Real Property L. § 443(3)(f). A dual agent can collect a fee from a tenant so long as they do not publish a listing for the subject rental property. *See id.* § 20.699.21(a)(2).

## VI.    PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM

The Court should dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 299 (2d Cir. 2022) (citation and internal quotation marks omitted). The "plausibility standard . . . asks for more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 556 (2006)). Plaintiffs do not meet these standards.

> A.    *Plaintiffs' First Amendment claim is meritless because speech proposing an illegal transaction receives no First Amendment protection.*

The FARE Act regulates conduct by prohibiting certain transactions: namely, collecting a broker fee from the tenant where the broker has acted on the landlord's behalf. Section IV, *supra*. Plaintiffs nonetheless allege that the FARE Act is "speaker- and content-based" and argue that the FARE Act should be subject to strict scrutiny. ECF No. 1 (Counts I and IV); Pls.' Mot. for Prelim. Inj., Mem. of Law 10, ECF No. 20. They also argue that the FARE Act fails to satisfy intermediate scrutiny. *Id.* at 11-15.[12]

Plaintiffs' allegations mischaracterize the FARE Act. At the outset, the FARE Act does not limit brokers' speech. It is not the broker's exercise of "her First Amendment right . . . that is forbidden under the Act," ECF No. 20 at 15, but a certain type of economic activity. Brokers can continue to publish listings highlighting the attractive features of their properties and publish advertisements trumpeting the benefits of their services. In addition, a broker's publication of a listing is not the only trigger for the Act's prohibition on collecting a fee from a tenant: the prohibition also applies to a landlord's agent (an agent who acts for a landlord to find or obtain a tenant) whether or not the agent publishes a listing. *See* N.Y.C. Admin. Code § 20.699.21(a).

---

[12] Plaintiffs also bring a free speech clause claim under the New York Constitution, Article I, Section 8, but the New York Constitution does not impose a stricter test for commercial speech regulation than the First Amendment. *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 508-509 (S.D.N.Y. 2009). The Court should dismiss Plaintiffs' New York Constitution free speech claim for the same reasons as their First Amendment claim.

Moreover, the FARE Act prohibits anyone, not just brokers, from posting listings that represent that unlawful fees must be paid. *Id.* § 20.699.21(d). The FARE Act is not "speaker-based."

Because they target an unlawful activity, the FARE Act's content-based restrictions are undoubtedly constitutional. "Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008) (citations omitted); *see Ragin v. New York Times Co.*, 923 F.2d 995, 1002-1003 (2d Cir. 1990). This is because speech intended to induce or commence illegal activities, whether commercial or not, has no social value and "enjoy[s] no First Amendment protection." *Williams*, 553 U.S. at 298 (citing *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 387-389 (1973)). The FARE Act's narrow content restriction merely makes it unlawful to propose a type of transaction that the Act separately proscribes. *See* N.Y.C. Admin. Code § 20.699.21(d) ("No person shall post a listing for the rental of residential real property that represents that fees must be paid in a manner that would violate this section.").[13] Thus, like a law that penalized the placement of an employment advertisement in a sex-designated classifieds column because it indicated unlawful sex discrimination, *Pittsburgh Press Co.*, 413 U.S. at 389, or a law that penalized advertisements that indicated a racial preference in the sale or rental of housing because they further racial discrimination in the sale or rental of housing, *Ragin*, 923 F.2d at 1002-1003, the FARE Act does not violate the First Amendment.

Similarly, the *Central Hudson* test is inapplicable to Plaintiffs' claims. *See Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 563-564 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform

---

[13] The FARE Act also requires that listings contain certain disclosures regarding fees, N.Y.C. Admin. Code § 20.699.22(a), but Plaintiffs have not challenged this aspect of the Act on First Amendment grounds.

the public about lawful activity. The government may ban commercial speech related to illegal activity . . . ."). Plaintiffs skip to the *Central Hudson* factors without stopping to ask whether the speech in question satisfies the threshold inquiry: it "must not be misleading and must concern lawful activity," *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012); *see also Safelite Grp. v. Jepsen*, 764 F.3d 258, 264-265 (2d Cir. 2014) (first asking whether commercial speech "is tainted by lies, misleading statements, or an illegal purpose, all of which may be regulated" (citing *Cent. Hudson*, 447 U.S. at 563-64)). Because the FARE Act only restricts speech related to illegal activity, it satisfies the First Amendment, and the inquiry stops there.

