UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REAL ESTATE BOARD OF NEW YORK, INC., NEW:
YORK STATE ASSOCIATION OF REALTORS, INC.,:
BOHEMIA REALTY GROUP, BOND NEW YORK REAL:
ESTATE CORP., REAL NEW YORK LLC, LEVEL:
GROUP INC., FOUR CORNERS REALTY, LLC, 21 WEST:
74 CORP., 8 WEST 119TH STREET HDFC,                   :
                                                      :   Civ. No. 1:24-cv-09678 (RA)
                                         Plaintiffs,  :
                                                      :
            v.                                        :
                                                      :
THE CITY OF NEW YORK, *a municipal entity*, VILDA:
VERA MAYUGA, *as Commissioner of New York City*:
*Department of Consumer and Worker Protection,*       :
                                                      :
                                         Defendants.  :
                                                      :
                                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**COMBINED REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


**HOGAN LOVELLS US LLP**
390 Madison Ave.
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT .............................................................1

ARGUMENT .......................................................................................1

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS AND THEIR COMPLAINT THEREFORE STATES A CLAIM...................................... 1

    A.    The Act's Publication Bar Unconstitutionally Burdens Brokers' Commercial Speech. .................................................................. 1

        1.    The City's Threshold Objections Lack Merit. ...................................... 3

        2.    The Publication Bar Is Subject To Strict Scrutiny............................... 6

        3.    The Publication Bar Fails Intermediate Scrutiny................................ 9

            a.    The City's putative interest in aligning the principal-agent relationship cannot justify the publication bar.........................10

            b.    The City's putative interest in increasing housing mobility cannot justify the publication bar. .............................12

            c.    The City's putative interest in ensuring broker fees reflect the fair market value of broker services cannot justify the publication bar. .......................................................14

    B.    State Law Preempts The Act........................................................ 14

        1.    The Legislature has Indicated its Intent to Occupy the Field of Broker Compensation and Agency Relationships. ............................ 14

        2.    The Act Conflicts with State law. ....................................................... 16

    C.    The Act Violates the Contracts Clause. ...................................... 17

        1.    Plaintiffs Have Contracts Severely Impaired by the Act. ................... 17

            a.    The Act Severely Impairs Listing Agreements Between Brokers and Landlords.............................................................19

            b.    The Act's Unconstitutional Impairment was Unforeseeable. .......................................................................20

         2.    The Act does not Further a Legitimate Purpose. ............................... 22

i

       3.     The Act is not Reasonable or Appropriate..........................................22

II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS. ...........................................................................................................26

    A.    Plaintiffs Will Suffer Irreparable Harm If The Act Goes Into Effect. ............26

    B.    The Balance of Harms and Equities Favor Plaintiffs.....................................27

CONCLUSION.....................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)............................................................................8

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)........................................................................23, 24

*Anderson v. Treadwell*,
  294 F.3d 453 (2d Cir. 2002)............................................................8, 9

*Arash Real Est. & Mgmt. Co. v. N.Y. City Dep't of Consumer Affs.*,
  148 A.D.3d 1137 (2d Dep't 2017)........................................................15

*Ashcroft v. American Civil Liberties Union*,
  542 U.S. 656 (2004)............................................................................14

*Buffalo Teachers Federation v. Tobe*,
  464 F.3d 362 (2d Cir. 2006)................................................................20

*Catholic Charities of Diocese of Albany v. Serio*,
  7 N.Y.3d 510 (2006) ............................................................................4

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.*,
  477 U.S. 557 (1980)........................................................................2, 8, 9

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
  868 F.3d 104 (2d Cir. 2017)................................................................11

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
  596 U.S. 61 (2022)................................................................................7

*DiFrancesco v. Cnty. of Rockland*,
  41 A.D.3d 530 (2d Dep't 2007)..........................................................16

*Elias Bochner, 287 7th Ave. Realty LLC v. City of N.Y.*,
  118 F.4th 505 (2d Cir. 2024) ..............................................................18

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983)............................................................................22

*Freedom Holdings Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)................................................................27

*General Motors Corp. v. Romein*,
    503 U.S. 181 (1992)...........................................................................................19, 20

*Jancyn Mfg. Corp. v. Cnty. Of Suffolk.*,
    71 N.Y.2d 91 (1987)...............................................................................................17

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996).....................................................................................26

*Joya v. Tutto Fresca Italian Food LLC*,
    2019 WL 3282941 (E.D.N.Y. July 22, 2019).......................................................18

*Long Island Board of Realtors, Inc. v. Incorporated Village of Massapequa Park*,
    277 F.3d 622 (2d Cir. 2002)..................................................................................8, 9

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)...............................................................................................8, 9

*Loveridge v. Pendleton Woolen Mills, Inc.*,
    788 F.2d 914 (2d Cir. 1986)..................................................................................27

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................................................18

*Melendez v. City of New York*,
    16 F.4th 992 (2021)...............................................................................................24

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024).................................................................................................6

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)..................................................................................28

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022)...............................................................................27

*People v. Sieger Agency Inc.*,
    56 Misc. 3d 1213(A) (N.Y. Dist. Ct. 2017) .........................................................16

*Real Estate Bd. of N.Y., Inc. v. New York Department of State*,
    Index No. 901586-20 .......................................................................................16, 21

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020).................................................................................................26

*Sanitation & Recycling Indus., Inc. v. City of N.Y.*,
    107 F.3d 985 (2d Cir. 1997)..................................................................................22

*Savage v. Gorski,*
  850 F.2d 64 (2d Cir. 1988)..................................................................................26

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
  502 U.S. 105 (1991)............................................................................................3

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)................................................................................. *passim*

*U.S. Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977)..............................................................................................23

*United States v. Caronia,*
  703 F.3d 149 (2d Cir. 2012)..............................................................................12

*Veterans Guardian VA Claims Consulting LLC v. Platkin,*
  2025 WL 968517 (3d Cir. Apr. 1, 2025) ...................................................... *passim*

*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976)............................................................................................3

*Vugo, Inc. v. City of New York,*
  931 F.3d 42 (2d Cir. 2019)................................................................................10

*Williams v. Rodriguez,*
  2021 WL 2037966 (D. Conn. May 21, 2021)....................................................26

*In re Wilson Sullivan Co.,*
  289 N.Y. 110 (1942)..........................................................................................15

*Young v. Ricketts,*
  825 F.3d 487 (8th Cir. 2016) .............................................................................4

**Statutes**

N.Y. Real Prop. Law § 238-a................................................................................16

N.Y. Real Prop. Law § 440..................................................................................15

N.Y. Real Prop. Law § 442..................................................................................15

N.Y. Real Prop. Law § 442-a..............................................................................15

N.Y. Real Prop. Law § 442-b ..............................................................................15

N.Y. Real Prop. Law § 443....................................................................12, 15, 17

**Other Authorities**

19 N.Y.C.R.R. § 175.7 ............................................................................................................15

19 N.Y.C.R.R. § 175.25 ..........................................................................................................15

N.Y.C. Admin. Code § 20-699.20 .............................................................................................6

N.Y.C. Admin. Code § 20-699.21 ...................................................................................... *passim*

N.Y.C. Admin. Code § 20-699.22 ....................................................................................11, 25

## PRELIMINARY STATEMENT

The Fairness in Apartment Rental Expenses Act (the "Act") should be enjoined before it goes into effect in June 2025. The Act represents the worst kind of First Amendment violation—targeting disfavored speech by disfavored speakers for disfavored treatment. The Act also unlawfully intrudes on a field of regulation already occupied by the State of New York and conflicts with the common law governing agency relationships in the State's rental marketplace. Finally, by invalidating existing exclusive listing agreements, the Act violates Plaintiffs' rights under the Contracts Clause.

