**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REAL ESTATE BOARD OF NEW YORK, INC., NEW: YORK STATE ASSOCIATION OF REALTORS, INC.,: BOHEMIA REALTY GROUP, BOND NEW YORK REAL: ESTATE CORP., REAL NEW YORK LLC, LEVEL: GROUP INC., FOUR CORNERS REALTY, LLC, 21 WEST: 74 CORP., 8 WEST 119TH STREET HDFC,

                           :

             Plaintiffs, :

                           : Civ. No. 1:24-cv-09678 (RA)

     v. :

                           :

THE CITY OF NEW YORK, *a municipal entity*, VILDA: VERA MAYUGA, *as Commissioner of New York City*: *Department of Consumer and Worker Protection,*

                           :

            Defendants. :

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

**HOGAN LOVELLS US LLP**
390 Madison Ave.
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

CONCLUSION....................................................................................................................13

# TABLE OF AUTHORITIES

Page

CASES:

*1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*,
  597 F. Supp. 3d 557 (S.D.N.Y. 2022)..........................................................................1, 2, 5, 10

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)...................................................................................................7, 10, 11

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983).............................................................................................................7

*City of Austin v. Reagan Nat'l Advert.*,
  596 U.S. 61 (2022).............................................................................................................6

*Clementine Co. v. Adams*,
  74 F.4th 77 (2d Cir. 2023) .................................................................................................8

*DoorDash, Inc., v. City of New York*,
  750 F. Supp. 3d 285 (S.D.N.Y. 2024)...............................................................................10

*IMS Health, Inc. v. Sorrell*,
  630 F.3d 263 (2d Cir. 2010)...............................................................................................10

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002).................................................................................................2

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006).............................................................................................................8

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011).................................................................................................5, 6, 7, 8

*Thompson v. Western States Med. Ctr.*,
  535 U.S. 357 (2002).............................................................................................................8

*TikTok Inc. v. Garland*,
  145 S. Ct. 57 (2025)............................................................................................................8, 9

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994)..........................................................................................................8, 9, 11

*United States v. Caronia*,
  703 F.3d 149 (2d Cir. 2012)...............................................................................................10

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
    133 F.4th 213 (3d Cir. 2025) ...................................................................................10

*Vugo, Inc. v. City of New York*,
    931 F.3d 42 (2d Cir. 2019)..........................................................................................6

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)....................................................................................................8

**STATUTES:**

N.Y.C. Admin. Code § 20-699.20 ...........................................................................6, 7

N.Y.C. Admin. Code § 20-699.21(a)(2) ................................................................1, 13

**RULES:**

Fed. R. App. P. 8(a)(1)(C) ..........................................................................................1

Fed. R. App. P. 8(a)(2)............................................................................................13

**OTHER AUTHORITIES:**

Gabrielle Fahmy, *Rents jumping shocking 15% after NYC ditches broker fees:*
    *'It's discouraging'*, N.Y. Post (June 21, 2025), https://perma.cc/ZHS3-D6MB ...................1,2

Rebecca Picciotto, *New York's Housing Crisis Is So Bad That a Socialist Is*
    *Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.
    wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?
    st=kH4RkN&reflink=desktopwebshare_permalink .............................................1,2

## INTRODUCTION

Plaintiffs move for an injunction pending appeal barring Defendants from enforcing section 20-699.21(a)(2) of the Fairness in Apartment Rental Expenses Act ("FARE Act"), which Plaintiffs have referred to as the "publication bar." *See* Fed. R. App. P. 8(a)(1)(C).

The FARE Act became law on December 13, 2024, and went into effect on June 11, 2025. ECF 61 ("Opinion & Order") 7. Recognizing that the Act would upend New York City's already beleaguered rental markets, Plaintiffs worked through the holidays to prepare a motion for a preliminary injunction to preserve the status quo pending the outcome of these proceedings, filing their motion nearly five months before the law went into effect. ECF 20 ("PI Mot."). The Court denied the motion on the afternoon of June 10, 2025. Opinion & Order 41-42. The resulting impact on the New York City rental market was just as Plaintiffs feared—available listings dropped nearly 30% and rents jumped 16% or more. Rebecca Picciotto, *New York's Housing Crisis Is So Bad That a Socialist Is Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?st=kH 4RkN&reflink=desktopwebshare_permalink; Gabrielle Fahmy, *Rents jumping shocking 15% after NYC ditches broker fees: 'It's discouraging'*, N.Y. Post (June 21, 2025), https://perma.cc/ZHS3-D6MB. Finding an affordable apartment in New York City is now harder than ever.