Plaintiffs' allegation that the Act violates the First Amendment by "chilling" landlords' speech, ECF No. 1 para. 153, also fails to state a plausible claim.[14] Nothing in the Act regulates communication between landlords and brokers. Landlords are liable for the publication of illegal listings that they permit or authorize. *See* N.Y.C. Admin. Code § 20.699.21(b)(2). Assuming that this provision somehow implicates a landlord's free speech rights, imposing liability on a party for an illegal act that it authorizes does not violate the First Amendment. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 932 (1982). (Plus, a landlord can easily avoid liability for prohibited listing content by reviewing a proposed listing before permitting or authorizing its publication.) The FARE Act's broader imposition of liability on landlords—for example, if a broker later demands an illegal fee from a prospective tenant—presents no First Amendment issue. In such a case, the landlord would not be liable for its speech or associations, but because of the broker's conduct. *See Scott v. Ross*, 140 F.3d 1275, 1283 (9th Cir. 1998).

---

[14] In their complaint, Plaintiffs allege that the FARE Act will upend the open listing model. The FARE Act does not prohibit open listings. But the First Amendment does not protect open listing arrangements in the first place. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-567 (2011); *see also Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) ("A business agreement or business dealings between a franchisor and a franchisee is not conduct with a 'significant expressive element.'") (citation omitted).

B.    *The FARE Act does not impair an obligation of contract within the meaning of the Contract Clause.*

The Contract Clause provides that no state shall pass any "Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Importantly, the constitutional limitation is on laws that impair the *obligation* of contracts, or "the law which binds the parties to perform their agreement." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429 (1934) (citing *Sturges v. Crowninshield*, 4 Wheat. 122, 197 (1819)). *Sturges*'s definition of an obligation of contract remains clear:

> A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money, on or before a certain day. *The contract binds him to pay that money, on that day; and this is its obligation*. Any law which releases a part of this obligation, must, in the literal sense of the word, impair it.

4 Wheat. at 197 (emphasis added). Although the test for a determining whether a law violates the Contract Clause has changed over the past two hundred years, *see Melendez*, 16 F.4th at 1022-1023, the definition of an obligation of contract has not, *see Local Div. 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618, 637 (1st Cir. 1981); *South Terminal Corp. v. EPA*, 504 F.2d 646, 680 (1st Cir. 1974); *Hum. Servs. Council of N.Y. v. City of New York*, 21-CV-11149 (PGG), 2024 U.S. Dist. LEXIS 208054, at *75-76 (S.D.N.Y. Nov. 14, 2024).

To gauge whether a law violates the Contract Clause, courts answer three questions: 1) Is the contractual impairment substantial? 2) If so, does the law serve a legitimate public purpose? 3) If it does, are the means used to accomplish this purpose reasonable and necessary? *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367-373 (2d Cir. 2006) (citations omitted). In turn, to evaluate whether a contractual impairment is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sven v. Melin*, 584 U.S. 811, 819

(2018). Plaintiffs' Contract Clause analysis is fatally flawed because they do not pause to consider what the clause actually prohibits. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537, 545 (E.D. Va. 1999) ("[T]he first step risks confusing the impairment of a contract with the impairment of its 'obligation,' which is all that the Contract Clause forbids." (citing *Ogden v. Saunders*, 25 U.S. 213, 256 (1827))).

Any Contract Clause analysis begins by "identifying the precise contractual right that has been impaired and the nature of the statutory impediment." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987). Plaintiffs do not identify the specific details of any allegedly impaired contracts; instead, they allege, *inter alia*, that the FARE Act "permanently and completely voids all existing listing agreements which require that the broker must seek compensation from the tenant," ECF No. 1 para. 137,[15] and quote Plaintiff Bond New York's standard exclusive listing agreement: "[i]f the Property is rented pursuant to this Agreement, BOND will collect its fee from the tenant," *id.* para. 140.