The City's response is a legal yo-yo. It undulates between varying government interests in an attempt to justify the burdens of the Act. But the City has yet to identify any interest that checks all the required boxes. The City's stated interests are either pretextual, post-hoc, and/or not targeted to effectively address a real and substantial public concern. The City also refuses to acknowledge any economic impact on Plaintiffs, while somehow also insisting that the law will serve as an economic panacea for tenants. Confusingly, and contrary to public statements by Councilmembers prior to enactment of the Act, the City now says this purported improvement will be brought about by *increasing* rents. The City's logic cannot withstand basic economic principles, betrays a fundamental misunderstanding of the City's rental market, and runs headlong into Plaintiffs' hard data. The Act should be enjoined.

## ARGUMENT

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS AND THEIR COMPLAINT THEREFORE STATES A CLAIM.

### A.     The Act's Publication Bar Unconstitutionally Burdens Brokers' Commercial Speech.

The publication bar violates the First Amendment by targeting particular disfavored speech—open listings—by particularly disfavored speakers—brokers. PI Br. 10-11. Such

1

speaker- and content-based burdens are subject to strict scrutiny.  *Id.*  But the Act's publication bar founders even under *Central Hudson*'s more permissive commercial-speech inquiry because it fails to directly advance a substantial government interest.  *Id.* at 11-15.

The City burns a substantial portion of its brief trying to avoid this straightforward First Amendment analysis.  The City first claims the Act does not implicate the First Amendment because it simply bars advertising an illegal transaction.  But Plaintiffs do not challenge the Act's ban on illegal advertisements.  Plaintiffs challenge a separate provision that burdens brokers' commercial speech about *lawful* brokerage services.  When the City finally turns to the provision at issue, it mischaracterizes it as prohibiting conduct rather than speech.  That is also wrong. Finally, in a last ditch effort to avoid First Amendment scrutiny, the City insists that a facial challenge can only succeed against a law that gives undue discretion to a public official over the licensing of public speech.  But a facial challenge against a law burdening commercial speech may succeed if it can be shown—as Plaintiffs have shown here—that the law prohibits a substantial amount of protected speech relative to its constitutional applications.

Once these threshold objections are swept away, the City has very little to offer on the merits.  The City attempts to meet *Central Hudson*'s tripartite test through shifting articulations of its government interest.  At times, the City describes its interest as aligning the principal-agent relationship.  *See*, *e.g.*, Opp. 2.  At other times, the City purports to be increasing housing mobility. *See*, *e.g.*, Opp. 10.  And at still other times, the City says it is ensuring only fair-market value is paid for broker services.  *See*, *e.g.*, Opp. 9.  The Court should reject this sleight of hand.  Even if these were not pretext or post-hoc rationalizations (and they are), none of the City's putative interests are directly and materially advanced by the publication bar.

1.    *The City's Threshold Objections Lack Merit.*

The City begins by defending Sections 20-699.21(a)(1) and (d) of the Act.  *See* Opp. 4-6. But those subsections are a red herring.  Section 20-699.21(a)(1) prohibits a landlord's agent from charging a broker fee to a tenant.  Section 20-699.21(d) prohibits listings "that represent that fees must be paid in a manner that would violate this section."  Plaintiffs agree that neither provision poses a First Amendment problem.  Section 20-699.21(a)(1) regulates conduct, not speech.  And Section 20-699.21(d) prohibits advertisements for transactions Section 20-699.21 makes illegal. *See Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 (1976) (States may bar advertisements for illegal transactions). Plaintiffs' First Amendment challenge focuses on the publication bar found in Section 20-699.21(a)(2), which provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property."

When it finally gets around to the publication bar, the City asserts that the bar regulates conduct and not speech because a broker will not be liable "for merely posting a listing for a residential rental, unless and until the broker imposes a fee on, or collects a fee from, a tenant." Opp. 6.  The implication apparently is that the City may burden commercial speech—such as by making it less profitable—without triggering the First Amendment so long as it does not prohibit that speech outright.  That is wrong.  "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).  To destroy the economic motive behind commercial speech is as good as prohibiting the speech; a law that "establishes a financial disincentive to create or publish works with a particular content" is therefore subject to First Amendment scrutiny.  *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).  Just as the City cannot forbid

3

publication of the *New York Times*, the City cannot forbid the *Times* from collecting a subscription fee from its readers.

*Young v. Ricketts*, 825 F.3d 487 (8th Cir. 2016) and *Catholic Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510 (2006), do not hold otherwise.  *Contra* Opp. 7.  *Ricketts* involved a challenge to Nebraska's Real Estate License Act.  825 F.3d at 489.  The plaintiff argued the First Amendment gave her the right to provide brokerage services to Nebraskans without a Nebraska real estate broker's license.  *Id*.  But the Eighth Circuit explained that Nebraska's licensing law did not operate to prevent plaintiff from "advertis[ing] in any manner she chooses" but rather from "engag[ing] in the business of [a] real estate broker, for compensation, without the license required by" state law. *Id*. at 492. This case could not be more different. The Broker Plaintiffs are licensed to provide brokerage services in the State of New York.  The publication bar is therefore not about preventing the Broker Plaintiffs from falsely holding themselves out as licensed brokers.  Rather, it specifically targets their commercial speech by rendering it unprofitable.

*Catholic Charities* is even further afield.  A religious organization challenged legislation requiring it to provide its employees with a health insurance plan that covered contraceptives.  7 N.Y.3d at 518.  The plaintiffs maintained that their religious free-exercise arguments should receive special solicitude because their speech as well as their religious rights were implicated by the contraceptive mandate.  *Id*. at 523.  The court rejected the Free Speech Clause argument, holding the mandate did "not interfere with plaintiffs' right to communicate, or to refrain from communicating, any message they like."  *Id*.  The same is not true here; the publication bar directly interferes with brokers' commercial speech by rendering it less profitable.