Plaintiffs are entitled to an injunction pending appeal because (1) they will "suffer irreparable injury absent the injunction," (2) Defendants will not "suffer substantial injury if the injunction is issued," (3) Plaintiffs have "demonstrated a substantial possibility," even if "less than a likelihood, of success on appeal," and (4) the public interest warrants interim relief. *1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 597 F. Supp. 3d 557, 570 (S.D.N.Y. 2022).

**ARGUMENT**

**1.** An injunction pending appeal is warranted given the harm that Plaintiffs and the public will suffer without one, even though the Court concluded that Plaintiffs cannot prevail on their free speech claims. *See id.* (noting that the "probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay") (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)). The publication bar outlaws tenant-pay open listings, where multiple brokers advertise a listing and the broker that presents the tenant that ultimately rents the apartment receives a fee from the tenant. Opinion & Order 22. That tenant-pay system is an essential means of connecting prospective tenants to vacant units in New York City. *See* ECF 22 ("Wagner Decl.") ¶ 12 (explaining that open listings are "a vital and material segment of the rental markets"). Ending the open-listing system constitutes a dramatic upheaval of the New York City rental marketplace, one that—as Plaintiffs demonstrated with economic analysis and declarations from industry experts—was always sure to wreak havoc on the market. PI Mot. 24-25. But there is no further need for economic forecasting. Now that the publication bar is in effect, it has "indeed ha[d] the outcome of which Plaintiffs warn[ed]." Opinion & Order 23.

**a.** *The publication bar has caused rents to rise, which decreases housing mobility.* For small landlords especially, the "costs of one brokerage commission could mean the difference between being in the red and making a very small profit for a building in any given month." ECF 23 ("Porco Decl.") ¶ 22. It should be no surprise, therefore, that once the publication bar went into effect "[r]ents rose overnight and have continued to climb." Picciotto, *supra*. Brokers have already been "inundated" by prospective tenants asking to pay a one-time broker fee rather than the higher rent in hopes of saving money over the life of the lease term. Fahmy, *supra*; *see also* Hourigan

Supp. Decl. ¶ 8 (explaining that "renters know the increased monthly rent will cause them to pay more for housing in New York City over the longer term, as the higher rent becomes compounded with every lease renewal"). Tenants had that option prior to the publication bar. ECF 27 ("Saltzberg Decl.") ¶ 21. Now they don't. And "[c]onsumers who want the option of paying a broker fee instead of higher rent resent having the choice taken away from them by the FARE Act's publication bar." Rahmanian Supp. Decl. ¶ 8; *accord* Hourigan Supp. Decl. ¶ 8; Saltzberg Supp. Decl. ¶ 8.

Worse, many consumers have been entirely priced out of apartments they previously qualified for. Rahmanian Supp. Decl. ¶ 9. Nearly all landlords require tenants to make salaries totaling 40 times the monthly rent for their unit to qualify for a rental. *Id*. Landlords also generally require guarantors to make 80 times the monthly rent to qualify as a guarantor. *Id*. As a result, when the rent for an apartment increases, fewer potential tenants and guarantors can qualify for the unit. *Id*. Before the Act, the average New Yorker would need to make $190,000 per year to qualify for the average rent of $4,750 per month. *Id*. Now that same New Yorker would need to make $220,000 per year to qualify for the same apartment. *Id*.