Initially, the Contract Clause only applies to existing contracts. *Bldg. & Realty Inst. of Westchester & Putnam Cntys. v. New York*, 19-CV-11285 (KMK); 20-CV-634 (KMK), 2021 U.S. Dist. LEXIS 174535, at *112-115 (S.D.N.Y. Sept. 14, 2021), *aff'd* 2024 U.S. App. LEXIS 5905 (2d Cir. Mar. 12, 2024) (unpublished opinion); *FOP, Metro. Police Dep't Labor Comm., D.C. Police Union v. District of Columbia*, 502 F. Supp. 3d 45, 59-60 (D.D.C. 2020). Some exclusive listing agreements will undoubtedly expire before the FARE Act takes effect, meaning that, when the Act does take effect, there will be brokers, landlords, and properties without

---

[15] Plaintiffs' complaint contains an additional Contract Clause allegation—that the prohibition on conditioning a rental on the tenant engaging an agent makes it "impossible for landlords to fulfill their explicit contractual obligation to refer all inquiries regarding their property to the broker." ECF No. 1 para. 139. This claim is implausible because nothing in the FARE Act bars landlords from making these referrals. *See* Section V, *supra*.

preexisting exclusive listing agreements. *See, e.g.*, ECF No. 20 at 20-21. Consequently, Plaintiffs' facial Contract Clause challenge fails, as they cannot demonstrate that the FARE Act "'could never be applied in a valid manner.'" *See Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 992 (2d Cir. 1997) (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988)). Moreover, Plaintiffs do not identify and allege facts regarding a single exclusive listing agreement that will not expire before the Act takes effect and accordingly do not pass the first hurdle to alleging a plausible as-applied challenge. *See Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, No. 21-2526; No. 21-2448, 2024 U.S. App. LEXIS 5905, at *12-13 (2d Cir. Mar. 12, 2024) (unpublished opinion).

      More fundamentally, the FARE Act does not substantially impair Plaintiffs' contracts because it does not impair an obligation of contract at all. As the *Sturges* quotation illustrates, the obligation of contracts refers to the parties' rights and obligations vis à vis each other. *Gilmore*, 64 F. Supp. 2d at 546 (citing *Metro. St. Louis Sewer Dist. v. Ruckelshaus*, 590 F. Supp. 385, 389 (E.D. Mo. 1984)). In other words, the threshold question is whether the law changes the relative position of the two contracting parties. *See South Terminal Corp.*, 504 F.2d at 680. A law that changes the relative position of a contracting party vis à vis third parties does not meet this definition and thus does not violate the Contract Clause. *See id.* (rejecting claim that a restriction on parking space rentals impaired obligations of existing construction and indenture contracts); *Perfect Puppy, Inc. v. City of East Providence*, 98 F. Supp. 3d 408, 413, 423-424 (D.R.I. 2015) (rejecting claim that a ban on commercial transactions in dogs and cats impaired the obligation of a lease for a space to be used "only for the purposes of a Puppy Sales store"). A law does not violate the Contract Clause because it makes a contract "less profitable than expected or make[s] performance less desirable, or even impossible." *Gilmore*, 64 F. Supp. at 546.

Plaintiff Bond New York's listing agreement states that "if the Property is rented pursuant to this Agreement, BOND will collect its fee from the tenant." ECF No. 1 para. 140. This term does not create any rights or duties between Bond New York and the landlord. If Bond New York fails to successfully collect a fee from a tenant, the contract contains no obligation that Bond New York may enforce against the landlord. Similarly, should Bond New York choose not to seek a fee from a tenant for whatever reason, the landlord would have no rights against it. In other words, this term does not "bind" the broker to the landlord, or vice versa. *See Sturges*, 4 Wheat. at 197. At most, the FARE Act prevents Plaintiffs from forming some future contracts with tenants. The Contract Clause does not limit the regulation of future contracts. *E.g.*, *Hum. Servs. Council of N.Y.*, 2024 U.S. Dist. LEXIS 208054, at *75-76.

As in *Perfect Puppy*, the FARE Act has not altered the respective obligations of the parties to an exclusive listing agreement, even if it does prevent them from fully achieving their aim when forming these agreements. *See* 98 F. Supp. 3d at 424. The landlord's primary contractual obligation is to give the broker the sole and exclusive right to rent the property and to refer all inquiries, offers, and proposals regarding the property to the broker, and the broker's primary contractual obligation is to represent the landlord with respect to the rental. *See* Pls.' Mot. for Prelim. Inj., Wagner Decl. Ex. A, Bond Exclusive Listing Agreement, ECF No. 22-1. The FARE Act has not altered any of these obligations. It has made the exclusive listing agreement less desirable and profitable for the broker. This effect is not a Contract Clause violation. *See Gilmore*, 64 F. Supp. at 546.