This case is instead analogous to the Third Circuit's recent decision in *Veterans Guardian VA Claims Consulting LLC v. Platkin*, 2025 WL 968517 (3d Cir. Apr. 1, 2025).  New Jersey

outlawed the practice of charging veterans for advice in navigating the process of claiming veterans benefits—at least until the VA had made an initial benefits decision. *Id*. at *1. The district court rejected a First Amendment challenge to the law after concluding it "does not bar giving advice but only charging for it." *Id*. at *3. In the district court's view, that meant the law "regulates not speech but conduct." *Id*. The Third Circuit reversed because "laws that ban charging for speech burden the right to speak." *Id.* at *3. As the court explained, "[m]any Americans, from journalists to playwrights to therapists speak for a living. Laws that bar these professionals from earning money on that speech limit their ability to speak and so must survive First Amendment scrutiny." *Id*. at *1. Brokers and sales agents also earn their living by speaking through lawful advertising about available housing, to the benefit of tenants and owners alike, and the First Amendment protects their residential real estate listings just as it does the speech of journalists, playwrights, therapists, and claims consultants. Because "pricing regulations are not exempt from the First Amendment—restricting compensation to licensed [brokers] still imposes a financial burden on speech." *Id*. at *4.

*Platkin* also shows why the publication bar imposes more than a mere "incidental burden[] on speech." Opp. 5 (quoting *Sorrell*, 564 U.S. at 567). New Jersey tried that circular argument too, and the Third Circuit deemed it "wrong twice over." *Platkin*, 2025 WL 968517, at *4. The speech of veterans-claim consultants in *Platkin* was "not just one step in service of some separately illegal act, unlike the speech involved in soliciting a crime, demanding ransom, or posing a 'White applicants only' sign as part of hiring discrimination." *Id*. Rather—as with the broker listings advertisements at issue here—the consultants' "speech is the core of what [they] do[]." *Id*.

Last, the City argues that a facial challenge can only succeed if the challenged law "gives a government official or agency substantial power to discriminate based on the content or

viewpoint of speech." Opp. 7 (quoting *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988)). That is a gross overstatement. That a law confers discretion on a public official to permit or deny speech is *one method* of succeeding in a facial challenge *to a licensing statute*. But Plaintiffs are not challenging a licensing statute. They challenge a cross-cutting burden on their commercial speech—one that admits of no exceptions. To succeed, Plaintiffs must demonstrate that the publication bar "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Plaintiffs easily clear that hurdle; the publication bar has no legitimate application. The City fails to identify a government interest justifying the publication bar, regardless of whether it is analyzed under strict or intermediate scrutiny.

### 2.  *The Publication Bar Is Subject To Strict Scrutiny.*

*Sorrell* teaches that laws imposing speaker- and content-based burdens on commercial speech are subject to strict scrutiny. 564 U.S. at 571. Strict scrutiny applies to the publication bar because, like Vermont's law in *Sorrell*, the publication bar "is directed at certain content and is aimed at particular speakers." *Id*. at 567. *First*, it applies only to "listing[s]." N.Y.C. Admin. Code § 20-699.21(a)(2). "The statute thus disfavors marketing, that is, speech with a particular content." *Sorrell*, 564 U.S. at 564. *Second*, it applies solely to "an agent," a term the Act defines as "a person who is licensed as a real estate broker or real estate salesperson." N.Y.C. Admin. Code § 20-699.20. The publication bar therefore also "disfavors specific speakers, namely" brokers. *Sorrell*, 564 U.S. at 564. "It follows that heightened judicial scrutiny is warranted." *Id*. at 565.

The City tries to distinguish *Sorrell*, claiming the publication bar "does not in any way regulate the content of rental advertisements." Opp. 13. But it does. Just as "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based

regulation," a law banning rental advertisements—and only rental advertisements—is a content-based regulation. *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 71 (2022). The publication bar therefore is not "agnostic as to content." *Id*. at 69. It "discriminate[s] based on 'the topic discussed or the idea or message expressed.' " *Id*. at 63-64 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)). In the City's terms, speakers may "avoid . . . the effects of the Act by altering their speech"—by publishing something other than a listing. Opp. 14 (citing *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025)) (internal quotation marks omitted).

Nor does the City have any answer to the publication bar's speaker-based burdens. Listings may be published "by other speakers with diverse purposes and viewpoints." *Sorrell*, 564 U.S. at 564. Landlords may publish their own listings. *See* PI Br. 11. A website—such as StreetEasy and RentHop—could charge tenants fees for accessing open listings (and thus collect a fee from those tenants related to the rental of the listed properties) without penalty. The Act only targets brokers for disfavored treatment. The City thus "gives possessors of the information broad discretion and wide latitude in disclosing the information, while at the same time restricting the information's use by some speakers for some purposes." *Sorrell*, 564 U.S. at 580.

It gets worse. The publication bar also discriminates on the basis of viewpoint. The City gives the game away when it admits "the legislative record shows" the reason the publication bar targets brokers specifically is because it is "intended to stop the practice of tenants being forced to pay fees to brokers retained by the landlord." Opp. 12. Just as Vermont's speech restriction was found to be viewpoint discriminatory because it was designed to reduce the marketing of brand-name drugs, the City's publication bar is viewpoint discriminatory because it aims to reduce the marketing of broker services the City finds undesirable. *Sorrell*, 564 U.S. at 565.

That the City thinks tenant-pay broker fees are bad because they do not properly reflect the principal-agent relationship, impact housing mobility, or do not reflect the fair-market value of brokers' services, *see infra* 10-14, does not change the applicable level of scrutiny.  "Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects" but "the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech."  *Id*. at 577-578.  Prospective tenants who find value in a broker's services will respond to an open tenant-pay listing and prospective tenants who don't, won't.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (opinion of Stevens, J.) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").  The Act does not bar tenant-pay broker fees; it bars *publication* of tenant-pay listings.  PI Br. 14-15.  The City cannot bar truthful advertisements about lawful services it thinks its residents are better off without.

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001), *Anderson v. Treadwell*, 294 F.3d 453 (2d Cir. 2002), and *Long Island Board of Realtors, Inc. v. Incorporated Village of Massapequa Park*, 277 F.3d 622 (2d Cir. 2002), are not to the contrary.  *See* Opp. 14-15.  *Lorillard* applied intermediate scrutiny to an advertisement regulation specifically designed "to eliminate deception and unfairness" and to "address the incidence of cigarette smoking and smokeless tobacco use by children under legal age."  533 U.S. at 533.  As the City points out, "[i]t is well established that governments 'are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction.'"  Opp. 6 (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985)).  And even then, *Lorillard* did not hold that strict scrutiny was inapplicable.  It simply declined to decide the question because *Central Hudson* provided "an adequate basis for decision" finding the speech

ban invalid. *Lorillard*, 533 U.S. at 555. *Anderson* and *Long Island Board of Realtors*, for their part, did not have the benefit of *Sorrell*, and so their application of *Central Hudson* to concededly "content-based regulation of commercial speech," *Long Island Bd.*, 277 F.3d at 626, does not control.