**b.** *The publication bar has reduced the affordable housing stock, which decreases housing mobility*. Even before the publication bar went into effect New York City's rental vacancy rate was "at a historic low" of just 1.4%. Opinion & Order 4. Yet the publication bar has made the housing search even harder by causing landlords to pull listings "to preserve optionality concerning payment of the broker fee." Rahmanian Supp. Decl. ¶ 10; *accord* Hourigan Supp. Decl. ¶ 11; Saltzberg Supp. Decl. ¶ 10; Porco Decl. ¶ 20 (explaining that "[t]o protect myself, I will have to stop sending available listings to other brokers"). Street Easy lost 2,000—or 30%—of its listings in New York City on the day the publication bar went into effect. Rahmanian Supp. Decl. ¶ 11.

3

That means consumers have access to far fewer listings, with many units being available only on a secondary word-of-mouth "shadow market." *Id.* ¶ 10; *accord* Hourigan Supp. Decl. ¶ 11; Saltzberg Supp. Decl. ¶ 10. And rent-stabilized and "under-market" units are the most likely to be delisted, as it is landlords operating small-margin units that are least able to shoulder the added cost of the broker fee. Hourigan Supp. Decl. ¶ 11.

     **c.** *The publication bar has made it more difficult for Plaintiffs to make ends meet.* The publication bar shatters the longstanding business model of New York City's brokers and makes it more difficult for agents to earn a living. *Id.* ¶ 13. Some agents are likely to be pushed out of the industry entirely. Rahmanian Supp. Decl. ¶ 13; Hourigan Supp. Decl. ¶ 15; Saltzberg Supp. Decl. ¶ 14; Porco Decl. ¶ 23 ("The impact of the FARE Act will likely force my brokerage business to collapse."). The publication bar hurts landlords, too, by increasing operation costs—requiring them to reduce valuable services, forego needed maintenance, and cancel upgrades. Porco Decl. ¶¶ 16-17. That creates safety issues, makes properties less competitive, and damages relationships with tenants. *Id.*; *see also id.* at ¶ 17 ("The margins for landlords are so thin, the FARE Act only makes them that much thinner.").

     In short, the publication bar has exacerbated—not alleviated—New York City's housing mobility problem by causing rents to increase and by further reducing the supply of affordable housing. It has also made it harder for brokers and landlords to continue to operate in a market that doesn't work without them. New York City was already in a housing crisis before the Act went into effect. PI Mot. 1; *see also* Opinion & Order 4 ("Few would dispute that New York City is in the midst of a 'housing emergency.' "); May 2, 2025 Hearing Tr. ("Tr.") 4:4-6 (counsel for Plaintiffs stating that "[m]y clients will be the first to tell you that the City has a substantial interest in addressing the housing crisis in New York"). The Court should enjoin the publication bar

4

pending appeal to prevent potentially needless exacerbation of the "untenable position" so many New Yorkers find themselves in.  Opinion & Order 4.

**2.**  The second factor also supports interim relief.  Maintaining the pre-publication-bar status quo will not "substantial[ly] injur[e]" Defendants.  *United Healthcare Workers E.*, 597 F. Supp. 3d at 570.  New York City has operated on a tenant-pay open listing system for decades. Defendants will not be harmed by a few additional months' delay as the Second Circuit considers the legality of the publication bar.  Plaintiffs have sought from the Second Circuit—without opposition—an accelerated briefing schedule that will have briefing concluded by October 9, 2025.  That the City Council already imposed a 180-day grace period between the law's enactment and its effective date demonstrates that market predictability and stability should prevail over immediate abolition of the open-listing system.  *See* Opinion & Order 7.

**3.**  The Court, of course, carefully considered the parties' briefing and argument before holding that Plaintiffs' complaint failed to state a free-speech claim under the First Amendment of the U.S. Constitution and Article I, Section 8 of the New York State Constitution.  *Id*. at 11-25. But there is at least a "substantial possibility" the Second Circuit will take a different view on the merits of Plaintiffs' claims.  *United Healthcare Workers E.*, 597 F. Supp. 3d at 570.  And that substantial possibility exists both as to the applicable level of scrutiny and the proper application of the *Central Hudson* analysis.

**a.**  The Court held the publication bar was not subject to strict scrutiny based on its determination that the publication bar is content neutral.  Opinion & Order 14-16.  But that holding misunderstands the commercial-speech framework and does not engage with Plaintiffs' argument for strict scrutiny under *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).