Finally, even if the FARE Act did substantially impair a contractual obligation, Plaintiffs have not plausibly alleged facts to support their allegation that the Act flunks the second and third prongs of the test. In a city with over 2.3 million renter-occupied units, *2023 Housing and*

17

*Vacancy Survey Selected Initial Findings* 7; ECF No. 1 para. 24, Plaintiffs cannot plausibly

allege that the City's interests in reducing barriers to housing mobility and protecting prospective

tenants from unexpected and unwanted fees, ECF No. 21-9 at 6-10, are not directed at remedying

a "broad and general social or economic problem," rather than providing a benefit to a special

interest. *See, e.g.*, *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-412

(1983); *cf. Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 52-54

(E.D.N.Y. 2020), *aff'd* 549 F.4th 540 (2d Cir. 2023) (stating that legislative goals related to

neighborhood stability and continuity are valid).

　　The Court should grant substantial deference to the City's legislative judgment that the

FARE Act is a reasonable and necessary means to further these interests, as is "'customary when

reviewing economic or social regulation . . . .'" *Energy Reserves Grp., Inc.*, 459 U.S. at 412-413

(quoting *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977)); *Sal Tinnerello & Sons, Inc. v.*

*Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) (citing *Energy Reserves Grp.*, 459 U.S. at

412-13). The government need not prove it made the best choice among available alternatives,

*Sal Tinnerello & Sons, Inc.*, 141 F.3d at 55, and courts may not second-guess the legislature's

determination, *Keystone*, 480 U.S. at 506.

　　Under these standards, Plaintiffs do not plausibly allege that the FARE Act is

unreasonable or unnecessary within the meaning of the Contract Clause. Their allegations do not

recognize the deferential standard for such claims. The Contract Clause simply does not require

that the City make a finding that landlords are better equipped to pay for brokers' services. *See*

ECF No. 1 para. 174. The City logically concluded that, given the features of New York City's

real estate market and the challenges faced by prospective tenants such as Neighbors Together's

members, it is preferable for the party who is selling a product (the landlord) to pay the costs to

market that product. That is what is meant by "properly align the principal-broker relationship."
ECF No. 21-9 at 10. Nor does the Contract Clause require the City to apply a "means test" and
restrict the FARE Act's protections to low-income New Yorkers. *See* ECF No. 1 para. 174. No
matter their income, all tenants will benefit from having a choice about whether to engage a
broker and pay their fees and from lower upfront housing costs.

     C.    *New York State Law does not preempt the FARE Act.*

New York City has broad powers to enact legislation relating to the welfare of its
citizens. *Ba Mar, Inc. v. Cnty. of Rockland*, 566 N.Y.S.2d 298, 302 (N.Y. App. Div. 1991) (citing
N.Y. Const., art. IX, § 2; N.Y. Mun. Home Rule L. § 10). The preemption doctrine limits this
power. *See Police Benevolent Ass'n of the City of N.Y. v. City of New York*, 224 N.E.3d 522, 528
(N.Y. 2023). As relevant here,[16] "[f]ield preemption prohibits a local government from
legislating in a field or area of the law where the legislature has assumed full regulatory
responsibility." *Id.* (citation and internal quotation marks omitted). The existence of state law—
meaning a state statute—on a subject does not automatically preclude local law on the same
subject. *Monroe-Livingston Sanitary Landfill, Inc. v. Caledonia*, 417 N.E.2d 78, 80 (N.Y. 1980).
Rather, preemption requires "legislation evidencing a State purpose to exclude the possibility of
varying local legislation." *Id.* (citing *People v. Cook*, 312 N.E.2d 452, 457 (N.Y. 1974)). There
must be clear evidence of this purpose; otherwise, "the power of local governments to regulate
would be illusory." *People v. Judiz*, 344 N.E.2d 399, 402 (N.Y. 1976) (quoting *Cook*, 312
N.E.2d at 457).

"An implied intent to preempt may be found in a declaration of State policy by the State
Legislature . . . or from the fact that the Legislature has enacted a comprehensive and detailed

---

[16] Plaintiffs have not pleaded a conflict preemption claim.

regulatory scheme in a particular area." *DJL Rest. Corp. v. City of New York*, 749 N.E.2d 186, 190 (N.Y. 2001) (citations and internal quotation marks omitted). In other words, the legislature may declare its desire for uniformity in a certain area, *see Jancyn Mfg. Corp. v. Cnty. of Suffolk*, 518 N.E.2d 903, 906-907 (N.Y. 1987), or enact a statutory scheme that is so detailed or so broad in scope to require a determination that it "has superseded all existing and future regulation," *id.* at 907; *see Hertz Corp. v. City of New York*, 607 N.E.2d 784, 785-786 (N.Y. 1992).