The City's insistence (Opp. 14) that "the legislative record does not reflect animus toward brokers" misses the mark. The City never meets Plaintiffs' evidence, *see* PI Br. 6-7, instead offering the Court a Councilmember's quote stating that "[t]he bill does not end broker fees." Opp. 14. But the fact that the Act does not show a *maximal* amount of animus towards brokers does not mean the Act was free from animus. And it is telling that in that same quote Councilmember Ossé accuses brokers of propagating "disinformation." *Id*. In truth, the publication bar was motivated by the City Council's unabashed loathing for brokers, who the Council unjustifiably see as "hell-bent on fleecing the people of [their] city." Lulich Decl. Ex. H. at 36. The publication bar punishes brokers for being brokers. PI Br. 6-7.

### 3. The Publication Bar Fails Intermediate Scrutiny.

In any event, Plaintiffs prevail even under the less-exacting *Central Hudson* test. To succeed under *Central Hudson*, the City must demonstrate (1) that the Act's publication bar arises from real anticipated harms; (2) that the Act's publication bar directly and materially advances a genuine government interest in addressing those harms; and (3) that the publication bar is proportional to the interest served. *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.*, 477 U.S. 557, 566 (1980). None of the three government interests variously articulated by the City satisfies that standard.

> a.    *The City's putative interest in aligning the principal-agent relationship cannot justify the publication bar.*

The City begins (at 2) by reiterating the Committee Report's insistence that the sole purpose of the Act is to "align the principal-agent relationship in the rental market." Szyfer Decl. Ex. C. at 10. That is inconsistent with the City's narrative leading up to the passage of the publication bar, and should therefore be rejected as pretext or a post-hoc rationalization. *See* PI Br. 13.

If the publication bar were truly about aligning the principal-agent relationship, then the City would not have stopped at the publication bar. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 56 (2d Cir. 2019) (explaining that "a disconnect between the government's interest in a speech restriction and the government's justification for exempting certain speech from that restriction reveals that the government is disfavoring a particular speaker or that a law does not actually advance a compelling state interest"). It would have prohibited all rental transactions—whether between broker and landlord, broker and tenant, or tenant and landlord—from taking place in the absence of fiduciary obligations. *See* PI Br. 14-15.

The City responds that the publication bar is intentionally targeted specifically to "stop the practice of tenants being forced to pay fees to brokers retained by the landlord." Opp. 12. But that is an altogether different interest than a generalized interest in aligning the principal-agent relationship. It is also more problematic. Although a law may certainly "carve out exceptions to a speech restriction for reasons unrelated to the government's basis for enacting the restriction," those exceptions must be "rational" and cannot be based in viewpoint discrimination. *Vugo*, 931 F.3d at 57. Like Vermont in *Sorrell*, the City may not "seek[] to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell*, 564 U.S. at 577.

The publication bar is also overinclusive.  While it is true that the Act does not "prohibit dual agents," (Opp. 11 n.5), the publication bar applies to *any* "agent," not just a "landlord's agent." *Compare* N.Y.C. Admin. Code § 20-699.21(a)(2) (publication bar) *with id.* § 20.699.21(a)(1) (tenant-fee bar).  The publication bar therefore covers a broker acting as a dual agent, with fiduciary responsibilities running to both the landlord and the tenant.  *See* PI Br. 15.  It would also cover the common scenario in which a broker who will ultimately become a tenant's agent posts a listing with a landlord's permission but without any fiduciary obligation to the landlord.  (*See, e.g.*, Wagner Decl. ¶ 21 (explaining that "[r]eal estate agents frequently present and show rental listings to prospective tenants without entering into any agency and/or compensation arrangements with owners" and "a representation or compensation relationship is never assumed or created simply by the 'publishing' of a listing"); Saltzberg Decl. ¶¶ 29, 30 (same)).  The Court should "refuse to conclude" that the publication bar "is narrowly drawn where it broadly impacts protected speech and only narrowly addresses the [City's] stated interest."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 118 (2d Cir. 2017).

The City further claims that the publication bar is necessary "to avoid creating a loophole" whereby a landlord retains a broker in secret to preserve that broker's ability to charge his fee to the tenant.  Opp. 12.  But any loophole is already covered by the Act's separate prohibition—to which Plaintiffs do not bring a First Amendment challenge—on posting a listing "that represents that fees must be paid in a manner that would violate this section."  N.Y.C. Admin. Code § 20-699.21(d).  Because "[e]very listing" must disclose "any fee to be paid by the prospective tenant," *id.* § 20-699.22, a tenant who suspects that a broker has been surreptitiously engaged by a landlord can sue based on the broker advertising a tenant-pay listing.  Moreover, if a lease agreement is consummated and the tenant charged, the tenant could sue directly under the provision prohibiting

11

a "landlord's agent" from imposing a tenant fee.  *See* N.Y.C. Admin. Code § 20-699.21(a)(1).  And

if that were not enough, Section 443 of the Real Property Law already requires a "tenant's agent"

to provide the agency disclosure form to the tenant "prior to entering into an agreement to act" as

the tenant's agent, and any agent failing to properly disclose agency relationships could face

discipline.  The publication bar adds nothing.

> b.  *The City's putative interest in increasing housing mobility cannot justify the publication bar.*

The City next attempts to smuggle in an additional interest.  The City states that "by

properly aligning the principal-agent relationship regarding real estate brokers," the publication

bar will increase housing mobility.  Opp. 10.  The economic evidence simply does not bear that

out.  The City still refuses to grapple with Plaintiffs' analysis demonstrating that the publication

bar is "unlikely to substantially increase overall tenant mobility in the New York City rental

market" because it will (1) decrease housing transparency by eliminating brokers' incentive to

publish open listings; (2) decrease the housing stock by pricing many landlords out of the market

entirely; and (3) price consumers out of apartments because of increased rents.  Chandan Decl.

¶¶ 13(f); *see also id.* at ¶¶ 30-33, 35; Saltzberg Decl. ¶¶ 11, 24; Foregger Decl. ¶ 11; *see also* PI

Br. 7.  The City has therefore failed to connect the publication bar to its asserted interest in

increasing housing mobility.  *See United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) ("A

commercial speech regulation 'may not be sustained if it provides only ineffective or remote

support for the government's purpose.' "); *Platkin*, 2025 WL 968517, at *6 (noting New Jersey's

obligation to demonstrate that the challenged law will be "effective" to address "fraud and

incompetence" in veterans-claim consulting).

The City contends that the publication bar will not reduce the number of open listings

because it does not "impose any liability for open listings."  Opp. 12.  That is too clever by half.