Under the Supreme Court's cases, even content-based commercial speech restrictions are subject only to intermediate scrutiny. *See City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 73 (2022) (noting that a previous decision "did not need to decide whether the off-premises prohibition was content based, as it regulated only commercial speech and so was subject to intermediate scrutiny in any event"). Plaintiffs accordingly did not argue for strict scrutiny solely because the publication bar is content based.[1] Plaintiffs instead argued that strict scrutiny applies because the publication bar seeks to achieve the City Council's "policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell*, 564 U.S. at 577; *see also* PI Mot. 10-11. As Plaintiffs explained, "[t]he Act does not bar tenant-pay broker fees; it bars *publication* of tenant-pay listings. The City cannot bar truthful advertisements about lawful services it thinks its residents are better off without." ECF 49 ("PI Reply") 8 (citation omitted).

The publication bar mirrors in all material respects the speech restriction struck down in *Sorrell*. In *Sorrell*, Vermont sought to achieve its goal of "diminishing detailers' ability to influence prescription decisions" through the indirect means of prohibiting marketing by pharmaceutical salespersons. *Sorrell*, 564 U.S. at 577. The City Council here sought to achieve its goal of prohibiting brokers from collecting tenant fees based on an open listing through the indirect means of rendering the publication of a tenant-pay open listing unprofitable. PI Mot. 11 (explaining that the publication bar's speaker-and-content-based restrictions are targeted to ensure

---

[1] The publication bar is not content neutral. *Contra* Opinion & Order 16. Although "regulations that apply generally to 'advertising' (without regard for whether the advertisements are commercial) may not necessarily be content-based," a regulation "construed as applying only to commercial advertising, is content-based." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 49 n.6 (2d Cir. 2019). It follows *a fortiorari* that the publication bar is content based. The publication bar is even more targeted than a ban on commercial advertising, as it regulates only a small subset of commercial advertisements: "listings," as that term is defined by the Act. *See* N.Y.C. Admin. Code § 20-699.20; PI Mot. 10; Tr. 32:8-19.

that "brokers cannot profit from property listings").  This Court even identified that indirect purpose when it stated that "although the [publication bar] has an effect on brokers' speech, *the speech itself is not the target—the agency relationship is*."  Opinion & Order 18 (emphasis added).

To illustrate the problem, consider a law targeting a disfavored medical treatment.  But imagine that instead of outlawing the treatment outright, this law prohibited the provision of that treatment by any medical provider that advertised the service.  A law barring certain medical treatments would not raise First Amendment concerns.  But the law burdening advertising raises heightened First Amendment scrutiny because it both inhibits access to the treatment *and* it stifles public discourse on the propriety of the treatment.  *See Bolger v. Young Drugs Prods. Corp.*, 463 U.S. 60, 74 (1983) (holding prohibition on mailing contraceptive advertisements in violation of the First Amendment in part because the prohibition deprives people of "truthful information bearing on their ability to discuss birth control and to make informed decisions in this area").

"The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."  *Sorrell*, 564 U.S. at 577 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996)).  That principle applies in full force here.  Many consumers would prefer to pay the tenant fee to avoid a higher monthly rent, Rahmanian Supp. Decl. ¶ 8; Hourigan Supp. Decl. ¶ 8; Saltzberg Supp. Decl. ¶ 8, but now they cannot find tenant-pay listings outside a word-of-mouth "shadow market," *id*. ¶ 10.  To compound the problem, landlords and brokers risk liability anytime a broker shares information about an open listing, which could be construed as publication triggering the publication bar's prohibition on chagrining a tenant fee.  *See* N.Y.C. Admin. Code § 20-699.20 (not defining the term "publish").  "As a result, even when a particular listing is not available, agents are hesitant to show other listings to consumers."  Saltzberg Supp. Decl. ¶ 14.

The Court turned *Sorrell* on its head by holding that the publication bar warrants less exacting scrutiny *because* it targets behavior beyond the regulated speech itself.  Opinion & Order 16.  That is precisely what a speech restriction cannot do.  "Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects" but "the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech."  *Sorrell*, 564 U.S. at 577 (quoting *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002)).