There is no evidence that New York's legislature intended to create uniform rules regarding the legal relationship between brokers, landlords, and tenants, particularly with respect to "tenant pays" listings. State-wide uniformity in this area would make little sense given New York City's "uniquely complex market," ECF No. 20 at 4: it is the only city in the state where "tenant pays" listings are common, ECF No. 21-9 at 6. Additionally, where the legislature has intended for a section of Article 12-A of the Real Property Law to preempt local legislation, it has explicitly stated as much. *See* N.Y. Real Prop. L. § 443-a(4) (expressly preempting laws which would, *inter alia*, deem certain characteristics of a property or its residents to be material defects and require their disclosure). Under the maxim *expressio unius est exclusio alterius*, this express language should negate any inference of implied field preemption and set the bounds for Article 12-A's preemptive scope. *See Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992) (citations omitted); *Martin v. Colon*, 149 N.E.3d 39, 42-43 (N.Y. 2020) (applying the maxim to statutory construction). The FARE Act falls far outside this scope.

To the extent that Plaintiffs allege that state law preempts the entire field of "the law governing real-estate transactions and real-estate brokers," ECF No. 1 para. 161, this is plainly incorrect. New York courts have repeatedly upheld local laws that govern brokers against preemption arguments. *See, e.g.*, *Arash Real Estate Mgmt. Co. v. N.Y.C. Dep't of Consumer*

*Affairs*, 52 N.Y.S.3d 102, 105-106 (N.Y. App. Div. 2017); *DiFrancesco v. Cnty. of Rockland*, 839 N.Y.S.2d 105, 107 (N.Y. App. Div. 2007). To the extent that Plaintiffs instead allege that state law preempts a smaller field, that subset must be determined with reference to legislative purpose. *See Jancyn Mfg. Corp.*, 518 N.E.3d at 906 (defining the field as "protection of the Long Island water supply"); *see also* Note, *Preemption as Purposivism's Last Refuge*, 126 Harv. L. Rev. 1056, 1067 (2013) (identifying that a theoretical problem with preemption is that "defining the field at a certain level of generality becomes the entire game").

The Court of Appeals has helpfully defined the purpose and ambit of Article 12-A. Article 12-A does contain a comprehensive plan, but it is a "comprehensive plan to assure, by means of licensing, that standards of competency, honesty and professionalism are observed by real estate brokers and salesmen." *2 Park Ave. Assocs. v. Cross & Brown Co.*, 327 N.E.2d 632, 633 (N.Y. 1975) (citations omitted); *see also In re Wilson Sullivan Co.*, 44 N.E.2d 387, 389 (N.Y. 1944) ("The purpose of article 12-A was to assure by means of licensing competency and the observance of professional conduct on the part of real estate brokers and salesmen."); *accord* 2019-42 N.Y. Reg. 43, 44 (Oct. 16, 2019); 2013-25 N.Y. Reg. 23, 25 (June 19, 2013) ("One of the purposes of Article 12-A is to ensure that real estate licensees deal honestly and fairly with members of the public."). Article 12-A's provisions all relate to this goal: for example, they aim to ensure that brokers are competent, *see* N.Y. Real Prop. L. § 441(1)(b); that salespeople are properly supervised by licensed brokers, *see id.* § 441 (1)(d); that brokers do not enter into certain financial arrangements that could undermine their loyalty to their clients, *see, e.g.*, N.Y. Real Prop. L. § 442(a) (generally prohibiting commission splitting other than with associated salespeople or other brokers); and that brokers act in a transparent and truthful manner, *see, e.g.*, N.Y. Real Prop. L. § 443 (setting disclosure requirements regarding agency relationships).