The publication bar eliminates brokers' incentive to publish open listings by making it impossible for brokers to collect tenant fees based on those listings. "Supreme Court cases" reflect the "[c]ommon sense" reality that "[s]omeone who cannot earn money from speaking has less incentive to speak and so will speak less." *Platkin*, 2025 WL 968517, at *3. The City's response (Opp. 12) that brokers can simply alter their business practices and collect their fees from landlords blinks economic reality. Landlords are often in just as tight a spot as tenants when it comes to the upfront costs of renting a new apartment, and many will be unable to absorb the cost of the broker fee. *See* Porco Decl. ¶ 17; Szyfer Decl. Ex. B. 8; PI Br. 4. There is a reason 50% of rentals require a tenant to pay the broker fee, Opp. 13, and it is not landlord greed. Landlords *can make more money* over the long term by paying the broker fee upfront and then charging a higher rent across the lease term. *See* PI Br. 6. Many landlords, however, simply cannot afford that up-front cost.

The City has no response to Plaintiffs' economic evidence that many landlords will pull their listings rather than pay the broker fee. *See* PI Br. 4. Moreover, many New Yorkers will be priced out of the units that stay on the market because they will not have an income sufficient to qualify for leases with the higher rents that will result when landlords inevitably pass the cost of the broker fee on to tenants. *See* PI Br. 6; *see also*, Rahmanian Decl. ¶ 27 ("Most landlords want their tenants to earn 40 times the monthly rent of their units.").

Regardless, the City's (new) newfound interest in increasing housing mobility is a post-hoc rationalization. The City Council's Committee Report expressly disavowed an economic purpose behind the publication bar, brushing away Plaintiffs' economic concerns in the process. The Report insisted that Plaintiffs "misunderst[oo]d" the Act and that the publication bar was "not an attempt to solve the affordability crisis in the city" but rather "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services

rendered, not a third party." Szyfer Decl. Ex. C. 10. The City should not now benefit from the very rationale it expressly disclaimed in enacting the law.

> c.    *The City's putative interest in ensuring broker fees reflect the fair market value of broker services cannot justify the publication bar.*

The City attempts a third bite at the apple with its argument that the publication bar is necessary to ensure that broker fees "reflect the fair market value of the broker's work." Opp. 9. The City posits that the effect of the publication bar will be to prevent landlords from passing the cost of the broker's fee on to tenants. *Id.* at 12. That makes little sense because those landlords who can absorb the upfront cost of broker fees will still ultimately pass those costs on to the tenant through higher monthly rent payments. *See* PI Br. 6. Indeed, it is well documented that that is what landlords who can currently pay the broker fee do, Councilmember Chi Ossé's armchair economics notwithstanding. *See* Opp. 10 n.4. The City has not met its burden to show otherwise. *See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666-667 (2004). Nor has it explained "why a more targeted solution would not work." *Platkin*, 2025 WL 968517, at *5. Regardless, this is a bald-faced post-hoc rationalization. The City did not mince words in the Committee Report released the day before the Act's passage. It stated that "[t]he purpose of this bill is to properly align the principal-agent relationship." Szyfer Decl. Ex. C. 10. That is not ensuring fair prices for services rendered.

## B.    State Law Preempts The Act.

> 1.    *The Legislature has Indicated its Intent to Occupy the Field of Broker Compensation and Agency Relationships.*

The Act's prohibitions are preempted by state law because the Legislature has indicated its intent to occupy the field of broker compensation and fiduciary relationships by enacting the comprehensive framework of RPL Article 12-A and associated state regulations. PI Br. 15-19. Among other things, Article 12-A defines fiduciary relationships in the field of real estate (RPL

14

§ 443); governs "commissions, fees and other compensation" that brokers can receive (*id.* § 442); and addresses how brokers may split their commissions (*id.*).  State regulations likewise regulate broker compensation and agency relationships, including when a real-estate broker may "receive compensation from more than one party," and require brokers to obtain owner authorization before advertising a property.  19 N.Y.C.R.R. §§ 175.7, 175.25.

The City and *amici* State of New York and the New York Department of State contend that RPL Article 12-A "does not occupy the field of real estate broker's fiduciary relationships" because it does not "alter agency relationships recognized by common law."  Opp. 20; State Br. 16-17.  This argument is unavailing.  The fact that RPL Section 443 was enacted within the framework of "the common law of agency with respect to residential real estate transactions," *see* RPL § 443(6), has no bearing on the Legislature's intent to occupy the field vis-à-vis local laws. *Sullivan*, on which the City relies, is not to the contrary.  There, the Court of Appeals held that the Unemployment Insurance Appeal Board erred in interpreting RPL Sections 440, 442-a and 442-b to abolish the "common law relationship of independent contractor."  *In re Wilson Sullivan Co.*, 289 N.Y. 110, 115 (1942).  Sullivan did not involve a preemption challenge and is silent as to the Legislature's intent to occupy the field.

The City and its *amici* also argue that "Courts have continued to interpret the RPL as a comprehensive scheme governing the licensing of brokers, but not all of broker relationships or broker commissions."  Opp. 17.  This argument likewise misses the mark.  The cases on which the City and its *amici* rely do not support their narrow reading of Article 12-A as governing only "the licensing of brokers."  To the extent courts have rejected field preemption challenges to local laws involving Article 12-A, the focus of those local laws differ markedly from the Act.  *See, e.g., Arash Real Est. & Mgmt. Co. v. N.Y. City Dep't of Consumer Affs.*, 148 A.D.3d 1137, 1139-40 (2d Dep't

2017) (Article 12-A "does not preempt local laws concerning disclosures related to tenant screening reports" because "State statutes do not necessarily preempt local laws having only tangential impact on the State's interests") (citations and quotation marks omitted); *DiFrancesco v. Cnty. of Rockland*, 41 A.D.3d 530, 531 (2d Dep't 2007) (Article 12-A does not preempt local law requiring brokers to inform property sellers and buyers of testing regulations for residential dwellings served by private water systems); *People v. Sieger Agency Inc.*, 56 Misc. 3d 1213(A), *4 (N.Y. Dist. Ct. 2017) (Article 12-A does not preempt local "regulation governing the use of land and solicitation of that rental use").

Notably, neither the City nor the State identifies a single case holding that Article 12-A does *not* relate to broker compensation or fiduciary relationships. The City's reliance (at 18-19) on the 2021 decision in *Real Estate Bd. of N.Y., Inc. v. New York Department of State*, Index No. 901586-20, April 9, 2021, is misplaced. In that Article 78 proceeding challenging the Department of State's interpretation of the Housing Stability and Tenant Protection Act of 2019 (HSTPA), the Court concluded that, based on the HSTPA's plain language and legislative history, the specific prohibition at issue in RPL § 238-a "was intended to apply to application fees, background check fees, credit check fees, and any other fees imposed as a pre-condition to negotiations for entry into a lease agreement"—not broker fees. The Court therefore held broker fees were not prohibited under the HSTPA, and DOS' guidance to the contrary amounted to an abuse of discretion. *Id.* at 7-8. The Court neither examined Article 12-A writ large, nor reached any conclusions as to its scope and purpose in the field preemption context.