*Clementine Co. v. Adams*, 74 F.4th 77 (2d Cir. 2023), is not to the contrary.  *Contra* Opinion & Order 15, 18.  *Clementine* was a challenge to the Key to NYC program, a mayoral initiative requiring indoor theaters to verify the vaccination status of patrons.  74 F.4th at 81.  The Second Circuit ruled that the program did not implicate the First Amendment at all because it "regulated conduct, not speech."  *Id*. at 86.  "It affected what indoor theater venues 'must *do*'—check the vaccination status of patrons and staff—'not what they may or may not *say*.' "  *Id*. (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006)).  *Clementine*'s alternative First Amendment analysis was premised on its earlier holding that any effect the Key to NYC program had on speech was merely "incidental."  *Id*. at 87 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  But as this Court recognized, that is not true of the publication bar, for which "[t]he broker's speech . . . serves as the predicate for the application of the prohibition."  Opinion & Order 13.  *Clementine* is also not a commercial-speech case, and is therefore not directly governed by *Sorrell*.  Plaintiffs' challenge here is.

*TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025) (per curiam) and *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), are also inapposite.  Neither permit the government to target particular speakers' ability to speak on a particular subject as an indirect means of regulating the

speakers' conduct. *See* Opinion & Order 17 (recognizing that the publication bar targets brokers because the bar's "application to any other group would . . . have little practical effect"). The must-carry provisions in *Turner* were not an indirect means of getting at some other policy objective. Because of the "special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television," the must-carry provisions were the only means of ensuring "widespread dissemination of information." *Turner*, 512 U.S. at 661-662. Here, by contrast, "speech itself is not the target." Opinion & Order 18. The publication bar limits speech—and thus access to critical housing information—only as an indirect means to limit a business practice the City Council dislikes.

*TikTok* is even further afield. *TikTok* involved "a regulation of non-expressive activity." 604 U.S. at 66. The Court declined to decide whether the First Amendment applied at all, *id.*, instead assuming that even if the First Amendment applied, any incidental effect on speech was justified because "requiring divestiture for the purpose of preventing a foreign adversary from accessing the sensitive data of 170 million U.S. TikTok users is not 'a subtle means of exercising a content preference.'" *Id*. at 68. The Court also repeatedly "emphasize[d] the inherent narrowness of" its holding. *Id*. Although "TikTok's scale and susceptibility to foreign adversary control, together with the vast swaths of sensitive data the platform collects, justif[ied] differential treatment to address the Government's national security concerns" in *TikTok*, a law like the publication bar "targeting any other speaker would by necessity entail a distinct inquiry and separate considerations." *Id*. at 68-69.

In any event, both *Turner* and *TikTok* reaffirm that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *TikTok*, 145 S. Ct. at 68 (quoting *Turner*, 512 U.S. at 658)). That is true here. As

this Court recognized, the publication bar is targeted at brokers "because brokers are primarily—if not exclusively—responsible for advertising open listings."  Opinion & Order 17.  And the publication bar is avowedly based on the City Council's content preference for landlord-pay open listings.  *Id.* at 18 (acknowledging that the publication bar targets "the agency relationship" between the payor and payee of the broker fee).  Combined, those two aspects of the publication bar call for strict scrutiny.  *See* PI Mot. 9-11; PI Reply 6-9.

 **b.** Plaintiffs have also demonstrated at least a "substantial possibility" of success under *Central Hudson*.  *United Healthcare Workers E.*, 597 F. Supp. 3d at 570.  The Court believed that Plaintiffs brought this suit based on policy disagreements rather than a genuine constitutional interest.  Opinion & Order 2, 41.  But Plaintiffs did not offer their economic evidence merely to "second-guess the policy decisions of the legislature."  *Id.* at 2 (quotation marks omitted).  They offered their economic evidence to show that the City did not meet its burden under *Central Hudson* to demonstrate that the publication bar will improve housing mobility.  *See United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) (A "commercial speech regulation 'may not be sustained if it provides only ineffective or remote support for the government's purpose.' " (quoting *44 Liquormart*, 517 U.S. at 505)); *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 223 (3d Cir. 2025) (noting New Jersey's obligation to demonstrate that the challenged law will be "effective" to address "fraud and incompetence" in veterans-claim consulting); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (concluding that "Vermont has not shown any effect on the integrity of the prescribing process or the trust patients have in their doctors from the use of [prescriber information] data in marketing"); *DoorDash, Inc. v. City of New York*, 750 F. Supp. 3d 285, 304-305 (S.D.N.Y. 2024) (holding that the City did not

connect study establishing restaurants' inability to collect customer data to the City's asserted interest in protecting the restaurant industry).