Significantly, Article 12-A does not displace common law agency rules, even though these rules also regulate brokers' conduct and business operations. Indeed, Article 12-A expressly does not "limit or alter the application of the common law of agency with respect to residential real estate transactions." N.Y. Real Prop. L. § 443(6); *Rivkin v. Century 21 Teran Realty LLC*, 887 N.E.2d 1113, 1118 (N.Y. 2008); *see also In re Wilson Sullivan Co.*, 44 N.E.2d at 389 (holding that the common law continues to govern the nature of the broker-salesperson relationship despite legislation on the subject). Though it sets rules to ensure brokers' competency, honesty, and professional conduct, Article 12-A does not regulate the formation of agency relationships between brokers and principals, nor does it fix the fiduciary duties that accompany these relationships. *See, e.g.*, *Sonnenschein v. Douglas Elliman-Gibbons & Ives*, 753 N.E.2d 857, 860-862 (N.Y. 2001). The common law governs these matters (meaning that state law is silent), and this is where the FARE Act permissibly intervenes. *See Cook*, 312 N.E.2d at 457.

The regulations cited by Plaintiffs, ECF No. 20 at 17-18, do not alter this conclusion. As noted above, Article 12-A—and by extension its implementing regulations—does not govern the formation of broker-principal relationships. The statute and regulations also do not regulate the "commission or compensation of a real estate broker." N.Y. Dep't of State, *Real Estate Broker FAQs*.[17] As with Article 12-A, the focus is on brokers' competency, honesty, and professionalism. For example, the regulations impose disclosure and consent requirements to ensure that brokers act in a competent and honest manner before serving as a dual agent. *See* N.Y. Comp. Codes R. & Regs. tit. 19, § 175.7. They prohibit net listing agreements because such

---

[17] *Available at* https://dos.ny.gov/real-estate-broker-frequently-asked-questions (last visited Mar. 4, 2025). (Section 442 only concerns brokers' splitting of commissions, not what brokers can charge their clients. N.Y. Real Prop. L. § 442.)

agreements create an obvious perverse incentive for the broker to undervalue the seller's property. *See id.* § 175.19.[18] And the advertising regulations ensure that listings are promoted transparently and honestly. *See id.* § 175.25. These regulations simply do not speak to the FARE Act's subject matter, let alone preempt it.

VII. **THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION.**

After dismissing Plaintiffs' claims, the Court should deny their motion for a preliminary injunction as moot. *See, e.g.*, *Jeannot v. New York*, 24-CV-05896 (HG), 2025 U.S. Dist. LEXIS 6357, at *50 (E.D.N.Y. Jan. 13, 2025); *Miller v. McDonald*, 720 F. Supp. 3d 198, 218 (W.D.N.Y. 2024). Should the Court consider the merits of Plaintiffs' motion, they have not established their entitlement to a preliminary injunction. To obtain the extraordinary remedy of a preliminary injunction, a movant must demonstrate 1) a likelihood of success on the merits; 2) irreparable harm; 3) the public interest favors granting the injunction; and 4) the equities weigh in favor granting the preliminary injunction. *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (citations omitted). In a case alleging constitutional injury, likelihood of success on the merits "'is the dominant, if not the dispositive, factor.'" *Id.* (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

A. *Plaintiffs' claims do not have a substantial likelihood of success.*

Because the Court should dismiss Plaintiffs' claims pursuant to Rule 12(b)(6), they "cannot establish a likelihood of success, substantial or otherwise, on the merits." *Marcel v. Donovan*, 11–CV–1560 (RRM) (VVP), 2012 U.S. Dist. LEXIS 34493, at *17 (E.D.N.Y. Mar. 14, 2012).

---

[18] This regulation also only applies to "sales" and is not relevant to rentals at all. N.Y. Comp. Codes R. & Regs. tit. 19, § 175.19.

B.    *Plaintiffs do not face irreparable harm.*

Irreparable harm is an injury that monetary damages cannot remedy. *Int'l Dairy Foods Ass'n*, 92 F.3d at 71 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).[19] The irreparable injury must be concrete and imminent, not remote or speculative. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). A "mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm. Rather, in order to show irreparable injury, plaintiff must show a likelihood of success on the merits of its constitutional claim." *Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 219-220 (D. Conn. 2020) (citations and internal quotation marks omitted).