## 2. *The Act Conflicts with State law.*

While their opening brief focused on field preemption, Plaintiffs advised the Court that they were not ruling out an argument based on conflict preemption, and reserved the right to amend the Complaint to assert that additional argument. PI Br. at 16 n. 10. The City's brief and the

*amicus* brief filed by the State and DOS have put conflict preemption squarely at issue through their repeated reliance on the common law of agency.

The Act *conflicts* with New York agency law and Article 12-A, and is therefore preempted for this additional reason, because it "prohibits conduct which the State law . . . considers acceptable or at least does not proscribe" and "imposes additional restrictions on rights granted by State law." *Jancyn Mfg. Corp. v. Cnty. Of Suffolk.*, 71 N.Y.2d 91, 97 (1987) (citations omitted).

First, the Act imposes vicarious liability on landlords for the acts of brokers who are not their agents, solely based on advertising: the Act essentially creates a principal-agent relationship between landlord and broker—such that the landlord may be held vicariously liable if the broker subsequently violates the Act by collecting their fee from the tenant —solely based on advertising and regardless of whether the landlord has retained the broker. N.Y.C. Admin Code § 20-699.21(a)(2).

Second, the Act significantly restricts brokers' right to serve as dual agents. Article 12-A and New York common law allow dual agency as long as the dual representation is disclosed to both parties. RPL § 443(4)(b); *id*. at § 443(1)(i). The Act, by contrast, limits when and how a broker may ask a tenant to engage that broker as a dual agent, and how dual agents may be compensated. N.Y.C. Admin Code §§ 20-699.21(a)(2), 20-699.21(c).

Accordingly, if this action proceeds beyond the preliminary injunction phase, Plaintiffs will seek leave to amend the Complaint to assert a claim for conflict preemption.

### C. The Act Violates the Contracts Clause.

#### 1. *Plaintiffs Have Contracts Severely Impaired by the Act.*

The City leads by contending that Plaintiffs' Contracts Clause claim fails at the threshold because Plaintiffs have not identified a specific contract that is impaired by the Act. Opp. 23-24. But Plaintiffs specifically pleaded in their complaint that Plaintiff BOND New York ("BOND")

"has many" exclusive-listing "contracts and the FARE Act's provisions prohibiting a broker from receiving compensation from the tenant when retained by the landlord directly and permanently impair those agreements."   Compl. ¶ 32.   Plaintiffs' complaint also quotes BOND's standard "Exclusive Right to Rent" agreement with landlords and explains that the FARE Act "severely impairs" Bond New York's right and those of all Brokerage Plaintiffs.  *Id.* ¶¶ 138-42.  The City's response seems to be that the complaint does not state a claim because it does not identify a particular contract that was in effect on November 12, 2024 and that will not expire before June 2025.  Opp. 23.  But there are "countless" exclusive-listing contracts that the FARE Act would impair.  *See* Compl. ¶¶ 139, 170.  Plaintiffs could hardly be expected to identify each and every one.  And Plaintiffs did not need to do more than they did in their complaint, because "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.' "  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see also Elias Bochner, 287 7th Ave. Realty LLC v. City of N.Y.*, 118 F.4th 505, 518-519 (2d Cir. 2024) (same).

To dispel any doubt, however, Plaintiffs are including with this opposition and reply listing agreements involving Plaintiffs BOND and REAL New York that meet the City's criteria.  Szyfer Supp. Decl. Ex A; Menger Decl., dated March 28, 2025.  And if necessary Plaintiffs can easily amend their pleading to incorporate these documents by reference.  *See, e.g., Joya v. Tutto Fresca Italian Food LLC*, 2019 WL 3282941, at *3 (E.D.N.Y. July 22, 2019) (permitting plaintiff to amend complaint to incorporate affidavit submitted in opposition papers).  The City's picayune objections should not keep the Court from granting a preliminary injunction.

          a.      *The Act Severely Impairs Listing Agreements Between Brokers and Landlords*

Preliminaries aside, the Act severely impairs the Broker Plaintiffs' exclusive-listing agreements with the landlords that retain them. PI Br. 20-21. As Plaintiffs explained—and as the exhibits bear out—the fundamental elements of an exclusive-listing agreement are that (1) the broker will attempt to secure tenants ready, willing, and able to rent the landlord's vacant apartments; (2) the broker will seek payment for her services from the tenant, not the landlord; and (3) the landlord will refer any inquiries about his vacant apartments to the broker. PI Br. 8, 20-21; Szyfer Supp. Decl. Ex A; Menger Decl. ¶¶ 3-4; Wagner Decl. ¶¶ 7-8, 18. The Act bars both (2) and (3), upending how both brokers and landlords understood the broker would be paid.

The City nonetheless contends that the Act "does not undermine the contractual bargain because it does not implicate any rights or obligations *of the contracting parties.*" Opp. 24. As the City sees it, the Act regulates the later agreement between the broker and the tenant to pay the broker's fees, which occurs after the Act has become effective. *Id.* at 25. But the City is looking to the wrong contracting parties; the Act impairs the broker-landlord contract by permanently abrogating the tenant-pay model that was legal at the time they entered into their contract and the cornerstone of that contract; no broker would promise to work without *some* way of being paid. The City actually defeats its own argument when it states that the Act is meant to "protect[ ] tenants . . . from a practice that permits landlords and brokers to reach agreements between themselves that place the obligation to pay for contracted services on the tenants, who are not a party to the Agreement." Opp. 27. That is exactly right; the Act impairs the agreement between the broker and landlord, and does so permanently and severely.

The City's reliance on *General Motors Corp. v. Romein,* 503 U.S. 181 (1992) is entirely misplaced. In *General Motors*, the Supreme Court rejected a Contracts Clause claim finding the

"employment contracts entered into after collective bargaining . . . make no express mention of workers' compensation benefits," nor could one imply the existence of such terms in the contracts as the employers suggested. *General Motors*, 503 U.S. at 187. Without any explicit terms concerning workers' compensation benefits in the contracts at issue, the Supreme Court's holding that "there was no contractual agreement regarding the specific workers' compensation terms allegedly at issue" is unsurprising. *Id.* at 186-187. Here, however, the listing agreements between BOND, REAL New York, and other brokers, and landlords, explicitly state that the brokers will obtain their compensation from tenants, which the Act now forbids.

The Second Circuit's holding in *Buffalo Teachers Federation v. Tobe,* 464 F.3d 362 (2d Cir. 2006), further underscores the severity of the impairment here. In *Buffalo Teachers,* the Second Circuit found "[c]ontract provisions" that go to compensation "are the most important elements" of a contract. 464 F.3d at 368. The provision stating BOND/REAL New York will seek compensation from the tenant and not the landlord constitutes a primary inducement for *both the broker and the landlord* under the listing agreement. Under these listing agreements, the landlords do not expect to be required to pay any compensation to the broker. The Act, however, directly and permanently impairs that bargain, and makes receiving compensation from a tenant or even "conditioning" a rental on a tenant retaining the broker's services a violation. Thus, as in *Buffalo Teachers*, the direct impairment of the compensation provision constitutes a severe impairment.