The Court appears to have conflated Defendants' obligation to demonstrate that the City Council had a substantial government interest with Defendants' obligation to demonstrate that the City Council had evidence before it that the speech restriction it chose to address that interest would prove effective. Plaintiffs wholeheartedly agree that "the City has substantiated the existence" of a housing crisis. Opinion & Order 21; *see* PI Mot. 3-4; Tr. 4:4-6. But a crisis cannot justify the trampling of First Amendment rights—even commercial-speech rights. Defendants had to demonstrate that the City Council had substantial reason to believe that the publication bar would improve rather than exacerbate the housing-mobility crisis the City identified. *See* Tr. 11:1-14. Defendants never did. They offered nothing but the kind of armchair economics that the Supreme Court has held insufficient to justify a commercial-speech restriction. *See 44 Liquormart,* 517 U.S. at 505. That a government's "predictive judgments are entitled to substantial deference does not mean . . . that they are insulated from meaningful judicial review altogether." *Turner*, 512 U.S. at 666. In "formulating its judgments," the City Council was required to "draw[] reasonable inferences based on substantial evidence." *Id.*

Though it is Defendants that bore the burden, Plaintiffs nonetheless offered substantial evidence that the publication bar will in fact worsen the housing crisis, including by contributing to housing-mobility problems. *See* PI Mot. 25; PI Reply 12-13. But like Defendants, the Court never grappled with Plaintiffs' analysis showing that the publication bar won't improve housing mobility because it will (1) decrease housing transparency by eliminating brokers' incentive to publish open listings; (2) decrease the housing stock by pricing many landlords out of the market

entirely; and (3) price consumers out of apartments because of increased rents.  *See* PI Reply 12-13.

Rather than address the record evidence, the Court simply asserted that the publication bar "undoubtedly advances the City's interest."  Opinion & Order 22.  But the Court should have recognized that the City Council had no evidence before it that barring tenant-pay opening listings would improve housing nobility. Defendants even declined this Court's invitation to hold an evidentiary hearing to backfill what the City Council had neglected during the legislative process. ECF 48, 54, 55.  That fact alone should doom the publication bar under *Central Hudson*.

**CONCLUSION**

For the foregoing reasons, the Court should enter an injunction enjoining enforcement of N.Y.C. Admin. Code § 20-699.21(a)(2) to preserve the status quo pending appeal.  Because every day that the publication bar remains in effect imposes further irreparable harm on Plaintiffs and further destabilizes the New York City rental market, Plaintiffs intend to seek emergency relief from the Second Circuit at **5 p.m. on July 11**, **2025**, absent a decision from this Court.  *See* Fed. R. App. P. 8(a)(2).

                                                             Respectfully submitted,

                                                             */s/ Claude G. Szyfer*
Sean Marotta (admitted *pro hac vice*)                       Claude G. Szyfer
J. Andrew Mackenzie (admitted *pro hac vice*)                Darya D. Anichkova
Hogan Lovells US LLP                                         Hogan Lovells US LLP
555 Thirteenth Street, N.W.                                  390 Madison Ave.
Washington, D.C. 20004                                       New York, N.Y. 10017
Telephone: (202) 637-5600                                    Telephone: (212) 918-3000
Facsimile: (202) 637-5910                                    Facsimile: (212) 918-3100
                                                             claude.szyfer@hoganlovells.com

                                                             *Counsel for Plaintiffs*

June 27, 2025

13

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York. This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities and signature block is 3,801 words.

Dated:    New York, New York
          June 27, 2025

                                        */s/ Claude G. Szyfer*
                                        Claude G. Szyfer