Plaintiffs do not credibly allege a constitutional injury. Nor do their other claimed irreparable harms pass muster. The FARE Act will affect all participants in New York City's rental market, who will have to adapt to changed market conditions. Broker fee arrangements in New York City's rental market will now be similar to the rest of the country. Plaintiffs make the general assertion that these changes will cause some brokerages to close or lose market share. But none of Plaintiffs' declarations or exhibits presents any concrete evidence regarding Plaintiffs' imminent closure or changes to Plaintiffs' relative market share. *See* ECF Nos. 22-27. Plaintiffs can adjust their business practices, deliver their services differently, and seek out new brokers, landlords, and tenants for business relationships. This stands in stark contrast to the cases where courts have found a likelihood of irreparable harm due to the destruction of a business: these cases largely involve dealerships that rely on one supplier. *See Loveridge v.*

---

[19] This standard applies even where the movant does not plead any damages claims. *See, e.g.*, *Seattle City Emps. Ret. Sys. v. Epsilon Global Active Value Fund II, L.P.*, C10-555RAJ, 2010 U.S. Dist. LEXIS 155134, at *5, 16 (W.D. Wash. May 11, 2010).

*Pendleton Wooden Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986) (citing *Roso-Lino Beverages Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y.,* 749 F.2d 124, 125–126 (2d Cir. 1984); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)).

Plaintiffs believe that the FARE Act will harm them because brokers will receive less revenue (which they do not plausibly allege) and landlords will incur more costs (which would be easy to calculate). *See, e.g.*, Wagner Decl., ECF No. 22 paras. 20, 25; Porco Decl., ECF No. 23 para. 24. Even if true, these impacts would be quintessential monetary damages.[20] *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) (citations omitted). Plaintiffs have not explained why these damages would be difficult to measure or establish. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

C. *The FARE Act promotes the public interest, and the equities militate against blocking it.*

The final two preliminary injunction factors merge because the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2d Cir. 2009). Here, "[g]iven that Plaintiff has failed to show either a substantial likelihood of success on the merits or a threat of irreparable injury, the last two factors of the four factor balancing test do not alter the outcome of this case." *White v. Corr. Med. Servs.*, 08-CV-277, 2009 U.S. Dist. LEXIS 16095, at *10 (W.D. Mich. Mar. 2, 2009) (citations omitted). Still, these last two factors also weigh against enjoining the FARE Act.

After studying the issue, the City Council determined that the FARE Act was in the public interest. *See* Section III, *supra*. Plaintiffs speculate that the FARE Act will lead to fewer listings, decreased transparency, and other ills such as increased rents, but StreetEasy and Zillow

---

[20] "Unrecoverable" monetary damages, ECF No. 20 at 23, typically refer to damages that would be impossible for a successful plaintiff to recover, such as because the defendant has sovereign immunity or is insolvent. *See Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (citing *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987)).

disagree with these predictions, *see FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%* (predicting that FARE Act will benefit not just renters, but all market participants). StreetEasy's predictions are more plausible than Plaintiffs'. As StreetEasy notes, decreased upfront costs should lead to more tenants moving, meaning that brokers should have more customers. In addition, rental data shows that properties that stopped charging tenants broker fees between 2012 and 2024 did not increase rents beyond market trends, *id.*, which undercuts Plaintiffs' assertion that shifting responsibility for broker fees will directly lead to higher rents.

New York is a city of renters, and the FARE Act promises to benefit millions of households, including Neighbors Together's members. The issuance of a preliminary injunction blocking the FARE Act would particularly harm low-income New York City residents who would be forced to pay broker fees during the pendency of the litigation. As described above, some will be unable to move due to these fees. Others will remain homeless or unstably housed for longer. All will face significant upfront burdens that make a complicated process even more arduous. These harms outweigh any harms to Plaintiffs.

There is much support for the City Council's determination that the FARE Act will promote the public interest. The Court should not rely on Plaintiffs' doomsday predictions to substitute its judgment about what is best for New York City. *See Kavasutra 6th St., Inc. v. Adams*, No. 24-15, 2024 U.S. App. LEXIS 32181, at *6 (2d Cir. Dec. 19, 2024) (unpublished opinion). The Court should deny Plaintiffs' motion.

## VIII.    CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' complaint for failure to state a claim and deny their motion for a preliminary injunction.

Respectfully submitted,


  /s/ Evan Henley
Evan Henley
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 5
New York, NY 10013
Phone: 212-298-5233
Facsimile: 646-616-4198
ewhenley@legal-aid.org
*Counsel for Amicus Curiae*
*Neighbors Together Corp.*

**<u>CERTIFICATE OF COMPLIANCE</u>**

     I hereby certify that the length of the foregoing document, excluding the caption, table of contents, table of authorities, signature block, and this certificate, is 8,739 words and that this document therefore complies with Local Civil Rule 7.1(c) and this Court's individual practice rules.

                                                     ___/s/ Evan Henley_____
                                                     Evan Henley