        *b.*     *The Act's Unconstitutional Impairment was Unforeseeable.*

The City contends that the "Act does not interfere with Plaintiffs' reasonable expectations because it was foreseeable." Opp. 26. That argument fails on all fronts. First, the City contends that "significant attention" has been paid to "fees" charged to tenants since at least 2019 when the State legislature enacted the HSTPA, and relies upon REBNY/NYSAR's prior Article 78

proceeding challenging the Department of State's arbitrary and capricious interpretation of the HSTPA. *Id.* But, the Court in the *Real Estate Bd. of N.Y., Inc. v. New York Department of State*[1] action held that the HSTPA specifically never addressed brokerage fees or commissions. *Real Estate Bd. of N.Y., Inc.,* at p. 8 ("No reference is made to 'broker's commissions' in the statute. Had the Legislature intended Real Property Law s 238-a to cover broker's commissions, it would have expressly stated it. The absence of that particular term has meaning and must have been intentional."). Moreover, in that action, the Court confirmed the "longstanding practice in New York City and other larger New York cities is for Landlords to enter into Exclusive Listing Agreements with real estate brokers or sales persons" and that the "customary practice is for tenants, upon execution of the lease agreement, to pay the broker's commission." *Id.* at 2.

In fact, the Department of State's website, through oral argument in REBNY/NYSAR's prior action, included its general counsel's memorandum, which stated unequivocally that even when the landlord contracted with a broker, the tenant was still required to pay a brokerage fee. Szyfer Supp. Decl. Exhibit B. The general counsel's memorandum explained that "[i]t is important to understand that, even if the broker is representing the landlord, in most transactions the tenant is responsible for paying the broker's commission." *Id.* at 1. The prior case could not have provided any notice of what the City was contemplating.

The City then waited nearly four additional years to introduce the initial version of the Act. But even that version contained a provision stating only that "[a] person collecting fees in connection with a rental real estate transaction, whether such person is a representative or an agent of the owner of the property or of the tenant or prospective tenant in such transaction, shall collect such fees from the party employing such person in such transaction," leaving open the possibility

---

[1]    Corrected Decision and Order, *In the matter of the Application of Real Estate Board of New York, Inc., et al., v. New York State Department of State,* Index No. 901586-20 (Sup. Ct. Albany Cnty. Apr. 12, 2021), ECF No. 65.

that a tenant could pay a broker engaged by the landlord by engaging the broker as a dual agent. (Compl. ¶ 104).  And the City did not hold any further hearings since the June 2024 hearing on the initial version of Int. No. 360.  The only other warning was an interim draft bill that led Plaintiffs to believe that their existing contracts would be grandfathered in.  *See* Szyfer Supp. Decl. Ex. D 5 (specifying that the law would apply "only to agreements . . . executed on or after" the effective date" of the Act).  In sum, the current version of the Act was wholly unforeseen, and its far-reaching impact never predicted.

### 2.    *The Act does not Further a Legitimate Purpose.*

The City vacillates as to the Act's actual purpose, *supra* p. 2, trying to hedge by claiming the Act "was designed to prevent common market practices that fail to align with expected principal-agent relationships, significantly burden consumers, and limit residents' ability to afford and access housing within the City."  (Opp. 27).  As Plaintiffs have explained, none of these asserted post-hoc "purposes" pass muster.  *Supra* pp. 10-14.  The Act, moreover, will actually decrease tenant affordability and mobility.  *Infra* pp. 23-24.  And the Act undermines well-established New York law governing principal-broker relationships and appears motivated by hostility towards brokers and brokerage fees.  *Supra* p. 14-17, 9.  None of these are legitimate state interests.

### 3.    *The Act is not Reasonable or Appropriate.*

Finally, the Act is neither a reasonable nor appropriate piece of legislation.  Importantly, where a piece of legislation substantially impairs contractual relations of the parties, the statute must be "specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 993 (2d Cir. 1997).  The more severe the impairment, the greater the level of scrutiny required.  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). And a substantial impairment is

unreasonable when "an evident and more moderate course would serve [the law's] purposes equally well." *U.S. Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 31 (1977); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 247 (1978).

The evidence here demonstrates the Act is neither a reasonable nor appropriate means to accomplish any of the various purported purposes the City has put forth. First, the City now concedes the Act will cause rents to increase, which directly undermines its purported public purpose of making housing more affordable and increasing tenant mobility. The City explains that with broker fees being shifted to landlords, "in many circumstances, they may choose to add the cost to tenants' rent, a cost"—according to the City—"that is often more accessible to tenants than the large upfront payment required" under present law. Opp. 28. But before the Act's passage, the City Council repeatedly claimed the Act *would not* cause increases because "market forces" set rents and if landlords could actually raise rents, they would have. City Council told the public that ending tenant-pay broker fees would put "**downward pressure** on overall rents." Szyfer Supp. Decl. Exhibit C 1 (emphasis in original).

Now, without any factual support, the City blithely states that renters actually prefer higher rents to paying a brokers' fee. (Opp. 28). But the City's unsupported assertions ignore the fact that the overwhelming majority of landlords utilize a "40 times the monthly rent" salary requirement to determine whether a potential tenant can afford an apartment. (Rahmanian Decl. ¶ 27). Higher monthly rents mean tenants must earn more in order to afford apartments—the $3,000 per month apartment requiring a broker's fee will now cost $3,300 or even $3,500 per month, meaning a person making $120,000 per year or even $130,000 per year will now be priced out of the same apartment. The Act will therefore actually have the double-whammy detrimental effect of increasing rents and reducing tenant access and mobility—both contrary to the City's new

23

public purposes of increasing affordability and tenant mobility. In short, the Act will not achieve its putative goals, even by impairing severely brokers' and landlords' contracts.

Relying on *Allied Structural Steel*, the City further argues the Act "is an appropriate and reasonable means" of legislation because it "does not single out BOND, or any of the Plaintiffs, but rather applies to all brokers and landlords in the City." (Opp. 27). But the City's logic fails to withstand scrutiny. Simply because the Supreme Court in *Allied Structural Steel* found the law at issue unreasonable, in part, because it purportedly singled out one employer, does not mean that a law applicable to all landlords and brokers in New York City is suddenly reasonable.

Worse, the Act benefits all tenants regardless of their ability to pay a broker's commission. In *Melendez v. City of New York*, the Second Circuit held that the failure of the Guaranty Law to include any need condition "weighed against" its reasonableness. 16 F.4th 992, 1043 (2021). Here, even those tenants who can easily afford to pay a broker's commission receive the Act's benefits at the expense of brokers and landlords' contracts with one another. Conversely, nothing in the legislative record demonstrates the City investigated whether landlords were better able to shoulder the financial impact of paying a brokerage fee than tenants. In *Melendez,* the Second Circuit noted that the City could "point to nothing in the record to compel a conclusion that commercial landlords are better positioned financially than guarantors to absorb the economic blows of the pandemic on commercial real estate." *Id*. at 1044. The same is true here. The City points to no evidence supporting the conclusion that landlords can absorb the costs of the brokerage fees, claiming only that landlords will increase rents—defeating the purpose of the Act.

The City could have easily implemented less draconian measures than those set forth in the Act. If the Council truly sought to "align principal-agent relationships," it could have simply enacted the initial version of Int. No. 360, which made clear that the party retaining the broker paid

the brokerage commission. Moreover, the Council could have just enacted a statute containing Sections 20-699.22(a) and (b), which include disclosures concerning the "total fee" to be paid by the prospective tenant as well as an "itemized written disclosure of any fees that the tenant must pay to the landlord or to any other person at the direction of the landlord in connection with such rental." Or it could have included the originally contemplated language exempting existing contracts. Szyfer Supp. Decl. Ex. D. Any of these alternatives would have avoided severely impairing the listing agreements in the same way.

Moreover, the Act permanently impairs "tenant pay" listing agreements between the brokers and landlords—should the Act go into effect, a broker and landlord can never again enter into an agreement where the broker agrees to relieve the landlord of any commission payment responsibility in exchange for receiving the exclusive right to market the units in that landlord's building. The Act's impairment of broker-landlord contracts is permanent.

Finally, the City contends that brokers can continue to "work with landlords by collecting the fees from landlords," or "collect fees from tenants by contracting with a prospective tenant who wants to engage a broker to represent the tenant's needs." (Opp. 28). But neither claim helps the City here. Forcing brokers to collect fees from landlords is precisely the fundamental impairment caused by the Act. Moreover, the City conveniently overlooks the impact of the Act's provision which forbids any "person" from "condition[ing] the rental of residential real property on a tenant engaging any agent, *including but not limited to a dual agent*." N.Y.C. Admin. Code § 20-699.21(c) (emphasis added). Thus, any "landlord's agent" who asks a potential tenant to retain them as a "dual agent" risks a violation of Section 20-699.21(c), and a claim of attempting to condition the rental of the property on the tenant retaining them. It is hard to imagine any potential tenant knowing that a broker has been retained by a landlord ever agreeing to retain the

25

broker.  In sum, the Act's broad reach and application to even dual agents demonstrates its unreasonable scope.

## II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS.

### A.    Plaintiffs Will Suffer Irreparable Harm If The Act Goes Into Effect.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted).  As soon as the publication bar goes into effect this June, the Broker Plaintiffs will suffer a violation of their First Amendment rights to speak unencumbered by viewpoint and content discrimination.  *See supra* pp. 1-14.

The City responds that this imminent constitutional violation is not irreparable so long as any related fiscal injury can be redressed by money damages.  Opp. 29.  That is wrong.  As the City's own authority confirms, it is the "the *alleged* violation of a constitutional right that triggers a finding of irreparable harm."  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  There is no requirement that the constitutional violation be pared with unrecoverable financial loss.  The other two cases cited by the City do not show otherwise.  Both *Williams v. Rodriguez*, 2021 WL 2037966 (D. Conn. May 21, 2021) and *Savage v. Gorski*, 850 F.2d 64 (2d Cir. 1988) turned on the absence of an ongoing First Amendment injury curable through temporary injunctive relief.  *See Williams*, 2021 WL 2037966, at *8 (explaining that "there is no evidence of ongoing constitutional deprivation which can be alleviated by the relief sought"); *Savage*, 850 F.2d at 67-68 (explaining that injunctive relief would "do nothing to abate" the chilling of the plaintiffs' First Amendment rights).  The same is not true here.  An order enjoining enforcement of the publication bar would permit the Broker Plaintiffs to continue their constitutionally protected commercial speech pending the outcome of these proceedings.

26

The City's argument fails on its own terms in any event.  As Plaintiffs have explained,  the rule that economic injury is not irreparable is subject to two important exceptions.  PI Br. 22-23.  *First*, "destruction of an ongoing business" may constitute irreparable harm.  *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986).  *Second*, significant economic injuries constitute irreparable harm, even if they do not threaten to destroy the entire business, if "no 'adequate compensatory or other corrective relief will be available at a later date.' "  *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022).

Both exceptions are applicable here.  The City does not dispute that the challenged provisions of the Act will cause significant economic harm to all of the Plaintiffs by making the business model of many brokers unprofitable and by rendering many rental units too expensive for landlords to operate.  *See* PI Br. 22-23.  For those Plaintiffs that are able to stay afloat, it will be all but impossible to determine the extent of their losses.  How is a broker to prove whether she would have obtained a tenant had she been permitted to post a tenant-pay listing, or had her existing exclusivity agreement remained enforceable?  And from whom can the broker recover for those losses?

The City has no answers.  It instead cites the inapposite rule (Opp. 30) that "ordinary compliance costs are typically insufficient to constitute irreparable injury."  *Freedom Holdings Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).  Plaintiffs are not concerned about "ordinary compliance costs"—they seek an injunction because enforcement of the Act pending trial "would force Plaintiffs out of business, or would fundamentally change the nature of their operations."  *Id*.

## B.    The Balance of Harms and Equities Favor Plaintiffs.

The City agrees that the balance of hardships and public interest factors merge when the Government is the opposing party.  Opp. 30; *see also* PI Br. 24.  "[S]ecuring First Amendment rights is in the public interest," and "the Government does not have an interest in the enforcement

of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation and alteration omitted).  That is why, in the First Amendment context, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Id.*

Finally, the equities tip decidedly in favor of Plaintiffs.  The Act is a transparent attempt to punish disfavored speakers.  *See supra* p. 9.  And that constitutional wrong is compounded by the havoc that the Act promises to wreak on New York City's housing market.  *See* PI Br. 24-25.  The City's typically perfunctory response (Opp. 30) attempts to meet Plaintiffs' hard economic evidence with intuition and conjecture.  That guesswork cannot counterbalance the livelihoods and constitutional rights on the other side of the ledger.

## CONCLUSION

For the foregoing reasons and those in Plaintiffs' opening brief, the Court should grant a preliminary injunction enjoining Defendants from enforcing the Act and deny the City's motion to dismiss.

<div style="display:flex; justify-content:space-between;">

Sean Marotta
J. Andrew Mackenzie
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*/s/ Claude G. Szyfer*
Claude G. Szyfer
Darya D. Anichkova
Hogan Lovells US LLP
390 Madison Ave.
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs*

</div>

April 11, 2025